**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **WILLIAM SPEER,** § | |
| § | |
| Petitioner, § | |
| § | |
| vs. § | Civil Action No. 2:04cv269 |
| § | |
| **NATHANIEL QUARTERMAN,** Director, § | |
| Texas Department of Criminal § | |
| Justice, Correctional § | |
| Institutions Division § | |
| § | |
| Respondent. § | |

**AMENDED PETITION FOR WRIT OF HABEAS CORPUS**
**BY A PERSON SENTENCED TO DEATH CURRENTLY IN STATE CUSTODY**

TO THE HONORABLE JUDGE T. JOHN WARD, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION:

WILLIAM SPEER, Petitioner, by and through his appointed attorney of record, Craig L. Henry, files this Petition for Writ of Habeas Corpus and in support shows the following:

## I.  JURSIDICTION

Petitioner invokes the jurisdiction of this Court pursuant to 28 U.S.C. Section 2254.

## II.  CUSTODY

1.  Petitioner is a citizen of the United States and a resident of the State of Texas.  He is presently confined in Respondent's custody on Death Row, Texas Department of Corrections, Livingston, Texas, pursuant to a judgment of conviction and sentence of death.

-1-

2.    Petitioner is indigent and is unable to pay the fees and costs of this action or to give security therefore.

### III. HISTORY OF PRIOR PROCEEDINGS

1.    On November 4, 1999, Petitioner was indicted by a Bowie County, Texas grand jury for the offense of capital murder pursuant to Texas Penal Code 19.03(6).

2.    Trial on the merits began October 15, 2001.

3.    On October 29, 2001, the jury returned a verdict of guilty.

4.    Immediately following the return of a verdict of guilty, the punishment phase began.

5.    On October 30, 2001, the jury answered the special issues in a manner such that the trial court sentenced Petitioner to death.

6.    The judgment of the trial court was affirmed by the Texas Court of Criminal Appeals in an opinion rendered in October 2003.

7.    On June 18, 2003, Petitioner filed his Application for Writ of Habeas Corpus under Article 11.071, Texas Code of Criminal Procedure.   This Writ raised substantial issues of constitutional dimension which were not litigated in the trial court nor raised by an evidentiary hearing prior to the filing of said Application for Writ of Habeas Corpus under Article 11.071, Texas Code of Criminal Procedure.

8.   On October 31, 2003, the trial court entered an order refusing to hold an evidentiary hearing on Petitioner's Application.

9.   On April 30, 2004, State District Judge Ralph K. Burgess issued his findings of fact and conclusions of law recommending that Petitioner's Application for Writ of Habeas Corpus be denied.   Those findings and conclusions were summary in nature and superficial in depth.   Such findings are open to review on collateral attack in federal court.   Judge Burgess' findings of fact fail to address many of the legal issues.

10.   Although the factual findings that were entered by Judge Burgess might otherwise be presumed correct by virtue of 28 U.S.C. §2254(d), Petitioner will demonstrate that such factual findings are not fairly supported by the trial record, upon which Judge Burgess' findings in large part rely.   Such presumption of correctness therefore cannot be sustained under 28 U.S.C. §2254(d)(8).

11.   On June 30, 2004, the Texas Court of Criminal Appeals denied Petitioner's Writ of Habeas Corpus.   See <u>ex parte Speer</u>, No. 59,101-01 (Tex. Crim. App. June 30, 2004).

12.   On May 30, 2005, Petitioner filed his federal petition for writ of habeas corpus in the United States District Court for the Eastern District of Texas; Marshall Division, styled *Speer v. Quarterman*, No. 2:04-cv-269.

13.   On May 13, 2008, the federal district court entered an order that abated his federal petition to allow Petitioner to return to state court for further proceedings to develop new claims he recently discovered based upon the prosecution's failure to disclose to his trial counsel that it offered incentives to inmate witnesses in exchange for their testimony.

14.   After Mr. Speer properly filed his successive petition, it was denied by written order of the Texas Court of Criminal Appeals on March 3, 2010.

### IV.   EXHAUSTION OF STATE REMEDIES

Petitioner presents claims in this Application for Writ of Habeas that are of constitutional dimension and that have been denied by the convicting court and by the Texas Court of Criminal Appeals.

### V.    BASIS OF THIS APPLICATION

**1.   Counsel Failed to Investigate or Present Evidence Which Would Have Mitigated Against the Imposition of the Death Penalty.**

#### Background

The principle ground upon which counsel rendered ineffective assistance to Mr. Speer involves trial counsels' failure to investigate and develop facts material to Mr. Speer's punishment.   Counsel failed to investigate Mr. Speer's family background, or his social, medical and mental history.   Mr. Speer's trial counsel could have investigated and presented a

wealth of evidence relevant to such mitigating factors at trial, but failed to do so.   An evidentiary hearing is required to fully develop this evidence.

Discussion

The purpose of a sentencing hearing is to provide the jury with the information necessary for it to render an "individualized sentencing determination . . . [based upon] the character and record of the individualized offender and the circumstances of the particular offense. *Penry v. Lynaugh*, 492 U.S. 302, 316 (1989) (citing *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)); see also *Amstrong v. Dugger*, 833 F.2d 1430, 1433 (11th Cir. 1987)("the major requirement of the penalty phase of a trial is that the sentence be individualized by focusing on the particularized characteristics of the individual.")   "The sentencing stage of any case, regardless of the potential punishment, is 'the time at which for many defendants the most important services of the entire proceeding can be performed.'" *Vela v. Estelle*, 708 F.2d 854, 964 (5th Cir. 1983), *cert. denied*, 464 U.S. 1053 (1984).   Where the potential punishment is death, as in the instant matter, the sentencing proceeding takes on added importance.

Ineffective assistance of counsel in capital cases has been a persistent problem in the United States. *See* James S. Liebman, *The Overproduction of Death*, 100 Colum. L.Rev. 2030, 2102-

10(2000).  In a recent case on ineffective assistance, *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court held that counsel's investigation and presentation of mitigation "fell short of the standards for capital defense work articulated by the American Bar Association ... standards to which we have long referred to as 'guides to determining what is reasonable.'"  In its discussion of the 1989 ABA Guidelines for counsel in capital cases, the Court held that the Guidelines set the applicable standards of performance of counsel:

> [I]nvestigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989).... Despite these well defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Id*. at 2537 (emphasis in original).  The Court then also adopted ABA guideline 11.8.6, which it described as stating:

> that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences.

*Id*. (Emphasis in original.)  Thus, the *Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used

in defining the "prevailing professional norms" in ineffective assistance cases.

New ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence.  The 2003 ABA Guidelines do not depart in principle or concept from *Strickland*, *Wiggins* or previous cases concerning counsel's obligation to investigate mitigating circumstances.  The 2003 ABA Guidelines at section 10.7 contain ten pages of discussion about counsel's "obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."  The description of counsel's obligation to investigate mitigating evidence for the sentencing phase of the case is as follows (omitting quotation marks and the lengthy footnotes attached to the test):

> Counsel's duty to investigate and present mitigating evidence is now well established.  *The duty to investigate exists regardless of the expressed desires of a client.*  Nor may counsel sit idly by, thinking that investigation would be futile.  *Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions unless counsel has first conducted a through investigation with respect to both phases of the case.  Because the sentencer in a capital case must consider mitigation, anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant, penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history.*  In the case of the client, this begins with the moment of conception [i.e., undertaking

representation of the capital defendant].  Counsel needs to explore:

(1)  Medical history;
(2)  Family and social history;
(3)  Educational history;
(4)  Military service;
(5)  Employment and training history;
(6)  Prior juvenile and adult correctional experience;

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of the first phase defense (*e.g.*, by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluation (including competency, mental retardation, or insanity), motion practice, and plea negotiations.
....
*It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others.  Records—from courts, government agencies, the military, employers, etc.—can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections.  Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children.  A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.*  The collection of corroborating information from multiple sources—a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.7 (2003) at pp.80-83.

The Supreme Court enunciated a two-prong test for analyzing an ineffective assistance of counsel claim in *Strickland v.*

*Washington*, 466 U.S. 668 (1984).   According to *Strickland*, first, the defendant must show that counsel's performance was deficient.   This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687.

A.   Performance

### 1.   Failure to investigate

It is clear that defense counsel's failure to investigate the basis of his client's mitigation defense can amount to ineffective assistance of counsel. *See, e.g., Williams v. Taylor*, 529 U.S. 362 (2000).   When considering a failure to investigate claim the Supreme Court has said, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

Under *Strickland*, Petitioner must show that his trial counsel's "acts or omissions" were not "the result of reasonable

professional judgment." *Strickland*, 466 U.S. at 690.   In the instant case, trial counsels' failure to conduct an investigation of Mr. Speer's background and resulting failure to present mitigating evidence at the sentencing hearing did not constitute reasonable professional judgment.   In preparing for a death penalty case, "a[n] attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir.) (citing *Thompson v. Wainwright*, 787 F.2d1447, 1450 (11th Cir. 1986), *cert denied*, 481 U.S. 1042 (1987).   "The failure to do so may render counsel's assistance ineffective." *Baxter v. Thomas*, 45 F. 3d 1501, 1513 (11th Cir.), *cert denied*, 516 U.S. 946 (1995).

     In scrutinizing counsel's performance, the courts make every effort to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689, and do not assume that counsel's performance is deficient "merely because we disagree with trial counsel's strategy." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999).   But with that said, it is indisputable that, in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a "reasonably substantial, independent investigation" into potential mitigating circumstances.   *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983).   In assessing counsel's performance, a reviewing court should look to such

factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional "leads" he had, and what results he might reasonably have expected from those leads. *Neal v. Puckett*, 286 F. 3d 230 (5th Cir. 2002)

In the instant case, trial counsel did not conduct any interviews of witnesses familiar with Mr. Speer's background. They did not retrieve or review "any records having to do with Mr. Speer's background, medical history, school history, history of drug use, prior convictions, prior incarcerations, or any other material relevant to Mr. Speer's history.

Although the decision whether to use mitigating evidence is for the client, "the lawyer must first evaluate potential avenues and advise the client of those offering possible merit." *Thompson v. Wainwright*, 787 F.2d at 1451; *Dobbs v. Turpin*, 142 F.3d 1383 (11th Cir. 1998). In other words, such a course of action "must flow from an informed decision." *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.), *cert denied*, 493 U.S. 1011 (1989); *Bouchillon v. Collins*, 907 F2d 589, 597 (5th Cir. 1990)("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum.")

Similarly, *Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the decision, do not serve any conceivable strategic purpose. *See Strickland*, 104 S. Ct. at 2061 ("Counsel may not

exclude certain lines of defense for other than strategic reasons." *Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996)(explaining basis for counsel's strategic decision not to offer mitigating evidence identified by the defendant),*cert. denied*, 519 U.S. 1120 (1997); *Loyd v. Whitley*, 977 F.2d 149,158 (5th Cir.1992)("whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny.  The crucial distinction between strategic judgment calls and just plain omissions has echoed in the judgments of this court.")*Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987)(*Strickland* does not require deference to decisions which do not yield any conceivable benefit to the defense); *Wilson v. Butler*, 813 F.2d 664,672 (5th Cir. 1987)(remanding for evidentiary hearing because record did not reflect whether counsel made a strategic decision not to present mitigating evidence of troubled background and mental impairment); *Moore v. Maggio*, 740 F.2d 308, 315-19 (5th Cir.1984)(explaining strategic purpose motivating counsel's decision to limit investigation by excluding implausible lines of mitigating evidence.)

Here, counsels' failure to present mitigating evidence is not entitled to deference because it was neither informed by a reasonable investigation nor supported by any logical position that such failure would benefit Mr. Speer's defense. "[C]ounsel has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary." *Strickland*, 104 S. Ct. at 2006. Counsel is "not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida*, 627 F.2d 706, 708(5th Cir. 1980). But strategic decisions made without an adequate investigation into the facts and law controlling plausible defensive theories are reasonable only to the extent that reasonable professional judgment supports counsel's limitation on the investigation. *Strickland*, 104 S. Ct. at 2066.

To be clear, we are dealing here with counsels' complete, rather than partial, failure to investigate whether there was potentially mitigating evidence that could be presented during the punishment phase of Mr. Speer's trial. The complete failure to search for mitigation distinguishes this case from those cases in which appellate courts have rejected similar claims because the record established counsel conducted an adequate investigation, but made an informed trial decision not to use the potentially mitigating evidence because it could have a prejudicial backlash. *See, e.g., Darden v. Wainwright*, 477 U.S. 168 (1986)(counsel's failure to present mitigating evidence relating to defendant's character, psychiatric evaluation and history as a family man did not constitute deficient performance where such evidence would have opened the door to otherwise excluded evidence that defendant had prior convictions, was

diagnosed as a sociopathic personality, and had in fact abandoned his family).

Given that counsels' conduct in failing to develop or present mitigating evidence was not informed by any investigation and not supported by reasonably professional limits upon investigation, there is no strategic decision entitled to deference. Moreover, there does not appear any justification for limiting, or in this case, completely omitting, any investigation into Mr. Speer's background. Therefore, trial counsels' failure to investigate and offer any mitigating evidence relating to Mr. Speer's background was professionally unreasonable and deficient performance in the context of this case. Mr. Speer's lawyers can offer no rational strategic explanation for their behavior. With their client's life at stake, these attorneys quite simply failed to investigate or produce the only evidence that offered a realistic chance of saving Mr. Speer from execution. Their abject failure stemmed not from a conscious decision to adopt an alternative strategy, but from sheer negligence. The Sixth Amendment will not tolerate such incompetence, particularly when a defendant's life hangs in the balance.

B.   Prejudice

Without doubt, Mr. Speer has satisfied the first *Strickland* requirement by establishing the deficiency of his counsels'

performance at the sentencing hearing.  Nonetheless, before Mr. Speer can prevail on his claim of ineffective assistance at sentencing, *Strickland* also requires that he make a showing of prejudice.  In order to obtain relief from this court, Mr. Speer must demonstrate "that there is a reasonable probability that, but for counsel's error, the result of [his sentencing hearing] would have been different."  *Strickland*, 466 U.S. at 694.  In gauging the likelihood of prejudice, the *Strickland* Court defined "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome."  *Id.*

This discussion must begin with a reminder that this ground focuses on the penalty phase of a capital case.  In this phase, the jury has considered evidence which convinced them of the defendant's guilt and is determining whether the defendant should live or die.  The defense role in the penalty phase is to present evidence to convince each member of the jury not to vote to have the defendant killed.  To achieve this goal, defense counsel should humanize his client, overcome the common prosecutorial position that the defendant is evil, and to provide the jury with reasons for the conduct by explaining the forces in the defendant's life that could have led up to the circumstances of murder.

The Eighth Amendment to the Constitution states "Excessive bail shall not be required, nor excessive fines imposed, nor

cruel and unusual punishments inflicted."  In a capital case, it requires that the death penalty be appropriate punishment in a specific case, and that it can only be imposed after adequate consideration of factors that might warrant mercy. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *California v. Brown*, 479 U.S. 538, 554 (1976). Mitigating evidence allows the consideration of "compassionate or mitigating factors stemming from the diverse frailties of humankind … [and] constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. at 304. *See also Skipper v. South Carolina*, 476 U.S. 1 (1986). The sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982), *See also Lockett v. Ohio*, 438 U.S. 586 (1978).

