IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| WILLIAM SPEER, | § | |
| Petitioner, | § | |
| | § | Civil Action No. 2:04-cv-269 |
| v. | § | (District Judge T. John Ward) |
| | § | |
| RICK THALER, | § | * DEATH PENALTY CASE * |
| Director, Texas Department | § | |
| of Criminal Justice, | § | ECF |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT

In October 2001, Petitioner William Speer was found guilty of capital murder and sentenced to death for brutally murdering Gary Dickerson while incarcerated in a penal institution. He now alleges that numerous constitutional violations occurred during his trial and seeks federal habeas corpus relief in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. As demonstrated below, however, Speer's amended federal habeas corpus petition must be denied because it is wholly without merit.

## SPEER'S ALLEGATIONS

The Director understands Speer to raise the following five grounds for habeas corpus relief:

1.  He was denied his right to effective assistance of counsel at the punishment phase of trial when counsel failed to investigate or present evidence which would have mitigated against the imposition of the death penalty [Amended Pet., at 4-18];

1

2.      His Sixth Amendment rights were violated when prospective juror Louis Viramontes was erroneously removed for cause [Amended Pet., at 18-22];

3.      He was deprived of due process and a fair trial because the prosecutor impermissibly vouched for the credibility of various witnesses [Amended Pet., at 22-25];

4.      He was denied his right to a speedy trial in violation of the Sixth and Fourteenth Amendments [Amended Pet., at 25-31]; and

5.      The State knowingly withheld material evidence in violation of Brady v. Maryland[1] and allowed false testimony to be presented in violation of Napue v. Illinois[2] [Amended Pet., at 31-97].

Although each of the above claims raised by Speer have been presented, word-for-word, to the state court in two prior state habeas proceedings and are thus considered exhausted, none provide an adequate basis for federal habeas relief.  Initially, the Director asserts that claim 5 is procedurally barred from federal habeas relief since it was rejected by the state court on independent and adequate state procedural grounds.  Moreover, Speer has completely failed to demonstrate that the state court's adjudication of the remainder of the claims was either contrary to, or involved unreasonable applications of, clearly established federal law.  As such, federal habeas relief should be denied.

STATEMENT OF THE CASE

Speer was indicted, convicted, and sentenced to death in Bowie County, Texas, for the July 11, 1997, capital murder of Gary Dickerson committed while

---

[1]     373 U.S. 83 (1963).

[2]     360 U.S. 264 (1959).

incarcerated in a penal institution.   CR 2-9 (Indictment), CR 160-164 (Judgment).[3] His conviction and sentence were affirmed on direct appeal by the Texas Court of Criminal Appeals in an unpublished opinion delivered October 8, 2003.  Speer v. State, No. 74,253 (Tex. Crim. App.).  Speer did not seek a writ of certiorari with the United States Supreme Court off of his direct appeal.

While his direct appeal was still pending, Speer filed a state application for writ of habeas corpus in the trial court raising the first four claims mentioned above.   Ex parte Speer, No. 59,101-01; SHCR at 27-56.[4]  After considering Speer's application, the State's answer, proposed findings of fact, and the record of the trial, the trial court ultimately entered findings of fact and conclusions of law recommending that relief be denied.  SHCR at 106-114.  Based upon the trial court's findings and conclusions as well as their own review of the record, the Court of Criminal Appeals ultimately adopted the trial court's findings and conclusions and denied relief.  SHCR at cover; Per Curiam Order dated June 30, 2004.

On May 30, 2005, Speer filed his first federal petition for writ of habeas corpus in this Court, to which the Director filed his first answer.  Docket Entry

---

[3]        The Director previously forwarded a copy of the state court records to the Court, which were filed on July 20, 2005.  "CR" refers to the Clerk's Record, and is preceded by volume number (if necessary) and followed by the relevant page number. "RR" refers to the Reporter's Record of transcribed trial proceedings, and is also preceded by volume number and followed by page numbers.  "SX" refers to the State's exhibits followed by exhibit number and page numbers where applicable.  "DX" refers to the defense's exhibits, and again is followed by exhibit number and page numbers.

[4]        "SHCR" refers to the state habeas Clerk's Record—the transcript of pleadings and documents filed with the court during Speer's original state habeas proceeding—and is also followed by the relevant page numbers.

("DE") 6, 15.  After obtaining a stay of these proceedings from this Court in May 2008 in order to allow him to exhaust an allegedly new claim for relief (claim 5 above), Speer returned to state court and filed a successive application for state habeas relief, raising for the first time his Brady/Napue claim.  DE 25.  In order to determine whether the claim was available at the time Speer filed his original state habeas application, the Court of Criminal Appeals remanded the cause to the trial court for factual development and credibility determinations.  After conducting numerous depositions and considering the arguments of counsel, the trial court determined that Speer's Brady/Napue claim was available when he filed his first state habeas petition and that he failed to satisfy the successive writ requirements of Article 11.071, Section 5.  Supp SHCR at 169-84, 228.[5]  Based on the trial court's findings and conclusions, the Court of Criminal Appeals ultimately dismissed Speer's successive application as an abuse of the writ.  Supp SHCR at cover;  Per Curiam Order dated March 3, 2010.

Speer promptly returned to federal court and filed the current amended petition for habeas corpus relief raising the five claims set out in the previous section.  DE 31.  The Director's supplemental answer now follows.

---

[5]    "Supp SHCR" refers to the supplemental state habeas Clerk's Record—the transcript of pleadings and documents filed with the court during Speer's second state habeas proceeding—and is followed by the relevant page numbers.  The depositions that were taken during this successive habeas proceeding will be referred to as "Supp SH deposition of" and will include the name of the deposed and will be followed by relevant page numbers.

## STATEMENT OF FACTS

I.    Facts of the Crime

Speer, also known as "Stay Puff," was an inmate in the general population section of TDCJ's Telford Unit, serving a life sentence for capital murder. 9 RR 50; 10 RR 158; SX 32. He was also a prospective member of the notorious Texas Mafia prison gang, whose leader in the Telford Unit at the time of the instant offense was Michael Constandine (a.k.a. Hammer). 9 RR 129, 133, 140; 10 RR 234. Constandine and the gang were involved in the illicit trade of smuggling tobacco into prison, but due to several failed transactions Constandine incurred a debt of around a thousand dollars to a rival prison gang. 9 RR 140-44. In order to obtain money to repay the rival gang, Constandine decided to strong-arm inmate James Baker into splitting a 240-pack drop of tobacco Baker was scheduled to receive on July 2, 1997. 9 RR 139, 145-48; 10 RR 226-28. However, the drop was witnessed by the assistant warden outside his window, and the tobacco was eventually intercepted by prison officials. 10 RR 148-53.

One day prior to the tobacco being seized, the victim in this case, Gary Dickerson, had been apprehended by prison officials for possessing contraband currency. 10 RR 259-63. That currency happened to belong to an African-American prison gang who had given it to Dickerson to purchase cigarettes through Baker. Id. Dickerson later approached Baker and threatened to tell prison authorities about the upcoming tobacco delivery if Baker did not help him avoid retaliation by the African-American gang. Id. After the tobacco was seized by prison officials, Dickerson checked himself into protective custody and was removed from general population. 10 RR 154, 229-30. Because of his threat to

5

Baker and subsequent removal from general population, it was (incorrectly) assumed by those involved that Dickerson had "snitched" and told authorities about the tobacco drop.  9 RR 148-52; 10 RR 229-31, 259-60.

About a week later, after he failed to give authorities adequate information that would keep him in protective custody, Dickerson was returned to his cell in general population.  9 RR 152-53; 10 RR 155-57, 230.  The next day, Constandine held a meeting with three other Texas Mafia members—Speer, Anibal "Big Foot" Canales, and Jessie "J. B." Barnes—wherein he decided that Dickerson must be killed in retaliation.  9 RR 154-61; 10 RR 133-35.  Originally, Constandine appointed Canales to murder Dickerson by strangling him to death in a "sleeper hold," but the task was ultimately given to Speer after he volunteered to do it.  9 RR 159-61; 10 RR 235-36.  Speer and Canales even rehearsed how Speer was going to place a choke hold on Dickerson while Canales held him down.  10 RR 237-39.

Later that day, Speer and Canales approached Dickerson and convinced him to return to his cell with them to smoke some cigarettes.  9 RR 161-64; 10 RR 45-46, 197-98, 240-41.  As Dickerson bent down to blow smoke in the vent below his toilet, Speer reached over and placed him in a choke hold until he eventually stopped breathing.  9 RR 164; 10 RR 45-46, 192-94, 252.  Speer later recounted to fellow Texas Mafia members that he choked Dickerson so hard that he crushed something in his throat, and that he told Dickerson as he was dying, "don't fuck with the Texas Mafia, not even in hell."  10 RR 45-47, 192-94, 254.  Speer also wrote a letter to fellow inmate and prospective gang member David Ellis describing the murder.  10 RR 36-44; SX 34.  In that letter, identified by

6

several Texas Mafia members as having been written by Speer, Speer said:

> I'm in Seg for killing a snitch.  He may not have snitched on the 240
> packs like the police say, but he had my family's name in his mouth
> in 1-Building, so I made his parole come early!  The Texas Mafia is
> not (sic) no joke.  We play the game and we play to win!

10 RR 39-40, 44; SX 34.

II.     Evidence Relating to Punishment

In addition to the abundant evidence presented at the guilt/innocence
phase of trial concerning the cold-blooded nature of Gary Dickerson's murder,
the State also presented evidence at the punishment phase of the impact
Dickerson's murder had on his family.  Gail Martin, one of Dickerson's four
siblings, testified about the close relationship Dickerson had with his family, and
how his death devastated her, her mother, and her siblings.  13 RR 10-16.

