IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| **WILLIAM SPEER,** | § | |
| Petitioner | § | |
| vs | § | No. 2:04cv269 |
| **RICK THALER, Director** | § | |
| Texas Department of Criminal Justice, | | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## REPORT AND RECOMMENDATION

William Speer ("Speer") an inmate confined to the Texas Department of Criminal Justice, Institutional Division, filed an application for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Speer challenged his capital murder conviction and death sentence imposed by the 5th Judicial District Court of Bowie County, Texas, in cause No. 16820, styled *The State of Texas vs. William Speer.* Pursuant to 28 U.S.C. §636, this case was referred to the undersigned United States Magistrate Judge for a Report and Recommendation for disposition of the application. For the reasons set forth below, the court should deny the application.

### Facts

On July 11, 1997, a Texas prison inmate named Gary Dickerson was strangled to death in his cell at the Barry Telford Unit in Bowie County, Texas. The events leading to his murder were as follows: A member of an African-American gang within the prison had given Dickerson money to buy contraband cigarettes from an inmate named James Baker. The prison

1

authorities confiscated the money from Dickerson, however, before he could purchase the cigarettes.   In order to stay square with the African American gang, Dickerson told Baker to give the cigarettes directly to the African-American gang member.   Dickerson threatened to inform the authorities about a large shipment of contraband tobacco Baker was about to receive if Baker did not comply with his request.

Inmate Michael Constandine, the leader of a prison gang called the Texas Mafia, had also become involved with Baker's smuggling operation.   Constandine himself owed money to a prison gang called the Texas Syndicate.   To raise money, he decided to obtain a cut of Baker's tobacco shipment.   Constandine threatened Baker with physical harm if he did not agree.

When the tobacco shipment was intercepted by authorities, all three gangs believed that Dickerson had told the authorities about Baker's operation.   Dickerson asked to be placed in protective custody, and his request was granted.   After a week, however, he was returned to the general population, when he proved unwilling to provide further information.   Within a day of being returned, he was killed.

Constandine testified that he met with three people to decide what action to take against Dickerson.   Two of them were gang members: Jessie Barnes and Anibal Canales.   The third was Speer, who was not a member of the gang, but was being considered for membership. Constandine ordered Speer and Canales to kill Dickerson.   While Barnes acted as lookout, Speer and Canales went to Dickerson's cell on the pretext of smoking a cigarette.   Speer choked Dickerson to death while Canales held his arms and feet.

**Procedural history**

On November 4, 1999, Speer was indicted for capital murder pursuant to Texas Penal Code §19.03 (6), killing while incarcerated.   After a jury trial, he was convicted and on October 30, 2001, the jury answered the special issues in a manner such that the trial court sentenced him to death.   The Texas Court of Criminal Appeals affirmed Speer's conviction and sentence in an unpublished opinion.   *Speer v. State,* No.74253 slip op. (Tex. Crim. App. Oct. 8, 2003) (unpublished).   Speer did not seek a writ of *certiorari* from the Supreme Court of the United States.

On June 18, 2003, Speer filed a petition for post-conviction relief with the Texas Court of Criminal Appeals.   On April 30, 2004, the trial judge entered findings of fact and conclusions of law and recommended that Speer's petition be denied.   In an unpublished opinion, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied Speer's petition. *Ex Parte Speer*, No. 59,101-01 slip op. ( Tex. Crim. App. June 30, 2004) (unpublished). On May 30, 2005, Speer   filed an application for a writ of *habeas corpus* with this Court.

On June 6, 2008, the Court stayed these proceedings so that Speer could return to state court and exhaust a new claim.   On March 3, 2010, the state court dismissed Speer's successive petition, and on March 27, 2010, Speer filed an amended application for a writ of *habeas corpus*, containing the new claim, with this Court.

**Claims**

Speer raised five claims in his amended petition for a writ of *habeas corpus*:

1. His counsel rendered ineffective assistance by failing to investigate or present evidence that would have mitigated against his receiving the death penalty.

3

2. The trial court denied him a fair and impartial jury by excusing a prospective juror on the basis of his personal views about the death penalty.

3. The prosecution's facial expressions during cross examination and his comments about the credibility of a defense witnesses denied Speer a fair trial.

4. The two-year delay between Speer's indictment and the beginning of his trial violated his right to a speedy trial.

5. The State deprived him of due process of law when it withheld material evidence and knowingly allowed false testimony to be presented.