In determining prejudice, the court is required to compare the evidence actually presented at sentencing with all the mitigating evidence contained in the post-conviction record. Stated to the point: Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that because of Mr.

Speer's reduced moral culpability, death was not an appropriate sentence?

The sentencing process consists of weighing mitigating and aggravating factors, and making adjustments in the severity of the sentence consistent with this calculus. *Vela v. Estelle*, 708 F.2d 954,965 (5th Cir. 1983), *cert. denied* 464 U.S. 1053 (1984). *See Penry v. Lynaugh*, 492 U.S. 302 (1989)(quoting *California v. Brown*, 479 U.S. 538 (1987)(O'Conner, J. concurring) for proposition that "evidence about the defendant's background is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse") *id.* (discussing the significance that mitigating evidence of childhood abuse and mental retardation have with respect to the individualized sentencing determination required by the Eighth Amendment for imposition of the death penalty); *Eddings*, 102 S.Ct. at 877 ("evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant" to an individualized sentencing determination). Counsels' lack of effort at the punishment phase of trial deprived Mr. Speer of the possibility of bringing out mitigating factors.  Mitigating evidence clearly would have been admissible.  The jury would have considered it and possibly been

influenced by it. [1] Accordingly, Mr. Speer's writ should be granted, entitling him to a new sentencing hearing.

**2. Prospective Juror Louis Viramontes was erroneously removed for cause thus violating Petitioner's rights under the Sixth Amendment of the United States Constitution.**

Factual Background:

Prospective juror Viramontes was excused for cause as a vacillating juror. The following transpired during the individual voir dire of prospective juror Viramontes:

Q.   Do you understand, Mr. Viramontes, I'm not trying to argue with you. There's a difference between what you believe is right – in other words, you don't believe that the death penalty should be given in these cases, or that you could give it in these cases, but that's not the question. The question is, can you under oath, answer these questions truthfully, based on the evidence?

A.   Well, I believe I can.

---

[1]   Several courts have found prejudice under similar circumstances. *See Dobbs v. Turpin*, 142 F.3d 1383, 1389-91 (11th Cir. 1998) (counsel's complete failure to investigate and present mitigating evidence at the punishment phase was prejudicial where such evidence was available); *Smith v. Stewart*, 140 F.3d 1263 (9th Cir. 1998), *cert. denied*, 525 U.S. 929 (1998) (counsel's complete failure to investigate and present any mitigating evidence at the punishment phase was prejudicial where such evidence was available); *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998) (failure to present mitigation evidence was prejudicial where several relatives, friends, death penalty experts, and a minister were available to testify); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) *cert. denied* 522 U.S. 907 (1997)  (holding defense counsel's performance ineffective and prejudicial at sentencing where he failed to make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors); *Glenn v. Tate*, 71 U.S. 910 (1996) (defendant's lawyers inadequate preparation for sentencing phase was prejudicial where they did not acquaint themselves with defendant's social history, never spoke to any of his numerous brothers and sisters, never examined his medical records, or talked to his probation officer); *Tucker v. Day*, 969 F.2d 155, 159 (5th Cir. 1992) (prejudicial impact where counsel failed to provide any assistance at a sentencing hearing); *Kubat v. Thieret*, 867 F.2d 351, 367 (7th Cir. 1989), *cert. denied*, 493 U.S. 874 (1989) (substandard argument and the presentation of no evidence was prejudicial where fifteen character witnesses were available to testify at the sentencing hearing; and it amounted to no representation at all).

Q.   That really is the bottom line.

A.   Yeah, that's what you're asking me.

Q.   Right.

A.   Okay, and no matter what I believe?

Q.   Right.  Would you be willing, and could you answer these questions, based on the evidence, regardless of the outcome, life or death, would you answer these truthfully based on the evidence?

A.   Oh, I could answer these questions, sure?

(R.R. Vol. 8, pp. 40-41).

## Argument and Authorities:

In *Witherspoon v. Illionois*, 391 U.S. 519 (1968), the Supreme Court set aside a defendant's death sentence where members of the venire had been excluded solely because they had conscientious scruples against capital punishment.  The Court held that a potential juror could not be excused for cause on the basis of his opposition to the death penalty unless he was "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." Id. at 522 n. 21.  Such persons may be excluded only if they make it unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward

the death penalty would prevent them from making an impartial decision as to the defendant's guilt. Id. The Supreme Court reasoned that a jury from which all persons who had reservations against imposing the death penalty had been excluded was a jury "uncommonly willing to condemn a man to die." Id. at 521.

Both the Supreme Court and the Fifth Circuit have insisted upon strict adherence to the mandate of *Witherspoon*. The courts have required a death sentence to be set aside even if only one potential juror has been excluded for opposing the death penalty on grounds broader than those set forth in *Witherspoon*, see *Davis v. Georgia*, 429 U.S. 122 (1976); *Mario v. Beto*, 434 F.2d 29 (5th Cir. 1970), regardless of whether the state has any peremptory challenges remaining at the close of voir dire. *Alderman v. Austin*, 663 F.2d 658 (5th Cir. 1982), aff'd in relevant part, 695 F.2d 124 (5th Cir. 1983) (en banc); *Granviel v. Estelle*, 655 F.2d 673, 678 (5th Cir. 1981); *Burns v. Estelle*, 592 F.2d 1297 (5th Cir. 1979), aff'd, 626 F.2d 396 (5th Cir. 1980) (en banc).

The Supreme Court reexamined the *Witherspoon* standard in *Adams v. Texas*, 448 U.S. 38 (198). In deciding whether certain potential jurors had been excluded properly pursuant to the Texas statute at issue, the Court discussed its prior opinions, including *Witherspoon*, and concluded that:

> [t]his line of cases establishes the general proposition
> that a juror may not be challenged for cause based on his
> views about capital punishment unless those views would
> prevent or substantially impair the performance of his
> duties as a juror in accordance with his instructions and
> his oath.  The State may insist, however, that jurors will
> consider and decide the facts impartially and
> conscientiously apply the law as charged by the court.

448 U.S. at 45.

The Supreme Court then undertook to clarify the issue in *Wainwright v. Witt*, 469 U.S. 412 (1985).  In so doing, the Court reaffirmed the above quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. Under *Wainwright*, a venireman may be excluded for cause consistent with the Sixth Amendment to the United States Constitution when his views on capital punishment are such that they would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  However, a prospective juror may not be excused merely because his beliefs about the death penalty might influence the decision making process. The dispositive question is simply whether a prospective juror can follow the law, notwithstanding staunch opposition to the death penalty.  In other words, unless a venireman is so irrevocably opposed to capital punishment that he could not follow the law or obey the

instructions of the trial court, he is not disqualified from jury service.

It is the burden of the challenging party to establish the veniremember challenged for cause will be substantially impaired in their ability to follow the law. Demonstrating that the venireperson has conscientious scruples against the death penalty is not alone sufficient to meet the prosecution's burden to show he will be substantially impaired from honestly answering the special issues in accordance with the evidence. In order to meet that burden, the prosecution should directly ask the question of the venireman whether his opposition to the death penalty is such as to cause him to answer one of the special issues in such a way as to assure a life sentence will be imposed, irrespective of what the evidence may be.

In Petitioner's case it is clear that neither the trial court nor the advocates could have conceivably gleaned from the questions asked or the answers given any meaningful impression of the juror's qualifications to honestly answer the special issues. Since the prosecutor failed to carry its burden of showing that prospective juror Viramontes was biased against the law, Petitioner's death sentence must be vacated and a new sentencing trial ordered.

**3.    Prosecutorial misconduct deprived Petitioner of his right to Due Process by impermissibly vouching for various witnesses' credibility.**

Factual Background:

While cross-examining a defense witness, the prosecutor made the following sidebar statement:

> "I'm not even asking for the truth of the matter.  I think the man is lying, and I want to see if he is going to tell the truth."

R.R., Vol. 11, pp. 33-34.

Additionally, the record reveals that throughout the cross-examination, the prosecutor repeatedly made a facial expression and shook his head in disbelief of the witness's testimony. R.R. Vol. 11, p. 36. Finally, in closing argument, the prosecutor referred to a defense witness as a liar.  R.R. Vol. 12, p. 54.

Discussion:

The ethical canons of an attorney's profession prohibit the direct expression of an advocate's opinion as to the veracity of a witness.  Rule 3.4(e) of the American Bar Association's proposed Model Rules of Professional Conduct.  The prejudice which may result from such expression falls into two categories. One is that, because of his position, the jury may tend to give weight to the prosecuting attorney's personal views. The second is where the jury may infer, from the form of counsel's language or conduct, that he had access to extra-judicial information, not available to the jury. *Patriarca v. United States*, 402 F.2d 314, 321 (1st Cir. 1968), *cert. denied*, 393 U.S, 1022. ("A prosecutor has no business telling the jury his individual

impressions of the evidence. Because he is the sovereign's representative, the jury may be misled into thinking his conclusions have been validated by the government's investigatory apparatus." *United States v. Kerr*, 981 F.2d 1050, 1054 (9th Cir. 1992); *see also United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980) (emphasizing that the prosecutor may not "place the prestige of the government behind the witness"). When such an implication is given, it is peculiarly prejudicial.

Courts have long recognized that it is highly improper for the government to refer to a defense witness as a liar. *United States v. Cooper*, 827 F.2d 991, 995 (4th Cir. 1987)("[W]e agree with Cooper that the prosecutor engaged in an improper excess of advocacy when he called defense witnesses 'liars.'"); *see also United States v. Moore*, 710 F.2d 157, 159 (4th Cir.)(improper for a prosecutor to directly express his "opinion as to the veracity of a witness"), *cert. denied* 464 U.S. 862 (1983).

With respect to claims of prosecutorial misconduct (of which vouching is a subset), a defendant "must show that the remarks were improper" and that they "prejudicially affected the defendant's substantial rights as to deprive the defendant of a fair trial.'" *United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995). There are several factors relevant to the determination of prejudice, including:

(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*Adam*, 70 F.3d at 776.

In Petitioner's case there is no question that the prosecutor's statements and actions are clear, unequivocal examples of vouching for the credibility of government witnesses.   Furthermore, the prosecutorial remarks in the case did not stop at merely seeking to vouch for the credibility of the government witnesses.   The prosecutor specifically called the jury's attention to his own credibility.   Accordingly, Petitioner's conviction and death sentence must be vacated and a new trial ordered.

**4.   Petitioner's Constitutional right to a speedy trial was violated.**

Factual Background:

The victim of the offense for which Petitioner was convicted died on July 11, 1997.   On August 28, 1997, the Bowie County District Attorney's office spoke with the Special Prosecution Unit and advised that capital murder charges would

be filed against Petitioner.  On September 14, 1997, Petitioner was placed in administrative segregation.  On November 4, 1999, Petitioner was indicted for the offense of capital murder. Petitioner's counsel were not appointed until March 3, 2000.  On August 23, 2001, a hearing was conducted on Petitioner's motion to dismiss on the ground of a lack of speedy trial.  This motion was denied by the trial court.  On October 15, 2001, trial commenced.  R.R. Vol. 3, pp. 16-23

Discussion:

The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution as applied through the Fourteenth Amendment.  *Kloper v. North Carolina*, 386 U.S. 213 (1967).  The same right is assured by Article I, Section 10 of the Texas Constitution.  The test for whether speedy trial rights have been violated under the federal and state constitutions is the same.  *Hull v. State*. 699 S.W.2d 220, 221 (Tex. Crim. App. 1985).

The determination of whether an accused has been denied the right to a speedy trial is to be made by use of a 'balancing test' which was set out in *Barker v. Wingo*, 407 U.S. 514 (1972). In each individual case a consideration must be made of the following factors:

(1)  the length of the delay;

(2)  the reason for the delay;

(3)  the defendant's assertion of the right; and

(4)  the prejudice resulting from the delay.

*Moore v. Arizona*, 414 U.S. 25 (1973); *Wilkerson v. State*, 510 S.W.2d 589 (Tex. Crim. App. 1973)

### Length of Delay

The first *Barker* factor, the length of the delay, is a triggering mechanism for analysis of the other factors.  *Barker*, 407 U.S. at 530-32.  Unless the delay is presumptively prejudicial, a court need not inquire into the other factors. The length of delay for speedy trial purposes is measured from the time the defendant is arrested or formally accused.  *United States v. Marion*, 404 U.S. 307, 313 (1971).  Generally, a delay of eight months is considered presumptively prejudicial, triggering further analysis of the speedy trial claim.  *State v. Rangel*, 980 S.W.2d 840, 843 (Tex. App. –San Antonio 1998, no pet.).

Petitioner was indicted on November 4, 1999.  Almost two years elapsed before his trial commenced.  This delay is sufficient to trigger a *Barker* inquiry.  Furthermore, this factor weighs in favor of finding a speedy trial violation.

### Reasons for the Delay

The State bears the burden of justifying the delay.  *State v. Rangel*, 980 S.W.2d 840, 843 (Tex. App. –San Antonio 1998, no pet.).  A deliberate attempt to delay a trial is weighted

heavily against the State, while more neutral reasons, such as negligence or overcrowded dockets, are weighed less heavily. *Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002). "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable an unacceptable reasons for delaying a criminal prosecution once it has begun." *Doggett v. United States*, 505 U.S. 647, 657 (1992). When the record is silent regarding the reason for the delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay. *Dragoo v. State*, 96 S.W.3d 308,314(Tex. Crim. App. 2003). Because the delay in this case is largely attributable to the State, this factor weighs in favor of finding a speedy trial violation.

## Assertion of the Right

The third factor that should be considered is the defendant's assertion of his right to a speedy trial. The defendant is responsible for asserting his right to a speedy trial. However, if a defendant fails to assert his speedy trial right, it does not amount to a waiver of that right. *Dragoo*, 96 S.W.3d at 314.

In the instant case, Petitioner requested an attorney on August 7, 1997, when he was questioned by law enforcement

officers.  R.R. Vol. 3, p. 17.   Petitioner was then moved from general population to administrative segregation on September 14, 1997. Petitioner was indicted on November 4, 1999 and counsel was appointed on March 3, 2000.  As a result of the change of Petitioner's custody status and denial of appointment of counsel, Petitioner was effectively impeded in assertion of his right to a speedy trial.   Accordingly, this factor should weigh in Petitioner's favor as well.

<u>Prejudice Resulting From the Delay</u>

The final factor that a court must consider is what prejudice the defendant suffered as a result of the delay. *Dragoo*, 86 S.W.2d at 826.  This prejudice to the defendant is assessed in light of the interests which the speedy trial right is designed to protect.  *State v. Munoz*, 991 S.W.2d 818, 826 (Tex. Crim. App. 1999).  These interests are:

(1)  preventing oppressive pretrial incarceration;

(2)  minimizing the anxiety and concern of the accused; and

(3)  limiting the possibility that the defense will be impaired. *Id.*   The defendant has the burden to make some showing of prejudice, although a showing of actual prejudice is not required. *Id.*  When the defendant makes a prima facie showing of prejudice, the State carries the burden of proving that the defendant "suffered no serious prejudice beyond that which

ensued from the ordinary and inevitable delay." *Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Crim. App. 1973).