The State then presented evidence concerning the previous capital murder
for which Speer was serving a life sentence when he murdered Dickerson.
Franklin Nanyoma, Speer's co-conspirator who himself received a seventy-five-
year sentence, described in detail the murder of their friend's father, Jerry
Collins, back in 1990.  13 RR 16-46.  About a month before the murder, Mr.
Collins's son, John, and Nanyoma had cashed close to nine-hundred dollars
worth of checks they had stolen from Mr. Collins's checkbook.  Id. at 19-22.  Mr.
Collins found out and became angry, and demanded that the boys repay the
amount or he would turn them over to the police.  Id. at 22-24.  After failing to
come up with a plan to repay the money, Speer volunteered to help his two
friends by murdering Mr. Collins.  Id. at 25-26.  Speer stole a handgun from his
mother's car, and, late one night, Nanyoma drove Speer to Mr. Collins's house

where John had purposely left a window unlocked.  Id. at 26-28.  Nanyoma waited in the car while Speer entered the house through the window, approached Mr. Collins while he was sleeping, and shot him in the head.  Id. at 28-33.  Speer then returned to the car, where he calmly described the murder to Nanyoma as they drove away.  Id. at 31-36.

In response, the defense presented the testimony of two volunteer prison chaplains in an attempt to demonstrate that Speer no longer was a future danger to society.  13 RR 46-105.  James Strickland and Gary Nixon, both of whom had spent considerable time ministering to Speer during his incarceration, each testified generally about their belief that Speer was remorseful and a sincerely "changed man" who now hungers "to know more about the Lord" and "[h]ow to live by His rules."  13 RR 53-60, 82-93.  Both testified they did not believe Speer to be a danger to society, and that he could be beneficial to the prison by sharing the gospel with other inmates.  13 RR 60, 92.

## STANDARD OF REVIEW

Speer's petition is governed by the heightened standard of review provided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C.A. § 2254 (West 2010).  Under § 2254(d), Speer may not obtain federal habeas corpus relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has recently explained this intentionally difficult standard stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 786 (2011)(citing Felker v. Turpin, 518 U.S. 651, 664 (1996)). In order to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, a petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id.

When reviewing claims previously rejected by a state court, the pivotal question for a federal court is whether the state court's determination was factually or legally unreasonable.  Id.; Montoya v. Johnson, 226 F.3d 399, 404 (5th Cir. 2000).  It is well established that a federal court may grant habeas relief only if a state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." (Terry) Williams v. Taylor, 529 U.S. 362, 413 (2000).  But under §2254(d), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also be unreasonable."  Id. at 411.  An "unreasonable

application" occurs then "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413. Thus, even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.  Richter, 131 S.Ct. at 786 (citing Lockyer v. Andrade, 538 U.S. 63, 71 (2003)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. (Terry) Williams, 529 U.S. at 409-11; Tucker v. Johnson, 242 F.3d 617, 620-21 (5th Cir. 2001).  Instead, federal habeas relief is only merited where the state court decision is both incorrect and objectively unreasonable.  (Terry) Williams, 529 U.S. at 411; Martin v. Cain, 246 F.3d 471, 476 (5th Cir. 2001).  In other words, a state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision.  Richter, 131 S.Ct. at 786 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Further, the Fifth Circuit has held that it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning."  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001); see Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"); Catalan

v. Cockrell, 315 F.3d 491, 493 (5th Cir. 2002) (applying AEDPA deferential standard of review where state habeas writ was denied without explanation). Indeed, state courts are presumed to know and follow the law.  Woodford v. Visciotti, 537 U.S. 19, 24 (2002).  And even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, the AEDPA deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]. "  Early v. Packer, 537 U.S. 3,  8 (2002).

Additionally, in review of a state prisoner's federal habeas petition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Jackson v. Johnson, 150 F.3d 520, 524 (5th Cir. 1998).  Except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which would challenge a state court finding must have been presented to the state court.  Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) (explaining that § 2254(d)(1) "refers in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law."  This backward-language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the time, i.e., the record before the state court.").  Because a federal habeas court is also prohibited from granting relief unless a decision was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of

11

a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254 (d)(2).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty.  28 U.S.C. § 2254(e)(2).  Thus, in state court, a petitioner "must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met."  (Michael) Williams v. Taylor, 529 U.S. 420, 437 (2000).

## ARGUMENT

I.   Speer has failed to demonstrate that he was denied effective assistance of counsel during the punishment phase of trial.

Speer first argues that he was deprived of his right to effective assistance of counsel at the punishment phase of the trial as a result of counsel's failure to properly investigate and present potential mitigating evidence. Amended Pet., at 4-18. Specifically, Speer contends that counsel was ineffective at punishment for failing to "conduct any interviews of witnesses familiar with Mr. Speer's background," and for failing to retrieve "any records having to do with Mr.

12

Speer's background, medical history, school history, history of drug use, prior convictions, prior incarcerations, or any other material relevant to Mr. Speer's history." Id. at 11. According to Speer, because there is no justification for counsel "completely omitting" any investigation into his background, counsel's performance was both professionally unreasonable and deficient. Id. at 13.

The state habeas court disagreed, however, as Speer raised this claim verbatim in his state habeas petition which was considered and ultimately rejected. SHCR at 30-40, 107, 111, cover; Per Curiam Order dated June 30, 2004. As explained below, Speer has not offered any evidence rebutting the state court's factual findings and legal conclusions. Nor has he even attempted to establish that the state court's conclusions are contrary to, or an unreasonable application of, Strickland v. Washington, 466 U.S. 668 (1984). Consequently, there is absolutely no basis upon which to grant federal habeas relief.

A.    The Strickland standard.

Under Strickland, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates that (1) counsel's performance was deficient and (2) this deficiency prejudiced his defense. Id. at 687-88, 690. In determining the merits of an alleged Sixth Amendment violation, courts "must be highly deferential" to counsel's conduct, and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. Id. at 687-89. A reviewing court "must strongly presume that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy." Wilkerson v. Collins, 950 F.2d 1054, 1065 (5th Cir. 1992). Every effort must be

13

made to eliminate the "distorting effects of hindsight." Strickland, 466 U.S. at 689. Accordingly, there is a strong presumption that an alleged deficiency "falls within the wide range of reasonable professional assistance." Id. This is particularly true when reviewed under the deferential lens imposed by the AEDPA, which when analyzed in conjunction with Strickland creates a difficult to surmount and "doubly" deferential assumption in favor of a state court denial. Richter, 131 S. Ct. at 786.

Further, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." Id. at 692. In order to establish that he has sustained prejudice, Speer "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." Id. at 694; Loyd v. Whitley, 977 F.2d 149, 159 (5th Cir. 1992). Because this showing of prejudice must be "rather appreciable," a mere allegation of prejudice or the possibility of a different outcome is not sufficient to satisfy the prejudice prong of Strickland. Crane v. Johnson, 178 F.3d 309, 312 (5th Cir. 1999); Armstead v. Scott, 37 F.3d 202, 206 (5th Cir. 1994). As the Supreme Court recently explained: "[T]he question in conducting Strickland's prejudice analysis is not whether a court can be certain [that] counsel's performance had no effect on the outcome or whether it is possible [that] a reasonable doubt might have been established if counsel [had] acted differently." Richter, 131 S. Ct. at 791 (emphasis added). Rather, the "likelihood of a different result must be substantial, not just conceivable."ld. at 792.

Because Speer must satisfy both prongs of the Strickland test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  Strickland, 466 U.S. at 697; Ramirez v. Dretke, 398 F.3d 691, 697 (5th Cir. 2005).

B.      Speer fails to provide any evidence to support his position.

"Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." Riley v. Cockrell,  339 F.3d 308, 316 (5th Cir. 2003) (citing Moore v. Johnson, 194 F.3d 586, 612 (5th Cir. 1999)). Accordingly, counsel may be constitutionally ineffective for failing to exercise reasonable professional judgment in investigating a defendant's personal history that would be relevant to evaluating his moral culpability.  Id. (citing Wiggins v. Smith, 539 U.S. 510 (2003)).  However, counsel is not per se deficient for failing to present such evidence.  Wiggins, 539 U.S. at 522; Moore, 194 F.3d at 615.  Counsel's decision not to investigate a particular matter "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Wiggins, 539 U.S. at 522. This assessment is made conducting an objective review of counsel's performance, measuring for "reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." Id. at 2536 (internal citations and quotations omitted). Further, in determining whether counsel's investigation and presentation of mitigating evidence prejudiced the defense, a state court must "evaluate the

totality of the available mitigating evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." Riley, 339 F.3d at 314 (citing (Terry) Williams, 529 U.S. at 397-98).

In order to establish that counsel was rendered ineffective by virtue of a failure to investigate, a convicted defendant must do more than merely allege a failure to investigate; he must state with specificity what the investigation would have revealed and how it would have altered the outcome of the case. Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998); Anderson v. Collins, 18 F.3d 1208, 1221 (5th Cir. 1994); United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989). Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. Strickland, 466 U.S. at 699. Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Id. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. Id.

As previously noted, Speer contends that his counsel failed to "conduct any interviews of witnesses familiar with Mr. Speer's background," and failed to review "any records having to do with Mr. Speer's background, medical history, school history, history of drug use, prior convictions, prior incarcerations, or any

other material relevant to Mr. Speer's history." Amended Pet., at 11. But aside from these bald assertions, Speer has completely failed to rebut the state court's finding that the investigation was adequate, or state with any specificity how further investigation would have altered the outcome of the case. In fact, the record belies Speer's self-serving accusation that counsel failed to prepare for the punishment phase.