**Standard of review**

Title 28 U.S.C. § 2254 (d) provides that relief in *habeas corpus* may not be granted with respect to any claim which was adjudicated on the merits in state court proceedings unless the adjudication of the claim resulted in a decision that was either (1) contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.   A state court determination which is objectively unreasonable meets the requirements of 28 U.S.C. § 2254 (d)(1).   *Woodford v. Visciotti,* 537 U.S. 19, 27 (2002).   Pure questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254 (d)(1), while pure questions of fact are reviewed under 28 U.S.C. § 2254 (d)(2).   *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001).   Factual findings made by the state court are accepted unless rebutted by clear and convincing evidence. 28 U.S.C. §2254 (e)(1).

28 U.S.C. § 2254 (b) generally prohibits granting relief on claims not previously presented to the state courts. If a federal application contains any such claims, the federal court will attempt to allow the applicant to return to state court and present them to the state court in a

successive petition, either by dismissing the entire petition without prejudice, *see Rose v. Lundy*, 455 U.S. 509, 522 (1982), or by staying the federal proceedings, s*ee Rhines v. Weber*, 544 U.S. 269, 277 (2005).

If the federal court is convinced that the state court would refuse to consider the merits of such a successive petition, however, the federal court will treat the unexhausted claims as if the state court had already refused to hear them on procedural grounds.  *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  The federal court generally does not review procedurally defaulted claims unless the applicant can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failing to address the claims would result in a fundamental miscarriage of justice.  *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).  If it is not entirely clear that the state court would refuse to hear a successive petition containing the new claims, however, the federal court will allow the state court the first opportunity to consider them.  *See Wilder v. Cockrell,* 274 F.3d 255, 262-63 (5th Cir. 2001).

**Analysis of claims**

Claim 1:   Speer's first claim is that his counsel rendered ineffective assistance by failing to investigate or present evidence that would have mitigated against his receiving the death penalty.  This claim was adjudicated on the merits by the state court, *see* State Habeas Transcript ("SHTr") Vol. 1, pp. 107 and 111, so the question for this Court is whether the state court's denial of the claim was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

The Supreme Court has held that counsel has a duty to make reasonable investigation into

mitigating evidence.   *See Wiggins v. Smith,* 539 U.S. 510 (2003).    The state court found that Speer's counsel investigated his past criminal record, psychological evaluations, and his family history, by interviewing family members and friends.   *See* Findings of Fact 5 - 9.   Its findings were based upon identical affidavits submitted by Richard Dodson and W. David Carter, Speer's defense counsel.

The affidavits stated:

> During the course of my representation of him, I conducted an investigation into William Speer's background for purposes of developing potential evidence in mitigation of the death penalty.   Those matters investigated included Mr. Speer's past criminal record, psychological evaluations and family history.   I participated in interviews with a number of individuals who were either family members or acquaintances of Mr. Speer prior to trial.   These interviews were conducted for purposes of developing, evaluating and potentially presenting evidence in mitigation of the death penalty. [Co-counsel] and I consulted about our investigation, information generated thereby and the nature of mitigating evidence ultimately presented to the court.   We also advised Mr. Speer about the nature of [the] mitigating evidence which would be presented on his behalf.

*See* SHTr pp. 89-94.    Speer contends that his trial counsel performed no investigation whatsoever:

> To be clear, we are dealing here with counsel's complete, rather than partial, failure to investigate whether there was potentially mitigating evidence that could be presented during the punishment phase of Mr. Speer's trial. . . [Trial counsel's] failure to investigate and offer any mitigating evidence relevant to Mr. Speer's background was professionally unreasonable and deficient performance in the context of this case.   Mr. Speer's lawyers can offer no rational explanation for their behavior.   With their client's life at stake, these attorneys quite simply failed to investigate or produce the only evidence that offered a realistic chance of saving Mr. Speer from execution.

*See* Amended Petition, p. 13.   Implicit in Speer's contention that his counsel did no investigation is the argument that the state court's finding that counsel did perform considerable investigation was unreasonable.   Because the state court's finding was based upon the affidavits of counsel, the burden on Speer is to show that these affidavits were clearly false.

Speer cites to no evidence which contradicts his counsel's affidavits.   Mere allegations to the contrary are insufficient to establish that the state court's crediting of his attorney's affidavit testimony was unreasonable.   Because the state court's denial of Speer's ineffective assistance claim was based upon factual determinations which were not unreasonable in light of the evidence presented in his state post-conviction proceedings, the Court should deny Speer's first claim.