A.   Oppressive Pretrial Incarceration:

After the murder, Petitioner experienced major changes to his inmate status.   TDCJ officials put him in administrative segregation on September 14, 1997 where he remained until the date of his trial.   It is patently obvious that Petitioner suffered some oppressive pretrial incarceration.

B.   Anxiety and Concern:

Considering the severity of the allegations against Petitioner, there can be no doubt that he experienced a certain amount of anxiety while he waited for trial. *See Thompson v. State*, 983 S.W.2d 780, 785 (Tex. App. – El Paso 1998, pet ref'd).

C.   Impaired Defense:

At trial there was a dispute over the authorship/authentication of certain letters allegedly attributable to Petitioner. The State claims to have gotten one crucial letter from an inmate Ellis who, by the time the State got around to trial, was out of prison "running from the law" and otherwise nowhere to be found. The prosecuting attorney realized early on the importance of the letter.   In his words, he wanted to have the jury see it "early and often". (R.R. Vol. 9, p. 7). The unavailability of inmate Ellis greatly prejudiced

Petitioner's ability to mount an effective defense. Since all factors weigh in Petitioner's favor, Petitioner's conviction must be vacated and a judgment of acquittal entered.

   **5.    The State deprived Mr. Speer of Due Process of Law when it withheld material evidence in violation of *Brady v. Maryland* and knowingly allowed false testimony to be presented to the jury in violation of *Giglio v. United States* and *Napue v. Illinois*.**

Mr. Speer was accused, convicted and sentenced to death for carrying out a "hit" on another prisoner at the Texas Department of Criminal Justice's Telford prison in Texarkana, Texas at the behest of the Texas Mafia ("TM") prison gang.  The State's case against Mr. Speer rested heavily on inmate testimony.  Evidence obtained in post-conviction by attorneys for Mr. Speer's co-defendant, Annibal Canales, Jr., demonstrates that the State suppressed material favorable evidence and knowingly presented material false testimony, namely that the prisoners had not received benefits in exchange for their testimony, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959).  In addition, the State violated Mr. Speer's rights as established in *Massiah v. United States*, 377 U.S.201 (1964), when it recruited a prisoner to act as the government agent in deliberately eliciting incriminating information from Mr. Speer.

TEX.CODE CRIM. PROC. Art. 11.071, § 5, provides:

(a)If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based upon the subsequent application unless the application contains specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for the violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the State's favor one or more of the special issues that were submitted to the jury in the applicant's trial under article 37.071 or 37.0711.

Speer filed his state-post conviction petition in 2004. Speer meets the requirements of 11.071 Sec. 5 (a)(1), because the factual basis for his claims that the prosecution did not disclose that it had offered incentives to inmate witnesses to testify against him was unavailable because this information was contained in another defendant's court file and that file was sealed. Speer did not present these claims in his initial state habeas application because the State withheld the information. The facts alleged by Mr. Speer relating to these claims establish good cause to excuse procedural default. All the facts underlying the claims Mr. Speer seeks to exhaust were only

recently discovered despite being in possession of the State. Under such circumstances, good cause is plainly shown. *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (State's suppression of *Brady* evidence constituted good cause to excuse procedural default).

Claims based on the kind of newly discovered evidence at issue in this case meet the requirements of § 5 and thus must be considered on the merits in state court. *See, e.g., Ex Parte Reed*, No. 50,961-03 (Tex. Crim. App. 2005) (authorizing successive proceedings on *Brady* allegations); *Ex Parte Rousseau*, No. 43, 534-01 (Tex. Crim. App. 2002)(authorizing successive proceedings on a claim that the State withheld impeachment evidence of eyewitnesses and evidence of innocence); *Ex Parte Washington*, No. 35, 410-02 (Tex. Crim. App. 2002)(authorizing successive proceedings on claim that the State withheld information regarding criminal records of punishment phase witnesses and presented false and misleading testimony); *Ex parte Murphy*, No. 30,035-02 (Tex. Crim. App. 2000) (authorizing successive proceedings on claim that prosecutors relied on perjured testimony); *Ex parte Faulder*, No. 10,395-03 (Tex. Crim. App. 1997) (authorizing successive proceedings on a claim that prosecutors allowed witnesses to testify falsely and withheld exculpatory evidence); *Ex parte Nichols*, No. 21,253-02 (Tex. Crim. App. 1997) (authorizing successive proceedings on claim

that prosecutors withheld the correct name and address of a witness with exculpatory information).

Mr. Speer has not engaged in intentionally dilatory tactics regarding the claims he wishes to exhaust. Mr. Speer's trial was in 2001. He subsequently filed a direct appeal to which the State responded. At no time did the State ever disclose the substance of the claims raised now. By failing to disclose this information in state court and subsequently arguing for a procedural default, the State is attempting to create a procedural trap for Mr. Speer whereby he is deprived from any court ever reaching the merits of his *Brady* claims.

**STATE MISCONDUCT**

Investigation documents and internal communications obtained by undersigned counsel paint a vivid picture of how intertwined TDCJ's and SPU's investigators are with each other and with the prisoners who served as informants, witnesses and sometimes agents. This collaboration creates a unique situation wherein the witnesses, victims and defendants in nearly every case are all in the custody and complete control of the prosecuting authority. At the same time, TDCJ exerts total control over the prisoners without outside influence and with minimal oversight. This unparalleled control TDCJ wields over the inmates' lives, especially those deemed to be gang members,

set the stage for how TDCJ and SPU approached and cultivated inmate witnesses.

To understand and evaluate the State's misconduct in Mr. Speer's case, both in the way in which this collaboration led the State to recruit Innes to elicit statements from Mr. Canales and Mr. Speer and the extensive and undisclosed prison benefits and deals the State's witnesses received in exchange for their testimony for SPU, it is essential to recognize that deals and benefits provided in exchange for cooperation and testimony in a prison environment are different from so-called "freeworld" deals and benefits in several important respects. Where *Brady* evidence involving informant witnesses generally includes promises not to prosecute and favorable plea agreements in exchange for testimony, in prison the incentives to cooperate are more varied and subtle precisely because the prison exerts total control over the inmate's environment, from whether he is permitted to hang pictures of his family on his cell wall to whether he is locked in his cell 23 hours a day. If an inmate has a long sentence, benefits that seem trivial to a free person, represent to a prisoner a way to make prison survivable.

When an inmate is classified as a confirmed gang member, his already constricted freedoms are even further reduced. Confirmed gang members generally serve all or most of their sentences in administrative segregation ("Ad Seg") *See* Exhibit 1

at Para F ("Offenders assigned Level 1 [of Ad Seg] are generally maintaining good behavior but have a requirement for segregation or separation from general population offenders. Additionally, the offender is considered a security risk due to being: . . . (c) a physical threat to the physical safety of offenders or staff for reasons other than behavior, such as membership in a Security Threat Group (STG)") According to TDCJ policies, an inmate is on "Administrative Segregation anytime he is separated from the general population by confinement in a cell for twenty (20) hours or more a day without a disciplinary hearing." Exhibit 1.

In reality, the best behaved prisoner in Ad Seg will be allowed out of his cell for either one hour a day, seven days a week; two hours, five days a week; or three hours, four days a week.  Exhibit 1 at 16.  Ad Seg inmates are housed in single man cells and allowed only one non-contact visit each week and no contact visits.  They are obviously not allowed work assignments and their movement is severely restricted. "Any time an offender is transported to or from his assigned cell, the offender is to be strip searched and placed in hand restraints prior to the opening of the cell door." *Id*.  Thus, any concession made by the State which can relive some of these conditions is of the utmost value to a prisoner housed in Ad Seg.

<u>Bruce Innes:</u>

Bruce Innes was a main witness in the State's case, presenting inculpatory notes alleged written by Mr. Speer. He also provided testimony alleging an admission from Mr. Speer regarding the Dickerson murder. Unbeknownst to defense counsel, and in violation of *Massiah v. United States*, 377 U.S. 201 (1964) and *United States v. Henry*, 447 U.S. 264 (1980), at the time he gathered these statements, Innes was acting as an undercover agent of the State. See Exhibit 2. This fact was never disclosed to the defense and was only discovered upon review of Mr. Canales' federal writ.

In early 1998, in Ad Seg and the target of a SPU prosecution himself, Innes supplied SPU with two incriminating "kites," one allegedly from Mr. Canales and one from Mr. Speer, which became crucial pieces of evidence in the prosecution's case against Mr. Speer. Realizing that Innes provided a ready conduit into TM activity and the circumstances surrounding Dickerson's murder, the State began cultivating Inness as a source of valuable evidence. Over the three years between the murder and Mr. Speer's trial, Innes became an important agent for the Special Prosecutions Unit ("SPU").

Although it is currently unclear when Innes was first approached about collecting information for the State, he was certainly acting as an agent for the State starting sometime

around July 11, 1997, the date of the murder January 28, 1998. Sometime in January 1998, Innes requested a meeting with the TDCJ Security Threat Group officer, which occurred on January 28, 1998. Exhibit 3. At that meeting, Innes stated:

> Lt. Dodson, Telford IAD, had requested any information or kites that inmate Innes had pertaining to the homicide of inmate Dickerson, Gary #587361, shortly after the incident occurred, but that inmate Innes denied knowing anything regarding the incident. However, Inmate Innes now admits that all though [sic] he did not have any prior knowledge of the situation, he sent a kite to both inmate Canales, Anibal #696334, now C/TM. Aka: Bigfoot/Jewboy/Dobie; and inmate Speer, William #668485, S/TM, AKA: Stay Puff; asking what happened.

*Id*. Innes then said that he had given the original kites to his attorney to assist in a plea bargain. *Id*.

Innes continued to work actively for SPU and TDCJ investigators, fueled on by Innes' "desperate need" to escape Ad Seg – where he had been living since at least July 1997 – and the State's eagerness to obtain the information Innes was acquiring.

Two undated I-60 requests clearly demonstrate Innes was acting as an agent for SPU.  In one, after asking to be moved, Innes wrote:

> As you know I'm a witness for special prosecution unit & was gathering information as a member of TM.

Exhibit 4 (I-60). He reaffirmed his role in another I-60:

> As you know I'm a cooperating witness in a murder case for the State the special prosecution division & A.P.

Merillat. I've been gathering information as a member of TM.

Exhibit 5 (I-60)

In exchange for his cooperation, SPU agreed to "de-confirm" Innes but expressed internal concern about losing his ability to surreptitiously collect information about the gang. By mid-1998, Innes also recognized the tension between becoming de-confirmed and his ability to retain bargaining power.  Worried about losing his informer-agent status, Innes wrote SPU June 18, 1998:

Dear Mr. Merillat,

I just received your letter of June 18th 98.  Thank you for responding:

Okay-first order of business.  Good [I] want to be (de-confirmed) the question I have is, will they do this even if they want me to milk my situation with TM.  Until the last?  Which I'm still corresponding for info in other words or must I cut all ties immediately to be de-confirmed I am willing to help in whatever capacity officials want me to.

Exhibit 6 (Innes 6/18/98 letter to Merillat)

The SPU, however, was not so willing to let Innes become declassified since he was so eagerly and effectively gathering information for the State.  Although Innes desperately wanted to be deconfirmed and begin accruing those benefits, Merillat recognized how Innes was of unique use to the State and worked with TDCJ investigators to identify further opportunities for Innes to inform:

> I received a letter from inmate Innes yesterday, June
> 23, 1998. In his letter, Innes states that he does
> want to process to have him 'deconfirmed' from the
> Texas Mafia started. Innes relates that he is willing
> to 'work' either or both of our offices in any way we
> can use him. He will correspond with gang members as
> usual, if you want him to, in order to help
> expose/uncover their activities, or do whatever is
> best. Innes is presenting a valuable, unique
> opportunity to possibly do some major damage to TM's
> business.

Exhibit 7 (Merillat 6/24/98 letter to Cheatham)

Later that year, Innes wrote Merillat to let him know that

he had "cut all contact with any and all Texas Mafia Members,"

and had "tried to get the Unit Mail Room (to return to sender)

all inmate mail because the only inmates writing me are gang

members." Exhibit 8 (Innes 7/25/98 letter to Merillat). In

response to the mail room's failure to follow his request, Innes

wrote an I-60 to "get help in this matter!" and also requested a

letter from Merillat to show or give to Classification to let

them know he was co-operating with SPU. Exhibit 8. For whatever

reason, Innes was clearly still receiving correspondence from

other prisoners by June 1999. That month, Merillat wrote Innes

a reminder:

> Please remember to keep any correspondence you get
> from inmates threatening you. It would be beneficial
> to try not to handle letters too much, as there might
> be a possibility of lifting prints from them. Let me
> know if you have anything like that, and I'll make
> arrangements to pick them up and have them processed.

Exhibit 9.

In August, Innes again reminded TDCJ of his work for SPU in

his continued attempt to have TDCJ deconfirm him:

> So I contacted the special prosecutor's office in
> Huntsville & offered to give my cooperation in solving
> & testifying in the case.  I have been providing
> information to Special Agent A.P. Merillat.  He will
> verify my cooperation.

Exhibit 10 (Handwritten Statement by Bruce David Innes regarding

his application to the Gang Renunciation Unite, 8/16/99).

A Wynne Unit sergeant also reminded the Wynne Security

Group office of Innes' undercover work for the State:

> Offender Innes has requested reclassification as an ex
> member, but claims that special prosecutor's office
> has instructed him to keep in contact with TM members
> (for purposes concerning the homicide)  You may want
> to contact Mr. C Dodson, Telford IAD, regarding any
> questions you have concerning this situation.

Exhibit 11 (Telford Unit Memo: Sgt. D Johnson to Wynne STG:

9/3/99)

In 2000, Innes' fishing for incriminating correspondence

apparently bore fruit as he purportedly received a letter from

Mr. Canales which he claims puts a hit on a prosecution trial

witness.  SPU investigation notes reveal that:

> D wrote Innes, advising that he (d) thought Whited had
> snitched.  Canales writes Whited needs to be hit –
> either by TM or another gang. (APM) sent Innes a
> letter asking him to correspond w Canales (see copy).

Exhibit 12 (SPU notes)

On March 13, 2000, Merillat notified Gang Intelligence at

the Wynne Unit about Innes' assistance:

> Innes provided that letter to me, and he, at my request agreed to correspond with Canales to confirm authorship of the letter, attempt to obtain details of actions against our witnesses, information on the Dickerson killing, etc.

Exhibit 13 (Merillat 3/13/00 Letter) Merillat also makes clear that this relationship has been ongoing:

> For several months, inmate Innes has been corresponding with me, providing information on TM activities, background information on the gang, and he has assisted our office with intelligence surrounding the killing of Dickerson and the persons responsible for the murder.

*Id.*

When Innes began having difficulty because his mail was being confiscated due to containing gang material, SPU became even more directly involved by essentially becoming a mail carrier for Innes.  Innes wrote to Merillat:

> I'm glad to be of service to you in the getting of information!  But I've had several letters denied by the unit gang intelligence officer – Mr. Sgt Burson – Man it must really be confusing to these people because, I claim to be an X – but they see these gang related letters coming and going to me!
>
> The fact that I am only in contact at the request of SPU and that they should not hold any writing against my de-confirmation process, because it is at this time damaging that process and it makes me look like a liar.