For instance, prior to the start of the trial, counsel for Speer, W. David Carter and Richard N. Dodson, filed a motion for discovery requesting, among other things, Speer's penitentiary packet and F.B.I. rap sheet showing his prior criminal record, along with "any evidence which might tend to mitigate the punishment imposed." CR 25-30. Counsel also filed a motion to retain a private investigator to  assist them in preparation for trial, which the court granted.[6] CR 34-36. Further, in an affidavit submitted during the state habeas proceedings, both counsel detailed the extent of their investigation into potentially mitigating evidence:

> During the course of my representation of him, I conducted an investigation into William Speer's background for purposes of developing potential evidence in mitigation of the death penalty. Those matters investigated included Mr. Speer's past criminal record, psychological evaluations and family history. I participated in interviews with a number of individuals who were either family members or acquaintances of Mr. Speer prior to trial. These interviews were conducted for purposes of developing, evaluating and potentially presenting evidence in mitigation of the death penalty.

---

[6]     Further support of the time and effort of trial counsel as to punishment is evidenced by their time records submitted for purposes of payment to the court following trial. CR 172-199.

>          Mr. Carter and I consulted about our investigation,
> information generated thereby and the nature of mitigating
> evidence ultimately presented to the Court.  We also advised Mr.
> Speer about the nature of mitigating evidence which would be
> presented on his behalf.

SHCR at 89-94.

The apparent conflict between counsels' affidavits and Speer's assertions was resolved by the state court when it explicitly found counsels' explanation regarding this matter credible.  See  SHCR at 107, 111.  This credibility determination is presumed correct in this proceeding unless refuted with clear and convincing evidence.  28 U.S.C. § 2254(e)(1);  Pondexter v. Dretke, 346 F.3d 142, 147-49 (5th Cir. 2003); Galvan v. Cockrell, 293 F.3d 760, 764 (5th Cir. 2002).  Yet Speer has  provided absolutely no evidence in either his original or amended federal habeas petitions to refute counsels' assertion on this matter. Indeed, Speer has simply filed an identical copy of his state writ petition without any evidence and without any attempt to establish that the state court's conclusions are contrary to, or an unreasonable application of, Strickland. Clearly, Speer's conclusory assertion that counsel "quite simply failed to investigate or produce the only evidence that offered a realistic chance of saving Mr. Speer from execution," without ever indicating what that evidence was, wholly fails to rebut the state court's presumably correct determination. Amended Pet., at 14; Pondexter, 346 F.3d at 147-49; Galvan, 293 F.3d at 764.

Moreover, in order to show that his counsel was deficient for failing to investigate, Speer must do more than merely allege a failure to investigate; he must state with specificity what the investigation would have revealed and how

it would have altered the outcome of the case.  Moawad, 143 F.3d at 948;
Anderson, 18 F.3d at 1221; Green, 882 F.2d at 1003.  Again, Speer has provided
absolutely no evidence nor provided any information indicating what exactly
counsel should have discovered and investigated.   Assuming arguendo that
counsel did not discover and investigate this information that Speer himself has
failed to provide, he still has failed to state with any specificity how the
information would have altered the outcome of his case.  Green, 882 F.2d at
1003.  Thus, Speer has wholly failed to show that the state court's adjudication
of his claim was contrary to, or involved an unreasonable application of, clearly
established federal law, and relief should be denied.

II.    The exclusion of prospective juror Louis Viramontes for cause was not
       erroneous and did not violate Speer's Sixth Amendment rights.

Speer next contends he was deprived of his Sixth Amendment rights when
prospective juror Louis Viramontes was removed for cause as a vacilating juror
based upon his sympathies against the death penalty.  Amended Pet., at 18-22.
Specifically, Speer alleges that Viramontes was struck solely because of his
"conscientious scruples against capital punishment," and that the prosecution
failed to show that Viramontes was biased against the law.  Id.  Speer bases his
argument on the following exchange between Viramontes and the prosecutor,
Mark Mullin, during voir dire:

> Q:        Do you understand, Mr. Viramontes, I'm not trying to
>           argue with you.  There's a difference between what you
>           believe is right—in other words, you don't believe that
>           the death penalty should be given in these cases, or
>           that you could give it in these cases, but that's not the

> question.  The question is, can you under oath, answer these questions truthfully, based on the evidence?

A:      Well, I believe I can.

Q:      That really is the bottom line.

A:      Yeah, that's what you're asking me.

Q:      Right.

A:      Okay, and no matter what I believe?

Q:      Right.  Would you be willing, and could you answer these  questions, based on the evidence, regardless of the outcome, life or death, would you answer these truthfully based on the evidence?

A:      Oh, I could answer these questions, sure.

Id.; 8 RR 40-41.

However, as with his previous claim, Speer raised this claim verbatim in his state habeas petition, which was considered and ultimately rejected by the state habeas court.  SHCR at 41-45, 107-108, 112, cover; Per Curiam Order dated June 30, 2004.  But again Speer has not even attempted to, much less established, how this decision was either contrary to, or involved an unreasonable application of, clearly established federal law. As discussed below, Speer's claim is wholly without merit and, as such, should be dismissed.

In Witherspoon v. Illinois, the Supreme Court held that a death sentence cannot be carried out where the jury that imposed that punishment was "chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its

20

infliction."  391 U.S. 510, 522 (1968); see also Adams v. Texas, 448 U.S. 38, 46 (1980) (holding that the Witherspoon rule is applicable to the bifurcated procedure employed by Texas in capital cases).  The proper standard for determining when a veniremen may be excused for cause because of his/her views is unequivocally set out in Wainwright v. Witt, 469 U.S. 412, 424 (1985). There, the Court stated that the critical inquiry is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" Id. at 424 (quoting Adams, 448 U.S. at 45).  A venire member must, therefore, be willing not only to accept that the death penalty is, in certain circumstances, an acceptable punishment, but also to answer the statutory questions without conscious distortion or bias. Mann v. Scott, 41 F.3d 968, 981 (5th Cir. 1994) (citing Adams, 448 U.S. at 46).

Speer, relying on the brief exchange cited above between prospective juror Viramontes and the prosecutor during voir dire, claims that the trial court erroneously allowed the prosecution to exclude Viramontes even though it was not shown that Viramontes was "so irrevocably opposed to capital punishment that he could not follow the law or obey the instructions of the trial court." Amended Pet., at 21-22.  A complete review of the record, however, clearly reveals that Viramontes was properly excluded in accordance with the Witt standard.  For example, immediately following Viramontes' response "Oh, I could answer these questions, sure" cited by Speer to show that Viramontes was a qualified juror who was improperly excluded, Viramontes made the following assertion:

Q:       Okay, but could you answer them in such a way that
         you possibly—possibly, that you know he would have to
         get the death penalty?

A:       No.

8 RR 41.

This exchange undermines Speer's entire claim that Viramontes was
improperly excluded.  Reviewing the entire record of Viramontes's voir dire,
many instances were found that demonstrate that Viramontes could not accept
the death penalty as an "acceptable punishment," much less answer the
statutory punishment issues "without conscious distortion or bias."  Mann, 41
F.3d at 981.  From the outset, Viramontes indicated his strong feelings against
the death penalty:

Q:       Mr. Viramontes, I see here that you're Catholic.  Some
         Catholics have a problem with the death penalty.
         Actually not all, because we've run into some that
         haven't.

A:       Uh, huh (yes).

Q:       But some have a problem with assessing the death
         penalty, and that's perfectly valid.  No issue.  No
         argument with that at all, but I need to find out if that
         sways you at all, and how you feel?

A:       Oh, yeah.  Pretty hard for me to believe in the death
         penalty.

8 RR 31.

Later, when asked about the extent of his feelings toward assessing the
death penalty, Viramontes made the following statement:

22

> Q:      Do you feel like you have such strong feelings about the death penalty that you would always be looking to answer these questions in such a way that he would get life rather than death?
>
> A:      Probably.

8 RR 43.  When asked by the judge regarding his ability to follow the law, Viramontes elaborated even more about his inability to assess the death penalty:

> Q:      Even that being the case that you don't really favor the death penalty, could you serve on a jury and answer those questions truthfully and honestly as the evidence leads you, or would you always answer those questions to make sure that he got a life sentence instead of the death penalty?
>
> A:      I think I answered that question already.
>
> Q:      Well, do it again, if you would.
>
> A:      Answer again.  No, I don't think I would give the man the death penalty at all.

8 RR 47.  Finally, when asked whether he would be able to put aside his personal belief against the death penalty and base his verdict solely on the evidence and instructions, Viramontes summarily stated that "it's going to influence the way I answer these questions.  No doubt about that."  8 RR 48.

Contrary to Speer's insinuation, it cannot be said that such a position represents a general objection to capital punishment.  Indeed, it is evident from the record that Viramontes could never return a verdict requiring the death penalty.  Thus, in no way could he answer the statutory punishment issues "without conscious distortion or bias."  Mann, 41 F.3d at 981.  Clearly, a venire

member who expressly refuses to inflict the death penalty under any circumstances demonstrates a bias that would "substantially impair" his/her performance as a juror in a capital murder trial.  See Witherspoon, 391 U.S. at 523, n.21.  Because the prosecution and trial court inquiries were sufficiently specific to meet the demands of the Constitution as set out in Witherspoon and Witt, there is no merit to the assertion that Viramontes was incorrectly challenged for cause.  As such, despite his attempt to narrow the record in support of his allegation, Speer has wholly failed to show that the state court's adjudication of his claim was contrary to, or involved an unreasonable application of, Witherspoon and Witt, and his claim should be denied.