Claim 2:   Speer's second claim is that the trial court denied him a fair and impartial jury by excusing a prospective juror on the basis of his personal views about the death penalty.   This claim was adjudicated on the merits by the state court, *see* SHTr. pp. 107-108 and 112, so the question for this Court is whether the state court's denial of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

A trial judge cannot excuse a prospective juror for cause simply because he or she voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.   *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).   The decisive question is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."   *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985).   In the present case, it is undisputed that Viramontes, the prospective juror at issue, had scruples against the infliction of the death penalty.   The issue for the court is whether the trial judge's determination -  that Viramontes' scruples against the death penalty would have prevented or substantially impaired the performance of his duties as a juror in accordance with

his instructions and his oath - was unreasonable in light of the answers he gave during his *voir dire*.

Viramontes initially stated that it was "pretty hard for me to believe in the death penalty," then stated that he did not think he would hesitate to impose it in the case of someone murdering a child, but he thought that was the only situation in which he would impose the death penalty. Viramontes indicated that he was aware that this case involved a prisoner killing another prisoner, and stated that he could not be responsible for imposing a death sentence in this case. After the prosecution explained  the special punishment issues, Viramontes was asked whether he could answer those  issues truthfully, based upon the evidence, and he replied, "Well, I believe I can." He was then asked two clarifying questions:

> Q: Would you be willing, and could you answer these questions, based on the evidence, regardless of the outcome, life or death, would you answer these questions truthfully, based on the evidence?
>
> A:  Oh, I could answer these questions, sure.
>
> Q:  Okay, but could you answer them in such a way that you possibly – possibly, that you know that he would have to get the death penalty?
>
> A:  No.

Viramontes then answered the remaining questions from both the prosecution and defense counsel in a manner consistent with these responses.  *See* Reporter's Record ("RR") Vol. 8, pp. 30-50.

In light of Viramontes' consistent answers that he would not be able to vote to impose the death penalty in any case that did not involve a child killing, the state court's determination -

that the trial court did not err in excusing Viramontes for cause, because his personal objections to the death penalty would have prevented or substantially impaired his ability to discharge his duties as a juror in accordance with the instructions and his oath - was not unreasonable.   The Court should deny Speer's second claim.

Claim 3:   Speer's third claim is that the prosecution's facial expressions during cross-examination and his comments about the credibility of a defense witnesses denied Speer a fair trial.   This claim was adjudicated on the merits by the state court, *see* SHTr. pp. 112-113, so the question for this Court is whether the state court's denial of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Speer points out that the prosecution called testifying witnesses liars on two occasions. The first occasion was during cross-examination of a defense witness named Terry Abbott. Abbott testified that around the time of the murder, he looked towards Dickerson's cell and saw Dickerson, his cell mate Tim Rice, and two other inmates, Richard Driver and Sam Brown, but he did not see either Speer or Canales.   On cross-examination, the prosecution got Abbott to admit that after looking towards Dickerson's cell, he left the area for between five to fifteen minutes to return to his cell and make a cup of coffee, and that during that time, Speer and Canales could have entered Dickerson's cell and killed him.   Also during cross-examination, the prosecutor got Abbott to admit that Speer was a friend of his, and to admit that he was a practicing pagan.

The alleged misconduct occurred when the prosecutor questioned Abbott about two

9

letters which had already been admitted into evidence, and which the prosecution contended had been written by Speer.   In one, the writer admits to killing a snitch, despite the fact that the snitch might not have actually snitched about 240 packs of cigarettes, as the police said.   This letter was unsigned. Another letter was signed "Stay Puff," and referred to "taking action," and mentioned several people's nicknames, but did not specifically discuss the crime at issue.   The handwriting in the two notes was quite similar, and Speer's thumb print was found on one of the letters.   The prosecution did not offer any expert handwriting analysis testimony, and it attempted to use Abbott's testimony to further connect the two letters to Speer.   Abbott admitted that Speer's nickname was "Stay Puff."   He also admitted that he often passed "kites" (letters or notes) between inmates.   When questioned about the exhibits, however, he said that he did not recognize the letters, did not recognize Speer's handwriting, and did not recognize Speer's signature.   The prosecutor, apparently unsatisfied by Abbott's response,   proceeded to ask a series of questions about the two letters:

> Q. I'm going to ask you, Mr. Abbott, in your understanding of prison language, of living in prison, what you think this means.   I'm not asking what the writer meant.   I'm asking what you think this means.   Okay?
>
> A. Yes, sir.
>
> Q. And we're going to see if we think you're telling the truth here.
>
>    *   *   *   *   *
>
> Q. (Reading letter) "my own family, Bro, God damn, it hurts really bad, and what tops it off even more, we, being me, Ham, J.B. and B.F., did not tell him or

anyone else we were going to do it.   We did not talk, we acted."   Who do you think (he's) talking about here?   Does that mean anything to you?"

DEFENSE COUNSEL: I'm sorry.   I object to the question that asks him what it means, judge.

Q. I'm not asking him what it means, judge.

THE COURT: Just let him finish.

Q. I'm sorry.

DEFENSE COUNSEL: I'm objecting to him making this witness to speculate what that means without some foundation of some term as an inmate he recognizes.

Q. I'm not even asking for the truth of the matter.   I think this man is lying, and I want to see if he is going to tell the truth.

DEFENSE COUNSEL: And I'm objecting to the side bar.

THE COURT: Sustain that.   Just answer the question, sir, if you understand it. What does that mean to you?   I'll let you answer that, and then we're finished with this.

Q. Does this mean anything to you?

A. Repeat that last part, would you please?

THE COURT: Just show it to him.

Q. "What really tops it off even more was we, being me, Ham, J.B. and B.F., did not tell him or anyone else we were going to do it."

A. (It) means they were going to do something they weren't supposed to do, yeah.

Q. Who is "they?"

A. Whoever is in that kite right there.

Q. That doesn't mean anything to you about who that might be?

THE COURT: Okay, that's enough.   That's enough, Mr. Mullin.   Sustain beyond that.

RR Vol. 11, pp. 32-34.

Attorneys are prohibited from offering personal opinions about the credibility of witnesses, although they may characterize a witness as not credible if such characterization is supported by discrepancies between the witness' testimony and known facts.   *Compare United States v. Moore*, 710 F.2d 157, 159 (4th Cir.), *cert. denied,* 464 U.S. 862 (1983) ( improper for a prosecutor to directly express his opinion as to the veracity of a witness) *with United States v. Tullos*, 868 F.2d 689, 696 (5th Cir.), *cert. denied sub nom Blanton v. United States,* 490 U.S. 1112 (1989) (prosecutor's characterizing defendant as a liar when defendant's testimony is at odds with evidence was not improper).

In the present case, the prosecutor's statement, "I think this man is lying and I want to see if he is going to tell the truth," is the type of statement which is specifically prohibited.   Further, during the cross-examination, the prosecutor compounded his error by making facial expressions and shaking his head during the witness's testimony.   The record shows that the Court sustained the objection to the prosecutor's statement that he thought Abbott was lying, and also that the Court instructed the prosecutor not to make faces or shake his head.   *See* RR Vol. 11, pp. 34, 36.

The question for the Court is whether the prosecutor's misconduct was so prejudicial that it rendered the trial fundamentally unfair.   *See Darden v. Wainwright,* 477 U.S. 168, 180 (1986).   Although tying the two letters to each other and to Speer was important, whether Abbott was

telling the truth about not having seen the letters, or about whether he was familiar with Speer's handwriting or signature, was not crucial to either the prosecution's case, or to Speer's defense. However improper the prosecutor's actions may have been in this instance, his actions did not render the trial fundamentally unfair.

The second occasion was during closing arguments in the punishment determination phase of the trial.  The prosecution called Randy Burroughs, a regional director of the Texas Mafia, to authenticate and explain an October 2000 letter that he had written to Joe Henry, another Texas Mafia gang member.  In that letter, Burroughs states that he had not heard from J.R. [Steiner], the president of the gang, and needed Henry to pass along the information contained in the letter to Steiner, then back to him [Burroughs] with instructions as to what to do. Because Burroughs was due to be released on January 1, 2001, he said that it was important for Henry to hurry.

One of the items concerned the crime at issue.   Burroughs' letter stated:

[Canales] just got shipped here from [the Beto unit].   Doyal Wayne [Hill] did a videotape against [Canales] and William Speer.   I didn't believe it, but Will showed me the transcript to the video!   I read it all.   They just shipped Doyal Wayne to a P.C. program on Eastham, he gets out in December.   I have his home address and all.   I will be going home in January.   After 23 years I am ready!