Exhibit 14 (Innes 3/6/00 letter to Merillat)  Merilatt quickly began to make special arrangements for Innes' mail.  He faxed a letter to Burson and personally spoke to another sergeant:

> Letter from Innes re: SPU asking him to correspond w/
> Canales to prove authorship, get info on this case
> etc. Innes needs SPU to let Sid @ (Wy) know, so they
> won't think he's trying to keep patch, etc. APM faxed
> letter to Sgt. Burson.

> 3/13/00  (APM) Spoke to Sgt. Kirb – S.L. @ (B.1) re:
> Canales writing to/from Innes. He will allow Innes
> letter through, & advise APM regarding any corresp.
> from Co.Ds.

Exhibit 12. Merillat also began sending the actual letters to

Mr. Canales that were allegedly from Innes. Having established

a more reliable mail system, Innes now became worried that his

value was diminishing. Concerned that he was not getting any

response to his letter to Canales, Innes wrote to Merillat:

> I wrote to Canales about the issue of taking 'Iron'
> out and sent it to you to mail out, I never heard from
> him or you! I wrote him directly to see if he got the
> letter and again reiterating that Iron issue – never
> got word back!? I'd like to ask if there is any
> witness list as evidence been made available to the
> defense counsel because if so and I'm on it, it could
> be the reason he's not responding

Exhibit 15 (Innes 6/4/00 letter to Merillat)

On June 12, 2000, Merillat wrote Innes expressing his

disappointment about the most recent attempt at collecting

incriminating evidence:

> Dear Bruce,

> I got your letter and the Stiner information today.
> Thanks for sending those documents. I have not heard
> anything about the Canales letters or any
> ramifications about the letters you sent him. I was
> hoping he might make some admissions etc, but
> evidently not  As far as a witness list, we haven't

sent one out yet, Mr. Mullin and I are holding off as
long as we can.

Exhibit 16 (Merillat 6/12/00 letter to Innes)

Mr. Innes was a crucial witness for the State.  However,
because Mr. Speer's defense was denied important impeachment
evidence regarding Mr. Innes, the jury was unable to place Mr.
Innes in proper context.  The evidence regarding Mr. Innes that
was suppressed by the State included:

> Evidence demonstrating Innes' renunciation of his gang
> affiliation was not true and that he was simply seeking the
> benefits conferred by not being labeled as a gang member;
>
> Evidence that Innes received favorable treatment in prison
> contraband cases such as possessing a weapon;
>
> Evidence that the relationship between SPU and Innes was
> ongoing and multifaceted whereby Innes was receiving Unit
> transfers and other benefits in exchange for his
> cooperation, including the solicitation of incriminating
> evidence;
>
> Evidence that SPU not only agreed to the deal revealed to
> the defense but that SPU agreed to continue to advocate for
> him including sending favorable recommendations to the
> parole board; and
>
> Evidence that Innes was allowed to speak to other State
> witnesses and corroborate their stories.

SPU was allowing Innes to seek the benefits of
deconfirmation despite evidence and even TDCJ employee's strong
concern that he had not renounced membership.  Lonnie Eason,
another TM member providing information to SPU, wrote to A.P.
Merillat in July of 2000 noting that Innes had not given up his
gang activity.  According to Eason, Innes "has been constantly

representing TM matters and has been pure 'Gun Ho'" Exhibit 17 (Letter of Eason. He also asks Merillat to "Just tell Innes to leave TM alone & lay low, He's outta there with em when he testify's anyway!" *Id*. TDCJ's concerns about Innes' renunciation are reflected in a letter dated June 2000, well after Innes had supposedly "renounced affiliation." The Estelle Unit copied a letter from Innes to a "District Major" of TM named James Nicholas. Attached to the letter, a TDCJ employee queries:

> Please note: According to I/M Innes 07 [illegible] screen he is supposed to be on the TM "Hit list" if he was why would he be writing the District Major a letter like this?

Exhibit 18.

Innes' cooperation with SPU gained him other advantages which were also suppressed by the State. Innes, for example, was not subjected to prosecution for taking a metal shaft from his fan and hiding it in a pipe chase, an action which normally would be considered concealing a shank. After "catching a case," Mr. Innes wrote Merillat:

> I was without a radio & I had a pair of headphones. My neighbor offered to connect me if I could come up with some wire & help him get his radio open. So I broke my fan down for the coil of copper wire inside & I used the metal shaft that [illegible] is on to make a screwdriver out of it to try & break the triangle shaped screws. Well it didn't work & I threw away, or tried to, in the back vent. . . .

Exhibit 19 (Innes 10/7/99 Letter)

Merillat responded:

Regarding the recent case you spoke of where a fan was
disassembled and part of it was in the pipe chase –
just because a disciplinary case was written, it does
not mean that our office will file criminal charges.
We have no control over the disciplinary process
within TDCJ.  However, when IAD comes to us to file
charges in criminal matters, we screen each case
individually, giving consideration to each element of
the case.  Simply calling an item a weapon does not
guarantee that the SPU will go to the grand jury
seeking an indictment.  Yes, I know that fingernail
clippers can be called a weapon, and we have
prosecuted inmates for less than that but – we have
only done that when the facts showed that the
defendant intended the item to be a weapon.  So, the
facts that you provided make a big difference in how
we would look at the case.

Exhibit 20 (SPU 10/14/99 Letter)

Thus, even though SPU admittedly has prosecuted inmates for

having less than fingernail clippers, In Innes' case SPU simply

chose to believe his version of events and nothing was pursued.

This information was never revealed to the defense.

The relationship between Innes and the SPU was much more

complicated than the State portrayed at trial.  Although the

State admitted that they had cut a deal with Innes in exchange

for his testimony, the communications between both parties

reveal that there were continual intricate and subtle

negotiations.  Innes, for example, wrote SPU from Midway, Texas

in July of 1999 stating:

Mr. Merillat I'm not just dead weight to you, as you
can see by the info – I'm asking you to help me get

> transferred A.S.A.P. I will continue to prove useful &
> help full [sic] But if I have problems I expect your
> help too.

Exhibit 21 (Innes 7/7/99 Letter)

He wrote again in October of 1999 when he suddenly believed

that the State had retracted its deal.  Since the last letter

Innes had been moved to the Wynne Unit.  He wrote:

> Also I get a letter from State Counsel for Inmates and
> it's a plea offer on the New Boston cases!  But I'm
> offered 10 on one case & five on the other one to run
> CC.  But I was told by Mr. David P. O'Neil that the
> agreement for my cooperation & testimony & the letters
> I had, would be 3 yrs & the weapon charge dropped.

Exhibit 19 (Innes 10/7/99 Letter)

Merillat, acknowledged the unit change, and reassured

Innes:

> I got your letter, and previously heard that you were
> on the Wynne Unit.  I recall our phone call when you
> were housed at Telford, and you advised me that Wynne
> would be agreeable for housing.  Now, we are not going
> back on anything let me know who promised you what as
> far as agreements on your pending cases. I have not
> been involved in any negotiations, deals or anything
> of that nature.  If someone made promises, let me know
> who it was so I can pursue that.

Exhibit 20 (SPU 10/14/99 Letter)

By July 200, Innes was already having difficulty at the

Wynne Unit and requesting another change.  Merillat wrote back

offering to help:

> I got your letter today.  I have made moves toward
> getting you somewhere else.  They aren't real
> supportive of my asking for particular units, but I'm
> willing to give it a go.

Exhibit 22 (SPU 7/12/00 Letter)

On November 6, 2000, almost immediately after Mr. Canales' trial, a SPU investigator wrote TDCJ's Bureau of Classification, asking it to "honor [the prisoner'] request" to be moved to specific units.   Innes, along with other inmate State witnesses were on this list. Exhibit 23.

These documents, which were never revealed to the defense, demonstrate that Innes' relationship with the State far exceeded simply getting a deal on his pending felonies.   Innes was continually receiving benefits from the prison system in exchange for actively seeking out evidence to use at Mr. Speer's trial.   This partnership even included illegally soliciting incriminating information from Mr. Speer's himself.   Had the jury been aware of this information, Innes' testimony would have been placed in proper perspective: that of a canny, sophisticated, and manipulative prisoner who would do whatever he could to make his time in prison easier.

Also, unbeknownst to the defense and the jury, the State had placed Innes together with another witness thus providing an opportunity to compare information.   This classic type of impeachment evidence was not disclosed to the defense.

An April 4, 2000, letter from Larry Whited indicates that he and Innes are in solidarity and working for SPU.   In the

letter Whited recounts how he and Innes have compared and corroborated each other's stories.   Whited mentions that he and Bruce Innes went to the John Sealy Hospital together:

> But anyway, we got to talk the whole way down there (and no, we didn't coach one another on our stories. Smile) and I found out a whole lot about some things that've been going on with the infamous Texas Mafia since I've been gone.   Which is good for me because "To Know Is To Be Prepared." If you know what I mean.

Exhibit 24 (Whited 4/4/00 Letter).   Whited also reveals more of Innes' incentive to cooperate:

> Which reminds me, A.P., the dude ask me to talk to you about helping him go on and get out of Seg so he can get somewhere to do his time, so even though I already know that there isn't a whole lot you can do, I'm still going to go on and try to do this because I gave him my word that I would.
>
> Not to mention the fact that if you'de [sic] have seen his face when he ask me, well, you'de [sic] have probably [sic] done the same thing (smile) He wants to come to population and be on the same farm as I am, A.P. Which to be honest, isn't really a bad idea since we're in this particular boat we are in.

*Id.*

## Steven Canida

At Mr. Speer's trial, the State went to great lengths to assure that its key eyewitness, Steven Canida, had obtained no benefits in exchange for his testimony:

Q:          Am I cutting any deals for you?

[Canida]      No, sir.

Q:          Why not?

[Canida]          There wasn't no deal I needed.   There wasn't no

                  deal to be made.

Q.                Do you – are you aware that I don't work for the
                  Texas Department of Criminal Justice?

[Canida]          Am I aware of it? I don't know who you work for.

Q.                You don't know who I work for?

[Canida]          No sir.

Q.                Do you know that I don't have the authority to
                  get you out of prison?

[Canida]          No, sir. I don't guess.  I don't know.

Q.                Alright.  Did somehow you have in your mind that
                  your testimony here last year and this year,
                  somehow helped you make parole?

[Canida]          No, sir, there ain't no way.  I did eleven years
                  on fifty.

SR 9:233.

Q.                Did you have any reason to think that your
                  helping the State in this case, had anything to
                  do with your getting out?

[Canida]          I wasn't helping the State in this case.  I was
                  helping my own conscience.

SR 9:234-35.

        In truth and fact, Canida did receive substantial benefits

from the State for his testimony.   On November 6, 2000, just

weeks after Canida testified, SPU wrote to the Board of Pardons

and Parole on Canida's behalf.   Exhibit 25 (Inmate witness

correspondence note).  Canida was paroled the following July,

having served only 11 years on a 50 year sentence.

Further, upon information and belief, Canida's cooperation with the State enabled him to diminish significantly his sentence and incarceration on a subsequent offense. Although an apparent candidate to be prosecuted as a habitual offender, he was ultimately sentenced to only 10 years, and served only one year before being paroled.

The extent of Canida's involvement and cooperation with authorities has not yet been fully revealed. Mr. Speer has not been given access to internal TDCJ documents regarding Canida, correspondence from Canida to TDCJ or other documents that would explain Canida's favorable treatment.

<u>Larry Whited</u>

Larry Whited did testify at Mr. Speer's trial not at Mr. Canales' trial. Whited, however, appears to have been instrumental in developing and investigating the case against Mr. Speer. Whited was one of the first inmates to contact authorities and offer help in exchange for various benefits. On July 27, 1997 Whited wrote:

> If you want to talk to me about this, then you take me away from here first. I do not care about your threats about refusing to cooperate. I will. But under my conditions (and parole is not one of them).

Exhibit 26 (Whited 7/27/97 Letter)

By April of 1998, SPU was already helping Whited become declassified as a gang member.   According to a letter from the SPU chief prosecutor:

> Larry Whited #575256 has cooperated with the State of Texas in the investigation of the murder of inmate Dickerson which occurred at the Telford Unit in July 1997.   Inmate Whited, previously confirmed as a Texas Mafia member, has provided valuable information against that gang, including details of how and why the killing was carried out, background information on gang activity at the Telford Unit and other information crucial to the prosecution of this murder case, which was a Texas Mafia hit on Dickerson, Please consider the possibility of classifying inmate Whited as "Ex-Texas Mafia," if this would be appropriate in light of his cooperation.

Exhibit 27 (SPU 4/22/98 Letter).  After Mr. Canales was convicted, SPU wrote the Texas Board of Pardons and Paroles on behalf of Whited, noting that although he "[d]id not testify, but cooperated."  Exhibit 25 (Inmate witness correspondence).

Whited's role in the investigation and prosecution of Mr. Speer is not entirely known.   However, it appears that much of the original prosecution theory may be attributed to Whited's contact.   Whited's extensive contact was not revealed to the defense prior to trial.

Attached as Exhibit 28 is an affidavit of attorney Richard N. Dodson, co-counsel during Speer's trial, wherein he states:

> (a)  that he has reviewed the Exhibits attached to this successive writ of habeas corpus;

(b)   that prior to trial he requested disclosure of any incentives offered to inmate witnesses in exchange for their testimony;

(c)   the information contained in the Exhibits attached hereto regarding inmate cooperation and benefits conferred upon them for their cooperation were not disclosed to defense counsel by the prosecutor prior to trial; and

(d)   had counsel been aware of the information contained within the Exhibits attached hereto prior to trial, that information would have been used to impeach the inmate witnesses testifying on behalf of the State

## **State Misconduct:**

Investigation documents and internal communications paint a vivid picture of how intertwined TDCJ's and SPU's investigators are with each other and with the prisoners who served as informants, witnesses and sometimes agents. This collaboration creates a unique situation wherein the witnesses, victims and defendants in nearly every case are all in the custody and complete control of the prosecuting authority. At the same time, TDCJ exerts total control over the prisoners without outside influence and with minimal oversight. This unparalleled control TDCJ wields over the inmates' lives, especially those deemed to be gang members, set the stage for how TDCJ and SPU approached and cultivated inmate witnesses.

To understand and evaluate the State's misconduct in Mr. Speer's case, both in the way in which this collaboration led the State to recruit Innes to elicit statements from Mr. Canales

and Mr. Speer and the extensive and undisclosed prison benefits and deals the State's witnesses received in exchange for their testimony for SPU, it is essential to recognize that deals and benefits provided in exchange for cooperation and testimony in a prison environment are different from so-called "freeworld" deals and benefits in several important respects.  Where *Brady* evidence involving informant witnesses generally includes promises not to prosecute and favorable plea agreements in exchange for testimony, in prison the incentives to cooperate are more varied and subtle precisely because the prison exerts total control over the inmate's environment, from whether he is permitted to hang pictures of his family on his cell wall to whether he is locked in his cell 23 hours a day.  If an inmate has a long sentence, benefits that seem trivial to a free person, represent to a prisoner a way to make prison survivable.