III.   Speer was not denied a fair trial by any prosecutorial misconduct.

In his next ground for relief, Speer alleges that he was denied the right to a fair trial when the prosecution impermissibly vouched for the credibility of various witnesses.  Amended Pet., at 22-25.  Speer first contends that the prosecution impermissibly expressed an opinion as to the veracity of a witness he was cross-examining when he stated, "I'm not even asking for the truth of the matter.  I think the man is lying, and I want to see if he is going to tell the truth."  11 RR 33-34.  Speer further contends that the prosecutor repeatedly made a facial expression and shook his head in disbelief "throughout" the cross-examination of this same witness, which also amounts to impermissibly vouching for the veracity of a witness.  Finally, Speer alleges that the prosecution again impermissibly vouched for the credibility of a witness during closing arguments when he referred to a witness for the defense as a liar.  12 RR 54.

24

Similar to his previous claims, Speer raised these exact allegations in his state habeas petition, which the state habeas court considered and rejected. SHCR 45-48, 108-10, 112-13, cover; Per Curiam Order dated June 30, 2004. Again, Speer has not even attempted to, much less established, how this decision was either contrary to, or involved an unreasonable application of, clearly established federal law.  As demonstrated below, Speer's trial was not rendered unfair by the prosecutor's alleged misconduct or improper remarks. Accordingly, Speer is not entitled to federal habeas relief on this claim.

The appropriate standard of review in a federal habeas case for a claim of improper prosecutorial comments is "the narrow one of due process, and not the broad exercise of supervisory power." Darden v. Wainwright, 477 U.S. 168, 180 (1986) (citing Donnelly v. DeChristoforo, 416 U.S. 637 (1986)); Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001).  The relevant question, therefore, is whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden, 477 U.S. at 180; Ortega v. McCotter, 808 F.2d 406, 410 (5th Cir. 1987).  It is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  Id. Instead, in order for Speer to prevail on a claim that improper conduct by the prosecution marred his trial, the asserted error must be of constitutional magnitude.  Bagley v. Collins, 1 F.3d 378, 380 (5th Cir. 1993).  This means that the prosecutorial conduct must be so prejudicial that it rendered the trial fundamentally unfair.  Styron v. Johnson, 262 F.3d 438, 449 (5th Cir. 2001).  The trial is rendered fundamentally unfair only if, in the context of the entire trial, there is a reasonable probability that the verdict might have differed absent the

misconduct.  Styron, 262 F.3d at 449; Foy v. Donnelly, 959 F.2d 1307, 1317 (5th Cir. 1992); Rogers v. Lynaugh, 848 F.2d 606, 609 (5th Cir. 1988).   Mere conclusory allegations do not suffice.  United States v. Jones, 614 F.2d 80, 82 (5th Cir. 1980).

Speer's claim wholly fails to meet this standard.  To start, each one of the alleged improper remarks were isolated incidents which could hardly undermine the fairness of the entire trial.  The prosecutor's side-bar remark concerning his belief that a witness for the defense was lying, along with his alleged improper facial expressions, were both singular incidents of misconduct to which defense counsel objected and the court ultimately sustained.  11 RR 34, 36.  Similarly, the prosecutor's lone comment during his closing argument concerning his opinion as to the veracity of a witness was also a single incident to which defense counsel did not even object.[7]  Such a single comment alone cannot so infect the trial with unfairness "as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181; Bradford v. Whitley, 953 F.2d 1008, 1013 (5th

---

[7]      It is well established that failure to comply with a state's contemporaneous objection rule will preclude federal habeas review absent a showing of cause for noncompliance with the rule and actual prejudice resulting from the alleged constitutional violation.  Wainwright v. Sykes, 433 U.S. 72, 86-88(1977); Ortega, 808 F.2d at 408.  In this case, the record clearly indicates that Speer's counsel did not object to the complained of remarks at trial.  12 RR 54.  As such, Speer's claim with regard to the prosecutor's comment during closing argument is procedurally defaulted.  Speer fails to allege, much less demonstrate cause for this default, and does not allege that trial counsel was ineffective for failing to object to the instant argument.  Further, any argument by Speer that the alleged misconduct amounted to "fundamental error" that need not be objected to is not cognizable in a habeas proceeding.  Ortega, 808 F.2d at 408 n. 1 (citing United States v. Young, 470 U.S. 1, 7 (1985)).  For this reason alone Speer's allegation concerning the closing argument comment should be denied.

Cir. 1992) (prosecutor's closing argument, in which he allegedly accused defendant of lying, did not so infect trial with unfairness as to violate defendant's due process rights, where prosecutor's comments were neither persistent nor pronounced in context of closing argument as whole).  Indeed, the prosecutor's remarks did not misstate any facts, nor did they implicate other constitutional rights.  See Darden, 477 U.S. at 182 (fact that prosecutor's statement was not a misstatement of the evidence and did not implicate other rights was a factor in determining that improper comments did not render petitioner's trial unfair).

Furthermore, the record demonstrates that each of the comments about which Speer's now complains were made in response to arguments made by defense counsel.  With regard to the prosecutor's side-bar comment concerning the veracity of the witness, this statement was clearly a comment invited by defense counsel (Mr. Carter) when counsel objected to questions the prosecutor was asking on cross-examination:

MR. CARTER:     I'm sorry.  I object to the question that asks
                him what that means, because –

MR. MULLIN:     —I'm not asking him what it means,
                Judge.

JUDGE CARTER:   Just let him finish.

MR. MULLIN:     I'm sorry.

MR. CARTER:       I'm objecting to him asking this witness to speculate what that means without some foundation of some term as an inmate, he recognizes.

MR. MULLIN:       I'm not even asking for the truth of the matter.  I think the man is lying, and I want to see if he is going to tell the truth.

MR. CARTER:       And I'm objecting to side bar.

JUDGE CARTER:     Sustain that.  Just answer the question, sir, if you understand it.  What does that mean to you?  I'll let you answer that, and then we're finished with this

11 RR 33-34 (italics added).

The statement made by the prosecutor was clearly a response to the objection made by defense counsel, and was not of such a constitutional magnitude that the verdict might have differed absent the misconduct.  See Styron, 262 F.3d at 449.  Moreover, the prosecutor's lone comment during closing arguments concerning the veracity of a single witness was also provoked by defense counsel.

In closing arguments following the defense counsel's closing argument, the prosecutor made the following comment concerning a defense witness:

And you heard from Richie Rich, the biggest liar of all that you heard from, and he had no good excuse why this was written to Ellis, when the order was to write it to Innes.  Why?  Because it was a lie.  There was no order.  He killed him.  He took credit for it.

28

12 RR 54.  This came in response to defense counsel's closing argument, where counsel made the following comments where he referred to almost all of the State's witnesses as liars:

> What do we learn from the evidence about inmates?  They are not to be trusted.
>
> * * *
>
> Investigator Dotson told you, they lie to me everyday. . . . They lie. Every inmate I asked on that stand said, yes, they're liars.  They've learned to lie in that system.
>
> * * *
>
> They lied to you on the witness stand, Ladies and Gentlemen.  All five of them did, and I'll take them one at a time.
>
> * * *
>
> Well, you remember what it said.  I want to talk to a prosecutor.  I'm doing this for my own sentence, and I want some help, and my brother needs some help.  He lied to you.  He lied to you.
>
> * * *
>
> He lied to you about the light, remember?. . . . So he lied then, or he was lying in front of you.  Both times though, he was under oath.
>
> * * *
>
> He said if the State would have offered him a deal, I'd have lied too. I'd have lied too.  It is their nature, Ladies and Gentlemen, and that's the proof they brought you.
>
> * * *
>
> Deals—lies—inconsistencies—suspects.  Plenty of them.

12 RR 19-30.

In fact, defense counsel's entire closing argument is rife with instances of counsel calling into question the veracity of the State's witnesses.  12 RR 14-36. The single concluding comment made by the prosecutor in this case was invited

29

by the aggressive closing argument of defense counsel.  As such, Speer cannot now argue that the prosecutor's sole comment rendered his whole trial fundamentally unfair.  United States v. Taylor, 210 F.3d 311, 319 (5th Cir. 2000) ("Where defense counsel insinuates that the government's witnesses perjured themselves because they entered into plea-bargains and were hoping to receive lighter sentences, a prosecutor may rebut those accusations, even if those statements otherwise would amount to a bolstering argument.").  "There is nothing impermissible about a prosecutor's pointing out inconsistent facts or testimony in the record and arguing that the jury should adopt a particular conclusion based on that evidence."  United States v. Washington, 44 F.3d 1271, 1279 (5th Cir. 1995); United States v. Loney, 959 F.2d 1332, 1343 (5th Cir. 1992) (stating that it was not impermissible to call defendant a "liar" based on evidence that indicated that defendant's statements and actions were not consistent).

Finally, Speer's trial is rendered fundamentally unfair only if, in the context of the entire trial, the remarks by the prosecutor were "crucial, critical, highly significant" factors.  Ortega, 808 F.2d at 411.  In other words, Speer has the burden of showing that the evidence against him was so insubstantial that, but for the remarks of the prosecution, no conviction would have occurred. Guidroz v. Lynaugh, 852 F.2d 832, 834 (5th Cir. 1988).  A defect of constitutional proportions is not to be found except in the most egregious circumstances. Ortega, 808 F.2d at 410.  Again, mere conclusory allegations do not suffice. Jones, 614 F.2d at 82.

In this case, Speer has wholly failed to establish the evidence was so insubstantial as to render the remarks "crucial, critical, highly significant factors" at trial. As discussed above, the misconduct complained of was isolated and invited by defense counsel, and was not of the nature that there is a reasonable probability that the verdict might have differed absent the misconduct. Styron, 262 F.3d at 449. Moreover, absent his conclusory allegations, Speer had presented absolutely no evidence demonstrating that his conviction would not have occurred absent these isolated remarks. Thus, Speer has failed to demonstrate how the evidence was so insubstantial that the remarks were "crucial, critical, highly significant factors" at trial. See Darden, 477 U.S. at 182 (weight of evidence against petitioner was a factor in determining that the improper comments did not render petitioner's trial unfair). As a result, the prosecutor's remarks did not deprive Speer of a fundamentally fair trial, and his claim should be denied.