Later in the letter, Burroughs said:

Mike Bennett is on level 3, Craig . . . is on level 2.   Greyhound is on level one. William is here with me. [Canales] is on D-pod level 1.   Bruce Richards' bitch ass is here with me.   Her daddy Charlie Ray just got shipped to Eastham with Doyal Wayne.   He is Christian now. . . .    P.S.   Remember I go home in January and need to hear from [Steiner] before then.

At the punishment phase of the trial, the State had the burden of proving beyond a reasonable doubt that there is a probability that Speer would commit acts of criminal violence

which would constitute a continuing threat to society.   The prosecution contended that Speer

passed along the transcript of Hill's testimony in his trial to Burroughs, knowing that the Texas

Mafia would retaliate against Hill for testifying against him (Speer) and Canales.   When the

prosecution questioned Burroughs, however, he testified that the "Will" who showed him the

transcript of Hill's testimony was not William Speer, but was an inmate named Herman Speer,

and he (Burroughs) had used the name "Will" to confuse authorities, in case the letter was

intercepted.   Burroughs also testified that he was not seeking permission to retaliate against Hill,

who was his best friend.

> During closing arguments, the prosecutor said:
>
> [Burroughs] needs to hear from J.R. Steiner, the president of the Texas Mafia
> about what to do about Doyal Wayne Hill.   He is not asking for permission to go
> have ice cream with him, he's asking permission from J.R. Steiner, do you want
> me to kill him for testifying.   And where did the transcript come from, folks?   "I
> didn't believe it, but Will showed me the transcript to the video." And on the
> stand, in trying to cover for William Speer, [Burroughs] said "Oh, there is no
> Will." [Burroughs] had just said ". . . against [Canales] and William Speer, I
> didn't believe it, but Will showed it to me."   Folks, [Burroughs] lied to you
> about "There is no Will, that's a code name." He sat on that stand, and twice today
> – I hope you can recollect this – twice on that stand, after saying "There is no
> Will, that's a code name," he sat there and called this man Will.

RR Vol. 12, p. 54.

As opposed to his remark about witness Abbott, which was phrased "I think this man is

lying," and was not based upon any evidence, the prosecutor's statement that witness Burroughs

lied to the jury was a fair inference, based upon the discrepancy between Burroughs's calling

Speer "Will" during his testimony and his contending that the "Will" in his letter did not refer to

Speer.   In this circumstance, the prosecutor's statement that the witness lied in his testimony is

not misconduct.   *See United States v. Tullos*, 868 F.2d at 696.

14

Because the first time the prosecutor said a witness was lying was not so prejudicial that it denied Speer a fundamentally fair trial, and because the second time the prosecutor said a witness was lying the statement was not improper, the state court's rejection of this claim was not the result of unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Darden v. Wainwright*.   The Court should deny Speer's third claim.

Claim 4:   Speer's fourth claim is that he was denied a speedy trial.   This claim was adjudicated on the merits by the state court, so the question for this Court is whether the state court's denial of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

The right to a speedy trial is guaranteed by the Sixth Amendment to the Constitution. Rather than set a particular time limit, however, the Supreme Court set forth a four part test for determining whether an accused's right to a speedy trial has been abridged.   Those elements are:

1.    The length of the delay
2.    The reason for the delay
3.    Whether (and when) the accused asserted his right to a speedy trial, and
4.    The prejudice (if any) resulting from the delay.

*See Barker v. Wingo*, 407 U.S. 514, 530 (1972).

 Regarding the first element, the "delay" is defined as the time between the date the defendant is arrested and/or formally charged and the date the trial begins.   *United States v. Marion*, 404 U.S. 307, 320 (1971).   It is not necessary to consider the effect of any of the other three factors unless the delay is presumptively prejudicial.   *Barker v. Wingo*, 407 U.S. at 530-32.

15

In the present case, Speer was charged with capital murder on November 4, 1999, and his trial began on October 16, 2001, a total of 611 days.   The state court concluded that the delay in this case was presumptively prejudicial, *see* SHTr. p.113, Conclusion of Law No. 18, and neither party to this proceeding disputes that finding.   Accordingly, the Court must consider the effect of the three remaining elements of the *Barker v. Wingo* test.