When an inmate is classified as a confirmed gang member, his already constricted freedoms are even further reduced. Confirmed gang members generally serve all or most of their sentences in administrative segregation ("Ad Seg"). Additionally, the offender is considered a security risk due to being: . . . (c) a physical threat to the physical safety of offenders or staff for reasons other than behavior, such as membership in a Security Threat Group (STG)").  According to TDCJ policies, an inmate is on "Administrative Segregation

anytime he is separated from the general population by confinement in a cell for twenty (20) hours or more a day without a disciplinary hearing."

In reality, the best behaved prisoner in Ad Seg will be allowed out of his cell for either one hour a day, seven days a week; two hours, five days a week; or three hours, four days a week.  Ad Seg inmates are housed in single man cells and allowed only one non-contact visit each week and no contact visits. They are obviously not allowed work assignments and their movement is severely restricted.   Thus, any concession made by the State which can relive some of these conditions is of the utmost value to a prisoner housed in Ad Seg.

<u>**Inmate Witnesses**</u>

<u>**Bruce Innes:**</u>

Bruce Innes was the main witness in the State's case, presenting inculpatory notes alleged written by Mr. Speer.  He also provided testimony alleging an admission from Mr. Speer regarding the Dickerson murder.  Unbeknownst to defense counsel, and in violation of *Massiah v. United States*, 377 U.S. 201 (1964) and *United States v. Henry*, 447 U.S. 264 (1980), at the time he gathered these statements, Innes was acting as an undercover agent of the State.  See Exhibit 2.  This fact was never disclosed to the defense and was only discovered upon review of Mr. Canales' federal writ.

In early 1998, in Ad Seg and the target of a SPU prosecution himself, Innes supplied SPU with two incriminating "kites," one allegedly from Mr. Canales and one from Mr. Speer, which became crucial pieces of evidence in the prosecution's case against Mr. Speer. Realizing that Innes provided a ready conduit into TM activity and the circumstances surrounding Dickerson's murder, the State began cultivating Inness as a source of valuable evidence.  Over the three years between the murder and Mr. Speer's trial, Innes became an important agent for the Special Prosecutions Unit ("SPU").

Although it is currently unclear when Innes was first approached about collecting information for the State, he was certainly acting as an agent for the State starting sometime around July 27, 1997, the date of the murder being July 12, 1997.  Sometime in January 1998, Innes requested a meeting with the TDCJ Security Threat Group officer, which occurred on January 28, 1998. Exhibit 3. At that meeting, Innes stated:

> Lt. Dodson, Telford IAD, had requested any information or kites that inmate Innes had pertaining to the homicide of inmate Dickerson, Gary #587361, shortly after the incident occurred, but that inmate Innes denied knowing anything regarding the incident. However, Inmate Innes now admits that all though [sic] he did not have any prior knowledge of the situation, he sent a kite to both inmate Canales, Anibal #696334, now C/TM. Aka: Bigfoot/Jewboy/Dobie; and inmate Speer, William #668485, S/TM, AKA: Stay Puff; asking what happened.

*Id.* Innes then said that he had given the original kites to his attorney to assist in a plea bargain. *Id.*

Innes continued to work actively for SPU and TDCJ investigators, fueled on by Innes' "desperate need" to escape Ad Seg – where he had been living since at least July 1997 – and the State's eagerness to obtain the information Innes was acquiring.

Two undated I-60 requests clearly demonstrate Innes was acting as an agent for SPU. In one, after asking to be moved, Innes wrote:

> As you know I'm a witness for special prosecution unit
> & was gathering information as a member of TM.

Exhibit 4 (I-60). He reaffirmed his role in another I-60:

> As you know I'm a cooperating witness in a murder case
> for the State the special prosecution division & A.P.
> Merillat. I've been gathering information as a member
> of TM.

Exhibit 5 (I-60)

In exchange for his cooperation, SPU agreed to "de-confirm" Innes but expressed internal concern about losing his ability to surreptitiously collect information about the gang. By mid-1998, Innes also recognized the tension between becoming de-confirmed and his ability to retain bargaining power. Worried about losing his informer-agent status, Innes wrote SPU June 18, 1998:

> Dear Mr. Merillat,

I just received your letter of June 18th 98.  Thank you for responding:

Okay-first order of business.  Good [I] want to be (de-confirmed) the question I have is, will they do this even if they want me to milk my situation with TM.  Until the last?  Which I'm still corresponding for info in other words or must I cut all ties immediately to be de-confirmed I am willing to help in whatever capacity officials want me to.

Exhibit 6 (Innes 6/18/98 letter to Merillat)

The SPU, however, was not so willing to let Innes become declassified since he was so eagerly and effectively gathering information for the State.  Although Innes desperately wanted to be deconfirmed and begin accruing those benefits, Merillat recognized how Innes was of unique use to the State and worked with TDCJ investigators to identify further opportunities for Innes to inform:

I received a letter from inmate Innes yesterday, June 23, 1998.  In his letter, Innes states that he does want to process to have him 'deconfirmed' from the Texas Mafia started.  Innes relates that he is willing to 'work' either or both of our offices in any way we can use him.  He will correspond with gang members as usual, if you want him to, in order to help expose/uncover their activities, or do whatever is best.  Innes is presenting a valuable, unique opportunity to possibly do some major damage to TM's business.

Exhibit 7 (Merillat 6/24/98 letter to Cheatham)

Later that year, Innes wrote Merillat to let him know that he had "cut all contact with any and all Texas Mafia Members," and had "tried to get the Unit Mail Room (to return to sender)

all inmate mail because the only inmates writing me are gang members." Exhibit 8 (Innes 7/25/98 letter to Merillat). In response to the mail room's failure to follow his request, Innes wrote an I-60 to "get help in this matter!" and also requested a letter from Merillat to show or give to Classification to let them know he was co-operating with SPU. Exhibit 8. For whatever reason, Innes was clearly still receiving correspondence from other prisoners by June 1999. That month, Merillat wrote Innes a reminder:

> I received your letter yesterday regarding threats from TM members. I'm faxing the letter to Sammy Buentello at Classification. I hope you receive proper attention and your safety is not jeopardized. Please remember to keep any correspondence you get from inmates threatening you. It would be beneficial to try not to handle letters too much, as there might be a possibility of lifting prints from them. Let me know if you have anything like that, and I'll make arrangements to pick them up and have them processed.

Exhibit 9.

In August, Innes again reminded TDCJ of his work for SPU in his continued attempt to have TDCJ deconfirm him:

> So I contacted the special prosecutor's office in Huntsville & offered to give my cooperation in solving & testifying in the case. I have been providing information to Special Agent A.P. Merillat. He will verify my cooperation.

Exhibit 10 (Handwritten Statement by Bruce David Innes regarding his application to the Gang Renunciation Unite, 8/16/99).

A Wynne Unit sergeant also reminded the Wynne Security Group office of Innes' undercover work for the State:

> Offender Innes has requested reclassification as an ex member, but claims that special prosecutor's office has instructed him to keep in contact with TM members (for purposes concerning the homicide)  You may want to contact Mr. C Dodson, Telford IAD, regarding any questions you have concerning this situation.

Exhibit 11 (Telford Unit Memo: Sgt. D Johnson to Wynne STG: 9/3/99)

In 2000, Innes' fishing for incriminating correspondence apparently bore fruit as he purportedly received a letter from Mr. Canales which he claims puts a hit on a prosecution trial witness.  SPU investigation notes reveal that:

> D wrote Innes, advising that he (d) thought Whited had snitched.  Canales writes Whited needs to be hit – either by TM or another gang. (APM) sent Innes a letter asking him to correspond w Canales (see copy).

Exhibit 12 (SPU notes)

On March 13, 2000, Merillat notified Gang Intelligence at the Wynne Unit about Innes' assistance:

> Innes provided that letter to me, and he, at my request agreed to correspond with Canales to confirm authorship of the letter, attempt to obtain details of actions against our witnesses, information on the Dickerson killing, etc.

Exhibit 13 (Merillat 3/13/00 Letter) Merillat also makes clear that this relationship has been ongoing:

> For several months, inmate Innes has been corresponding with me, providing information on TM activities, background information on the gang, and he

> has assisted our office with intelligence surrounding
> the killing of Dickerson and the persons responsible
> for the murder.

*Id.*

When Innes began having difficulty because his mail was being confiscated due to containing gang material, SPU became even more directly involved by essentially becoming a mail carrier for Innes. Innes wrote to Merillat:

> I'm glad to be of service to you in the getting of information! But I've had several letters denied by the unit gang intelligence officer – Mr. Sgt Burson – Man it must really be confusing to these people because, I claim to be an X – but they see these gang related letters coming and going to me!
>
> The fact that I am only in contact at the request of SPU and that they should not hold any writing against my de-confirmation process, because it is at this time damaging that process and it makes me look like a liar.

Exhibit 14 (Innes 3/6/00 letter to Merillat) Merilatt quickly began to make special arrangements for Innes' mail. He faxed a letter to Burson and personally spoke to another sergeant:

> Letter from Innes re: SPU asking him to correspond w/ Canales to prove authorship, get info on this case etc. Innes needs SPU to let Sid @ (Wy) know, so they won't think he's trying to keep patch, etc. APM faxed letter to Sgt. Burson.
>
> 3/13/00 (APM) Spoke to Sgt. Kirb – S.L. @ (B.1) re: Canales writing to/from Innes. He will allow Innes letter through, & advise APM regarding any corresp. from Co.Ds.

Exhibit 12. Merillat also began sending the actual letters to Mr. Canales that were allegedly from Innes. Having established

a more reliable mail system, Innes now became worried that his value was diminishing.   Concerned that he was not getting any response to his letter to Canales, Innes wrote to Merillat:

> I wrote to Canales about the issue of taking 'Iron' out and sent it to you to mail out, I never heard from him or you!  I wrote him directly to see if he got the letter and again reiterating that Iron issue – never got word back!?  I'd like to ask if there is any witness list as evidence been made available to the defense counsel because if so and I'm on it, it could be the reason he's not responding

Exhibit 15 (Innes 6/4/00 letter to Merillat)

On June 12, 2000, Merillat wrote Innes expressing his disappointment about the most recent attempt at collecting incriminating evidence:

> Dear Bruce,
>
> I got your letter and the Stiner information today. Thanks for sending those documents.  I have not heard anything about the Canales letters or any ramifications about the letters you sent him.  I was hoping he might make some admissions etc, but evidently not  As far as a witness list, we haven't sent one out yet, Mr. Mullin and I are holding off as long as we can.

Exhibit 16 (Merillat 6/12/00 letter to Innes)

Mr. Innes was a crucial witness for the State.  However, because Mr. Speer's defense was denied important impeachment evidence regarding Mr. Innes, the jury was unable to place Mr. Innes in proper context.  The evidence regarding Mr. Innes that was suppressed by the State included:

Evidence demonstrating Innes' renunciation of his gang affiliation was not true and that he was simply seeking the benefits conferred by not being labeled as a gang member;

Evidence that Innes received favorable treatment in prison contraband cases such as possessing a weapon;

Evidence that the relationship between SPU and Innes was ongoing and multifaceted whereby Innes was receiving Unit transfers and other benefits in exchange for his cooperation, including the solicitation of incriminating evidence;

Evidence that SPU not only agreed to the deal revealed to the defense but that SPU agreed to continue to advocate for him including sending favorable recommendations to the parole board; and

Evidence that Innes was allowed to speak to other State witnesses and corroborate their stories.

SPU was allowing Innes to seek the benefits of deconfirmation despite evidence and even TDCJ employee's strong concern that he had not renounced membership.  Lonnie Eason, another TM member providing information to SPU, wrote to A.P. Merillat in July of 2000 noting that Innes had not given up his gang activity.  According to Eason, Innes "has been constantly representing TM matters and has been pure 'Gun Ho'" Exhibit 17 (Letter of Eason.  He also asks Merillat to "Just tell Innes to leave TM alone & lay low, He's outta there with em when he testify's anyway!" *Id*. TDCJ's concerns about Innes' renunciation are reflected in a letter dated June 2000, well after Innes had supposedly "renounced affiliation."  The Estelle Unit copied a

letter from Innes to a "District Major" of TM named James

Nicholas.  Attached to the letter, a TDCJ employee queries:

> Please note:  According to I/M Innes 07 [illegible]
> screen he is supposed to be on the TM "Hit list" if he
> was why would he be writing the District Major a
> letter like this?

Exhibit 18.

Innes' cooperation with SPU gained him other advantages

which were also suppressed by the State.  Innes, for example,

was not subjected to prosecution for taking a metal shaft from

his fan and hiding it in a pipe chase, an action which normally

would be considered concealing a shank.  After "catching a

case," Mr. Innes wrote Merillat:

> I was without a radio & I had a pair of headphones.
> My neighbor offered to connect me if I could come up
> with some wire & help him get his radio open.  So I
> broke my fan down for the coil of copper wire inside &
> I used the metal shaft that [illegible] is on to make
> a screwdriver out of it to try & break the triangle
> shaped screws.  Well it didn't work & I threw away, or
> tried to, in the back vent. . . .

Exhibit 19 (Innes 10/7/99 Letter)

Merillat responded:

> Regarding the recent case you spoke of where a fan was
> disassembled and part of it was in the pipe chase –
> just because a disciplinary case was written, it does
> not mean that our office will file criminal charges.
> We have no control over the disciplinary process
> within TDCJ.  However, when IAD comes to us to file
> charges in criminal matters, we screen each case
> individually, giving consideration to each element of
> the case.  Simply calling an item a weapon does not
> guarantee that the SPU will go to the grand jury
> seeking an indictment.  Yes, I know that fingernail

-64-

> clippers can be called a weapon, and we have
> prosecuted inmates for less than that but – we have
> only done that when the facts showed that the
> defendant intended the item to be a weapon. So, the
> facts that you provided make a big difference in how
> we would look at the case.

Exhibit 20 (SPU 10/14/99 Letter)

Thus, even though SPU admittedly has prosecuted inmates for

having less than fingernail clippers, In Innes' case SPU simply

chose to believe his version of events and nothing was pursued.

This information was never revealed to the defense.

The relationship between Innes and the SPU was much more

complicated than the State portrayed at trial. Although the

State admitted that they had cut a deal with Innes in exchange

for his testimony, the communications between both parties

reveal that there were continual intricate and subtle

negotiations. Innes, for example, wrote SPU from Midway, Texas

in July of 1999 stating:

> Mr. Merillat I'm not just dead weight to you, as you
> can see by the info – I'm asking you to help me get
> transferred A.S.A.P. I will continue to prove useful &
> help full [sic] But if I have problems I expect your
> help too.

Exhibit 21 (Innes 7/7/99 Letter)

He wrote again in October of 1999 when he suddenly believed

that the State had retracted its deal. Since the last letter

Innes had been moved to the Wynne Unit. He wrote:

> Also I get a letter from State Counsel for Inmates and
> it's a plea offer on the New Boston cases! But I'm

offered 10 on one case & five on the other one to run
CC. But I was told by Mr. David P. O'Neil that the
agreement for my cooperation & testimony & the letters
I had, would be 3 yrs & the weapon charge dropped.