IV.   Speer has failed to demonstrate that he was denied his right to a speedy trial.

In his next claim for relief, Speer asserts that his Sixth and Fourteenth Amendment rights to a speedy trial were violated by the almost two year delay between his indictment for capital murder on November 4, 1999, and the subsequent trial commencing on October 16, 2001. Amended Pet., at 25-30. Speer accurately sets forth the law as it pertains to his right to a speedy trial. Id. at 26. Under Barker v. Wingo, whether a defendant's rights have been violated by post-indictment delay is determined by a balancing process involving four factors:  (1) the length of delay; (2) the reason for the delay; (3) the

defendant's assertion of his right; and (4) the prejudice to the defendant resulting from the delay.  407 U.S. 514, 530-33 (1972);  Knox v. Johnson, 224 F.3d 470, 477 (5th Cir. 2000).  Under these four factors, however, Speer does not establish that a speedy trial violation occurred in this case.

Speer again raised the same allegation verbatim in his state habeas petition, which the state habeas court considered and ultimately rejected.  SHCR 48-54, 110-11, 113-14, cover; Per Curiam Order dated June 30, 2004.  The state habeas court, applying the Barker balancing test when considering Speer's allegation, adopted the following findings of fact and conclusions of law made by the trial court:

FINDINGS OF FACT

28. Gary Dickerson, the victim in this case, was killed on July 11, 1997.

29. William Speer was indicted on November 4, 1999.

30. On December 1, 1999, the Court requested legal representation for William Speer pursuant to Article 26.051(d) of the Texas Code of Criminal Procedure.

31. On January 31, 2000, Carol Helms with the State Counsel for Offenders, who was appointed as a result of the request pursuant to Article 26.051(d) filed a  Motion to Withdraw from representation of William Speer.

32. On February 4, 2000, Carol Helm's Motion to Withdraw was granted.

33. On February 7, 2000, [Speer] was served a copy of the indictment in this cause.

34.   On March 31, 2000, Richard Dotson and David Carter were appointed to represent [Speer].

35.   On April 20, 2000, a pretrial hearing in this cause combined with co-defendants established that the co-defendant Anibal Canales would be tried before [Speer].

36.   Between March 31, 2000 and August 20, 2001, counsel for [Speer] engaged in discovery and pretrial matters on behalf of [Speer].

37.   On August 20, 2001, a Motion to Dismiss for Lack of Speedy Trial was filed by [Speer]'s counsel.

38.   A hearing on the Motion to Dismiss for Lack of Speedy Trial was heard on August 23, 2001.

39.   The Court denied [Speer]'s Motion to Dismiss for Lack of Speedy Trial and set the case for trial October 16, 2001.

40.   The Court finds that from the date of indictment to the date of trial a total of 611 days passed.

41.   The Court finds that from the date counsel was finally appointed and trial on the merits began, a total of 564 days had passed.

42.   The Court finds that no request for speedy trial was ever filed.

43.   The Court finds that between the time the Motion to Dismiss for Lack of Speedy Trial was filed and the hearing on the motion was 3 days.

44.   The Court finds that the trial was set on October 16, 2001.

45.   The Court finds that at the time of the trial [Speer] was serving a life sentence in the Texas Department of Criminal Justice for murder.

CONCLUSIONS OF LAW

18.　The length of delay of more than two years from the date of indictment to the date of trial is presumptively prejudicial and requires the court to review all factors set forth in Barker v. Wingo, 407 U.S. 514 (1972).

19.　[Speer] failed to assert his right to a speedy trial prior to filing his motion to dismiss for failure to hold a speedy trial.

20.　There was no deliberate attempt by the state to prejudice the defense. Dragoo v. State, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003).

21.　The court properly determined that [Speer] was not prejudiced by the length of time from indictment to the time of trial. Doggett v. United States, 505 U.S. 647 (1992).

22.　[Speer] fails to demonstrate that his conviction was unlawfully obtained. Accordingly, it is recommended to the Texas Court of Criminal Appeals that relief be denied.

SHCR 110-11, 113-14.

Speer has not offered any evidence rebutting the state court's factual findings and legal conclusions. As discussed below, the state habeas court correctly applied Barker v. Wingo and reasonably determined that no violation of Speer's rights had occurred. Because Speer has not even attempted to establish, much less establish that the state court's conclusions are contrary to, or an unreasonable application of, Barker, he is not entitled to federal habeas relief under the AEDPA standards.

A.　The length of delay admittedly is presumptively prejudicial.

The first Barker factor serves as a triggering mechanism for speedy trial analysis. Doggett v. United States, 505 U.S. 647, 650-54 (1992). If the length

34

of delay crosses a threshold level between "ordinary" delay and "presumptively prejudicial" delay, the district court must make findings regarding the remaining three factors and balance all four factors.  United States v. Lucien, 61F.3d at 371 (citing Robinson v. Whitley, 2 F.3d at 568).  However, unless the delay is excessive thereby raising a presumption of prejudice, there is no need to inquire into the remaining three factors. Gray v. King,  724 F.2d 1199, 1202 (5th Cir. 1983); Cowart v. Hargett, 16 F.3d 642, 646 (5th Cir. 1994).  This circuit generally requires a delay of one year to trigger speedy trial analysis.  Lucien, 61F.3d at 371 (citing Robinson, 2 F.3d at 568).

Because the delay between the day of indictment and the start of the trial was almost two years in length, the state habeas court was correct in determining that the delay was "presumptively prejudicial" under the Barker v. Wingo standard.  Yet even if a delay is presumptively prejudicial, as in the instant case, that determination alone does not warrant the conclusion that a petitioner's right to a speedy trial has been violated.  Barker, 407 U.S. at 536 (five-year delay between arrest and trial did not violate right);  Robinson, 2 F.3d at 568, 571 (forty-four month delay between arrest and trial did not violate right); Bell v. Lynaugh, 828 F.2d 1085, 1094-95 (5th Cir. 1986) (eight-year delay between arrest and trial did not violate right);  Turner v. Estelle, 515 F.2d 853, 860 (5th Cir. 1975) (four year, eight month delay between indictment and trial did not violate right).

Instead, "as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to

trigger the Barker enquiry." Doggett,  505 U.S. at 652 (citations omitted). A reviewing court must then "make findings regarding the remaining three [Barker] factors and balance all accordingly." Robinson, 2 F.3d at 568 (citing Barker, 407 U.S. at 530). Thus, even though Speer is entitled to a presumption of prejudice due to the length of delay, such a presumption is clearly rebuttable, as in the instant case where the state habeas court concluded that, after reviewing the remaining Barker factors, Speer's rights had not been violated. Doggett,505 U.S. at 658; see 2 SHCR 113-14.  This determination should be upheld by this Court because it was entirely reasonable.

B.     There is no assigned reason for the delay.

Under Barker, when evaluating reasons for the delay, deliberate delaying tactics by the prosecutor should weigh heavily against the government while more neutral reasons such as negligence or overcrowded courts should weigh less heavily.  Barker, 407 U.S. at 530; Cowart, 16 F.3d at 647; Gray, 724 F.2d at 1203.  The government is not held responsible for delays resulting from the defendant's actions.  United States v. Loud Hawk, 474 U.S. 302, 316-17 (1986); Cowart, 16 F.3d at 647; Robinson, 2 F.3d at 569.  Although he provides no evidence to support his assertion, Speer contends that the delay "is largely attributable to the State" which "weighs in favor of finding a speedy trial violation."  Amended Pet., at 28.  However, the record is silent as to any reason for the delay, and as such the second part of the Barker test should not weigh heavily against the State.

In this case, there is no evidence in the record that the State ever sought or received a continuance in this cause, much less that the State deliberately

36

attempted to prejudice Speer or delay the trial.  Indeed, the only evidence concerning the setting of the trial came when the State filed a motion seeking to try Speer and his co-defendants jointly, to which Speer responded by filing a Motion for Severance.[8]  A hearing was held on the motions on August 24, 2000, where the trial court ultimately granted Speer's motion to sever and ordered that Speer's trial be separate from his co-defendants.  CR 50, 66.  The Motion for Joint Trial obviously was not an attempt by the State to delay Speer's trial, nor can it be argued that Speer's right to a speedy trial was prejudiced as a result. "In the absence of an assigned reason for delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay."  United States v. Macino, 486 F.2d 750, 753 (5th Cir. 1973); see Dragoo v. State, 96 S.W. 3d 308, 313 (Tex. Crim. App. 2003).  Here, the state habeas court properly determined that there was no deliberate attempt by the state to prejudice Speer, and Speer has failed to rebut this presumptively correct conclusion.  28 U.S.C. § 2254(e)(1).  Thus, the reasons for the delay in Speer's case are neutral under the Barker test, and should weigh "'less heavily'" against the State than they would weigh if the State deliberately endeavored to postpone trial.  Barker, 407 U.S. at 533.

     C.     Speer never asserted his right to a speedy trial.

The third Barker factor concerns the defendant's zeal in pursuing his right to a speedy trial.  The burden is on the defendant to assert his speedy trial right,

---

[8]     The State's Motion for Joint Trial is not contained in the record.  However, it is referenced in Speer's Response and in his Motion for Severance, both filed July 31, 2000.  CR 43-50.

and his failure to do so makes it difficult for him to prove denial of that right. Barker, 407 U.S. at 532; Doggett, 505 U.S. at 658  (the "presumption of prejudice" is "extenuated . . . by the defendant's acquiescence" in the delay). While it is no longer the rule that the failure to expressly demand a speedy trial ipso facto results in the loss of that right, the accused nonetheless has the responsibility to assert it. Id. at 528.  In this regard, "the point at which the defendant asserts the right is important because it may reflect the seriousness of the personal prejudice he is experiencing." United States v. Palmer, 537 F.2d 1287, 1288 (5th Cir. 1976).  As the record indicates, this factor weighs heavily against Speer.