Regarding the second element, the state court made no finding as to the reason for the delay in bringing Speer to trial, although it did specifically find that there was no deliberate attempt by the state to delay the trial.   *See* SHTr. p.113, Conclusion of Law No. 20.   Again, neither party takes issue with this conclusion.   Deliberate attempts to delay the trial are weighed heavily in favor of the accused while neutral reasons such as crowded dockets or clerical errors are weighed less heavily. *Id*. Because the court did not make any finding other than a lack of deliberateness on the state's part, the second part of the *Barker v. Wingo* test also weighs in Speer's favor, although not heavily.

Regarding the third element, the state court concluded that Speer failed to request a trial date prior to filing a motion to dismiss for failure to provide a speedy trial.   *See* SHTr. p.113, Conclusion of Law No. 19, and that he filed a motion to dismiss the indictment with prejudice on the grounds that his right to a speedy trial had been violated on August 20, 2001, the court held a hearing on the motion on August 23, 2001, and at that hearing the court set his case for trial to begin on October 16, 2001.   *See* SHTr. p. 110-11, Findings of Fact Nos. 37-39.   Speer takes some issue with the state court's conclusion, contending that because he was placed in Administrative segregation after the killing, and because his original appointed counsel withdrew and new counsel was not appointed until March 31, 2000, his ability to request a speedy trial was

16

impeded by the state.   Although Speer seems to imply that he would have requested a speedy trial had he had access to counsel earlier, this implication is belied by the fact that he did not mention his right to a speedy trial for over sixteen months after his second  counsel was appointed.

Even if the Court construes Speer's motion to dismiss as an assertion of his right to a speedy trial, it does not help his argument, because the trial court convened a hearing on this motion a mere three days after it was filed, and set a trial date for less than two months later.   In other words, once Speer asserted his right to a speedy trial, the court quickly accommodated him. The third element of the *Barker v. Wingo* test weighs against Speer.

Regarding the fourth and final part, the state court concluded that Speer was not prejudiced by the delay in bringing his case to trial.   *See* SHTr. p.114, Conclusion of Law No. 21.   Prejudice is determined in light of the three interests protected by the speedy trial guarantee:

1.     Preventing oppressive pre-trial incarceration
2.     Minimizing the anxiety and concern of the accused, and
3.     Limiting the possibility that the defense will be impaired.

*Barker v. Wingo*, 407 U.S. at 532.   Speer takes exception to the state courts' conclusion that he was not prejudiced, contending that in his case the 611 day delay in his case infringed upon all three interests.   Regarding whether the delay resulted in oppressive pre-trial incarceration, Speer concedes that he was incarcerated for reasons unrelated to the offense at issue in this case.   He contends, however, that he was placed in Administrative Segregation for the entire time from the date of the incident until his trial.   Speer provides no evidence that Administrative Segregation is significantly more oppressive than incarceration among the general population, so the delay in this case did not result in oppressive pre-trial incarceration.

17

Regarding whether the delay increased Speer's anxiety and concern, while the Court agrees with Speer's contention that "there is no doubt that he experienced a certain amount of anxiety while he waited for trial," it is not clear that proceeding to trial sooner would have significantly lessened his anxiety and concern.   Whatever anxiety and concern Speer experienced before his trial would seem likely less than the anxiety and concern he experienced once sentenced to death.   The trial court's rapid response to Speer's motion to dismiss the indictment suggests that he could have proceeded to trial sooner had he so desired.   The delay in this case did not result in additional anxiety and concern for Speer.

Regarding whether the delay impaired Speer's ability to defend against the charges, he contends that one of the letters used as evidence against him was allegedly provided to prison authorities by an inmate named Ellis, who, by the time of Speer's trial, was out of prison and could not be located.   The letter in question, State's exhibit 34, was admitted based upon testimony by inmate Michael Constandine, who stated that he recognized Speer's signature on the document, and testimony by Charles Parker, a latent print examiner for the Austin Police Department.   *See* RR Vol. 10, pp. 16-17.   Speer does not establish how locating Ellis, or calling him as a witness, could have helped his defense, so the Court finds that Speer's ability to defend against the capital murder charges in his case was not impaired by the delay in bringing him to trial.   Because Speer can establish none of the three prongs of the fourth element of the *Barker v. Wingo* test, this element weighs against Speer.