Exhibit 19 (Innes 10/7/99 Letter)

Merillat, acknowledged the unit change, and reassured

Innes:

I got your letter, and previously heard that you were
on the Wynne Unit.  I recall our phone call when you
were housed at Telford, and you advised me that Wynne
would be agreeable for housing.  Now, we are not going
back on anything let me know who promised you what as
far as agreements on your pending cases. I have not
been involved in any negotiations, deals or anything
of that nature.  If someone made promises, let me know
who it was so I can pursue that.

Exhibit 20 (SPU 10/14/99 Letter)

By July 200, Innes was already having difficulty at the

Wynne Unit and requesting another change.  Merillat wrote back

offering to help:

I got your letter today.  I have made moves toward
getting you somewhere else.  They aren't real
supportive of my asking for particular units, but I'm
willing to give it a go.

Exhibit 22 (SPU 7/12/00 Letter)

On November 6, 2000, almost immediately after Mr. Canales'

trial, a SPU investigator wrote TDCJ's Bureau of Classification,

asking it to "honor [the prisoner'] request" to be moved to

specific units.  Innes, along with other inmate State witnesses

were on this list.  Exhibit 23.

These documents, which were never revealed to the defense, demonstrate that Innes' relationship with the State far exceeded simply getting a deal on his pending felonies. Innes was continually receiving benefits from the prison system in exchange for actively seeking out evidence to use at Mr. Speer's trial. This partnership even included illegally soliciting incriminating information from Mr. Speer's himself. Had the jury been aware of this information, Innes' testimony would have been placed in proper perspective: that of a canny, sophisticated, and manipulative prisoner who would do whatever he could to make his time in prison easier.

Also, unbeknownst to the defense and the jury, the State had placed Innes together with another witness thus providing an opportunity to compare information. This classic type of impeachment evidence was not disclosed to the defense.

An April 4, 2000, letter from Larry Whited indicates that he and Innes are in solidarity and working for SPU. In the letter Whited recounts how he and Innes have compared and corroborated each other's stories. Whited mentions that he and Bruce Innes went to the John Sealy Hospital together:

> But anyway, we got to talk the whole way down there (and no, we didn't coach one another on our stories. Smile) and I found out a whole lot about some things that've been going on with the infamous Texas Mafia since I've been gone. Which is good for me because "To Know Is To Be Prepared." If you know what I mean.

Exhibit 24 (Whited 4/4/00 Letter).   Whited also reveals more of

Innes' incentive to cooperate:

> Which reminds me, A.P., the dude ask me to talk to you
> about helping him go on and get out of Seg so he can
> get somewhere to do his time, so even though I already
> know that there isn't a whole lot you can do, I'm
> still going to go on and try to do this because I gave
> him my word that I would.
>
> Not to mention the fact that if you'de [sic] have seen
> his face when he ask me, well, you'de [sic] have
> probably [sic] done the same thing (smile) He wants to
> come to population and be on the same farm as I am,
> A.P. Which to be honest, isn't really a bad idea since
> we're in this particular boat we are in.

*Id.*

**Larry Whited:**

Whited appears to have been instrumental in developing and

investigating the case against Mr. Speer.   Whited was one of the

first inmates to contact authorities and offer help in exchange

for various benefits.   On July 27, 1997 Whited wrote:

> If you want to talk to me about this, then you take me
> away from here first.   I do not care about your
> threats about refusing to cooperate.   I will.   But
> under my conditions (and parole is not one of them).

Exhibit 26 (Whited 7/27/97 Letter)

By April of 1998, SPU was already helping Whited become

declassified as a gang member.   According to a letter from the

SPU chief prosecutor:

> Larry Whited #575256 has cooperated with the State of
> Texas in the investigation of the murder of inmate
> Dickerson which occurred at the Telford Unit in July
> 1997.   Inmate Whited, previously confirmed as a Texas

> Mafia member, has provided valuable information against that gang, including details of how and why the killing was carried out, background information on gang activity at the Telford Unit and other information crucial to the prosecution of this murder case, which was a Texas Mafia hit on Dickerson, Please consider the possibility of classifying inmate Whited as "Ex-Texas Mafia," if this would be appropriate in light of his cooperation.

Exhibit 27 (SPU 4/22/98 Letter). After Mr. Canales was convicted, SPU wrote the Texas Board of Pardons and Paroles on behalf of Whited, noting that although he "[d]id not testify, but cooperated." Exhibit 25 (Inmate witness correspondence).

During Larry Whited's deposition, he confirmed what Speer has alleged: Telford prisoners viewed the case as an opportunity to win the prison lottery. Mr. Whited recollected that inmates saw the case as offering rich opportunities to improve their situations ("And there was a lot of people that weren't involved in it that… were saying that they were because they wanted to get write-ups off of them …"), and observed that prisoners would lie to get a case dismissed or to get transferred to another facility. (*Deposition of Larry Whited*, page 66-67, 135). Deposed inmate witnesses repeatedly offered examples of their own powerlessness in effecting these kinds of changes on their own, without an influential sponsor such as Investigator Merillat or prosecutor Mark Mullin. *See e.g. (Deposition of Richard Driver*, page 26) ("[Y]ou were pretty much placed where you're at. And if

they needed –if they felt that you needed to move, that was not a decision that you made, it was a decision that they made.")

As detailed above, Bruce Innes was desperate to escape from administrative segregation ("ad seg") and otherwise escape the consequences of his membership in the Texas Mafia.  Mr. Whited, a Texas Mafia lieutenant, was placed in ad seg after Mr. Dickerson's murder, and his path away from ad seg and gang identification provides a useful template to understand Mr. Innes' own release from ad seg and the burdens of gang affiliation.  Importantly for this case, SPU featured prominently in Mr. Whited's efforts to improve his living conditions, making it reasonable to believe that it similarly assisted Mr. Innes as he observed Mr. Whited's success with SPU and otherwise interacted with SPU Investigator A.P. Merrillat.

Mr. Whited recalled quite clearly that A.P. Merillat told him that if Whited told the truth, Merillat would help get him out of ad seg and would help him renounce his gang membership in the eyes of the Texas Department of Criminal Justice ("TDCJ"). Investigator Merillat helped him by contacting Sammy Buentello, the then-head of TDCJ's Security Threat Group Mangement Office, to get Mr. Whited moved off of the notoriously hellish Estelle High Security unit and onto the "mellow" Wynne unit which was desirable as it offered more privileges, freedoms, and greater opportunities to participate in trades.  (*Deposition of Larry*

*Whited*, pages 49-50) (*Deposition of Bruce Innes*, page 160); (*Deposition of Richard Driver*, pages 16, 97).   While Mr. Whited was initially in administrative segregation on Wynne, he was, thanks to Investigator Merillat, eventually moved into general population on Wynne.   Investigator Merillat also worked to persuade TDCJ to reverse Mr. Whited's disciplinary case relating to the murder of Mr. Dickerson, and sent at least one supportive letter to the parole board on Mr. White's behalf. (*Deposition of Larry Whited*, page 64).

Mr. Innes, like Mr. Whited, was sent to Estelle High Security from the Telford unit.   As did Mr. Whited, Mr. Innes reported that Estelle High Security was "very, very stressful". (*Deposition of Bruce Innes*, pages 25-26) (describing it as "hell"); (*Deposition of Larry Whited*, page 47) ("and that place is bad, I mean, then that place is bad.   They can do anything they want to you there.   I mean, it was bad, bad, bad place [sic]").   Innes was released from there to two other units before landing on the Wynne Unit, where he was held in ad seg before moving into general population.   While Mr. Innes now attributes this move primarily to his advocacy skills, before Mr. Canales's trial, he worked additional angles, asking Mr. Whited to write Mr. Merillat for support in his efforts and acknowledged that being a witness for the State was "the only way I can get out of Ad. Seg." (*Deposition of Bruce Innes*, page 75).   He was

ultimately transferred to safekeeping in the Hughes unit, a
housing assignment Mr. Innes plainly values highly. His
gratitude to Investigator Merillat and Mullin is similarly
obvious by a lengthy "thank you" letter from Innes to Merillat
and Mullin that Mark Mullin only recently disclosed on April 6,
2009 [2] in which Innes states:

> "Man I've been in a state of shock every since leaving
> Telford and finding out my status! Also about the
> fact that I've no more court! I'm just blown away by
> all you've done for me. I'm in transit as I write –
> on Walls unit waiting to hit my unit in the morning.
> I just had to write & send my most heartfelt
> gratitude!
> I've never much given God a chance but if this is any
> indication of how He works, I think I need to dig deep
> & see what is there. This isn't just wasted ink &
> paper, I've truly been profoundly affected by all of
> this!
> I know its only the start of a long turn around, but
> you've given me a heck of a head start & a new faith
> in life!
> God bless & keep us all safe."

Innes letter to Merrillat and Mullin dated November 10, 2000.
Exhibit 29. Mr. Innes also stated that he had sent both Mr.
Mullin and Investigator Merillat belts and wallets as gifts.
(*Deposition of Bruce Innes*, page 79).

While Innes admitted to the substantial benefits SPU
secured for him in terms of his housing assignments, he

---

[2] On April 6, 2009, Mr. Mullin wrote undersigned counsel a letter stating that, "Shortly after my deposition on March 31st, A.P. Merillat came into my office and we were visiting. As we spoke, he looked at the wall behind me and asked if a framed letter hanging on my wall was from Bruce Innes. Because we had spent hours in deposition reading letters from Mr. Innes, A.P. recognized the handwriting. It never occurred to me that years ago I kept a letter out of the file to frame. I am proud of the letter because it reveals Mr. Innes' thoughts that A.P. and I caused him to consider taking a more positive direction in life. I certainly don't consider it <u>Brady</u> material, but I told you everything was in my case file and I wanted to correct that misstatement."

minimized his contacts with SPU, including SPU's assistance with disciplinary problems, and SPU's requests for Mr. Innes's assistance in the case against Mr. Canales and Mr. Speer. (*Deposition of Bruce Innes*, page 86). For example, Innes claimed he wrote to Merillat only about three times prior to Mr. Canales's trial, *Id*. At 86. Innes further claimed that Merillat never asked him to do anything because "there was nothing I could do for that man in here." *Id*. At 88. These assertion are patently false as indisputable documentary evidence proves that Merillat and Innes were in frequent contact prior to Mr. Canales's trial and Innes clearly was actively seeking incriminating evidence at the behest of Merillat.

The inmates' continued allegiance to Merillat and Mullin was evident in the depositions. Over eight years after Mr. Speer's trial, Mr. Innes immediately contacted Mr. Merillat and Mr. Mullin when he received his deposition subpoena to find out if they wanted to have "some say about it" and to ask if they wanted to be present. (*Deposition of Bruce Innes*, page 84). Mr. Whited would not even participate until he spoke to Mr. Merrilat on the phone and was assured that Merillat told him it was all right to proceed with the deposition. (*Recorded Proceedings of Larry Whited*, page 13).

**<u>Steven Canida:</u>**

At Mr. Speer's trial, the State went to great lengths to assure that its key eyewitness, Steven Canida, had obtained no benefits in exchange for his testimony:

| | |
|---|---|
| Q: | Am I cutting any deals for you? |
| [Canida] | No, sir. |
| Q: | Why not? |
| [Canida] | There wasn't no deal I needed.   There wasn't no deal to be made. |
| Q. | Do you – are you aware that I don't work for the Texas Department of Criminal Justice? |
| [Canida] | Am I aware of it? I don't know who you work for. |
| Q. | You don't know who I work for? |
| [Canida] | No sir. |
| Q. | Do you know that I don't have the authority to get you out of prison? |
| [Canida] | No, sir. I don't guess.  I don't know. |
| Q. | Alright.   Did somehow you have in your mind that your testimony here last year and this year, somehow helped you make parole? |
| [Canida] | No, sir, there ain't no way.  I did eleven years on fifty. |

SR 9:233.

| | |
|---|---|
| Q. | Did you have any reason to think that your helping the State in this case, had anything to do with your getting out? |
| [Canida] | I wasn't helping the State in this case.  I was helping my own conscience. |

SR 9:234-35.

In truth and fact, Canida did receive substantial benefits from the State for his testimony.   On November 6, 2000, just weeks after Canida testified, SPU wrote to the Board of Pardons and Parole on Canida's behalf.   Exhibit 25 (Inmate witness correspondence note).   Canida was paroled the following July, having served only 11 years on a 50 year sentence.

Further, upon information and belief, Canida's cooperation with the State enabled him to diminish significantly his sentence and incarceration on a subsequent offense.   Although an apparent candidate to be prosecuted as a habitual offender, he was ultimately sentenced to only 10 years, and served only one year before being paroled.

**Richard Driver:**

While Mr. Driver reports that Mark Mullin made "no guarantees," he did pledge to "see what they could do" with respect to Mr. Driver's classification and housing.   (*Deposition of Richard Driver*, page 70).   More dramatically, Mr. Driver was accused of conspiring with another prisoner and TM member, Michael Constadine, to kill Dickerson, yet nonetheless testified for the State.   In his deposition, Mr. Driver acknowledged he would have sought reassurances from the State that he would not

be targeted for prosecution, but he could not recall the
specifics of those assurances.

### State Investigator and Prosecutor

**A.P. Merillat:**

SPU Investigator A.P. Merillat knowingly withheld witness
impeachment evidence, cultivated inmate witnesses for use as
informants and possessed knowledge of information which would
demonstrate that certain state witnesses testified falsely.
Prosecution files revealed that Merillat was actively using
Texas Mafia members to elicit damaging information in exchange
for certain benefits. *See, e.g.,* Exhibit 13 (Merillat 3/13/00
Letter) ("Innes provided that letter to me, and he, at my
request agreed to correspond with Canales to confirm authorship
of the letter, attempt to obtain details of actions against our
witnesses, information on the Dickerson killing, etc."); Exhibit
2 (SPU Letter 6/15/98) (Merillat contacted TDCJ
Records/Classification to inform them he was leaving it up to
Innes "as to whether or not he wants the de-confirmation process
started, or if he wants to lay low and provide us information on
the gang.")

Attached as exhibits to Mr. Speer's amended writ, are
numerous documents, previously undisclosed to his trial
attorneys, that demonstrate that inmate witnesses did in fact
receive favorable treatment and that members of the prosecution

actively sought to assist these witnesses receive beneficial treatment in prison. The resulting benefits conveyed to and enjoyed by the inmates were apparent to the prosecution; at stake were fundamental issues such as time to be served in prison, conditions of incarceration as basic as time out of cell, opportunity to buy items from the prison commissary, and the chance to have visits with people outside of prison. *See, e.g., Deposition of Merrillat* at 88-90. The deposition testimony to date substantially supports these claims, either by providing additional evidence or significant impeachment, as with Mr. Innes, the "pivotal," "most important" witness in the State's case against Mr. Speer. *See, e.g., Deposition of Mark Mullin* at page 10.

Further, what Mr. Speer believes happened here was the most prosaic type of state misconduct: the lead investigator exercised significant discretion over witness contacts, had a fine appreciation of the tools he could deploy to build the State's case, and misunderstood the extent of the State's constitutional obligation to disclose evidence. Further, he, as well as the prosecutor, repeatedly interpreted information and documents in ways that minimized their exculpatory and/or impeachment value.