Indeed, as the state habeas court found and the record demonstrates conclusively, no request for a speedy trial was ever filed by Speer.  SHCR 111, 113; CR 2-205.  The record reflects that Speer's Motion to Dismiss for Lack of Speedy Trial was not filed until August 20, 2001, almost a year and a half after Speer was appointed counsel on March 31, 2000. CR 23-24, 86-87.  During that time, defense counsel engaged in numerous discovery and pretrial matters on behalf of Speer, but never filed a speedy trial request. CR 10-14, 25-35, 43-50, 66-84, 86-88, 172-199.   Even after filing his Motion to Dismiss, Speer still did not "invoke" his right to a speedy trial under controlling federal precedent because requests for dismissal of the charges rather than for a trial are not assertions of the right to a speedy trial. See, e.g., Cowart, 16 F.3d at 647 (pro se request for dismissal rather than request for a trial is not an assertion of the right to a speedy trial);  Hill v. Wainwright, 617 F.2d 375, 378 (5th Cir. 1980) (same). As such, Speer never asserted his right to a speedy trial. But once Speer

38

filed his Motion to Dismiss for Lack a Speedy Trial, a hearing was held three days later on August 23, 2001, where the motion was denied and the case was set for trial on October 16, 2001.   Here, just as on state habeas, Speer does not attempt to dispute the state court's factual determinations nor does he assert that he ever attempted to invoke his right at any earlier date.

Instead, Speer alleges that he was "effectively impeded" in asserting his right to a speedy trial as a result of his move from general population to administrative segregation on September 14, 1997, and as a result of the denial of his request for an attorney when he was being questioned by police on August 7, 1997.  Amended Pet., at 28-29.  But neither excuse applies here because Speer was neither arrested nor indicted for this crime until November 4, 1999.  See United States v. MacDonald, 456 U.S. 1, 6-7 (1982) (the period of delay is determined from the earlier of either the date of arrest or the date of indictment).  Thus, he would not have been able to assert his right to a speedy trial until after that date anyway.  In any event, Speer again has provided no evidence to demonstrate how his being in administrative segregation or not having an attorney prior to his being indicted had any effect on ability to assert his right to a speedy trial.

Based on the record evidence, Speer never asserted his right to a speedy trial, and did not file his Motion to Dismiss until August 20, 2001, some two months prior to trial and almost a year and a half after counsel was appointed, when he filed a single motion seeking dismissal.  Speer's failure to assert his right "make[s] it difficult for . . . [him] to prove that he was denied a speedy trial, and, furthermore, can be a strong indication that he did not want one."  Barker,

39

407 U.S. at 528. Consequently, he failed to display the "dogged persistence" found by a sister circuit necessary for asserting the right. Cain v. Smith, 686 F.2d 374, 384 (6th Cir. 1982). The state habeas court thus acted reasonably in deciding that the factor did not weigh in Speer's favor.

     D.    Speer was not prejudiced by the delay.

The fourth and final Barker factor is the degree of prejudice suffered by the defendant as a result of the delay. Prejudice resulting from an alleged speedy trial violation is judged in light of the three interests protected by the speedy trial guarantee: (1) preventing "oppressive pretrial incarceration," (2) minimizing the "anxiety and concern of the accused," and (3) limiting the possibility "that the defense will be impaired." Barker, 407 U.S. at 532; Robinson, 2 F.3d at 570. The most important of the three inquiries is the possibility that the defense will be impaired. Barker, 407 U.S. at 532; United States v. Juarez-Fierro, 935 F.2d 672, 676 (5th Cir. 1990). Speer again has failed to provide any evidence to demonstrate how he was prejudiced in any of the three protected interests listed above.

To start, Speer cannot allege that his interest in preventing "oppressive pretrial incarceration" led to any prejudice caused by the delay because Speer was already serving a life sentence for a previous capital murder conviction. CR 2-3; 13 RR 16-36. Although he alleges that it is "patently obvious that [Speer] suffered some oppressive pretrial incarceration" due to his being placed in administrative segregation two months after the crime was committed up until the time of trial, Speer does not provide any evidence to show how his placement in administrative segregation was a result of any excessive delay. Inmates may

40

be placed in administrative segregation for any number of reasons as determined by officials within TDCJ even though they have never been charged with a crime.[9]  The fact that Speer was placed in administrative segregation in no way demonstrates any prejudice resulted from an excessive pretrial delay in this case.  Because he was already incarcerated for life for a previous capital murder conviction, Speer's interest in preventing "oppressive pretrial incarceration" was not remotely violated by the almost two year delay between his indictment and his trial.

Similarly, Speer has provided no evidence other than his own conclusory allegations that he experienced "anxiety and concern" as result of the delay in bringing the case to trial.  Although it is likely that Speer did experience a certain amount of anxiety while he awaited trial due to the severity of the allegations, there has been no evidence presented to suggest that delay caused Speer any more anxiety than what any another similarly situated person might normally experience.  In fact, it could be argued that because he was already incarcerated for life for a previous capital murder conviction, the small delay between indictment and trial would have a lesser effect on Speer than a person facing a possible conviction for the first time.  Further, as discussed previously, Speer never once asserted his right to a speedy trial, which might have demonstrated a certain level of anxiety caused by the delay.  As such, contrary

---

[9]     Speer's placement in segregated confinement simply constitutes a change in the conditions of his confinement and as such do not implicate the protections afforded by the Due Process Clause.  Sandin v. Conner, 515 U.S. 472, 486 (1995).

to his assertion, there is no evidence to indicate that Speer experienced increased "anxiety and concern" as a result of the delay.

Finally, there is no evidence presented to establish that Speer's defense was impaired as a result of the two-year delay.  If anything, this delay allowed Speer's counsel ample time to accumulate information in order to present a well-organized and thorough defense.  See CR 10-14, 25-35, 43-50, 66-84, 86-88, 172-199.  Speer claims to have been prejudiced by the unavailability of an inmate named Ellis, who Speer claims was out of prison "running from the law" by the time the trial commenced.  Amended Pet., at 30.  However, this issue was raised for the first time in his state writ, and no evidence was offered at the hearing to indicate that the absence of this witness caused any problems for Speer.  3 RR 16-23.  Further, Speer has provided no evidence to show that any attempt to find Ellis was made or to demonstrate that he is indeed "nowhere to be found."  As such, Speer has failed to show that the short two year period from indictment to trial had any effect on his ability to prepare a defense.

Taking into account all the Barker factors, Speer simply failed to establish that his Sixth and Fourteenth Amendment rights were violated.  The trial court thus did not err in denying his motion to dismiss the indictment for lack of a speedy trial, and the state habeas court properly rejected this claim in his state habeas application.  Because Speer has failed to establish that the state habeas court's conclusions are contrary to, or an unreasonable application of, Barker, he is not entitled to federal habeas relief.

V.     In addition to being procedurally barred, Speer's allegation that the
       State withheld material evidence and knowingly allowed perjured
       testimony is also utterly meritless and does not warrant relief.

In his final allegation, Speer accuses the State of suppressing material evidence and knowingly presenting false testimony in violation of Brady v. Maryland and Napue v. Illinois.  Amended Pet., at 31-97.  Relying on the fact that the State's case against him was composed mainly of inmate testimony, Speer alleges that the State failed to disclose evidence that these inmates had received benefits in exchange for their testimony.  Specifically, Speer argues that the Special Prosecution Unit (SPU) who prosecuted his case wields "unparalleled control" over these inmates and used that power to obtain beneficial testimony in exchange for favorable treatment within the prison system that was not reported to the defense.  Id.  Speer also alleges that his rights under Massiah v. United States, 377 U.S. 201 (1964), were violated by the prosecution's use of testimony by an inmate Speer believes was acting as a government agent.  Id. at 31, 37-48.

However, Speer already raised these allegations with the state court below in a successive application for a writ of habeas corpus.  Ex parte Speer, No. 59,101-02 (Tex. Crim. App. 2010).  As discussed previously, after the trial court determined that Speer's claims were not new and should have been raised in his initial habeas petition, the Court of Criminal Appeals dismissed this application as an abuse of the writ pursuant to Texas Code of Criminal Procedure Article 11.071, Section 5.  Supp SHCR at 183, cover; Per Curiam Order dated March 3, 2010.  As a consequence, Speer is now procedurally barred from receiving relief

on his Brady/Napue claim in this Court.  Procedural default aside, Speer's allegation still would not entitled him to relief because the information he refers to was neither suppressed nor material, nor did any witness testify falsely.  As a result, federal habeas relief should be denied.

A.     Speer's new claim is procedurally defaulted.

Precedent clearly dictates that procedural default of a petitioner's federal habeas claim occurs where the last state court to consider a claim "clearly and expressly" dismisses it based upon a state procedural rule that provides an adequate basis for denial of relief, independent of the merits.  Rocha v. Thaler, 626 F.3d 815, 820-21 (5th Cir. 2010)(citing Nobles v. Johnson, 127 F.3d 409, 422 (5th Cir. 1997)); Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citing Coleman v. Thompson, 501 U.S. 722, 729-30 (1991)).  The "independent" and "adequate" requirements are satisfied where the court clearly indicates that its dismissal of a particular claim rests upon a state ground that bars relief, and that bar is strictly and regularly followed by the state courts.  Finley, 243 F.3d at 218.  The rule is not independent when it "fairly appears to rest primarily on federal law, or to be interwoven with federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." Coleman, 501 U.S. at 735 (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)). This doctrine ensures that federal courts give proper respect to state procedural rules.  Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997).