The first two parts of the *Barker v. Wingo* test weigh in favor of finding a speedy trial violation, and the second two parts weight against finding a violation.   In light of these findings, the state court's rejection of Speer's speedy trial claim was neither contrary to, nor the result of

an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Barker v. Wingo*.   This Court should deny Speer's fourth claim.

Claim 5:   Speer's fifth and final claim is that the prosecution deprived him of Due Process of Law when it withheld material evidence and knowingly allowed false testimony to be presented.   This claim was first raised in the State court in a successive petition.   The Texas Court of Criminal Appeals dismissed the petition as an abuse of the writ because Speer's allegations failed to satisfy the requirements of TEX.CRIM.PROC. Art. 11.071 §5 (a).   This section has three parts:   Subsection (a)(1) provides that the merits of the claim may not be considered and relief on the claim may not be granted unless the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application.   Subsection (a)(2) provides that the merits of the claim may not be considered and relief may not be granted unless the application contains sufficient specific facts establishing that by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.   Subsection (a)(3) provides that the merits of the claim may not be considered and relief may not be granted unless the application contains sufficient specific facts establishing that by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's jury trial under Article 37.071 or 37.0711.

When the Texas Court of Criminal Appeals dismisses a subsequent petition for

post-conviction relief and gives no reason beyond citing to Art.11.071 §5 (a), it is unclear whether the State court decided the claims on procedural grounds or on the merits.  *See Balentine v. Thaler*, 626 F.3d 842, 851-57 (5th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 2992 (2011).   In this circumstance the Court must determine whether the state court's decision fairly appears to rest primarily on federal law, or appears to be interwoven with the federal law, and the adequacy and independence of any possible state law ground is not clear from the face of the opinion.   If these elements are met, it will treat the state's decision as being on the merits. Otherwise, it will treat the claim as having been procedurally defaulted.

The analysis begins with reviewing the subsequent petition to determine upon what subsection of Art. 11.071 §5 (a) the petitioner relied in arguing that his claims should be considered on the merits. *See Balentine*, 626 F.3d at 854.   Speer contended in his state petition that the factual basis of this claim was not available to him at the time he filed his application for state post conviction relief, because the state did not disclose, until after Speer's federal *habeas corpus* proceedings had been initiated, that it offered incentives to inmate witnesses in exchange for their testimony.   Because the basis of the state court's dismissal was subsection 5 (a)(1), the claim is procedurally defaulted.   Speer contends, however, that he can establish cause for failing to present his claims to the state court in either his direct appeal or in his state post-conviction proceedings.   As he points out, his claim is based upon *Brady v. Maryland*, 373 U.S. 83 (1963), and the Supreme Court of the United States has held that the elements of a *Brady* claim are indistinguishable from the elements of the "cause and prejudice" exception to the procedural default bar:

> We set out in *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), the three
> components or essential elements of a Brady prosecutorial misconduct claim:
> "The evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. at 281-82.   "[Cause and prejudice" in this case "parallel two of the three components of the alleged *Brady* violation itself." Id., at 282.   Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the state's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes.   527 U.S. at 282.

*Banks v. Dretke*, 540 U.S. 668, 691 (2004).   The Court must conduct a *de novo* review of the prejudice component of Canales's claim.

 "Prejudice" sufficient to overcome a procedural default has the same test as "materiality" under *Brady* - whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.   *United States v. Bagley*, 473 U.S. 667, 684 (1985).

After the authorities determined that Dickerson had been murdered, they questioned the inmates but received no information.   An inmate named Bruce Innes, who knew about the reason for the killing, asked Canales and Speer to write him letters telling him what happened, and he received letters back from both of them.   Innes was already serving a long sentence, and was at that point facing a serious charge of possessing a weapon and assaulting an officer.   He decided to use the letters to get a plea bargain on the charges and get declassified as a gang member, which would have improved the conditions of his confinement.

Innes turned Canales's and Speer's letters over to his attorney, who negotiated a deal. Investigators for the Special Prosecutions Unit ("SPU") asked Innes to keep in written contact with Texas Mafia gang members, so that they could learn of other criminal activity.   Innes went along with this request, both to help with his declassification, and in order to keep the gang

members from knowing that he had turned state's evidence.

Speer contends that at the time Innes solicited written statements from Canales and Speer, Innes was acting as an undercover agent of the State.   The evidence, however, is that Innes did not agree to work with the State until after he had turned over the statements to his attorney and they negotiated a plea bargain on his pending charges. *See* Deposition of Bruce Innes, pp. 131-138.