In addition, in grooming the State's witnesses, Merillat not too subtly communicated to them their special relationship

with the SPU.   When Innes contacted Merillat about a disciplinary case he received for possessing a weapon in prison – in this instance, the metal shaft from a disassembled fan that Innes had hidden in a pipe chase – Merillat reassured him:

> Regarding the recent case you spoke of where a fan was disassembled and part of it was put in the pipe chase – just because a disciplinary case was written, it does not mean that our office will file criminal charges….Yes, I know that fingernail clipper can be called a weapon, and we have prosecuted inmates for less than that <u>but</u> – we have <u>only</u> done that when the facts showed that the defendant intended the item to be a weapon.   So, the facts that you provided make a big difference in how we would look at the case.

Exhibit 20.   In light of Innes' very violent history in prison, SPU's willingness to look the other way demonstrates the lengths to which the State was willing to go to secure testimony, no matter how compromised, against Mr. Speer.   Remarkably, this letter was never disclosed to Speer's trial attorneys.

Moreover, when asked directly whether he provided Speer with copies of the parole letters written on behalf of the State's inmate witnesses, Mr. Merillat replied:

> "No; and I need to clear that up because parole letters are not usually written until after a trial, so I don't know that we would have given them to them during trial because I don't believe they were written yet, so I just want to make that clear that I believe the letters are written after trial….

*Merillat Deposition* at page 15.   In actual truth and fact, the parole letters were written on November 6, 2000, shortly after

Mr. Canales' trial and almost a year prior to Speer's trial. *See* Exhibit 23.

Merillat's deposition also reflects his considerable independence, his imperfect understanding of the State's duties of disclosure, as well as strong antipathy against defense lawyers. For example, Merillat indicated he did not put all of his inmate correspondence in a case file. Some letters, he explained, were about "personal" or "spiritual" matters, and he did not consider those relevant to the case. Therefore, he would not put them in the case file, and, indeed, he might not even keep them at all.

> If it's a spiritual matter that I talk to an inmate
> about or he talks to me about or I don't want to say
> personal because it's personal outside of the case, if
> it's a matter of family or something like that I
> believe has nothing to do with the case, I didn't
> always copy and put it in the file. I will either
> keep it in my own, or sometimes I don't even keep
> those letters. But there are instances where I have
> communicated with inmates that have nothing to do with
> the case and Mr. Mullin won't even know about it[3] … So
> there are situations where he won't know that I have
> communicated….And it's happened hundreds of times, yes
> sir.

(*Deposition of Merillat* at 20-21).

He also plainly saw the State's disclosure requirements as extending only to exculpatory evidence. For example, he explained:

---

[3]   The knowledge of the police investigating team is imputed to the prosecution, whether the prosecuting attorneys are aware of that knowledge or not. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (prosecutor has "duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police").

> Now, if Mr. Mullin asks me about a situation or about
> an inmate being transferred, I'll tell him that I've
> written classification and asking that he be moved or
> that he's having trouble with his property.  Now, here
> again I won't tell them every time because I don't
> believe myself that it's exculpatory information, so
> if the prison is holding back his property while he's
> in transit, I just don't see how that affects the
> guilt or innocence of a case, so I don't always tell
> Mr. Mullin about that.   There are occasions that I
> have but usually not; and where that ends up, it'll be
> in a folder somewhere.  I don't really know.

(*Deposition of Merillat* at 22-23).   This is an incorrect

understanding of the law.   The Supreme Court has rejected any

distinction between impeachment and exculpatory evidence for

purposes of *Brady* analysis.   *United States v. Bagley*, 473 U.S.

667 (1985).

When asked about the letters he wrote on behalf of the

inmate witnesses to the Parole Board, Merillat seemed to equate

his responsibility to something akin to the Jencks Act, (18

U.S.C. §3500) obligation: "[I]f I'm testifying about it, yes, I

wrote parole letters on these inmates and the defense said give

them to me, I'll give it." (*Deposition of Merillat* at 75).

Merillat then went on to explain his office's open file policy

as follows:

> I believe we have the most liberal open file policy in
> the state of all of our prosecutions.  Lawyers can
> come and go through everything we have.   **Now, I do
> point out that my binder I consider work product, and
> I don't make that available to them**.  But like I said,
> if there's anything that I believe is exculpatory, I'm
> not sure of, I'll check with whatever prosecutor I'm

working with and I will make that available if  that's
right.

(*Deposition of Merillat* at 27).  When asked whether the maroon

folder he considered as work product contained the letters he

had written to other agencies, Merillat responded:

> If the letters weren't written until after trial, of
> course, I'm not going to show it to anybody because
> they don't exist yet.  If there's something in there
> that is important to the case on either side, yeah,
> I'll show it because like I said, it's not attached to
> that binder.  It will either be slid inside the binder
> or separate from the binder.  I just carry it with me.
> So I just apologize. I don't know if there were in a
> Manila folder.  I just don't know how those letters
> were kept…..I believe the letters were either in the
> binder or near it somewhere in the folder.  I just
> don't recall.

(*Deposition of Merillat* at 28).

When asked directly about the impeachment value of, e.g.,

the letter from Merillat to Innes indicating that SPU would

likely not prosecute him on a weapons charge for keeping parts

of a dismantled fan in his cell (Exhibit 20), Merillat admitted

he did not think about impeachment.  Merillat was asked whether

the fact that "probably the reason that the case was not

prosecuted as a weapons case was because of Innes's cooperation,

do you understand that to be potentially impeachment evidence

that could be used against Mr. Innes?" He responded: "…So as far

as the impeachment, I don't know. I don't understand all about

that." (*Deposition of Merillat* at 99).  Merillat further

testified during his deposition that Innes "could have read

into" Merillat's letter about the weapons case that "it probably won't be pursued if he continues to cooperate." (*Deposition of Merillat* at 100). When asked whether this might be impeaching, Merillat reflected, "at the time I'd never considered that, no sir." (*Deposition of Merillat* at 102).

Merillat's testimony also makes clear that the significance of this weapons charge. He details the significant criminal consequences, as well as prison disciplinary restrictions Innes would have faced if prosecuted, calling the weapons charge potentially "a terrible problem" for Innes. (*Deposition of Merillat* at 88-90, 93). Further, he was clear that the reason Innes had not been prosecuted was "probably because he was helping us with these cases[.]," namely the cases against Canales and Speer (*Deposition of Merillat* at 94). He also makes clear that this case was intentionally kept open to hang over Innes's head prior to his testimony to prevent "manipulate[ion]" by Innes. (*Deposition of Merillat* at 101).

Perhaps compounding Merillat's incorrect understanding of the State's obligations to disclose information is his attitude toward defense counsel. At his deposition, undersigned counsel noticed that Merillat had a handwritten note affixed to a folder Merillat had brought with him to the deposition, and asked him to explain the significance of this verse. Merillat responded it was "a Bible verse that I like to read all the time that I

think is directed to defense lawyers.  It just gives me – it boots my confidence that I'm doing the right thing. …"He that justifies the wicked and he that condeems [sic] the just are both an abomination to the Lord."  "That's in Proverbs, and I think that's directly on point, no offense to you, sir….I think what I do is more right in light of what God considers righteous than what you do." (*Deposition of Merillat* at 121, 123).

**Mark Mullin:**

Mr. Mullin's deposition more clearly demonstrates that the parole letters written on behalf of the State's inmate witnesses were never disclosed to defense counsel.  Mullin testified that he "gave full discovery and copies to everybody, at least those two parties, I think everybody, I think all four defendants, before there was even a trial." (*Deposition of Mullin* at 15).  Since, neither the parole letters nor the letters requesting preferential housing transfers pursuant to the inmate's request were written until after the Canales' trial, Speer's trial counsel would have never been provided these important impeachment documents. (Exhibits 23 and 25).  Mullin also confirms that the maroon binder kept by Merillat only "have gotten placed into the prosecution file shortly after [Speer's] trial, no doubt, as is a custom." (*Deposition of Mullin* at 18).  Mullin also confirmed that Innes "wanted de-confirmation because it affects where he lives and where he can go to school, and it

affects his life very, very deeply if he's a confirmed member of the Texas Mafia.  Administrative segregation is an unpleasant place." (*Deposition of Mullin* at 20).

Prosecutor Mullin's deposition reflects remarkably finely-parsed readings of some of the documents at issue in this litigation.  For example, he carefully explained that Merillat's letter to TDCJ discussing Innes's desire to deconfirm his gang affiliation did not assist in furthering Innes's deconfirmation; he was simply "passing this information on" to TDCJ, as though SPU's letter did not lend Innes much-needed credibility. (*Deposition of Mullin* at 54), *accord Deposition of Merillat* at 104 ("Sometimes an inmate with a legitimate request does get transferred [to a different prison unit]. It would have looked nicer or better, more professional, for use to request with a reason, yes, sir.")  Most curiously, and perhaps as further demonstration of the impeachment value of the letter, this letter was contained in his file marked "Miscellaneous Innes Letters" which contained letters that he "did not intend to offer into evidence during the trial, but that I kept separate because Innes was an important witness…." (*Deposition of Mullin* at 26).

Prosecutor Mullin then described the process in which he provided defense counsel with additional discovery materials as it came into his office, "if we get other stuff, we give them a

copy.   If it's a little, we might fax it to them.   If it's bigger , we might take it with us when we get to Texarkana….**some of this stuff, the deals that were cut and stuff, I would have stated on the record in pretrial**." (*Deposition of Mullin* at 40-41).   When confronted with the fact that during no pretrial hearing did he ever mention SPU's assistance in Innes's deconfirmation nor make any mention that parole letters were written on Innes and other inmate's behalf, Mullin responded, "I'm not disputing that there's not talk of other benefits.   I am disputing that - - I'm not even sure there were other benefits.   It's one thing to keep a man safe, it's another to buy his testimony." (*Deposition of Mullin* at 41).   When questioned further, Mullin admitted that Innes "was looking to better his living condition" by "getting himself out of ad seg" "where its 23 hours in a cell and one hour alone in a rec yard"; "where his commissary is limited";   and where anytime he is moved he is chained. (*Deposition of Mullin* at 42).   Yet, none of this information was ever disclosed to Speer's trial counsel. Finally, nearing the end of his deposition, Prosecutor Mullin acknowledges that a copy of deposition exhibit 23 (successive writ exhibit 25) containing a list of inmate witnesses for whom the State wrote parole letters may not have been copied for Speer's trial attorneys because it was contained with the three

ring Maroon binder which Merillat maintained was work product. (*Deposition of Mullin* at 87-88).

**David Carter:**

David Carter and Dick Dodson were appointed to represent Mr. Speer.  Early on in their representation of Mr. Speer they were provided with a copy of the "entire" prosecution file that had previously been provided to the Office of Offender Counsel. In the spring of 2000, the defense filed a formal discovery motion seeking "documents concerning witnesses the State would call, and any exculpatory evidence, and any evidence for impeachment of their witnesses." (*Deposition of David Carter*, page 7).  The defense also requested "the gang intelligence files, disciplinary files, virtually every file that we knew of from the Department of Corrections on all the witnesses … to try to gather as much information as we could on the witnesses to try to impeach them." (*Deposition of David Carter*, page 8). The formal discovery motion filed on behalf of Speer specifically requested "whether or not any witness or prospective witness received compensation, or reward, or possibly will received receive compensation or reward for his or her aid to the prosecution's investigator during the instant investigation…Obviously, our desire was to  ask for anything and everything we thought was discoverable." (*Deposition of David Carter*, page 9).

Mr. Carter recollected that the State had an open file policy and understood that the entire prosecution file would be available for inspection by the defense. (*Deposition of David Carter*, page 11). During a pretrial hearing, Mr. Dodson asked prosecutor Mullin whether he had been provided with information relating to all "deals plea bargains, or rewards that these inmates were given for testifying. Prosecutor Mullin responded that the only inmates who had received "plea bargains" were Mr. Barnes, Mr. Schwartz, and Jesus Catillo. Mr. Dodson then asked whether any other inmates had received plea bargains and the prosecutor Mullin indicated that Bruce Innes had received a plea bargain and was entering a plea in accordance with that arrangement in another courtroom that very date. Prosecutor mullin made no mention of any other promises or rewards conferred on Mr. Innes. *Deposition of David Carter*, page 13-14). The prosecution never disclosed that Mr. Innes had requested an out of state transfer in exchange for his cooperation. (*Deposition of David Carter*, page 19, 21). Nor did the State provide Speer with a copy of a June 15, 1998 letter from A.P. Merillat, SPU's investigator, to Records and Classification of the Texas Department of Corrections, in which Merillat stated, that he will leave it up to Innes "as to whether or not he wants the de-conformation process started or if he wants to lay low and provide Mr. Merillat's office with

information on the gang."   Mr. Merillat also made it clear to officials with the Texas Department of Corrections that if Innes "doesn't respond to their letters, they will suspect something"…. *(Deposition of David Carter*, page 24; Deposition Exhibit 5).

Mr. Carter acknowledged that the State failed to supply the defense with Mr. Innes' handwritten note wherein he identifies that he has been "a cooperating witness in a murder case for the State and the Special Prosecution Division", and "has been gathering information as a member of the [Texas Mafia]."   The letter further goes on to state Innes' desire to be moved to another unit. (*Deposition of David Carter*, page 27; Deposition Exhibit 6).   Likewise, the State never disclosed another handwritten note by Innes in which he also indicated that he needed to be moved to another unit.   In that note, Innes expressed his serious concerns regarding the fact that officials had blocked his mail and that he would no longer be able to continue gathering information for the Special Prosecution Unit. (*Deposition of David Carter*, page 29-30; Deposition Exhibit 7).

`   Mr. Carter also testified that he had not previously been furnished with a June 18, 1998 letter from Innes to Investigator Merillat wherein he expressed a "desire to be de-conformed" as a Texas Mafia member and inquires whether TDCJ "will do that even though the [SPU] want him "to milk his situation with the Texas

Mafia to the last."   Mr. Carter related that Mr. Innes' de-
confirmation would be of substantial benefit to Innes in that he
"would be awarded more desirable living arrangements, he [would]
not be watched as closely, and he becomes more of a general
population inmate."  Had the State disclosed this document prior
to trial, Mr. Carter stated that he would have sought to impeach
Innes with his statement "about milking his situation with the
Texas Mafia and … working both sides of the fence with the
system or otherwise trying to question his credibility."   Mr.
Carter went on to add that had he known that Innes' cooperation
assisted in his de-conformation process, he would have sought to
impeach Innes with the dramatic effects the de-conformation
would have had on his prison life.  (*Deposition of David Carter*,
pages 31-32, Deposition Exhibit 8).

Mr. Carter also acknowledged that the State had not
provided the defense with the following documentation and that
had he received the information contained therein prior to
trial, he would have sought to impeach Innes with the following:

1.   Letter dated June 24, 1998 from A.P. Merillat on SPU
     Letterhead addressed to Bill Cheatham, TDCJ Classification,
     stating that Innes wanted to start the process to have him
     de-confirmed from the Texas Mafia and that Innes was
     willing to "work" for either or both of our offices in any
     way he could.  However, his first concern is that his
     "paper ties" to the TM be cut and your office recognize his
     desire to get out of the gang.  He acknowledges that it
     won't be long until his situation is known, especially if
     he testifies in our case.  But, he insists that he is
     willing to go forward. (Deposition Exhibit 9);

2.  Handwritten letter from Innes to Merillat dated July 25, 1998, wherein Innes he needs a letter that he can show State Classification in September demonstrating he is a cooperating witness with SPU against TM and no longer participating in gang activity. (Deposition Exhibit 10).

3.  Handwritten letter from Innes dated August 16, 1999 to unknown recipient stating that he disassociated with TM because of a murder in Telford and he was working with SPU and was offering to testify in exchange for being de-confirmed as a TM member. (Deposition Exhibit 12).

4.  Handwritten notes from Investigator Merillat dated March 1, 200 and March 13, 2000 indicating that Merilatt had sent Innes a letter asking him to correspond with Canales to obtain a print of Canales for comparison by DPS lab. (Deposition 13).

5.  Letter dated March 13, 2000 from Merillat on SPU stationary to Sgt. Burson of the Gang Intelligence Unit advising that Innes had expressed a desire to assist the State in the prosecution of a murder at the Telford Unit and that in exchange for his cooperation and assistance he desires to "drop his patch." (Deposition Exhibit 14)

6.  Handwritten letter from Innes to Merillat dated March 6, 2000 expressing his desire to be deconfirmed but advising that Gang Intelligence had denied several of his letters because of a confusion relating to his cooperation with SPU and still writing to confirmed gang members.  Innes also states that these letters should not be held against him in his deconfirmation proceedings because he is only writing at the behest of SPU. (Deposition Exhibit 15).

7.  Handwritten letter from Innes to Merillat dated June 4, 2000 wherein Innes states that he wrote Canales and Canales would not respond.  Innes also inquired as to whether SPU sent out their witness list and whether that was the reason that Canales had not responded.  Innes also stated that he was corresponding with another TM member named Lonnie Cason and that he later found out that Cason was also working for SPU and didn't want Merillat to believe that he was still active and corresponding on behalf of the gang. (Deposition Exhibit 16).

8.   Letter dated June 12, 2000 from Merillat to Innes stating
     that SPU is holding off on send out their witness list as
     long as they can.  Also stating he doesn't know if Lonnie
     Eason is playing both ends at once or what, but he has
     begun the renunciation process to drop his patch.  Also
     stating that he hopes that Eason is sincere, because they
     will ask him to help in the case and his true motives will
     surface when it comes down to giving considerable
     information. (Deposition Exhibit 17)

9.   Handwritten Letter from Lonnie Eason dated July 9, 2000 to
     Merillat advising that Innes is not sincere in breaking his
     ties with TM and that Innes has been constantly
     representing matters for TM.  That he objects to Innes
     involving him further with TM.  Eason also asks Merillat
     for his assistance in recovering certain property and that
     it be done in a "confidential" manner so that it won't
     appear to be payment for his cooperation. (Deposition
     Exhibit 18).

10.  Letter dated October 14, 1999 from Merillat to Innes
     discussing new weapons charge Innes picked up for having
     disassembled a fan and placing a part in the pipe chase.
     Merillat assures Innes that just because a disciplinary
     case was written does not mean that his office will pursue
     criminal charges.  Yes, his office has prosecuted inmates
     for having nail clippers as weapons but – they have only
     done it when facts showed that a defendant intended the
     item to be a weapon. (Deposition Exhibit 19)

11.  Handwritten letter dated October 1999 from Innes to
     Merillat advising him that he picked up a new disciplinary
     case for disassembling a fan and hiding a part in the pipe
     chase.  Innes also advises that he has been informed that
     the State will not live up to the previous plea bargain
     they made in connection with his cooperation.  Also
     requesting a transfer to another unit. (Deposition Exhibit
     20).

12.  Handwritten letter dated July 7, 1999 from Innes to
     Merillat requesting that he be transferred to another unit
     A.S.A.P. and stating that he is just not dead weight.  Also
     states that he will continue to prove useful to the SPU but
     that he has problems too and expects SPU's help.
     (Deposition Exhibit 21).

13. Letter dated July 12, 2000 from Merillat to Innes stating that he has made moves toward getting Innes moved somewhere else. That when it comes time for Canales and Speer's trial, "there won't be any crawfishing, it will be gut-check time. If Eason or anyone else has been taking us for a ride, it will be quite evident then." (Deposition Exhibit 22).

(*Deposition of David Carter*, pages 34 – 60).

When showed a letter dated November 6, 2000 from Merillat to Sammy Buentello (Deposition Exhibit 23) listing the inmate witnesses who had testified on behalf of the State and requesting that there requests for transfers be approved, Mr. Carter stated that he had not been provided with a copy of that letter prior to Speer's trial. Mr. Carter described that letter as "a smoking gun" containing information he considered "invaluable" as the State had gone to great lengths to elicit testimony from each inmate witness that SPU had not provided any reward to them in exchange for their testimony. (*Deposition of David Carter*, pages 60 – 64). Likewise, Mr. Carter described a memorandum from Merillat dated November 6, 2000 (Deposition Exhibit 25) in much the same way. In this memorandum, Merillat states the names of all inmate witnesses who testified or cooperated and indicates that he wrote letters of recommendation to the Board of Pardons and Paroles on their behalf and also wrote a letter to Classification on behalf of Innes' deconfirmation. (*Deposition of David Carter*, pages 64-65).

Mr. Carter also stated that he shared prosecutor Mullin's and investigator Merillat's opinion that Innes was a "pivotal witness" in the State's case against Speer.  Mr. Carter described Innes as "proving up the only written document that was characterized as a confession . . . by Mr. Speer.  Without that letter and [Innes] proving it up, it was a substantially different case."  Mr. Carter recalled that Innes was called to testify towards the beginning of the State's case and that in his professional experience, the State typically calls their "most important witnesses first, rather than last." (*Deposition of David Carter*, pages 33-34).

**Richard Dotson:**

By means of affidavit, Richard Dodson testified that he was appointed co-counsel for Mr. Speer.  That he reviewed the Exhibits attached to Speer's successive writ for habeas corpus.  That prior to trial, he had requested disclosure of any incentives offered to inmate witnesses in exchange for their testimony.  That the information contained in the Exhibits attached to Speer's successive writ of habeas corpus regarding inmate cooperation and benefits conferred upon them for their cooperation were not disclosed to counsel by the prosecutor prior to Speer's trial.  Had he been made aware of the information contained within such Exhibits, that information

would have been used for impeachment of the State's inmate witnesses.  Exhibit 28.

**Craig Henry:**

Undersigned counsel testified my affidavit as follows:

1.  In October 2001, a jury found Applicant guilty of the offense of capital murder.  The jury answered the special issues submitted pursuant to Texas Code of Criminal Procedure Article 37.071 in favor of the State, and the convicting court set Applicant's punishment at death.

2.  The Court of Criminal Appeals affirmed Applicant's conviction and sentence on direct appeal.  *Speer v. State*, No. AP-74,253 (Tex. Crim. App. October 8, 2003) (not designated for publication).

3.  Applicant filed his initial post-conviction application for writ of habeas corpus with the convicting court on October 30, 2001.  The Court of Criminal Appeals denied Applicant relief.  *Ex parte Speer*, No, 59,101-01 (Tex. Crim. App. June 30, 2004) (not designated for publication).

4.  On May 30, 2005, Applicant filed a federal Writ of Habeas Corpus with the United States District Court for the Eastern District of Texas, Marshall Division.  That writ is currently pending under Civil Action No. 2:04cv269.

5.  In preparation of both the state and federal writ, I obtained both the Clerk's Record and the Reporter's Record from the Bowie County District Clerk's office.

6.  On or about May 1, 2007, I accessed the Public Access to Court Electronic Records (PACER) and reviewed for the first time the federal petition of Anibal Canales, Applicant's co-defendant, filed under cause number 2:03cv69 on November 29, 2004, in the United States District Court for the Eastern District of Texas, Marshall Division.

7.  Attached to Mr. Canales' federal petition were numerous letters and other documents indicating that the State suppressed material favorable evidence during Applicant's trial in that pivotal prisoners called to testify on behalf of the State had received benefits in exchange for their

testimony.  However, these letters and other documents were filed under seal in Mr. Canales' case.

8.    Thereafter, I contacted Applicant's trial counsel and inquired as to whether or not they were aware that the prisoners who testified on behalf of the State were given benefits other than the plea bargain agreements which had disclosed to them prior to Applicant's trial.  Applicant's trial counsel responded that the State had not disclosed any other benefit conferred on the inmate witnesses.

9.    Prior to examining Mr. Canales' federal writ, I had relied on the prosecutor's statement made during a August 23, 2001 pretrial hearing wherein the prosecutor stated he had previously furnished trial counsel with all "plea bargains and rewards" supplied to the State's witnesses.  *See* Volume 3 of the Reporter's Record of trial at page 6.

10.   On October 16, 2007, in the United States District Court for the Eastern District of Texas, Marshall Division, the federal district court assigned Applicant's federal writ, I filed a Motion for Discovery requesting, among other things, that the Court (1) unseal the exhibits attached to Mr. Canales' federal writ; (2) issue an order allowing inspection of the prosecution's files from both Applicant's trial and the trial of Mr. Canales; (3) allow the issuance of multiple subpoenas duces tecum against TDCJ divisions, the Special Prosecution Unit ("SPU") and the Board of Pardons and Paroles requesting access to, among other things, all files, internal notes and correspondence related to the investigation of Applicant or the witnesses who testified against him; and (4) grant the authority to conduct numerous depositions of investigators, prosecutors, TDCJ employees and the inmate witnesses who had received benefits for their testimony or the various State employees involved in conferring those benefits upon them.

11.   On November 5, 2007, the Director of the Texas Department of Criminal Justice, Correctional Institutions Division, Respondent, filed his request for extension of time to respond to Applicant's Motion for Discovery.

12.   On November 9, 2007, the federal district court entered an order allowing the Respondent an additional thirty (30) days, up to and including December 7, 2007 in which to respond to Applicant's Motion for Discovery.

13.     On December 7, 2007, Respondent Quarterman filed his
        response in opposition to Applicant's Motion for Discovery
        on the grounds that Applicant's *Brady* claims were
        procedurally barred and unexhausted.

14.     On March 23, 2008, Applicant filed a motion in federal
        district court requesting a stay of his federal habeas
        proceeding to allow him to return to state court to exhaust
        his recently discovered claims.

15.     On April 16, 2008, Respondent Quarterman filed his response
        in opposition to Applicant's Motion for Stay and Abeyance
        of the federal habeas proceeding.

16.     On May 13, 2008, the federal district court entered an
        order granting Applicant's motion to stay and abate his
        federal habeas proceedings.

17.     On May 14, 2008, Respondent Quarterman filed his Motion to
        Amend Order Granting Applicant's Motion to Hold Case in
        Abeyance requesting that the language of said order be
        amended to insure that it places reasonable limits on
        Applicant's trip to state court and back.

18.     On June 6, 2008, the federal district court amended its
        order requiring Applicant to either file his successive
        petition or request for the appointment of counsel within
        30 days from the date of entry of this order.  But in any
        event, Speer shall files his successive petition in state
        court no later than 60 days from the date of entry of this
        order.  Furthermore, if the state court either dismisses or
        denies Speer's successive petition, Speer must return to
        federal court within 30 days from the date of that state
        court disposition.

19.     On June 9, 2008, I filed a motion for appointment of
        counsel for Applicant in the 5th Judicial District Court of
        Bowie County, Texas.

20.     At no time following my written request for discovery in
        federal court did the State offer an opportunity for an
        examination of the exhibits filed under seal in Mr.
        Canales' case. Therefore, on June 9, 2008, I obtained an
        order from the state district court allowing inspection and
        copying of the exhibits filed under seal in the case of ex
        parte Anibal Canales.

21. On July 8, 2008, I timely filed Speer's Successive Application for Writ of Habeas Corpus Pursuant to Article 11.071 of the Texas Code of Criminal Procedure. Attached to the successive writ as exhibits are certain letters and other documentation indicating that the State suppressed material favorable evidence during Applicant's trial in that pivotal prisoners called to testify on behalf of the State had received benefits in exchange for their testimony. As stated previously, these letters and other documents were filed under seal in Mr. Canales' case and Applicant was not allowed access to them until he obtained the June 9, 2008 order from the state district court.

22. On November 5, 2008, the Texas Court of Criminal Appeals entered an order remanding the cause "so that the habeas record can be supplemented with evidence relating to the Section 5 bar."

23. At no time following my written request for discovery in federal court did the State offer an opportunity for an inspection of the prosecution's trial file in Applicant's case or in co-defendant Canales case. Therefore, on January 13, 2009, I obtained an order from the state district court authorizing an inspection of the trial files of both Speer and Canales. Said order also authorized the depositions of Speer's trial counsel, the prosecutor and his investigator and further provided that all discovery ordered was to be complete on or before March 31, 2009.

24. No other requests to examine the exhibits attached to the Canales' writ or request to examine the prosecution's trial file were made by me or refused by the State.

25. Pursuant to the state district court's order authorizing discovery, I travelled to Austin, Texas during the week of February 16, 2009 and reviewed the prosecution files of Mr. Canales and Mr. Speer.

Exhibit 30.

WHEREFORE, Mr. Speer prays that this Court:

1. Issue a writ of habeas corpus vacating his unlawfully

obtained conviction and sentence;

2.   Grant him a full and fair evidentiary hearing on all claims raised by this Petition;

3.   Grant him full and complete discovery pending said evidentiary hearing, such discovery to include, but not limited to, the contents of the District Attorney's files in his case and the right to take depositions and to obtain subpoenas for witnesses and documents necessary to the resolution of the claims raised herein;

4.   Grant Mr. Speer such other and further relief as may be just and proper.

Respectfully submitted,

**CRAIG L. HENRY**
Attorney at Law
723 Main Street
P.O. Box 3226
Texarkana, Texas 75504
(903) 792-4645
Fax (903) 792-5073


By /s/_____
   **CRAIG L. HENRY**
   Arkansas Bar # 90142
   Oklahoma Bar # 016779
   Texas Bar # 09479260
   Attorney for Petitioner

**STATE OF TEXAS**

**COUNTY OF BOWIE**

## AFFIDAVIT OF VERIFICATION

Before me, the undersigned authority, on this day personally appeared Craig L. Henry who, being duly sworn, stated as follows:

"My name is Craig L. Henry.  I represent William Speer.  I have communicated with Mr. Speer and I am authorized to state on his behalf that it is his desire to have full and complete review at all federal courts of every issue that might result in a reversal of his conviction and sentence of death.

I have read the foregoing Application for Writ of Habeas Corpus.  I am familiar with the factual matters set forth therein and they are, according to my information, knowledge and belief, true, correct and accurate."

FURTHER AFFIANT SAYETH NOT.


/s/Craig L. Henry_____
**Craig L. Henry**


Subscribed and sworn to before me this 27th day of April, 2010.

-99-

/s/ Melinda Robertson____
Melinda Robertson
Notary Public in and for
the State of Texas

Commission Expires: 04/27/11

## Certificate of Service

I certify that all counsel of record have been served electronically by the CM/ECF system, or by regular mail on this 26th day of April, 2010.

/s/_Craig L. Henry
**Craig L. Henry**