Here, the Court of Criminal Appeals delivered a plain statement of its reliance on state procedural rules when it dismissed Speer's second habeas application as an abuse of the writ: "We have reviewed this subsequent

44

application and find that the allegations fail to satisfy the requirements of Article 11.071, § 5(a).  Accordingly, the application is dismissed as an abuse of the writ.  Article 11.071, § 5(c)." Per Curiam Order dated March 3, 2010.  The Texas court strictly and regularly applies its abuse-of-the-writ statute, and dismissal of a habeas petition upon such grounds constitutes an independent and adequate state procedural bar.    Rocha, 626 F.3d at 830; Hughes v. Quarterman, 530 F.3d 336, 342 (5th Cir. 2008) (citing Emery v. Johnson, 139 F.3d 191, 196 (5th Cir. 1998)); Aguilar v. Dretke, 428 F.3d 526, 533 (5th Cir.2005) ("This court has consistently held that Texas' abuse-of-writ rule is ordinarily an 'adequate and independent' procedural ground on which to base a procedural default ruling.").  Thus, where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice that is attributable to the default.[10]   Murray v. Carrier, 477 U.S. 478, 485 (1986); Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977).

In this case, Speer argues that good cause exists to excuse the default because the factual basis for his claims were not available due to being withheld by the State.  Amended Pet., at 32-33.  Relying on his Brady allegation, Speer contends that the State is attempting to create a "procedural trap" wherein he is deprived of this Court ever reaching the merits of a claim that is based on

---

[10]     Speer can also overcome the procedural bar by asserting a miscarriage of justice.  Coleman, 501 U.S. at 750.  But he makes no attempt to establish that this exception applies.  Even assuming Speer had argued facts in support of this exception, such would be barred from federal habeas review.  See Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

"newly discovered evidence."  Id. at 33-34.  However, this is contrary to the state court's finding that the information Speer now claims is "new" was available to both his trial attorneys prior to trial and subsequent post-conviction attorneys following the conclusion of the trial.  Supp SHCR at 175-183.  As discussed in more detail below, all of the information Speer claims was suppressed by the State was actually contained in the prosecutions files to which defense counsel had unimpeded access.  Because there is simply no merit to his assertion that the evidence was previously unavailable, Speer fails to demonstrate good cause to excuse the procedural bar.  Moreover, he fails to make any argument that he will be prejudiced as a result.  As such, he claim is procedurally barred from federal habeas relief.

> B.   Regardless of the procedural bar, Speer fails to demonstrate that a violation of either Brady or Napue occurred.

In Brady, the Supreme Court announced that due process requires the State to disclose material, exculpatory evidence to the defense.  373 U.S. at 87.  In order to establish a Brady violation, Speer must demonstrate that (1) the prosecution suppressed evidence, (2) that evidence was favorable to the defense, and (3) the evidence was material to either guilt or punishment.  Banks v. Dretke, 540 U.S. 668, 691 (2004); Graves v. Cockrell, 351 F.3d 143, 153-54 (5th Cir. 2003).  The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  United States v. Bagley, 473 U.S.667, 684 (1985).  In this case, Speer claims that the State purposefully withheld evidence that certain inmate witnesses received beneficial treatment in exchange for their

46

testimony which could have been used to impeach their credibility.  As discussed in detail below, however, Speer completely fails to establish any of the criteria necessary to demonstrate a violation of Brady.

Similarly, Speer fails to establish that the State knowingly allowed false testimony concerning the alleged benefits received by the witnesses.  In Napue, the Supreme Court held that a criminal defendant is denied due process when the State knowingly uses perjured testimony or allows false testimony to go uncorrected at trial.  360 U.S. 264; see also Giglio v. United States, 405 U.S. 150 (1972).  A petitioner seeking to obtain relief on such a claim must show that (1) the testimony is false, (2) the State knew that the testimony was false, and (3) the testimony was material.  Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001); Pyles v. Johnson, 136 F.3d 986, 996 (5th Cir. 1998).  Again, Speer falls short of establishing any of the criteria necessary to demonstrate a violation under Napue.

1)   Bruce Innes

Speer first contends that the State withheld favorable impeachment evidence concerning inmate Bruce Innes, a fellow Texas Mafia member who testified that Speer had confided both in writing and in person that he had murdered Dickerson. Amended Pet., at 37-49. Although Innes admitted during his testimony that he had received a "sweetheart deal" from the SPU on two pending indictments in exchange for his testimony—three years as opposed to the twenty-five year minimum originally offered by the district attorney—Speer claims that there is much more that the State withheld.  9 RR 33-34; 10 RR 78-84; 12 RR 33-34.  According to Speer, the State failed to turn over evidence that

47

Innes was in fact an "undercover agent"working for SPU who continually received benefits in exchange for actively seeking out evidence against Speer. Amended Pet., at 37-49.  Among the benefits allegedly received by Innes: (1) being declassified as a gang member despite failing to renounce his affiliation; (2) favorable treatment in prison disciplinary cases; (3) unit and housing transfers; (4) favorable recommendations to the parole board; and (5) being allowed to speak to other witnesses to corroborate their stories.  Id.

In support of his allegations, Speer provides numerous documents (most of them letters between Innes and SPU investigator A.P. Merillat) that he claims were withheld from him which supposedly demonstrate the depth of Innes' relationship with SPU.  Amended Pet., at Ex. 1-24.  Speer believes that had he been aware of this evidence, Innes's testimony could have been properly impeached as "that of a canny, sophisticated, and manipulative prisoner who would do whatever he could to make his time in prison easier."  Id. at 48.  But nothing in the record supports Speer's contention that this evidence was ever withheld from his defense counsel.  See Ross v. Estelle, 694 F.2d 1008, 1011 (5th Cir. 1983)(finding that unsupported claims should be dismissed as conclusory allegations).

In fact, the record developed during Speer's successive state habeas proceedings demonstrates that each of these documents, with the exception of exhibits 1, 12, 13, and14, was in the prosecution's files to which the defense had full access.[11]  Supp SHCR at 171-75; Supp SH deposition of Mark Mullin (SPU

---

[11]     Exhibit 1 was not published until after Speer's trial on the merits but was made available to counsel immediately thereafter.  Supp SHCR at 171-75.  Exhibits

prosecutor) at 10-18, 26, 45-46, 55, 63-64, 72, 85-89, 99; Supp SH deposition of A.P. Merillat (SPU investigator) at 94-98, 140-43; Supp SH deposition of David Carter (defense counsel) at 21, 83.  Defense counsel was never denied access to the State's file at any time.  Supp SH deposition of Mark Mullin at 13, 56; Supp SH deposition of David Carter at 83.  Further, Speer fails to provide any evidence to show that the "benefits" Innes received from allegedly being an agent, if any, were withheld from defense counsel.  The record actually indicates just the opposite:  that in addition to being aware of the deal Innes struck with SPU in exchange for his testimony, defense counsel argued that certain witnesses received benefits for their testimony and was aware that Innes had sought declassification as a gang member for his testimony.  10 RR 82-84; 14 RR 32; Supp SH deposition of David Carter at 87.  Thus, Speer wholly fails to establish that evidence was withheld in violation of Brady.

Indeed, with regard to the alleged benefits Innes received, Speer fails to prove that Innes actually received much of the purported benefits, much less demonstrate that they were in exchange for his testimony.  Although defense counsel was aware that Innes was seeking to become declassified as a gang member, no evidence has been presented showing that it ever happened, much less that it was agreed upon in exchange for testimony.  Supp SH deposition of David Carter at 86-87.  Similarly, there is no evidence that Innes actually received preferential treatment in disciplinary cases, received requested transfers, or received favorable recommendations to the parole board as a result

12-14 were part of SPU investigator A.P. Merillat's folder and were not included in the case file until a few days after trial.  Id.

of his testimony against Speer.  Despite the fact that TDCJ, who maintains custody of the inmates while incarcerated, moved the inmate witnesses prior to trial for the convenience of both the court and the attorneys, no evidence has been presented showing that it did so in exchange for testimony in this case. Supp SH deposition of Mark Mullin at 48.

In reality, TDCJ does not normally honor requests by the SPU to move inmates.  Supp SH deposition of A.P. Merillat at 108.  Nor does the SPU have any influence or control over how TDCJ handles disciplinary cases.  Id. at 138; see also Amended Pet., at Ex. 20.  The SPU also has no control over the Board of Pardons and Parole, and the letters they write on behalf of witnesses do not recommend or request parole.  Id. at 138.  Given what little influence the SPU has over TDCJ and the parole board, it is hard to imagine that they would use it as a bargaining chip in order to obtain testimony in a case.  Because the record is largely silent as to whether Innes actually received any of the alleged benefits mentioned, much less whether they were promised in exchange for Innes's testimony, Speer fails to show that the missing evidence would be have been favorable to his defense.  Additionally, he also fails to show that Innes testified falsely about the benefits he did receive as a result of his testimony.  As such, Speer's allegation falls short under both Brady and Napue.

Finally, assuming that the documents provided had been withheld by the SPU and that they somehow demonstrated that Innes received the afore-mentioned benefits for his testimony, Speer's allegation still runs aground of Brady and Napue because the evidence is not material.  To start, any evidence that Innes may have been working as an "undercover agent" for the SPU is

50

belied by his direct testimony in this case that he never worked "in any way, shape, form, or fashion, as an agent for the State." 3 RR 50; Supp SH deposition of David Carter at 16.  Innes never sought out information on behalf of the SPU. 3 RR 49-50; Supp SH deposition of Mark Mullin at 31.  Rather, he provided the SPU with incriminating information that he was already in possession of in order to help himself get a better deal on his pending indictments.  3 RR 50; 10 RR 82, 95.

Furthermore, details of the "sweetheart" deal he received and Innes's admission that he was testifying simply "to help himself" already placed him in the perspective of a canny, manipulative inmate who would do whatever he could to make his life easier.  9 RR 33-34; 10 RR 95.  Such impeachment material renders immaterial the fact that he may have received favorable treatment in a disciplinary case or housing request.  Moreover, defense counsel thoroughly exposed Innes's motivation for testifying in this case on cross-examination by showing that the deal was contingent on his testimony in this case and "holding up his end of the bargain." 9 RR 42-43; 10 RR 90-92; 12 RR 34. Counsel also effectively portray Innes as a chronic rule violator and habitual liar who was using this information to get what he wants out of the system.  10 RR 87-93.  As a result, additional evidence concerning Innes's alleged relationship with SPU or favorable treatment he may have received from the prison system would do little to help counsel impeach Innes's credibility further. Because Speer fails to show that the evidence in question was material, his claim again falls short of establishing a violation under either Brady or Napue, and relief must be denied.

2)    Steven Canida

Speer next contends that the State withheld favorable impeachment evidence concerning Steven Canida, a non-gang-member inmate who testified that he witnessed Speer and Canales enter Dickerson's cell with him moments before he was murdered.  Amended Pet., at 49-51.  Despite specific testimony stating that no deals were made in exchange for his testimony, Speer believes that Canida received "substantial benefits" from the State in the form of a letter to the Board of Pardons and Parole that ultimately led to his release less than a year after he testified in the Canales case.  Id.  Citing no evidence other than his own "information and belief," Speer also accuses the State of significantly diminishing the sentence Canida received on a subsequent offense as a result of his cooperation.  Id.  As with inmate Innes, however, Speer wholly fails to demonstrate a violation of any of the requirements of Brady or Napue.

Initially, Speer fails to provide any evidence establishing that Canida received benefits in exchange for his testimony.  As mentioned above, Speer does not even attempt to support his self-serving second accusation concerning Canida's subsequent offense, which therefore renders the claim conclusory.  See Schlang v. Heard, 691 F.2d 796, 799 (5th Cir. 1982) (finding that "mere conclusory statements do not raise a constitutional issue in a habeas case").  Concerning Canida's parole, Speer provides only an unsigned, unauthenticated memorandum stating that a letter was written to the parole board for each of the inmates who testified. Amended Pet., at Ex. 25.  But this letter does not suggest who wrote the letter or what its contents entailed.  Indeed, there is nothing to indicate that a letter was written on Canida's behalf as a result of his

52

cooperation, much less that SPU recommended or requested parole for Canida. See Supp SH deposition of A.P. Merillat at 137.   As a result, neither claim warrants consideration from this Court.

Regardless of the lack of evidence linking Canida's cooperation with any tangible benefit, Speer is faced with the impossible task of showing that the State suppressed such evidence.  Brady, 373 U.S. at 87.  But again, Speer has provided no such evidence.  Instead, he relies on the above-mentioned memo that states that a letter was written for Canida to the parole board a few weeks after Canida testified in the Canales case.  Speer infers that because "a letter" was written to the parole board, it must have influenced them to parole Canida a few months later.   But, by the time Canida testified in the instant case, he was already out of prison, a fact of which defense counsel was well aware.   Supp SH deposition of David Carter at 86; 9 RR 33, 215-17, 244-47.  Canida also rebutted this assumption by testifying that he was released on mandatory supervision and not parole, and that in no way did he believe that his testimony in either case somehow helped him get released.  9 RR 233-34. Thus, it is unclear how the State could have suppressed evidence that they helped Canida obtain early release on parole when in fact he was released as a result of mandatory supervision instead.

Moreover, Speer provides no compelling argument as to how this evidence could be considered favorable or material.  By the time he testified in this case, Canida had already been released from prison, thus alleviating any reason for him to testify simply in order to receive a benefit from the State.  Further, defense counsel already impeached Canida's credibility on cross-examination

and in closing argument by repeatedly stating that Canida had been released only after he agreed to testify for the State. 9 RR 215-17, 220; 12 RR 21-22. As such, any evidence of such a benefit conferred by the State would only be cumulative of the argument already made by counsel before the jury, and immaterial under either Brady or Napue.

> 3)   Larry Whited and Richard Driver

Speer next alleges that the State withheld evidence concerning various benefits inmates Larry Whited and Richard Driver received in exchange for their assistance in investigating and developing the case against him. Amended Pet., at 51-53, 69-71, 75-76. Speer believes that certain documents suggesting that Whited negotiated with SPU for certain benefits, such as gang declassification and transfers, were not revealed to defense counsel before trial. Id. In one short paragraph, Speer also implies that similar promises were made to Driver but also not revealed to the defense prior to trial. Id. Neither claim, however, warrants consideration from this Court.

To start, the only evidence provided by Speer to support his assertions, Exhibits 25 and 27, were in the prosecution's files to which the defense had full access. Supp SHCR at 183; Supp SH deposition of Mark Mullin at 56; Supp SH deposition of A.P. Merillat at 78-80. Because he fails to provide any evidence showing that other "benefits" were somehow suppressed by the State, Speer fails to satisfy the first prong of Brady. Moreover, neither Whited nor Driver testified at Speer's trial. As a result, it is unclear how any suppressed evidence concerning various benefits they received in exchange for their help could be considered either exculpatory or impeachment evidence under Brady, much less

constitute a violation under Napue.  Speer offers no argument to clarify, and even admits that Whited's role in the investigation "is not entirely known." Amended Pet., at 52.  In light of this failure to satisfy any of the three prongs under Brady, relief should be denied.

C.     Speer was not deprived of his right to counsel under Massiah.

Coupled with his allegation that the State suppressed information that inmate Innes was actually an undercover agent working for the SPU to gather evidence against him, Speer also complains that the use of this evidence violated his right to counsel under  Massiah v. United States.  Because formal judicial proceedings had not yet begun, however, the State's use of an inmate informant does not implicate the right to counsel.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  By its very terms, the right of the accused to the assistance of counsel is available only after a criminal prosecution has commenced.  Rothgery v. Gillespie County, 554 U.S. 191, 198 (2008); McNeil v. Wisconsin, 501 U.S. 171, 175 (1991).  For purposes of the right to counsel, the Supreme Court has determined that a criminal prosecution has commenced at "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  Rothgery, 554 U.S. at 198; see also United States v. Gouveia, 467 U.S. 180, 192 (1984) (stating that inmates in administrative segregation not constitutionally entitled to counsel before adversary judicial proceedings had been initiated).  This rule recognizes the point at which "the government has committed itself to

55

prosecute," "the adverse positions of government and defendant have solidified," and the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." Id. (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)).

At issue is the incriminating letter Innes provided the SPU, which was written by Speer to inmate David Ellis, along with Speer's confession to Innes that he murdered Dickerson.  See Statement of Facts, supra.  Although it is unclear when Innes acquired the letter or when Speer made his admission to Innes, the record suggests that it was sometime shortly after the offense occurred, but definitely before Innes spoke to the State about a possible deal.  10 RR 26-32, 45-46; Supp SHCR at 178; Supp SH deposition of Mark Mullin at 31; Supp SH deposition of David Carter at 16.  But Speer was not indicted until November 1999.  CR 2.  Because judicial proceedings had not yet begun against Speer when the evidence was gathered, the right to counsel had not yet attached.  Rothgery, 554 U.S. at 213 ("A criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the initiation of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."); Michigan v. Jackson, 475 U.S. 625, 629 n. 3 (1986) (right to counsel attaches at the initial appearance before a judicial officer).  Thus, even were it presumed that Innes was acting as a state agent, any acts taken by Innes on behalf of the State still would not implicate the Sixth Amendment.  Jackson, 475 U.S. at 629.

To the extent that Speer might also complain that the use of Innes's testimony violated his privilege against self-incrimination, his complaint must

still fail.   Assuming that Innes was acting as a state agent, a conversation between an undercover state agent and an inmate does not necessarily implicate the self-incrimination concerns.   See   Illinois v. Perkins, 496 U.S. 292, 296 (1990)(citing Miranda v. Arizona, 384 U.S. 436 (1966)).   The essential elements of a "police-dominated atmosphere" and compulsion are not present when an inmate speaks freely to someone he believes to be a fellow inmate.   Id.   Hence, even were it assumed that Innes was a state agent, because judicial proceedings had not begun and because Speer was not subject to custodial interrogation, self-incrimination concerns do not arise.   See Massiah, 377 U.S. at 206-07 (holding that in federal criminal prosecution, after defendant indicted and where defendant makes incriminating statements to codefendant acting as state agent and where such statements were recorded by federal agent, use of such statements violates the Fifth and Sixth Amendments).

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that Speer's petition for writ of habeas corpus be denied, and that no Certificate of Appealability issue in this case.


Respectfully submitted,


GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

57

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division


  s/ Jeremy Greenwell
JEREMY C. GREENWELL*
Assistant Attorney General
Postconviction Litigation Division
State Bar No. 24038926

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1600
(512) 320-8132 (Fax)
E-mail: jeremy.greenwell@oag.state.tx.us

*Lead Counsel                    ATTORNEYS FOR RESPONDENT

58

CERTIFICATE OF SERVICE

I certify that on the 1st day of August, 2011, a true and correct copy of the above pleading was electronically served to the following counsel for Speer by filing the foregoing document with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court.

CRAIG L. HENRY
Attorney at Law
723 Main St.
P.O. Box 3226
Texarkana, TX 75504-3226
lawyrntx@aol.com

   s/ Jeremy Greenwell
JEREMY C. GREENWELL
Assistant Attorney General

59