 Speer next contends that the prosecution suppressed evidence that Innes's renunciation of his gang affiliation was untrue and he was simply seeking the benefits conferred by not being labeled a gang member.   This is one possible inference from the fact that Innes stayed involved with gang activities between the time he disclosed his desire to the authorities to be reclassified and the time he testified against Canales and Speer.   The other possible inference is that, as the evidence shows, Innes was asked by the SPU to continue collecting information about the gang during this time period and did not want to tip off the gang about his pending betrayal in order to remain an effective informant.   Of these two possible explanations, Speer's is so much less likely that its value as further impeachment of Innes would have been negligible.

Speer next contends that Innes received favorable treatment beyond the plea bargain on the two pending charges, specifically, the SPU decided not to prosecute him for a second weapons charge.   This allegation is true, but because the benefit was simply an additional example of benefits Innes admitted receiving, there is not a reasonable probability that it would have significantly further impeached his credibility.   Similarly, while Innes received some general assistance from the Special Prosecutions Unit regarding the conditions of his confinement and parole, and the assistance he received was related to his cooperation, which

22

included soliciting incriminating statements from Texas Mafia gang members, the assistance was much less significant than the benefits of the plea agreement, so that its disclosure would not have significantly further impeached Innes's credibility.

Speer next contends that Innes was allowed to speak to other state witnesses and corroborate their stories.  The evidence he offers in support of this allegation is that an inmate named Larry Whited wrote in a letter to the SPU investigator that while he and Innes were riding in a bus to a hospital "we got to talk the whole way down there (and no, we didn't coach one another on our stories. Smile)" *See* Successive Application for Writ of Habeas Corpus, Ex. 24.[1] Whited's use of the word "smile" in this context suggests that although he was instructed not to discuss the case with Innes, he did not take the admonition seriously.  The problem with this allegation is that since Whited did not testify in Speer's trial, Speer was not harmed by any unauthorized conversations between Innes and Whited.

Speer next points out that inmate Steven Canida testified that he had obtained no benefits in exchange for his testimony, but just weeks after he testified against Speer, the SPU wrote a letter to the Board of Pardons and Paroles on his behalf.  Speer concedes that his allegations are made "upon information and belief" and that "the extent of Canida's involvement and cooperation with authorities has not yet been fully revealed."  This is insufficient support for the Court to accept his allegation that Canida made an agreement with the state before he testified.

Speer next contends that inmate Whited received benefits from the state in exchange for "developing and investigating the case against Mr. Speer."  Because Whited did not testify at trial, however, and evidence of any benefits he received would not have impeached the

---

[1] The copy of Exhibit 24 attached to Speer's successive state petition, and the electronic copy filed with this Court are both missing the first page, where the passage at issue is located.   The page can be found in the electronic copy of the letter submitted as exhibit 27 to

credibility of the witnesses who did testify.   Speer also points out that Richard Driver was accused of being involved with the gang's discussions about whether to kill Dickerson, but he cooperated with authorities and was not charged.   Speer does not contend that evidence of this agreement was suppressed, but he does contend that the prosecution failed to reveal that the inspector for the SPU pledged to see what they could do with respect to Driver's classification and housing.   Because Driver did not testify at Speer's trial, this pledge would not have been admissible.

Because Speer fails to establish that there is a reasonable probability that, had the evidence he claims was withheld been disclosed to the defense prior to trial, the result in either the guilt-determination phase or the punishment-determination phase of his capital murder trial would have been different, he cannot establish either the "materiality" element of his substantive *Brady* claim, or the "prejudice" element of the "cause and prejudice" exception to the procedural default of his *Brady* claim. Therefore, this Court should deny his fifth and final claim.

**Conclusion**

Because it does not appear that Speer is entitled to relief on any of his five claims, this Court should deny his application for a writ of *habeas corpus*.

Within fourteen (14) days after receipt of the Magistrate Judge's Report and Recommendation, any party may serve and file written objections to the findings and recommendations within.

A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this Report and Recommendation within fourteen days after

---

the Amended Petition for a Writ of Habeas Corpus filed on July 14, 2011 in *Canales v. Thaler*, No.2:03cv069 (EDTX).

being served with a copy thereof shall bar that party from *de novo* review by the District Judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected to factual findings and legal conclusions accepted and adopted by the District Court. *Douglass v. United States Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 28th day of November, 2012.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE