REPORTER'S RECORD

CAUSE NO. 99-F-0506-005

VOL. *13* OF *17*

| | | |
|---|---|---|
| THE STATE OF TEXAS | } | IN THE DISTRICT COURT |
| VS. | } | BOWIE COUNTY, TEXAS |
| WILLIAM SPEER | } | FIFTH DISTRICT COURT |

*************************

PUNISHMENT PHASE

*************************

On the 15th day of October, 2001, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE JACK CARTER, Judge presiding, held in New Boston, Bowie County, Texas.

Proceedings reported by Gregg Shorthand.

Genny Day, C.S.R.
Official Court Reporter, 5th Judicial District of Texas
23 Paul Drive, Texarkana, Texas 75503
(903) 792-0077



**EXHIBIT Q**

```
1                    A P P E A R A N C E S

2    Mr. Mark Mullin, Prosecutor

3    Special Prosecution Unit

4    SBOT: 00788093

5    The State of Texas

6    340 Hwy 75N, Suite A.

7    Huntsville, TX. 77340

8    Phone: (409) 291-2369

9              For the State of Texas

10

11   Mr. Richard Dodson, Attorney at Law

12   SBOT: 05942230

13   #4 Woodmont Crossing

14   Texarkana, TX. 75503

15   Phone: (903) 792-5400

16          and

17   Mr. David Carter

18   SBOT: 039332780

19   Mercy, Carter, & Elliott

20   1730 Galleria Oaks Dr.

21   Texarkana, Tx. 75503

22   Phone: (903) 794-9419

23            For Defendant, William Speer

24

25
```

```
 1                        VOLUME 13

 2                        I N D E X

 3   OCTOBER 29, 2001

 4                  PUNISHMENT PHASE - STATE

 5   Opening Statement by Mr. Mullin for The State      Page 6

 6   Opening Statement by Mr. Dodson for Defense        Page 8

 7                    DIRECT   CROSS   REDIRECT   RECROSS

 8   WITNESS          EXAM     EXAM    EXAM       EXAM

 9   Gail Martin        10      13      15

10   Franklin Nanyoma   16      36

11                 PUNISHMENT PHASE - DEFENSE

12   James Strickland   46      60      79         81

13   Gary Nixon         82      93     104

14   William Speer     106       -

15

16   Motions in Limine                             109

17                      E X H I B I T S

18   NO.     DESCRIPTION                  OFF'D    REC'D

19   S44     Photograph                    12      12

20   S45     Docket Sheet                  77       -

21

22

23

24

25
```

```
 1                        OCTOBER 29, 2001

 2   PUNISHMENT PHASE:

 3   JURY OUT OF THE COURTROOM:

 4                   JUDGE CARTER; Is there anything that we need to

 5   take up before we bring the jury in?

 6                   MR. DODSON: Two issues, Your Honor.

 7                   One, we're going to request the rule be invoked

 8   during the punishment phase as well.

 9                   And two, Mr. Mullin has shown me for the first

10   time this morning, a photograph of the deceased, Gary

11   Dickerson.   I don't know the time frame--don't know how old it

12   is, but this is the first time I've seen it, and it was not

13   previously provided to us, and we would oppose it's

14   introduction.

15                   MR. MULLIN: Judge, we had asked--Mr. Dickerson's

16   sisters are here--this is the first time we've actually met.

17   They live in Dallas.   I work at Huntsville.   We've talked over

18   the phone before, and I asked them to bring some photographs

19   with them.   This morning I looked through them, and I found one

20   of the two of them and Mr. Dickerson.   It's sometime well in

21   the past, because Mr. Dickerson was in prison for quite some

22   time, and I had not seen the photographs before; had not gotten

23   with them in Dallas, and that is the only exhibit we intend to

24   offer through their testimony.

25                   MR. DODSON: Judge, they've been on the witness
```

```
 1    list for two months.
 2                    JUDGE CARTER; Well, I think that's--okay, if
 3    that is an objection, I'll overrule the objection, and let them
 4    show that's their picture and his picture at some point in
 5    time.
 6                    Anything else that we need to take up?
 7                    MR. DODSON: Request that the rule be invoked
 8    during punishment.
 9                    JUDGE CARTER; Alright.
10                    MR. DODSON: Are they allowed?
11                    JUDGE CARTER; Yeah, I allowed them in for this,
12    but not for--
13                    MR. DODSON: --you allowed them in for closing
14    arguments, but we're getting ready for a new hearing.
15                    JUDGE CARTER:  Yes, you need to designate--would
16    you have your witnesses stand then at this time.
17                    MR. MULLIN: Gail Martin was the only one on the
18    list.  We're not going to ask Ms. Byrd to testify.
19                    JUDGE CARTER; Is she going to be your first
20    witness?
21                    MR. MULLIN: Yes.  May she--I guess she will be
22    excused for any openings, but after that may she come in once
23    she is excused?
24                    JUDGE CARTER; I think since we're going into
25    punishment, this is the time for her to be excused if she's
```

1    going to be a witness.  All witnesses are to be excused.

2              Raise your right hand, please.

3              Do you solemnly swear your testimony will be the

4    truth, the whole truth, and nothing but the truth, so help you,

5    God.

6              The rule concerning separation of witnesses has

7    been invoked, and this means it will be necessary that you

8    remain outside the Courtroom until it is time for you to

9    testify, and then we'll call you in to testify at that time,

10   and don't discuss this with anyone except the attorneys.

11             Alright, if you will step outside at this time,

12   please.

13             (MS. GAIL MARTIN EXCLUDED FROM THE COURTROOM)

14             JUDGE CARTER; Alright, are we ready to proceed

15   then?

16             MR. MULLIN: The State is ready.

17             MR. DODSON: Yes.

18             JUDGE CARTER; Bring in the jury.

19             Do you have anything to read in the Indictment?

20             MR. CARTER; There wasn't any enhancement.

21             MR. MULLIN: Well, I put an enhancement in there,

22   but is there any purpose in reading it?

23             I don't mind reading it.

24             JUDGE CARTER; Well, if there's no enhancement.

25             MR. MULLIN; There is one.  I guess we will go

1    ahead and do that, Judge.

2    JURY IN THE COURTROOM:

3                    JUDGE CARTER; Be seated, please.  Ladies and

4    Gentlemen, we are ready now to go into the second phase of the

5    trial, and I'm not going to give any lengthy explanation.

6    Basically, it's the same procedure.  Obviously, the testimony

7    is not going to be as lengthy, but there will be some

8    testimony.  Both sides to have a right to again make an opening

9    statement, and then to present evidence just as we did in the

10   other phase of the trial.

11                   Then when we are completed with the evidence,

12   I will give you another Charge--a set of instructions, and then

13   the final arguments by the attorneys.

14                   Are you ready to proceed now, Mr. Mullin?

15                   MR. MULLIN: The State's ready, Your Honor.

16                   JUDGE CARTER; Mr. Dodson?

17                   MR. DODSON: Yes, Your Honor.

18                   JUDGE CARTER;  Alright.  Do you want to make an

19   opening?

20                   MR. MULLIN: Yes, Your Honor, at this time the

21   State would abandon the enhancement paragraph as to the

22   Defendant, William Speer only.

23                   JUDGE CARTER; Alright, sir.

24   OPENING STATEMENT BY MR. MULLIN:

25                   I don't envy you the job you have to do, but

1  please don't shrink back from it.  We need to finish what we

2  started.  The State is seeking the death penalty in this case,

3  and so that's where we are headed, and that's what we're asking

4  for, so that there's no misconception.

5          This part of the trial should be considerably

6  shorter than the first part.  The first part wasn't very long.

7  It didn't take very long.

8          I think what's going to happen in the next hour

9  or two hours, I intend to call two witnesses.  I intend to call

10  Ms. Gail Martin, who is one of Gary Dickerson's sisters.  We

11  are just going to introduce you to Gary Dickerson a little bit.

12  I want you to understand he was a human; he was a person, and

13  had a life, and then I intend to bring another inmate.  His

14  name is Franklin Nanyoma.

15          Mr. Nanyoma is a co-defendant with William Speer

16  when William Speer was sixteen years old, and committed his

17  first capital murder, and Mr. Nanyoma is going to tell you how

18  that murder happened.

19          As in the first part of the trial--well, I won't

20  go there--but at this time, that is what I expect to do.  I

21  think that is the only two witnesses I will call now.  I'll

22  reserve the right to change my mind, but for now I think that's

23  where we're going.  You should hear the details of Mr. Speer's

24  first murder, and it should be pretty eye opening to you.

25          Thank you.

Genny Day, C.S.R.
Official Court Reporter, 5th Judicial District of Texas
23 Paul Drive, Texarkana, Texas 75503
(903) 792-0077

```
 1              JUDGE CARTER; Alright, Mr. Dodson.
 2   OPENING STATEMENT BY MR. DODSON:
 3              Ladies and Gentlemen, after many days of jury
 4   selection, the twelve of you were selected on this jury because
 5   you promised each of us that you could abide by the oath that
 6   you have taken as jurors.
 7              You also promised that you would not enter into
 8   a punishment phase of the trial with any pre-conceived notions
 9   or ideas on what the ultimate verdict or decision should be.
10   Many of you were asked by Mr. Mullin if you thought an
11   individual could change.  For those of you who were
12   specifically asked that question, you said, yes, I think
13   individuals change.  And they can change.
14              We anticipate the evidence to show that the first
15   murder occurred when William was sixteen years old, in Harris
16   County, down in Houston.  William at age sixteen was sentenced
17   to life in prison in the Texas Department of Corrections.
18   William has grown up in the Texas Department of Corrections.
19              We anticipate to show that William has made a
20   remarkable change.  You'll hear that through two prison
21   chaplains.  Volunteer chaplains, a Mr. Strickland, and Mr.
22   Nixon.  They're out of Sulphur Springs.
23              You recall when we were talking to each of you
24   individually, Mr. Mullin stressed the importance to each of you
25   that if William was found guilty, he would have been found
```

1    guilty of committing two capital murders.  He also stressed to

2    you that that does not automatically dictate the answer to

3    the two issues that you're going to be submitted.  The issue on

4    future dangerousness, and the issue of mitigation.  Each of you

5    agreed to that.

6              Moreover, Mr. Mullin said, you're going to wait

7    to hear all of the punishment evidence, aren't you?  And you

8    said, yes.

9              Now Mr. Mullin is going to go first, then we're

10   going to put on some testimony.  The reason he's going first is

11   because he has the burden of proving beyond a reasonable doubt,

12   that there is a probability--so it's two issues--beyond a

13   reasonable doubt that there is a probability that William will

14   commit acts of violence in the future, and be a continuing

15   threat to society.

16             I submit to you that the evidence that Mr. Mullin

17   stressed during voir dire, that you wait upon, is going to show

18   that he is not able to meet his burden of proof, and at the

19   conclusion of all this punishment evidence, based upon the

20   evidence that you're presented with, I'm going to come back and

21   ask you to answer these two issues so that William receives

22   life.

23             Thank you.

24             JUDGE CARTER; Alright, call your first witness,

25   please.

```
 1                  PUNISHMENT PHASE - STATE
 2                  MR. MULLIN: The State calls to the stand, Ms.
 3   Gail Martin.
 4                       GAIL MARTIN
 5   having been duly sworn, testified as follows:
 6                    DIRECT EXAMINATION
 7   BY MR. MULLIN:
 8        Q.   Hi, Ms. Martin.
 9        A.   Hi.
10        Q.   Would you tell the jury your name, please?
11        A.   Gail Martin.
12        Q.   Ms. Martin, you knew Gary Dickerson?
13        A.   Yes, sir.
14        Q.   How did you know him?
15        A.   That's my brother.
16        Q.   He was your brother.  How many siblings were there
17   in your family?
18        A.   Five.
19        Q.   How many sisters?
20        A.   One sister.
21        Q.   And you had three brothers?
22        A.   Three brothers.
23        Q.   Alright. Gary had problems with the law for quite
24   some time, didn't he?
25        A.   Yes, sir.
```

1       Q.   Was he older or younger than you?

2       A.   He was older.

3       Q.   What do you remember most about Gary?

4       A.   I always called him my protector.  He was my big

5 brother, and always looking out for me, and just a great

6 brother.

7       Q.   Where is your--what's happened with your father?

8       A.   He passed away about three years ago.

9       Q.   And your mother, Ms. Martin?

10      A.   Lost her last November.

11      Q.   Almost a year ago?

12      A.   Almost a year, uh, huh (yes).

13      Q.   What was your mother's relationship like with Gary?

14      A.   They were very close.

15      Q.   Even when he was in prison?

16      A.   Oh, yes.

17      Q.   Did she ever give up on him?

18      A.   Never.  Never.

19      Q.   Did Gary correspond with his family?

20      A.   Yes, very regularly.

21      Q.   Did he do other things for the family?

22      A.   Yes, he always made us gifts.  I remember he would

23 go buy it, and he would send home something.  You know, always

24 thinking of us.

25      Q.   What kinds of gifts can an inmate make?

1      A.   He made the most beautiful things out of--with

2  matches.   He made us jewelry boxes, clocks, picture frames,

3  purses, wallets.

4      Q.   Are inmates allowed to work in the craft shop there

5  at the prison?

6      A.   Yes.

7      Q.   I'm going to show you State's Exhibit 44.   Have you

8  seen that before?

9      A.   Yes, sir.

10      Q.   Is that accurate of the way these people looked on

11  that day?

12      A.   Yes, sir.

13            MR. MULLIN: Your Honor, the State offers into

14  evidence, Number 44.

15            MR. DODSON: Your Honor, we would renew the

16  object that we made earlier.

17            JUDGE CARTER; Yes, sir, that is overruled.

18      Q.(MR. MULLIN): Ms. Martin, who was in State's Exhibit 44?

19      A.(MS. MARTIN): That's me and my sister with Gary.

20      Q.   Okay.   Out in a boat in the water?

21      A.   Yes, out on Lake Texoma.

22      Q.   Did you all used to like to do that?

23      A.   Oh, yeah. Loved to camp.

24      Q.   I think Gary kept getting in trouble with burglaries,

25  is that right?

13

1    A.   Yes.

2    Q.   Made some drug--had drug problems?

3    A.   Yes.

4    Q.   And that kept getting him in trouble?

5    A.   Yes, sir.

6    Q.   Did you love your brother?

7    A.   Very much.

8    Q.   Did your mother?

9    A.   Very, very much.

10   Q.   What kind of affect did you see in your mother after

11   Gary died?

12       A.   It devastated her.

13           MR. DODSON: Your Honor, I am going to object at

14   this time.   I think we're headed toward victim impact, which

15   is not admissible at this point.

16           JUDGE CARTER; I will allow that question.

17   Overruled.

18   Q.(MR. MULLIN): We're talking about your mother.

19   A.(MS. MARTIN): It devastated her.   She loved him so.

20   Q.   Do you miss your brother?

21   A.   Yes, sir.

22   Q.   Pass the witness.

23                       CROSS EXAMINATION

24   BY MR. DODSON:

25   Q.   Ms. Martin, I'm Dick Dodson, we haven't met have we?

1      A.   No.

2      Q.   I am one of William's lawyers.   When is the last time

3  you personally visited Gary?

4      A.   The last time I saw him was when he was home.

5      Q.   When was that?

6      A.   It was in--the end of '94, or early '95.

7      Q.   How old are you?

8      A.   Forty.

9      Q.   At the time of his death, Gary was 45--let me look--

10  my math's not very good.

11     A.   He was 44.

12     Q.   Alright, what is the age difference between you and

13  Gary?

14     A.   Eight years.

15     Q.   Okay.   He has basically been in the penitentiary the

16  majority of your adult--your life--has he not?

17     A.   Oh, some of it, yes.

18     Q.   Okay.   I believe he went in when he was 18?

19     A.   Yes, sir.

20     Q.   And you would have been 10?

21     A.   Uh, huh (yes).

22     Q.   Okay, and you did not visit him in prison, did you?

23     A.   Yes, several times.

24     Q.   Okay, but the last--when he was in prison earlier, but

25  not since '94?

1       A.   No.

2       Q.   Okay.   Thank you.

3            JUDGE CARTER; Anything further?

4            MR. MULLIN: Yes, sir.

5                      REDIRECT EXAMINATION

6  BY MR. MULLIN:

7       Q.   Ms. Martin, do you--do you personally know if your

8  mother was--had continued to see Gary?

9       A.   Yes, she visited him often.

10      Q.   Do you know if she was scheduled to visit him before

11  his death?

12      A.   Yes, she was supposed to go the next day.

13      Q.   The next day.   Okay.   The fact that your brother was

14  eight years older than you, and spent so much of his time in

15  TDCJ, does that in any way mean that you didn't love him just

16  as much?

17      A.   No, sir.   No, sir.

18            MR. MULLIN: Nothing further, Judge.

19            MR. DODSON: Nothing further.

20            JUDGE CARTER; Thank you, Ma'am, that's all.   You

21  may step down.

22            Call your next witness, please.

23            MR. MULLIN; The next one is an inmate.   His name

24  if Franklin Nanyoma.

25            The State would ask that Ms. Martin be excused

1    from the rule and allowed to remain in the Courtroom.

2                    MR. DODSON: That's fine.

3                    JUDGE CARTER; You may remain seated in here now.

4                        FRANKLIN NANYOMA

5    having been duly sworn, testified as follows:

6                        DIRECT EXAMINATION

7    BY MR. MULLIN:

8         Q.   Good afternoon, Mr. Nanyoma.

9         A.   Good afternoon.

10        Q.   Are you alright today?

11        A.   Yes, sir.

12        Q.   Mr. Nanyoma, well, we have met and talked a couple of

13   times, right?

14        A.   Yes, sir.

15        Q.   You had nothing to do--don't know anything about the

16   murder of Gary Dickerson, do you?

17        A.   No, sir.

18        Q.   Mr. Nanyoma, you're in TDC for murder?

19        A.   Yes, sir.

20        Q.   Seventy-five years?

21        A.   Yes, sir.

22        Q.   Is that for the murder of a Mr. Collins?

23        A.   Yes, sir.

24        Q.   Jerry Collins?

25        A.   Jerry D. Collins.

1        Q.   Mr. Nanyoma, do you and I, or you and anybody, have

2    any kind of deal cut for your testimony today?

3        A.   No, sir.

4        Q.   Has anyone offered or suggested in any way that they

5    could somehow help you if you took the stand and testified?

6        A.   No, sir.

7        Q.   Is it anyway--in anyway in your mind that someone is

8    going to do something to help you because of your testimony

9    here today?

10       A.   No, sir.

11       Q.   Mr. Nanyoma, how old are you?

12       A.   I'm 30 years old.

13       Q.   And Mr. Speer is, what?  Three years younger than you?

14       A.   I think so.

15       Q.   You're older than he is?

16       A.   Yes, sir.

17       Q.   The Defendant, William Speer, how did you know him?

18   What name did you know him by?

19       A.   Keith.

20       Q.   Keith.  William Keith Speer?

21       A.   Yes, sir.

22       Q.   Do you recognize--do you see him in the Courtroom?

23       A.   No, I don't see him.

24       Q.   How long has it been since you've seen William Keith

25   Speer?

1      A.   It's been about eleven years.

2      Q.   You haven't seen him since then?

3      A.   No, sir.

4      Q.   Okay.  The person, William Keith Speer--the person you

5  called Keith back eleven years ago, was he a heavy set person

6  back then?

7      A.   Yes, sir.

8      Q.   Overweight?

9      A.   A little bit.  Yes, sir.

10      Q.   Okay.  He was 16 then, wasn't he?

11      A.   15 or 16.

12      Q.   And you haven't seen him in eleven years?

13      A.   No, sir.

14      Q.   So if he walked in front of you, do you know if you

15  would recognize him?

16      A.   It's been a long time, you know.

17      Q.   Let me ask you this, do you recognize the person in

18  this photograph, State's Exhibit 32?

19      A.   (No audible response).

20      Q.   You can hold that if you like?

21      A.   Yeah, that's Keith.

22      Q.   Is that Keith?

23      A.   Yes, sir.

24      Q.   Is that the person that we're talking about?  William

25  Keith Speer?

1    A.   Yes, sir.

2    Q.   Alright.  But you don't see him in the Courtroom?

3    A.   I don't recognize him here, no, sir.

4    Q.   Alright.  But this is the person that you're calling

5    Keith?

6    A.   That's him.

7    Q.   Alright.  Have you had any conversation with him in

8    the last eleven years?

9    A.   No, sir.

10   Q.   Mr. Nanyoma, let's talk about what happened--why you

11   were in prison.

12        What was your dealing with the victim, Jerry

13   Collins?

14   A.   He was my best friend's father.

15   Q.   Who was your best friend then?

16   A    John Collins.

17   Q.   John Collins, and Jerry Collins was his father?

18   A.   Yes, sir.

19   Q.   And did you have occasion to have some kind of problem

20   with Mr. Collins?

21   A.   Yes, sir.

22   Q.   Okay.  Explain--we're not going to go for hours here--

23   just explain the gist of it.  What was that about?

24   A.   We had gotten some checks from his father--from Mr.

25   Collins.

1      Q.   You had gotten some?

2      A.   His son got them--John Collins got the checks, and he

3  didn't have no way of cashing the checks.  I was the only one

4  old enough to cash them.  I had a car and I had a license, and

5  he asked me to cash the checks.  I went and cashed the checks--

6  you know, forged the checks, and later on we spent all of that

7  money, you know.  It was about Eight Hundred--Nine Hundred

8  Dollars.

9      Q.   Alright, let me stop you.  I'm going to stop you

10 once in a while.  I don't mean to interrupt you.

11     A.   Yes, sir.

12     Q.   You, at the time were how old?

13     A.   I was about 17--18.  About 18 years old.

14     Q.   You're not sure?

15     A.   17 or 18.

16     Q.   Well, what year are we talking about?

17     A.   '89--around '89.

18     Q.   Alright, the year that Mr. Collins was killed, do you

19 know what year that was?

20     A.   I believe it was in '90--the beginning of 1990.

21     Q.   Alright.  In 1990--think back to your birthday.  When

22 is your birthday?

23     A.   August 30.

24     Q.   Of?

25     A.   1971.

1    Q.   Of '71--so you would have been 18 or 19.

2    A.   18.

3    Q.   And you said you had a car?

4    A.   Yes, sir.

5    Q.   What kind of a car did you have?

6    A.   I had a Monte Carlo.  A 1981 Monte Carlo.

7    Q.   Okay, a decent car?

8    A.   Yes, sir.

9    Q.   Did your friend, John Collins have a car?

10   A.   He had a car, but his dad wouldn't let him drive the

11   car around.

12   Q.   Okay, were you friends with William Speer at the time?

13   A.   Yes, sir.

14   Q.   Did he have a car?

15   A.   No, sir.

16   Q.   Okay. Do you know if he was old enough to drive, or

17   do you remember?

18   A.   He wasn't old enough to drive.

19   Q.   As far as you remember?

20   A.   Right.

21   Q.   Now you got some--John Collins, the son got some

22   checks?

23   A.   Yes, sir.

24   Q.   Did you have some way to cash those checks?

25   A.   Yes, sir.

22

```
1        Q.   Okay.

2        A.   I already had a bank account.  I believe it was M-One

3   Bank in Edgebrook, and you know, at that time I didn't have any

4   money in my account or anything like that, but I used to go in

5   there and cash my checks--you know, when I used to work and

6   stuff, and I knew how to go and cash a check, you know.  I

7   knew where the check needed to be signed and everything.

8        Q.   Okay, and so you cashed some checks for John Collins?

9        A.   Yes, sir.

10       Q.   You said Eight or Nine Hundred Dollars?

11       A.   Yes, sir.

12       Q.   Did this become a problem?

13       A.   Yes, sir.

14       Q.   Why?

15       A.   About a month after--it was several checks--about a

16   month after the checks were cashed, his father, Mr. Collins,

17   got the check stubs in the mail, and he wanted to know--you

18   know, where his money was at, and why this had been done, and I

19   got called over there.  You know, John told me his father

20   needed to talk to me, and I went down there, and he was real

21   upset, you know--

22       Q.   --Mr. Collins?

23       A.   Yes, sir.  He was real upset, and at that time I was

24   on probation for carrying a gun in school, and I was on

25   unadjudicated probation, and Mr. Collins made a threat that if
```

 1   I didn't pay him his money back, you know, that he was going to

 2   turn me in to the authorities.

 3        Q.   Yes.  And were you ever able to resolve that problem

 4   with Mr. Collins?

 5        A.   I tried.  I had a lot of expensive jewelry--bracelets,

 6   watch, and necklaces, and stuff, and I tried to take them over

 7   there to Mr. Collins, and you know--more like a collateral

 8   until I could get the money to pay him.  He didn't want that.

 9   He wanted his money.

10        Q.   Okay, so did you all ever work out your problems?

11        A.   No, sir.

12        Q.   Okay.  After that did you have occasion to speak with

13   the son, John Collins, about the situation?

14        A.   Yes, sir.

15        Q.   I mean, one time--several times?  How many?

16        A.   Several times.

17        Q.   Okay, and what was the gist of you all's conversation?

18        A.   What did you all talk about?

19        Q.   First, I was upset.  I was upset, because I remember

20   John had--he told me not to worry aabout the check stubs.  He

21   told me  not to worry about it, and I remember he threw one of

22   the receipts--he had thrown them up on top of the roof of the

23   house, and I was upset.  You know, this man was threatening to

24   throw me in jail, and he was telling me not to worry about it.

25             So I told him, look man, we need to come up with

1    this money, you know.  You need to help me, you know, whatever

2    way. you need to help me.

3        Q.   Uh, huh (yes).

4        A.   But he wasn't working--I wasn't working, you know.

5        Q.   Okay, let me stop you.  At any point did William

6    Speer--the person that you identified as Keith--was he ever in

7    on any of these conversations?

8        A.   Toward the end, yes, sir.  Toward the end of our

9    conversations.

10       Q.   So how long are we talking, from the time you knew you

11   had a problem with Mr. Collins, until Mr. Collins death, how

12   big a time frame are we looking at?

13       A.   I would say it was about the span of about a month,

14   that we had our talks, you know.

15       Q.   Yeah.  And during the span you had several talks with

16   John Collins, is that right?

17       A.   Yes, sir.

18       Q.   And you had at some point--some talks was Keith

19   involved?

20       A.   Yes, he was present.

21       Q.   Alright.  What--how did it come out, how you all were

22   finally going to resolve the problem?  How did that happen?

23       A.   John had made a comment about how his dad--he wished

24   his dad would have been dead, you know.

25       Q.   Uh, huh (yes).

1    A.   And if I remember correct, you know, it was all three

2    of us--we were present, and you know, we all used to joke

3    around and stuff, and nobody took that serious, you know.   But

4    then it came up more than once, you know.   It came up more than

5    once.   He was complaining about how his father owed him money

6    and you know, blamed his dad with a lot of things that happened

7    with his mother a few years before, you know, and you know--the

8    thought was just thrown in the air, you know.

9    Q.   Sure.   So at some point was there a decision made how

10   to handle the problem?   Ultimately, here's how we're going to

11   do it?

12   A.   Okay.

13   Q.   First of all, was there a decision made?

14   A.   Yes, sir, but a few--I'd say after a while there was,

15   but before then I still tried to resolve it.   You know, without

16   having to resort to that.

17   Q.   Yes.

18   A.   You know, to going and having the man killed or

19   anything.

20   Q.   Uh, huh (yes).   And in talking about what to do about

21   Mr. Collins, did Mr. Speer, or Keith, ever have any ideas about

22   how to handle it?

23   A.   Yes, sir.

24   Q.   What was his idea?

25   A.   Well, first he volunteered for it, you know.

1    Q.   Volunteered for what?

2    A.   For the--to commit the murder, you know.

3    Q.   To murder--?

4    A.   --like saying, you know, well, yeah, you know.  Do it,

5    you know.  Get it done. Do it.  Then we didn't have no way of

6    having this man killed, or killing this man, because we didn't

7    have a gun.  I didn't possess a gun.  You know, I didn't own a

8    gun.

9    Q.   Okay.

10   A.   I tried to talk to several other guys and get a gun,

11   but--

12   Q.   --but you never got one?

13   A.   No.

14   Q.   Alright.  Did you ever--were you ever able to come up

15   with a gun?

16   A    No, sir.

17   Q.   Alright, did anyone of the three of you ever come up

18   with a gun?

19   A.   Yes, sir.

20   Q.   Who?

21   A.   Keith.

22   Q.   Keith.  Do you remember what kind of gun it was?

23   A.   I believe it was a 25 automatic--semi-automatic

24   pistol.

25   Q.   Okay, and did he tell you where he got the gun?

1      A      Yes, sir.

2      Q.     Where?

3      A.     He got it from his mom.  She used to keep it in the

4  glove compartment in her car.

5      Q.     Okay.  You're not saying the mother handed it to him?

6      A.     No, sir.

7      Q.     But he got it from the car?

8      A.     He got it.  Yes.

9      Q.     Now did--let's be clear here.  Did Keith ever in your

10 presence suggest here's what we need to do, or here's what I

11 think we ought to do?

12     A.     It was more like all three of us had an input on how

13 it was going to be done.

14     Q.     Okay.

15     A.     John had the house set up, you know. He came up with

16 the idea about leaving the window open.

17     Q.     Okay.

18     A.     To get in the house, because he wasn't staying at that

19 house at that moment, you know--at that time.

20     Q.     Okay.

21     A.     Neither was I.  We discussed it, and he was the only

22 one that volunteered to do it.

23     Q.     Who volunteered?

24     A.     Keith.

25     Q.     Keith volunteered to do what?  Let's be specific.

```
 1        A.   To go in, and commit the actual murder.

 2        Q.   Kill Mr. Collins?

 3        A.   Yes, sir.

 4        Q.   Alright.   You're saying Keith volunteered for that?

 5        A.   Yes, sir.

 6        Q.   And so what was the plan to be as you understood it?

 7   What was supposed to happen?

 8        A.   Okay.   Mr. Collins had given me a deadline of

 9   Wednesday.   I remember it was a Wednesday, that he wanted his

10   money by Wednesday, and Tuesday night--we had talked that we

11   were going to get together that Tuesday night.   You know, I was

12   to pick them up because I was the only one with a car.   Pick

13   Keith up, and take him over there.   We waited until it was late

14   at night, you know, and there was nobody--no lights on in the

15   neighborhood, and I parked my car--I remember I parked my car--

16   I went and picked him up, parked my car--

17        Q.   You picked who up?

18        A.   Keith.

19        Q.   Okay.

20        A.   Went and parked my car at an angle from Mr. Speer--

21   I mean Mr. Collins' house, an angle a few houses away, so we

22   already knew and had it understood, how the house was already

23   set up to go in through the back window--

24        Q.   And how did you know how the house was set up?

25        A.   Because John had told us the house was going to be
```

1    open.

2        Q.   He had told you--alright.

3        A.   And he got out of my car and--

4        Q.   --who got out of your car?

5        A.   Keith--he got out of my car.  He had the pistol with

6    him, and I stood outside of my car.  You know, I was leaning--I

7    remember I was leaning outside of my car, facing Mr. Collins'

8    house--you know, his bedroom was right by the window--by one of

9    the windows, facing the street.

10       Q.   Uh, huh (yes).  Now let me slow down, so we don't go

11    too fast.  Did you watch Keith walk to Mr. Collins' house?

12       A.   Yes, sir.

13       Q.   Did you see him--do you know if he went into the

14    house?

15       A.   Yes, sir.

16       Q.   While you were--from the time you saw Keith--at some

17    point did he disappear from view?

18       A.   Yes, sir.

19       Q.   Okay, from the time he disappeared from view at the

20    house, until--well, let me get a little more detail, and then

21    I'll ask you that question.

22             As you were standing there watching, did you

23    hear anything?  As you're standing there leaning against your

24    car, were you watching the house?

25       A.   Yes, sir, I was watching the house.

1      Q.    Did you here anything?

2      A.    Not until he went inside the house.

3      Q.    Alright.   Now after Keith's inside the house, did you

4    hear anything?

5      A.    Yes, sir.

6      Q.    What did you hear?

7      A.    I heard a gunshot.

8      Q.    Okay, did you see anything?

9      A.    Yes, sir, I saw the flash from the gunshot.   I saw the

10   flash by the window of the house.

11     Q.    Of Mr. Collins' house?

12     A.    Yes, sir.

13     Q.    From the time Keith disappeared at the house, until

14   the time you heard the gunshot, do you have any idea about how

15   long that was?

16     A.    I would say the span of about three minutes.

17     Q.    Okay, after you heard the gunshot and saw the flash,

18   did you see Keith again?

19     A.    A few minutes later he came out the door.

20     Q.    Out which door?

21     A.    The front door of the house.

22     Q.    Is that the way he went in?

23     A     No, sir, he went in through the back window.

24     Q.    The back window, but came out the front door?

25     A.    Yes, sir.

1      Q.   Alright.   Where did he go?

2      A.   He came straight to the car.

3      Q,   Alright, when he got to the car, did he have the gun

4   with him?

5      A.   Yes, sir.

6      Q.   Now at this point, had you all gone there to do what

7   you intended to do?

8      A.   Yes, sir.

9      Q.   I mean, you knew what was going to happen.

10     A.   I knew what was going to happen.   Yes, sir.

11     Q.   And that's what you intended to happen?

12     A.   Yes, sir.

13     Q.   And you took part in that, didn't you?

14     A.   Yes, sir, I did.

15     Q.   And you--when you heard the gunshot, in your mind you

16   pretty much knew what had taken place?

17     A.   Yes, sir.

18     Q.   And when Keith came back to the car, did he get in

19   the car?

20     A.   Yes, sir.

21     Q.   What happened with the gun at that point?

22     A.   First we--after he got in my car, I remember we went

23   riding around, you know.   I was nervous, you know.   I was

24   nervous.

25     Q.   What was his demeanor?

```
1        A.   He was calm, you know.  He wasn't nervous, that I
2   could see he wasn't just, you know, nervous.   I was more
3   nervous.  I know I was, you know.
4        Q.   Did he appear nervous to you?
5        A.   No, sir.
6        Q.   Okay, so what did you all do with the gun?
7        A.   So we went riding around, and I asked--I kept asking,
8   man, are you sure that he's dead?  Are you sure?  He kept
9   telling me, yeah, he knew that he was dead, but I kept asking
10  you know, an insisting question, you know, so he said, well,
11  let's go back, you know.  I'll make sure.  So we went back.
12       Q.   Alright, let's--
13       A.   --he still had the gun with him.
14       Q.   Okay, he still had the gun with him?
15       A.   Yeah, he still had the gun with him?
16       Q.   Alright, while you're riding around in the car, did
17  Keith tell you what he did?
18       A.   Yes, sir.
19       Q.   What did he say?
20       A.   He said that he went in there--in the house--and
21  John's dad was asleep in his bed, and that he walked up to him,
22  and that--
23       Q.   --that Keith walked up to--
24       A.   --Mr. Collins while he was asleep in his bed, but
25  right at the point--I remember he said, right at the point
```

1  where he pulled the trigger, the man opened his eyes, you know.

2      Q.   And looked at him?

3      A.   Yes.

4      Q.   Did he say where he shot him?

5      A.   He told me he shot him in the head.

6      Q.   Did you ever at any point find out where he was

7  actually shot?

8             MR. DODSON: Judge, I'm going to object that would

9  be hearsay unless he has personal knowledge.

10            JUDGE CARTER; Yeah, I sustain that.

11     Q.(MR. MULLIN); Do you know where he was shot?

12     A.(MR. NANYOMA): Yes, sir.

13     Q.   How would you know that?

14     A.   Well, when I went to trial later on, I knew that--

15  they showed me pictures of the man. He got shot right by his

16  eye.

17     Q.   Okay. So--but Keith told you--what did Keith tell you

18  he did?  I want you to be specific.

19     A.   He told me that he went in there. He just told me,

20  well, I did it, you know.  I did it, and he described it

21  because I asked him, well, what was he like?  And he told me,

22  well, I shot him in the head, you know.  The man opened his

23  eyes before I shot him, and I shot him--

24     Q.   --okay--

25     A.   --and come out the house.

34

1      Q.   And after you all were riding around, I think your

2   testimony was, you asked Keith, are you sure you did it?

3      A.   Right.   I kept asking.

4      Q.   Okay, and what was his answer to that?

5      A.   He kept saying, yes.   You know, at first he kept

6   saying, yes, yes, you know.

7      Q.   Okay, and then what did he respond to after that?

8      A.   Let's go back.

9      Q.   Let's go back to where?

10      A.   To the house.

11      Q.   Did you?

12      A.   Yes, sir, we went back.

13      Q.   You drove back to Mr. Collins house?

14      A.   I drove right back, yes, sir.

15      Q.   Where did you park?

16      A.   Parked at the same place.

17      Q.   What did you do?

18      A.   I stood outside the car again.

19      Q.   What did Keith do?

20      A.   He went back inside the house.

21      Q.   How did he get in?

22      A.   The front door.

23      Q.   Did you watch him walk in?

24      A.   Yes, sir.

25      Q.   He went back in the house?

1      A.   Yes, sir.

2      Q.   How long was he in the house?

3      A.   Not that long--two minutes at the most.

4      Q.   Okay, did you see Keith again?

5      A.   Yes, sir, he came back out.

6      Q.   Out which way?

7      A.   The same--the front door.

8      Q.   The front door.  When he came out the front door where

9 did he go?

10     A.   Back to my car.

11     Q.   Did he get in your car?

12     A.   Yes, sir.

13     Q.   Did he tell you anything at that point?

14     A.   When we got back inside my car and you know, turned on

15 my engine and we left again, and I asked him, well?  And he

16 said, well, yeah, he's dead.  And I remember he said something

17 about that he heard like a gurgling noise coming from the body,

18 and then after that, I just left, and took him back home.

19     Q.   Was the gun in the car?

20     A.   Yes, sir.

21     Q.   What did you all do with the gun?

22     A.   He put it in my glove compartment.

23     Q.   Why?

24     A.   I got kind of nervous, you know, after that I started

25 thinking, you know, man, this dude just went and did that, I

1  don't want him, you know, to trip on and do it to me, put--you

2  know, put the gun in the glove compartment--so I just put the

3  gun in the glove compartment.

4       Q.   So you locked it up?

5       A.   Yes, sir.

6       Q.   And at some point was it removed from the glove box?

7       A.   Yes, sir.

8       Q.   Who removed it?

9       A.   He did.

10       Q.   After he came out the second time and got in your car,

11  what was Mr. Speer's demeanor like that time?

12       A.   Same.   Just--I don't want to say, cold, but he was

13  just--he wasn't nervous, he was calm, you know.

14       Q.   He wasn't frantic?   He wasn't anxious or worried?

15       A.   Oh, no, sir.

16       Q.   I'll pass the witness.

17                      CROSS EXAMINATION

18  BY MR. DODSON:

19       Q.   Mr. Nanyoma, I'm Dick Dodson.   I represent William.

20  You knew him eleven years ago as Keith.   We have not met, have

21  we?

22       A.   No, sir, we haven't.

23       Q.   Now our investigator went out and talked to you

24  Friday out at the prison?

25       A.   Yes, sir.

37

```
 1        Q.   Where are you housed?  Where do you normally stay?
 2                  MR. MULLIN:  Your Honor, we're going to--
 3                  May we approach reach quick, please?
 4                  BENCH CONFERENCE - ALL ATTORNEYS
 5                  MR. MULLIN: What we're concerned about is the
 6        safety issue.  Does he really have to know in front of
 7        Mr. Speer where he's housed?
 8                  MR. DODSON: I'll rephrase the question.
 9        Q.(MR. DODSON): You're not housed here at Telford?
10        A.(MR. NANYOMA: No, sir.
11        Q.   And they had you brought up to Telford this past week?
12        A.   Yes, sir, last week.
13        Q.   Now, I believe you told us that your date of birth
14   was when?
15        A.   8-30-71.
16        Q.   '71?
17        A.   Yes, sir.
18        Q.   Okay, and if the records show that the death of Mr.
19   Collins happened in January of 1991, you wouldn't dispute that,
20   would you?
21        A.   No, sir.
22        Q.   Now at the time you were 19, right?  If you were born
23   in '71 and this happened in '91, but your birthday hadn't
24   arrived yet, you'd be 19?
25        A.   I was about 18 or 19, that's what I said.
```

38

1    Q.   Nineteen and a half.

2    A.   I don't know about the half.

3    Q.   Well, if you were born in '71, and the offense was in

4  '91, that's twenty years, but you weren't quite that twentieth

5  birthday?

6    A.   We'll say 19.

7    Q.   Okay.  Now I believe you indicated you thought

8  William was 16?

9    A.   Yes, sir.

10   Q.   William didn't have a whole lot of friends, did he?

11   A.   No, sir, he didn't.

12   Q.   Didn't you make the statement that you were about the

13  only friend he had?

14   A.   Yes, sir.

15   Q.   I believe you referred to him as Regordo.

16   A.   Yeah.

17   Q.   Which is Spanish for what?

18   A.   Like 'Fat Boy'--you know.

19   Q.   Fat Boy?

20   A.   Yeah.

21   Q.   Okay.  Now you and John Collins were best friends?

22   A.   Yes, sir.

23   Q.   And at one point in time you had--at this time you'd

24  been kicked out of your own house for your own problems,

25  correct?

| | |
|---|---|
| 1 | A.   Yes, sir. |
| 2 | Q.   And had asked about living at John Collins house-- |
| 3 | A.   --yes, sir |
| 4 | Q.   --but Mr. Collins wouldn't let you? |
| 5 | A.   Well, he--matter of fact, he let me stay there a few |

nights.  I remember he let me stay there a few nights.  Then
after that, you know, John told me, you know, my dad doesn't
want you to stay here.

Q.   Did you still sneak in the house at the night to
stay?

A.   No, sir.

Q.   Okay.  Now after Jerry Collins found out that his son
and you were cashing his checks, he kicked John Collins out
of the house as well?

A.   Yes, sir.

Q.   At which point in time you went to live with William's
aunt, a Cindy Patterson?

A.   Yes, sir.

Q.   And she had a daughter named Candy, who was your
girlfriend?

A.   Yes, sir.

Q.   Okay, and your girlfriend--she was at the time was 14?

A.   About 14, yes, sir.

Q.   Okay, and you were 19?

A.   Yes, sir.

1    Q.    Is that how you got to know William?

2    A.    Yes, sir.

3    Q.    Was through your 14 year old girlfriend?

4    A.    Yes, sir, through the family.  Actually, through their

5    family.

6    Q.    Through the family?

7    A.    Yes, sir.

8    Q.    Okay.  Now as I understand you said that you were the

9    only one who was old enough to cash checks?

10   A.    Yes, sir.

11   Q.    And you were the only one who knew how to cash a

12   check?

13   A.    Out of the group, yes, sir.

14   Q.    I guess the point is, they didn't even know that

15   you're supposed to turn the check over and write your name on

16   it to endorse it, did they?

17   A.    No, I don't think they knew that.

18   Q.    And you knew how to do that?

19   A.    I knew how to do all of that, yes, sir.

20   Q.    Okay.  Now Mr. Collins gave you until January 24th,

21   '91 to pay the money back?

22   A.    I don't remember the date.

23   Q.    He gave you an exact date?

24   A.    I remember he told me Wednesday--it was on a

25   Wednesday.

1    Q.   He was killed either the night before, or early that

2    day?

3    A.   That Wednesday morning he was dead, right.

4    Q.   Now I believe you indicated that you and John Collins-

5    -Mr. Collins' son, talked about killing him first?

6    A.   Yes, sir.

7    Q.   And that was before William was brought into the

8    conversation, wasn't it?

9    A.   Yes, sir, I assume.  Yes, sir.

10    Q.   You indicated that John commented he wished his dad

11    was dead?

12    A.   Yes, sir, he did.

13    Q.   And this lasted over about a month, did it not?

14    A.   About a month period, yes, sir.

15    Q.   You said you didn't have a gun?

16    A.   No, sir, I didn't.

17    Q.   Now you approached Victor and Lee Garza about getting

18    a gun, didn't you?

19    A.   Yes, sir.

20    Q.   Talked to Lee Garza about killing Mr. Collins, didn't

21    you?

22    A.   No, sir.

23    Q.   You didn't ask him to kill him?

24    A.   No, sir, I asked him for the gun.  First, I asked him

25    for the money to pay Mr. Collins back.

1    Q.   Let me stop you there.

2              You asked the two Garza boys--one of them who was

3    15, for some money to pay Mr. Collins?

4    A.   I asked Victor, the oldest one.

5    Q.   Alright.  And you told them why you needed to pay Mr.

6    Collins, didn't you?

7    A.   Yes, sir, I told them.

8    Q.   And then you asked the Garza boys for a gun?

9    A.   Later on, yes, sir, I did.

10   Q.   They obviously knew what you wanted to do with the

11   gun, didn't they?

12   A.   Yes, sir.

13   Q.   And they wouldn't do it?

14   A.   No, sir.

15   Q.   Now I believe you indicated at some point in time

16   William was involved when you were talking about killing Mr.

17   Collins?

18   A.   Yes, sir.

19   Q.   Okay.  Now let's be clear.  This was not William's

20   idea, was it?

21   A.   No, it wasn't his idea.

22   Q.   You had already talked about it?

23   A.   It wasn't his idea at all.

24   Q.   Okay.  You're 19 and you had gotten into a problem,

25   and William came in on the tail end of it?

1        A.   Pretty much so.

2        Q.   Alright.   Now as far as the night of the shooting,

3    John was part of the plan. He made sure the window was open so

4    you could get in?

5        A.   Yes, sir.

6        Q.   Correct?   You knew what the house looked like.   Did

7    you tell William about it?

8        A.   Yes, sir.

9        Q.   Now, after the shooting--or before the shooting, did

10   William leave the car and start toward the door and come back

11   and tell you that he couldn't do it?

12       A.   No, sir.

13       Q.   He never at any point in time said I can't do it?

14       A.   No, sir.

15       Q.   Okay.   Obviously, you were encouraging him to do it

16   because it was your plan?

17       A.   It was our plan.

18       Q.   But it was to get you out of trouble.   You and John

19   who came up with it first?

20       A.   Right.

21       Q.   Now you were convicted of murder?

22       A.   Yes, sir, I was.

23       Q.   Did you pay William any money?

24       A.   No, sir.

25       Q.   Give him a car or anything to do it with?

44

```
1        A.   No, sir.

2        Q.   After this was over, William came up sometime later--

3   let me back up.

4                 When it was over, William was the one who got

5   the gun out of your glove box, and put it back in the glove box

6   of his mother's car?

7        A.   Right.

8        Q.   Alright. Were you all together during that period of

9   time?

10       A.   After?

11       Q.   Yes?

12       A.   Yes, sir.

13       Q.   Okay.  My point is, if William wanted to get the gun

14  out of the glove box, he could have?

15       A.   Yes, sir, he could have.

16       Q.   And he eventually did put it back in his mom's car?

17       A.   Yes, sir.

18       Q.   Now after this was over with,  William put a

19  surveillance tape or wire on him from the police, and tried to

20  get you to confess?

21       A.   Yes, sir.

22       Q.   Basically told you what happened?

23       A.   He called me one night.

24       Q.   He asked you what happened, did he not?

25                 MR. MULLIN: Your Honor, could he answer the
```

```
 1    question, please?

 2                  MR. DODSON: I think he misunderstood the

 3    question.

 4                  JUDGE CARTER; Restate the question.

 5         Q.(MR. DODSON): My question is, William was wired for

 6    sound?

 7         A.(MR. NANYOMA): Right.

 8         Q.   And he asked you, Nanyoma, what happened to Mr.

 9    Collins, or something along those lines, did he not?

10         A.   No.  No.  No, sir.

11         Q.   Was he wanting you to make a statement incriminating

12    yourself?

13         A.   Yes, sir.

14         Q.   And you found that to be bizarre because William knew

15    exactly what happened, and you wondered why he was asking you?

16         A.   Right.

17         Q.   Wasn't real smart, was it?

18         A.   No.

19         Q.   William wasn't--his thought process didn't work on

20    that, did it?

21         A.   He just kept saying that--kept telling me, man, they

22    know you did it.  They know you killed John's dad.  He kept

23    repeating it over and over, and I was like--I did what?  You

24    know?  And then I made a statement that, I said, well, if

25    anybody knows the murderer, you know the murderer a lot better
```

1    than what I do, and then I told him to get out of my car.

2         Q.   And you were convicted and received a sentence of

3    seventy-five years?

4         A.   Yes, sir.

5         Q.   Pass the witness.

6              MR. MULLIN: One moment, Judge.  Nothing further,

7    Judge.

8              JUDGE CARTER; Alright,

9              MR. MULLIN: Again, Judge, if I could have

10   another moment.

11             JUDGE CARTER; Yes, sir.

12             MR. MULLIN: The State will rest.

13             JUDGE CARTER; Are you ready?

14             MR. DODSON: Judge, if we could, could we take

15   about a ten minute break?

16             JUDGE CARTER; Alright, Ladies and Gentlemen,

17   we'll take a short break at this time.

18   RECESS.

19   JURY IN THE COURTROOM:

20             JUDGE CARTER: Alright, Mr. Dodson, call your

21   witness.

22             MR. DODSON: Alright, James Strickland.

23                  PUNISHMENT PHASE - DEFENSE

24                      JAMES STRICKLAND

25   having been duly sworn, testified as follows:

47

                         DIRECT EXAMINATION

BY MR. DODSON:

    Q.   State your name for the jury, please.

    A.   James Strickland.

    Q.   And where do you live, Mr. Strickland?

    A.   Klondike, Texas.

    Q.   Where is Klondike, Texas?

    A.   It's about thirty miles North of Sulphur Springs.

    Q.   Okay, and how are you employed?

    A.   I manage a Northeast Texas Food Bank, and I have a janitorial business.

    Q.   Alright, you are involved in Fruitful Harvest Prison Ministries, is that correct?

    A.   That's correct.

    Q.   What is Fruitful Harvest Prison Ministries?

    A.   It's just a group of volunteers that minister in prisons and jails and tell people about the Lord.

    Q.   How did you get involved--are they based out of Sulphur Springs area?

    A.   Yes, they are.

    Q.   How did you get involved with it?

    A.   I heard about the ministry, and felt like it was something I might be interested in and had an opportunity to go one time and felt like that's what the Lord wanted me to do.

    Q.   You are a layman, are you not?

48

1        A.   Yes, I am.

2        Q.   Do you--you don't--you're not a pastor of your own

3   church?

4        A.   No, I'm not.

5        Q.   Okay.  How long have you been doing this?

6        A.   Nine years.

7        Q.   Alright, and what is required of you before you can be

8   a volunteer chaplain at the Texas Department of Corrections,

9   Institutional Division?

10       A.   Well, before you can be a part of Fruitful Harvest,

11  the Director, Charlie Sickle, talks with you, and watches you

12  inside the--behind the wire, whatever, to determine to his

13  understanding if your interest--your motive is what he thinks

14  it should be, and then you have to--

15       Q.   --let me stop you right there. First of all you've

16  got to convince whoever is in charge of Fruitful Ministries?

17       A.   Right.

18       Q.   Okay, then what happens?

19       A.   And then you fill out an application with the Texas

20  Department of Corrections, and you have to be approved before

21  you can go into the units as just a participator.  You go

22  to ministering the units--at the Telford Unit, we had to go

23  through forty-two hours training.

24       Q.   Forty-two hours?

25       A.   Yes.

49

1      Q.   And what does that training consist of?

2      A.   The security aspect of it, and scenarios of what could

3   happen, warnings from the system--not to choose sides, to be

4   us against them.   Just tell us what to expect inside, and what

5   to do if something should happen.

6      Q.   Who conducts this training session?   The prison

7   chaplain?

8      A.   The prison chaplain along with the officers--some of

9   the officers.

10     Q.   Okay.   First of all, do you believe in the death

11  penalty?

12     A.   Yes, sir, I do.

13     Q.   Have you ministered to inmates who were facing the

14  death penalty?

15     A.   Yes, sir, I have.

16     Q.   Okay.   What units--are you specifically at Telford,

17  or do you go to other units?

18     A.   Many units.

19     Q.   Are there lots of approved volunteer chaplains

20  serving the prisons?

21     A.   No, I don't think there's a lot.   There's a few.

22     Q.   Let me ask you--are there some units where your group

23  is the only approved chaplains for some units?

24     A.   I wouldn't think so, no, sir.

25     Q.   Okay.   You indicated that you have ministered to

50

1    inmates who were facing the death penalty?

2        A.    Yes.

3        Q.    Have there been inmates that you ministered to, facing

4    the death penalty, that you thought they needed to die?

5        A.    In my opinion, yes, sir.

6        Q.    You thought the death penalty was appropriate for

7    this individual?

8        A.    Yes, sir.

9        Q.    Okay.  How do you know William Speer?

10       A.    I met him on the B-pod, of Ad Seg Unit at the Telford.

11       Q.    Now let's talk if we could about Administrative

12   Segregation.  You called it Ad Seg, right?

13       A.    Yes, sir.

14       Q.    How do you minister to somebody in Administrative

15   Segregation physically?

16       A.    Physically?

17       Q.    Or logistically?

18       A.    Through a piece of expanded metal over a slit in the

19   door.

20       Q.    Okay.  Do they just let you in the day room, or let

21   you in the pod and you walk around each individual cell?

22       A.    At that time we did, yes.

23       Q.    Okay.  Now let's go back, do you know the first time

24   that you met with William?

25       A.    It was the end of February, year 2000.

1    Q.   Okay, and how was it you came to be in contact with

2    him?

3    A.   The unit chaplain gave us an I-60 that he had

4    requested to see someone from the chaplain's office.

5    Q.   An I-60 is a request form?

6    A.   A request form for someone from the chaplain's office,

7    yes, sir.

8    Q.   Alright. Can you describe your first meeting with him?

9    A.   Yes, sir.  As I walked up to the cell, he walked to

10   the door, and his words were, 'Praise the Lord.  I've been

11   praying that He would send someone here so that I could tell

12   them what He has been doing in my life.'

13   Q.   Okay.  Now how many inmates--if you can't answer this,

14   that's fine--but about how many inmates in a year do you

15   minister to?

16   A.   A couple of thousand.

17   Q.   Now what is--can you describe to me the typical

18   inmate that you work with--or is there such a thing as a

19   typical inmate?

20   A.   I don't think so.

21   Q.   Let me ask you this way.  Do you--what percentage of

22   the people that you minister to, do you personally feel are

23   sincere?

24   A.   I can't give you a number.  I know it's a very small

25   percentage. Very small.

52

1    Q.   Then why do you say that?

2    A.   Some people are looking for relief, just somebody to

3    talk to--just for company.  Some people are looking--they don't

4    even know what they're looking for, but the sincere change that

5    I see is very small.

6    Q.   The percentage of people that change in your view are

7    small?

8    A.   Yes.

9    Q.   What to you are signs or indications that somebody is

10   sincere?

11   A.   Well, there's two things I look for.  The word of God

12   says that the eyes are the window of the soul, and sometimes

13   there's a lot of darkness in the eyes, and if there's a change,

14   there's some light there.  I can't always tell that, but the

15   Bible also says that the natural man does not understand the

16   spiritual things.  And when I talk to a man about the scripture

17   and if I see a hunger there to know more, or he can talk to me

18   about principles that the natural man can't see, then I believe

19   there's a definite change.

20   Q.   Alright.  Let's talk about non-scriptural signs of

21   sincerity versus somebody not being sincere.  I believe you

22   indicated to me that typically they always ask for something?

23   A.   Yes, they do.

24   Q.   What does that tell you?

25   A.   It tells me they're trying to use me.

53

1    Q.   What do they ask you for?

2    A.   They'll ask you to--they'll ask you for a pen.

3  They'll ask you to contact someone. They'll ask you to put

4  money on their books--on their account.   Just about anything

5  you can name.

6    Q.   Has William ever asked you for anything?

7    A.   No, sir, he has not.

8    Q.   Is that unusual?

9    A.   Pretty unusual.  Yes, it is.

10   Q.   Okay, do you--you mentioned two things that you look

11  to that you derive from the Bible.  First of all, you'll agree

12  with me, depending on what one's looking for, they can extract

13  a few lines out of the Bible to say anything for them.   Would

14  you agree with that?

15   A.   Take it out of context and prove just about anything,

16  yes, sir.

17   Q.   Alright, but let's talk about the look in their eyes

18  and the other example you gave.   Does William fit those

19  descriptions?

20   A.   Of the change? What I'm looking for?

21   Q.   Yes?

22   A.   Yes, he has.

23   Q.   How?

24   A.   Well, I saw a brightness in his eyes, and he had a

25  hunger--what I sensed is a hunger to know more about the Lord--

1   more about the word.  When I would talk to him about the

2   scripture, he would have questions, and as things come up in

3   his life from week to week, and he went to the word to see what

4   was going on, and he had questions about what some of the

5   things meant.

6       Q.   What are some of the things he was looking for, or

7   asking you questions about?

8       A.   I remember, I guess, the main thing in my mind now

9   is about spiritual warfare--about attacks on his mind.

10      Q.   Had he discussed with you that in the past he had

11  participated in a game called, Dungeons and Dragons?

12      A.   It came up in a discussion.

13      Q.   Was he still doing that when you visited him, or was

14  that something that was in the past?

15      A.   That was in the past.

16      Q.   Alright.  You understand some people interpret

17  Dungeons and Dragons as being satanic based?

18      A.   Yes, I do.

19      Q.   Okay.  Now, how often would you visit with William?

20      A.   About every other week.

21      Q.   Over what period of time?

22      A.   Over about a year--a little over a year.

23      Q.   You also work with another volunteer chaplain named

24  Gary Nixon?

25      A.   That's right.



1    Q.   Now Mr. Nixon, I believe has been doing this a couple

2  of years longer than you have?

3    A.   That's right.

4    Q.   Do you all--how do you work your visits when you go

5  to Telford?

6    A.   Well, when we would get inside the pods, we would

7  usually split up.  One start on one side, and one on the other,

8  and we'd meet in the middle.  We would rotate who we visited.

9    Q.   Would you both be ministering to the same--to William,

10 or would one of you be there one time, and the other one the

11 next?

12   A.   Well, with William sometimes during the visit--most

13 of the time, both of us would be there.

14   Q.   Okay.  You said that you saw this hunger or thirst.

15 What do you mean by that?

16   A.   A desire to know more about the Lord--more about His

17 word.  How to live according to His rules.

18   Q.   Did he make you work?

19   A.   Yes, he did.

20   Q.   How?

21   A.   Well, he asked me a lot of things I didn't know.

22   Q.   And what would you have to do?

23   A.   I would have to go search the word and pray.

24   Q.   When you would meet up with William the next time,

25 would he be prepared?

56

1    A.   Oh, yeah.

2    Q.   Was that unusual?

3    A.   Yes, it is.

4    Q.   Why?

5    A.   Most of the time they're not prepared.   Most of the

6  time they want something to be handed to them.

7    Q.   Now being in Administrative Segregation, he's not

8  free to go to worship service or chapel or anything of that

9  nature, correct?

10    A.   Correct.

11    Q.   Okay, so all of your ministry has to occur when he's

12  in Administrative Segregation?

13    A.   Right.

14    Q.   Did William talk to you specifically about the murder

15  charge against Gary Nixon--excuse me--Gary Dickerson?

16    A.   No.

17    Q.   Did you ask him about Gary Dickerson?

18    A.   No.

19    Q.   Why not?

20    A.   That's not what I'm there for.   I'm not interested in

21  the crime.

22    Q.   Why aren't you interested in their crime?

23    A.   I don't want that to affect me ministering to them.

24    Q.   Okay. Did he talk to you about the murder that

25  occurred when he was sixteen in Houston?

57

```
 1        A.   No, he didn't.

 2        Q.   Did he ever talk to you about his past behavior?

 3        A.   Oh, yes.

 4        Q.   And would you describe--do you remember the first

 5   conversation you had on that subject?

 6        A.   The first conversation--no, I don't.

 7        Q.   Okay.  Do you specifically remember conversations that

 8   you had on that subject?

 9        A.   Yes, I do.

10        Q.   Okay. Describe for the jury those conversations?

11        A.   He--it had been after I'd got to know him, and he felt

12   at liberty to speak, and he told me about some addictions that

13   he had had in the past, and several things that he had done

14   that the Lord had completely delivered him from the desire to

15   do those things.

16        Q.   Did he indicate remorse for his past behaviors?

17        A.   Yes, he did.

18        Q.   How?

19        A.   He was ashamed of it.  He didn't like to talk about

20   it.

21        Q.   Did not specifically--of course, you knew this case

22   was pending when you were ministering to him, did you not?  Did

23   you not?

24        A.   Later I did.

25        Q.   Okay, at first you didn't?
```

58

```
1        A.   No, I didn't.
2        Q.   He did not make any specific admissions, but his
3    general talk of remorse of his past life and his past
4    behaviors?
5        A.   Yes.
6        Q.   Are you aware that he has been convicted of capital
7    murder when he was sixteen years old?
8        A.   I am now, yes.
9        Q.   Okay, does that change your opinion of William?
10       A.   No, it doesn't.
11       Q.   You have now become aware that this jury has found
12   him guilty of the murder of Gary Dickerson?
13       A    .Yes.
14       Q.   Does that change your opinion?
15       A.   No, it doesn't.
16       Q.   Why not?
17       A.   Well, it's my opinion.  I mean, that's me.
18       Q.   The testimony--you've been out in the hall, but the
19   testimony is that this death of Gary Dickerson occurred in
20   1997.  I believe you've indicated that you first started
21   ministering with William in the year 2000?
22       A.   That's right.
23       Q.   A description of an individual who would commit two
24   capital murders, is that the William Speer you see today?
25       A.   Not the one I know.
```

1        Q.    Okay.  Now when is the last time you saw William?

2        A.    It's been several months.  I don't recall the last

3   date.

4        Q.    Why did you--why has it been several months since

5   you've seen him?

6        A.    My help--I lost my help at work, and have been having

7   to work on Saturdays.

8        Q.    Okay.  Do you still go to other prisons?

9        A.    Yes, sir.

10       Q.    Do other prisons have a visitation schedule on some

11   day other than Saturday?

12       A.    Yes.

13       Q.    Okay.  Over the period of time that you ministered

14   to William, did you get to know him personally?

15       A.    Yes, I did.

16       Q.    And get to know about him as an individual?

17       A.    Yes, sir.

18       Q.    One of the questions that this jury is going to be

19   asked, is the question of future danger.  Do you think that

20   William, that you have ministered to for a year or a year and

21   a half, is a future danger?

22       A.    In my opinion, he's not.

23       Q.    Why not?

24       A.    I believe he's a changed man.  His way of thinking has

25   changed.

60

```
1        Q.   Does he deserve to die?

2        A.   I don't think so.

3        Q.   Why not?

4        A.   I believe that he's a changed man, and the Lord can

5   use him inside to change other people.

6        Q.   Is he ready to die?

7        A.   I believe he is.

8        Q.   He says he is?

9        A.   He says he is.

10       Q.   Do you think that he has a place of serving people in

11  prison in the future?

12       A.   Yes, I do.

13       Q.   Have you ever testified on behalf of an inmate before?

14       A.   Never.  No.

15       Q.   Have you been asked to?

16       A.   Yes.

17       Q.   This is the first time you've come to Court, despite

18  being asked before?

19       A.   First time I've been subpoenaed.

20       Q.   Obviously, we subpoenaed you because we knew what you

21  were going to say.  Is that correct?

22       A.   Correct.

23       Q.   Pass the witness.

24                       CROSS EXAMINATION

25  BY MR. MULLIN:
```

61

1       Q.   Hi, Mr. Strickland.

2       A.   Hi.

3       Q.   You and I, the best I remember, we visited on the

4  phone briefly, didn't we?

5       A.   Right.

6       Q.   Several weeks ago or something?

7       A.   Yes.

8       Q.   And then we actually met face to face outside this

9  morning?

10      A.   Right.

11      Q.   Mr. Strickland, you love William Speer, don't you?

12      A.   Yes.

13      Q.   Let's make sure--I think you and I are on the same

14  page for the most part here.  Let's see if we are.  I'm sure

15  that there's a lot of ways you could express the definition of

16  Christianity, but for the purposes of this, would you agree

17  with me that the Christianity that you're speaking about, that

18  you're saying that William has now professed, is that--the

19  Christianity that Jesus described to Nicodemus in John, Chapter

20  3, 'Ye must be born again.'  Is that what we mean by Christian?

21      A.   Christianity means Christ-like.

22      Q.   Okay, but to become a Christian--

23      A.   --means to be born again.

24      Q.   Okay.  So I'm sure there are a lot of things that

25  could be said about it, but that's a pretty good basis for us

1    to agree on?  Do you agree?

2        A.   I agree.

3        Q.   Okay.  So in other words, we're not talking about

4    someone born into a society that professes Christianity?

5        A.   No, I'm not.

6        Q.   We're not talking about someone who, you know--'well,

7    hey, I'm American, so I must be a Christian.'

8        A.   No, I'm not.

9        Q.   Alright, we're talking about someone who specifically

10   has--professes to be born again through the Spirit of Christ?

11        A.   Talking about someone who at some point in their life

12   come to the conclusion that they were lost, and they needed a

13   Savior, and believed that Savior was Jesus Christ, and they

14   asked Him to forgive them of their sins, and to save them.

15        Q.   Okay. So with that common basis, let's look at a few

16   things.  Now first of all--and I already understand you don't

17   want--you don't want William Speer to die?

18        A.   No, sir, I don't want him to die.

19        Q.   Sure. But you do agree that there's nothing

20   scripturally, Old Testament--New Testament, or otherwise, that

21   prohibits that?

22        A.   I agree.

23        Q.   You believe that under Romans 13 that the governments

24   are established by God and that we should follow that?

25        A.   Yes, I do.

1    Q.   And so our system of justice, the way we do it, you

2  believe is appropriate, do you not?

3    A.   Yes, I do.

4    Q.   And you don't see any Biblical bar to Mr. Speer

5  receiving the death penalty, do you?

6    A.   No, I don't.

7    Q.   Okay.  Mr. Strickland, inmates--in your nine years of

8  ministering to inmates, certainly you've seen many occasions

9  where they have hidden behind the label of Christianity, have

10 you not?

11   A.   Yes, I have.

12   Q.   For various reasons?

13   A.   Yes.

14   Q.   We could go into all of them, but there's a number

15 of reasons somebody might do that in prison?

16   A.   As well as in the free world, yes.

17   Q.   Absolutely.  You bet.  And of course, I mean, I'm

18 understanding you're saying you don't think Mr. Speer's doing

19 that?

20   A.   No, sir, I don't think he is.

21   Q.   Okay.  Do you--do you know absolutely--and I'm not

22 supposed to ask you the question, because I don't know the

23 answer, but I'm going to--do you know absolutely, without a

24 doubt, that William Speer is a totally changed man, and that

25 there is no manipulation or selfish motive behind this?

64

1     A.   Do I know that without a doubt?

2     Q.   Oh, yeah?

3     A.   No, I don't know that without a doubt.  I mean, I

4 don't doubt his conversion, but there's no way anybody could

5 know perfectly.

6     Q.   Okay.  And that's what I'm getting at.  I mean, we

7 understand how you feel about it, but to know, you can't be

8 sure--I think is what you agreed with, right?

9     A.   The best of my judgment, I believe he's a changed

10 man.

11    Q.   Right, but there is room there that you could be

12 wrong?

13    A.   Yes.

14    Q.   Okay.  Now you first started seeing Mr. Speer--do you

15 call him, William--Keith--what?

16    A.   William.

17    Q.   William--when you first started seeing Mr. Speer, you

18 said it was February of 2000?

19    A.   Yes.

20    Q.   Do you remember the date?  Wasn't it like the 24th?

21    A.   It was the last Saturday in February.

22    Q.   The last Saturday in February.  And had he indicated--

23 so it was late February, right?

24    A.   Yes.

25    Q.   Had he indicated at that time when you first met him,

1    how long he had been a Christian?

2         A.   Yes.

3         Q.   How long?

4         A.   Just a few days, or a couple of weeks.   Just a short

5    period of time--maybe a month, I don't know exactly, just a

6    short period of time.

7         Q.   Very short period?

8         A.   Yes.

9         Q.   Did he indicate to you, Mr. Strickland what helped him

10   come to this point in his life?

11        A.   He told me that he had been somewhere--I don't recall

12   exactly where it was--about some charges, and when he came back

13   in his cell, after reflecting on his life, and how he had been,

14   and that he--he became broken, and just fell on his knees, and

15   wept, and asked the Lord to forgive him, and he said, more or

16   less, it was like the Lord came in the cell with him, and

17   lifted the burden off his shoulders.

18        Q.   He had been somewhere?

19        A.   Yes.

20        Q.   Away from the unit in other words?

21        A.   I don't know that.

22        Q.   But he was out of his cell?

23        A.   I believe so, yes.

24        Q.   You got the impression he had traveled or something

25   like that, and came back?

66

1      A.   I got that impression, yes.

2      Q.   Okay, and then he came back, and when he came back

3  at that point you felt like he had his experience?

4      A.   Yes.

5      Q.   Okay, and that was sometime shortly before you met

6  him?

7      A.   Right.

8      Q.   Mr. Strickland, do--in your experience do Christians--

9  honest to God, born again, real deal Christians--ever do bad

10  things?

11     A.   According to the word of God, they do.

12     Q.   Sure.  We've all sinned and come short of the glory

13  of God, I mean, we all do things wrong.  Right?

14     A.   Right.

15     Q.   We're all sinners saved by grace, right?

16     A.   Right.

17     Q.   And I guess, would you agree with me that we hope--

18  that we have a hope that we will attain His likeness on that

19  day when we go to be with Him?

20     A.   Right.

21     Q.   And until then we will continue to have shortcomings?

22     A.   We're in a process.

23     Q.   Sure, and some are more mature in that process than

24  others?

25     A.   Right.

67

1     Q.   Did you feel, Mr. Strickland, from the very beginning-
2    -from the very first--that Mr. Speer was the real deal?
3     A.   Yes, I did.
4     Q.   Okay, so you felt that connection from him back in
5    late February of 2000?
6     A.   I felt that he was different than most.
7     Q.   Okay, but that's when--I mean, you're not saying you
8    sensed it, and then months--or you met him, and then months
9    later you started seeing this change?  You felt like he was
10   different already when you met him?
11    A.   I felt like he was--there was a difference--I saw a
12   change as time went on.
13    Q.   As he grew?
14    A.   Yes.
15    Q.   Okay, but you felt like he was already for real when
16   you met him--meaning he was a Christian already?
17    A.   Yes.
18    Q.   Okay, and even through his shortcomings, you continued
19   to believe that as you've ministered to him?
20    A    .Yes.
21    Q.   And you haven't seen him--well really, you haven't
22   seen him almost any this calendar year?
23    A.   No, I haven't.
24    Q.   Now Mr. Strickland, does it seem odd to you to think
25   of Mr. Speer committing two murders in his past?

68

```
 1        A.   Yes, it does.
 2        Q.   It doesn't seem like the William, you--or the Speer
 3   you know?
 4        A.   Right.
 5        Q.   You said he had talked to you about past behaviors--
 6   drug addictions--I think is what you mentioned?
 7        A.   I didn't name that.
 8        Q.   I'm sorry, I thought you did.
 9        A.   I said some addictions, but I didn't get his
10   permission to--
11        Q.   --oh, I'm sorry, I assumed that.  You're right, I
12   assumed that. You said addictions, I assumed drug addictions,
13   but he mentioned some addictions?
14        A.   Right.
15        Q.   Okay, but he never--if I understand you correctly--he
16   never actually came out and told you how sorry he was for
17   taking the life of two men?
18        A.   We never talked about the murder.
19        Q.   But he could have had he wanted to?
20        A.   To some degree.
21        Q.   I mean if someone wanted to get that off their chest--
22        A.   --I'll listen, but I don't discuss their crimes with
23   them--
24        Q.   --okay--
25        A.   --I'll listen.
```

1    Q.   But I want to be clear, if William Speer wanted to
2    talk to you about his two murders, would you have allowed him
3    to get that off his chest?
4    A.   Yes, I would.
5    Q.   Okay, and I know you're not Catholic, you don't do
6    confessions, but you would have allowed him to bear his soul on
7    that, had he wanted to?
8    A.   Yes.
9    Q.   Alright.  I'm not asking if he's remorseful, I'm
10   asking you, have you ever heard William Speer express remorse
11   for either of those deaths?
12   A.   The deaths were not named.  I've heard him express
13   remorse about his past life.
14   Q.   Okay.  Did you ever, Mr. Strickland, know Gary
15   Dickerson?
16   A.   No, I did not.
17   Q.   You never had a chance to meet Gary Dickerson, did
18   you?
19   A.   Not that I recall.
20   Q.   Do you know who Gary Dickerson is?
21   A.   No, I don't.
22   Q.   Gary Dickerson is the second man that William Keith
23   Speer murdered.  He was an inmate.  You never ministered to
24   him?
25   A.   Not that I recall.

70

1      Q.   And that you recall, you never got a chance to know
2  and love him?
3      A.   No, I didn't.
4      Q.   Did Mr. Speer ever mention to you the name, Gary
5  Dickerson?
6      A.   Not that I recall.
7      Q.   Did he ever mention to you the name, Jerry Collins?
8      A.   Not that I recall.
9      Q.   Did you know that was his first murder victim?
10     A.   No, I did not.
11     Q.   You said you had visited with people who were facing
12 the death penalty--and please understand this question--I am
13 not at all disputing you, I just want to find out the
14 situation.  People who were facing the death penalty would be
15 people on--mostly would be people on death row?  Is that right?
16     A.   Yes.
17     Q.   I mean there's not many other people in that
18 situation. right?
19     A.   (No audible response).
20     Q.   I'm trying--where I'm going is, I'm trying to find
21 out where you would have ministered to guys who were facing the
22 death penalty?  That's where I'm headed.
23     A.   Well, they don't--I've ministered to guys in county
24 jail, and in diagnostic.
25     Q.   Okay.  Who--in diagnostic?

71

```
 1        A.   Right.

 2        Q.   Diagnostic in TDCJ?

 3        A.   Right.

 4        Q.   Who were headed to death row?

 5        A.   Not TD--yes.

 6        Q.   In county jail who may have committed--have

 7   allegations?

 8        A.   Right.

 9        Q.   Okay.  Alright.  Did you ever minister to an

10   individual over at Telford by the name of Terry Abbott?

11        A.   Terry Abbott?  I don't recall the name.

12        Q.   Okay. Do you know an individual over there by the

13   name of Bruce Richards?

14        A.   I don't recall that name.

15        Q.   Okay.  Just a few more things, Mr. Strickland.

16             Now, I would assume that you would expect, Mr.

17   Strickland, someone who has totally changed their life over,

18   the way you believe Mr. Speer has, to do--to separate

19   themselves from any past gang activity?

20        A.   I would expect them to.  Sometimes it takes a process.

21        Q.   Well, there must be a difference between actually

22   getting out of a gang, or something like that, that process

23   might take a while, do you agree?

24        A.   I agree.

25        Q.   But I'm talking about, would you expect them to
```

72

1   cease and desist immediately their dealings with the gang?

2   Helping or dealing with them in the same type of gang type

3   situations?

4        A.   Immediately?

5        Q.   Yes?

6        A.   It don't always work that way.

7        Q.   Okay.

8        A.   It didn't work that way with me.

9        Q.   Okay.  Do you think it worked that way with Mr.

10  Speer?

11       A.   I don't know.

12       Q.   Okay, would you--would you have thought, when you

13  first met him, and in the months after you met Mr. Speer--

14  would you have thought from the sincerity he showed, the

15  conviction that he showed, that he would have already been

16  removed from that life?

17       A.   I knew he was still contacting some of the people

18  from his past as far as the change that had taken place in

19  his life.  Telling people about that.

20       Q.   Alright.  Witnessing to them?

21       A.   Yes.

22       Q.   About the Lord?

23       A.   Yes.

24       Q.   Okay, and certainly--I mean--when you got out of the

25  gang, you know, probably went and told your old gang buddies

1   about the Lord too.  Maybe, I mean, you would expect a

2   Christian to do that. Right?

3       A.   Yes.

4       Q.   Sure, so there's nothing wrong with someone getting

5   out of a gang, and go back and say, hey, I've found Jesus, and

6   I'd like for you to know Him.  Do you agree?

7       A.   I was never in a gang.

8       Q.   Okay, well you had said something to the effect, of

9   'I didn't' a while ago, and that's how I took it.

10      A.   Okay, can I clarify that?

11      Q.   Oh, yes, absolutely.

12      A.   I believe that when you're born again, the Spirit of

13  God comes to live inside you.  You don't get a brand new mind

14  at that time.  The scripture tells us that we are to renew our

15  mind.

16      Q.   Uh, huh (yes).

17      A.   By the word, and it takes a while to change our

18  process of thinking.

19      Q.   Right.  And I guess what I'm trying to figure out is,

20  do you think Speer has already gotten to that point that his

21  thinking process has significantly changed?  That's what I--

22      A.   I believe it's a process that takes place from the

23  time you're born again until you die.

24      Q.   Okay.

25      A.   It never stops.

1      Q.   But at some point--I mean, does it seem incongruous to

2   you for someone who is professing Christ, and witnessing to

3   gang members to--would it seem incongruous if they were still

4   dealing with them in an underhanded way, or a way that enhanced

5   the gang?  Would you expect that from a Christian?

6      A.   No, I wouldn't.

7      Q.   Okay, that's where I was trying to go.  Do we--do we

8   as a society have to hate someone in order to sentence them to

9   death?

10     A.   Hate?

11     Q.   Yes?

12     A.   No, I don't think so.

13     Q.   No.  If to carry out justice, if the death penalty

14  in certain situations is justice, doesn't require hate on our

15  part, does it?

16     A.   No, it doesn't.

17     Q.   As a matter of fact, it doesn't even require judging

18  that man's soul, does it?

19     A.   Not in my opinion.

20     Q.   It's--would you agree with me that it is appropriate

21  to look at someone's actions and determine if they did, or no

22  they didn't do that, first of all, in the context of criminal

23  justice?  Is that appropriate?

24     A.   Would you say that again?

25     Q.   In other words, for a jury to find someone guilty,

1    that's not the same thing as judging that man, is it?   If they

2    look at his actions by the evidence, and say, yes, he did it,

3    or no, he didn't do it?

4         A.   What do you mean, judging him?

5         Q.   The scripture says, 'thou shalt not judge'--right?

6         A.   But what that means is, but someone else down, to

7    build yourself up.   That's what that judgment means.

8         Q.   Right.   So that's not what our criminal justice system

9    seeks to do in these situations, is it?

10        A.   No.

11        Q.   Okay.   So would you also agree with me that if we

12   sentence someone to die in our criminal justice system, it

13   doesn't take--it doesn't take us putting them down to build

14   ourselves up, judging them, right?

15        A.   I don't think so.

16        Q.   We don't have to hate them, right?

17        A.   Right.

18        Q.   We don't have to hope they go to hell, or anything

19   else, but it is appropriate to punish someone according to

20   their actions, is it not?

21        A.   It is.

22        Q.   Okay.   Mr. Strickland, I see judgment and punishment

23   as two different things.   How do you feel about that?   Do you

24   agree with that?

25        A.   I don't know.

1      Q.   Do you have any kids?

2      A.   Yes, I do.

3      Q.   Every time--did you ever punish your kids when they

4  were growing up, if they're grown?

5      A.   I did punish them, but I wish I hadn't.  I should have

6  disciplined them rather than punish them.

7      Q.   Alright, do you think punishment is wrong?

8      A.   Punishment--yes, I do.

9      Q.   Do you think that the death penalty is punishment?

10     A.   I don't see punishment for crime as wrong.  No, I

11  don't.

12     Q.   For a crime?

13     A.   Right.

14     Q.   So we've made a distinction between--

15     A.   --we were talking about children, there to begin with.

16     Q.   You bet.  We've made a distinction between raising

17  kids and criminal justice.

18     A.   Right.

19     Q.   Okay.  Would you agree with me, Mr. Strickland, that

20  it's human nature for us to cry out to God more when we have--

21  when we face something very difficult in our life?  I mean

22  that's our more of a tendency to do that then?

23     A.   I think that the Lord allows the circumstances to be

24  arranged until we get to the point of hopeless despair, where

25  we have nowhere to go but to Him.

1      Q.   Agreed.  And would you also agree that it's human

2   nature that we are able to be on our best behavior when we are

3   facing our most serious and dark times?

4      A.   I agree.

5            MR. MULLIN:Your Honor, the State offers into

6   evidence, State's Exhibit 45.  This is a self-authenticated

7   document.

8            MR. DODSON: Your Honor, I have not seen this.

9   May we approach, Judge?

10               BENCH CONFERENCE - ALL ATTORNEYS

11           MR. DODSON: This is a docket sheet that has

12        every motion from investigator and discovery motions, and

13        everything.  We don't have a problem, if you instruct the

14        jury that he was arraigned on February 7, 2000.  That's

15        what you're getting at, isn't it?

16           MR. MULLIN: Uh, huh (yes).

17           JUDGE CARTER; Why don't we just do it that way.

18      Q.(MR. MULLIN); Mr. Strickland, did you have any--did you

19   know that that William Speer was arraigned for the first time

20   in this Court on capital murder charges on February 7th, of

21   2000?

22      A.(MR. STRICKLAND): No, I did not.

23      Q.   Okay.  Do you have any reason to dispute that

24   whatsoever?

25      A.   No.

78

1     Q.    Okay, can we agree--if you can take my word for it--

2    that he was arraigned for the first time on February 7th, 2000?

3              MR. DODSON: That's fine, Judge.  We will

4    stipulate to that.

5              JUDGE CARTER; Stipulated.

6              MR. MULLIN: Okay.

7     Q.(MR. MULLIN): Can you understand--I'm not saying this is

8    what happened, Mr. Strickland, but I'm asking, can you at least

9    understand why someone might look at the timing--if he came

10   here on February 7th of 2000, and received an Indictment for

11   capital murder, and a few days later said, I'd like to talk to

12   a chaplain, I'm a Christian?  Can you understand how someone

13   might think there's manipulation going on there?

14    A.(MR. STRICKLAND): Yes, I can understand, but what I

15   cannot understand is how a man facing that would be

16   experiencing the joy that I saw.

17    Q.    Okay.  That's fair enough.  But it could give people

18   pause?

19    A.    Yes.

20    Q.    Would you agree?

21    A.    Yes.

22    Q.    Thank you, Mr. Strickland.

23              I do have another question.  I apologize to the

24   Court.

25              Mr. Strickland, what we have talked about here

79

1    today is that William Speer, you believe is a Christian, and

2    we've agreed on pretty much what that means.  We think we

3    understand each other what that means.  Is that in and of

4    itself though--does that mean that someone should not receive

5    the death penalty just because they're a Christian?

6         A.   No, it doesn't.  Not in my opinion.

7         Q.   Okay, so that in and of itself may not be enough, is

8    that right?

9         A.   Not in my opinion.

10        Q.   Thank you, Mr. Strickland.

11                      REDIRECT EXAMINATION

12   BY MR. DODSON:

13        Q.   Mr. Strickland, let's go back to something you made

14   reference to when I was talking with you.  I believe William

15   told you that he had been to Court; came back; reflected on his

16   life; broke down; fell on his knees.  Would you tell us more

17   about that, please sir?

18        A.   I don't recall that he said, been to Court.  He said

19   he had--

20        Q.   --he'd been out of his cell--

21        A.   --it was something about a case against him.

22        Q.   Okay. Alright.

23        A.   And that when he came back in--

24        Q.   --let me stop you there.  He said something about a

25   case against him?

80

1      A.   Right.   Yes.

2      Q.   Alright.   Then he had this case against him; he's out

3  of the unit; he comes back and what happens?

4      A.   A short period of time after that--I don't know if

5  it was hours or days--he started reflecting on his life up to

6  that point, and he had been basically a waste and all of the

7  things that he had been involved in, and he became broken about

8  that, and fell on his knees and wept and felt like the Lord was

9  dealing with him, and asked God to forgive him, and to change

10  his life.

11      Q.   Obviously, Mr. Mullin asked you if you could

12  understand how it would be suspicious the timing of this, and

13  you agree with that?

14      A.   Sure.

15      Q.   But you also said, you can't understand how he would

16  have the expression of joy that he had if this wasn't legit and

17  sincere?

18      A.   Yes, I did.

19      Q.   Okay, and what do you mean by that?

20      A.   It's something that I already explained.   The guy I

21  minister with and I talked about that, and all the other people

22  that are involved with the ministry, and what I told them, it

23  was like it was just joy coming out of that cell when he walked

24  to that door.   There was just a glow on his face.

25      Q.   This is not a warm and happy place, is it?

1          A.   No, it's not.

2          Q.   And you saw a glow in Administrative Segregation when

3     you saw William Speer?

4          A.   I did.

5          Q.   Pass the witness.

6                    MR. MULLIN:  Briefly, Your Honor.

7                         RECROSS EXAMINATION

8     BY MR. MULLIN:

9          Q.   Mr. Strickland, you said he asked for God's

10    forgiveness?

11         A.   Yes.

12         Q.   At that point?

13         A.   Yes.

14         Q.   Do you agree with me that as gracious and good a God

15    as He is, first of all, he would freely forgive someone who

16    repented, right?

17         A.   Sure.

18         Q.   Sure. But that does not remove someone from the

19    appropriate laws that man has?

20         A.   No, it doesn't.

21         Q.   It does not--that does not mean someone shouldn't be

22    punished under man's law, even though God has forgiven him, do

23    you agree?

24         A.   God said, obey the laws of the land.

25         Q.   Even like the thief on the cross?

82

1     A.   Yes.

2     Q.   Mr. Strickland, I've asked you leading questions, and

3  now I'm going to give you an opportunity, is there anything you

4  wish I would have asked you that I haven't covered with you?

5     A.   No, sir.

6     Q.   Thank you.

7          JUDGE CARTER; Alright, is that all?

8          MR. DODSON: Yes, sir.

9          JUDGE CARTER; Thank you, sir, you may step down

10  now.   Thank you.

11          MR. DODSON: Gary Nixon.

12              GARY NIXON

13  having been duly sworn, testified as follows:

14              DIRECT EXAMINATION

15  BY MR. DODSON:

16     Q.   State your name, please?

17     A.   Gary S. Nixon.

18     Q.   And Mr. Nixon, how are you employed?

19     A.   I am self employed.

20     Q.   What do you do?

21     A.   I'm a contractor, painting and remodel.

22     Q.   We just heard from James Strickland.

23     A.   Yes, sir.

24     Q.   I understand that you and Mr. Strickland are involved

25  in Fruitful Harvest Ministries out of Sulphur Springs?

1     A.   Yes, we are.

2     Q.   How did you get involved with that?

3     A.   Invitation from a friend to get involved at the county

4   jail in Sulphur Springs.

5     Q.   And when was that?

6     A.   That was 1991.

7     Q.   Are you still doing it?

8     A.   Yes, sir.

9     Q.   You're the chaplain at the Hopkins County Jail?

10    A.   Yes, sir.

11    Q.   Okay.  What was the process that you went through to

12  become involved in the Fruitful Harvest Ministries?  Did you

13  start at the county jail?

14    A.   Yes, sir.

15    Q.   Did you move on to something else?

16    A.   Yes, sir, we moved on to the Texas Department of

17  Criminal Justice down at Tennessee Colony, and we were visiting

18  Michaels Unit; Beedle 1; Cofield; in that area.

19    Q.   Have you--when did you get involved in Telford?

20    A.   1999.

21    Q.   And prior to '99, you have been going to other units?

22    A.   Yes, sir.

23    Q.   Mr. Strickland made reference to a forty-two hour

24  training program at Telford.  Did you go through the same

25  program?

1        A.   Yes, sir, the same school.

2        Q.   Approximately how many inmates do you minister to a

3   year--any way of knowing?

4        A.   No, sir, it could be--between the county and Texas

5   Department of Criminal Justice it could approach a thousand.

6        Q.   In connection with people in county jail waiting

7   trial, have you ministered to people who were facing

8   potentially the death penalty?

9        A.   Yes, sir.

10        Q.   Have you ministered to people that you thought well,

11   if that individual--the death penalty is appropriate?

12        A.   Yes, sir.

13        Q.   Okay.  Do you believe in the death penalty?

14        A.   Yes, I do.

15        Q.   Okay.  What is--if there is--what is the typical

16   inmate you work with?  Describe them?

17        A.   They don't have the same degree of education or

18   background that I might have experienced, or you, or other

19   people.  Most of them will come from either a broken home, or

20   an uncaring home.  They more than likely didn't finish high

21   school, and they've run with the wrong crowd at a very young

22   age.

23        Q.   What are the majority of them looking to you for?

24   What do they want out of you--most of them?

25        A.   Guidance.

1     Q.   Okay.   Have you over the years felt that you have

2     been conned by these people?   Trying to take advantage of you?

3     A.   Certainly.

4     Q.   What types of things do you look for to make that

5     determination?

6     A.   Usually it's--they'll start out making requests of me.

7     Can you do this, or would you do this?   Could you--could you

8     call my lawyer for me and find out--you know, just--they want

9     favors.

10    Q.   When did you first meet William Speer?

11    A.   February the 25th of 2000.

12    Q.   Were you by yourself when you met him?

13    A.   No, I was with James Strickland.

14    Q.   Alright.   Had William at that point in time indicated

15    to you about any dreams that he had had?

16    A.   Not at that time, no, sir.

17    Q.   Okay, how often have you--since February, 2000--how

18    many times have you seen William, or what is your typical

19    pattern of seeing him?

20    A.   Well, probably visit William every other Saturday.

21    Twice a month.

22    Q.   Okay, there are a number of inmates at the Telford

23    Unit that you minister to, is that correct?

24    A.   Yes, sir.

25    Q.   Now as I understand it, you and Mr. Strickland may

1   show up together.  You may spend some time with the inmate

2   together, but basically you split up to cover more territory?

3       A.   Yes, we do.

4       Q.   Would that have been what you would have done the

5   25th, the first day you met William?  Eventually, you all split

6   up?

7       A.   Shortly after that first meeting, yes, sir.

8       Q.   Okay.  And you may have stayed longer with William, or

9   he may have stayed longer with William?

10      A.   Right.

11      Q.   Okay.  How many times have you testified on behalf of

12  an inmate that you were ministering to?

13      A.   Just once.

14      Q.   How many times have you been asked--when I say,

15  testify--I mean, through letters, go to parole hearings, or

16  whatever--have you been asked frequently to do that?

17      A.   Occasionally, yes, sir.

18      Q.   Alright.  Have there been times you've said, no, I'm

19  not going to do it?

20      A.   Yes, sir.

21      Q.   Or better yet, you don't want me there?

22      A.   Right.

23      Q.   Alright.  When is the last time you saw William out

24  at the prison?

25      A.   It would have been a week ago this past Saturday.

1    Q.   Do you try to go every other week unless they're on

2    lock down or some--they won't let you in, or something?

3    A.   Yes, sir.

4    Q.   What types of things do you all talk about?

5    A.   Mainly, ninety percent of our conversation is usually

6    about the Bible and scripture.  We have some time where we will

7    share family things.  How's my family doing, and so on and so

8    forth, but the bulk of the conversation is around scripture and

9    the Bible.

10   Q.   Is that unusual to have such a large percentage of the

11   conversation devoted to the Bible with these people that you

12   typically minister to?

13   A.   Yeah, I would say it's unusual.  Yes, sir.

14   Q.   Does William make you do your homework?

15   A    .Yes, sir.

16   Q.   In what way?

17   A.   He will see if I can run a word study for him on

18   certain scriptures to find out and make comparisons to see if

19   there's a connection between the words.  It's just a word study

20   program that I do for him sometimes.

21   Q.   Now do you make a practice of talking to the inmate as

22   to specifically why they're in jail?  What have you done?

23   A.   I never ask that question.

24   Q.   Why not?

25   A.   Purely irrelevant to me.

1   Q.   Okay.  Now you were aware, are you not, that while you

2   were ministering to him, even up to last week, William had this

3   capital murder charge pending against him?  Were you aware of

4   that?

5   A.   I was aware of that, yes, sir.

6   Q.   Okay.  In fact I believe you talked with Mr. Mullin

7   about this almost six, eight, nine months ago, did you not?

8   A.   (No audible response).

9   Q.   Did you talk to Mr. Mullin?

10   A.   Four months maybe.

11   Q.   Four months?

12   A.   Uh, huh (yes).

13   Q.   Okay.  William did not specifically indicate to you

14   any of the facts or details about the death of Gary Dickerson,

15   did he?

16   A.   No, sir.

17   Q.   But did you and William have conversations about

18   murder?

19   A.   Yes, sir.

20   Q.   Specifically, what happened?

21   A.   The only conversation that I can recall where that

22   word was used, was he asked me to run a study on the difference

23   between the meaning of murder and kill.

24   Q.   In what context? In terms of forgiveness?

25   A.   Yes, sir.  Uh, huh (yes).

89

1     Q.   Did you indicate that--take that as a sign of remorse

2  or something he was searching for, or an answer to?

3     A.   Oh, I always believed he was remorseful, yes.

4     Q.   Obviously William has been convicted of capital

5  murder, or you wouldn't be here today.  The testimony is that

6  this is the second murder that he's committed.

7     A.   Okay.

8     Q.   Does that change the opinion of the William Speer

9  you have been ministering to for the last two years--year and

10  a half?

11     A.   No, sir.

12     Q.   Why not?

13     A.   Because William would have to seek forgiveness higher

14  up the chain than myself.  I'm not the one that can forgive

15  him.

16     Q.   Okay.  Does William--does his commitment or belief,

17  or expressions of belief in Christ, based on seeing a thousand

18  inmates a year the last nine years, do you think that is

19  sincere and genuine?

20     A.   Yes, I do.

21     Q.   And why?

22     A.   Well, everybody has to have a discerning power.

23  That's what Courtrooms are about--a discerning power.  They

24  will discern something different than I might discern, but you

25  have to discern the intent of a person's heart in order to know

90

1  how to minister to them, and that's a gift that I believe a

2  spiritual Christian would receive from the Lord--is the power

3  to discern if the man is serious or not.

4      Q.   And you feel that way?

5      A.   Yes, sir.

6      Q.   Do you think he is a changed individual from what

7  he may have been in the past?

8      A.   I didn't know him from before, but he's definitely a

9  changed person.

10     Q.   Okay. Based on your familiarity with William and your

11  ministering to him and praying to him--praying with him--is he

12  a future danger in your view?

13     A.   In my estimation, no, sir.

14     Q.   Now there are no certainties in life, are there?

15     A.   No, sir.

16     Q.   You can never be one hundred percent sure?

17     A.   No, sir.

18     Q.   But based on your experience, you don't have any

19  hesitation saying it's your opinion and your belief that he's

20  changed, and he's not a future danger?

21     A.   That's correct.

22     Q.   Does it cause you concern that William has not

23  specifically said--what does he call you?

24     A.   Chaplain Gary, I guess, most of the time.

25     Q.   Alright, has it caused you concern that William has

91

1    not said, Chaplain Gary, please forgive me, I have committed

2    two murders?   Does that cause you concern that he has not said

3    that?

4         A.   No, sir.

5         Q.   Why no?

6         A.   Like I stated, I can't be the one to forgive him.

7         Q.   The fact that he has not broken down and specifically

8    talked to you, does that diminish your opinion of his

9    sincerity?

10        A.   No, sir.

11        Q.   Okay.   Of course, you're not a Catholic priest, are

12   you?

13        A.   No.

14        Q.   And William is not Catholic?

15        A.   No.

16        Q.   So you don't particularly take confession, do you?

17        A.   No.

18        Q.   Alright.   Have you been conned before?

19        A.   Yes.

20        Q.   Is that more frequent than not that they're trying to

21   gain something?

22        A.   The majority of them, yes, it's a con.

23        Q.   Have you seen any indication that that's what William

24   is trying to do today?

25        A.   No.

1  Q.  Or now?

2  A.  No.

3  Q.  In the two years that you've known him?

4  A.  No.

5  Q.  Is William free of sin?

6  A.  No, none of us are free of sin.

7  Q.  If one makes minor transgressions, does that mean your

8  Christianity is not sincere?

9  A.  Well, I hope not.

10  Q.  Why do you say that?  Are you in trouble?

11  A.  Yeah, I'm in deep trouble.

12  Q.  We're all in trouble, aren't we?

13  A.  Yeah, we sure are.  Yes, sir.

14  Q.  Whether that includes a bad attitude or cussing or

15  whatever it may be, it doesn't change your opinion?

16  A.  No, sir.

17  Q.  Do you have an opinion as to whether or not William

18  has a purpose in life now?

19  A.  I believe he has a purpose, yes, sir.

20  Q.  What is that?

21  A.  I believe that it's to share the gospel. I really do.

22  Q.  Do you think he can continue to grow personally?

23  A.  Sure.  Yes.

24  Q.  Do you think he can help others grow as well?

25  A.  Certainly.

93

1      Q.  Have you seen him grow in the last year and a half?

2      A.  Yes, I have.

3      Q.  You understand he's been in prison since he was

4  sixteen years old?

5      A.  Yes, I do.  I know that.

6      Q.  The time that he's been under--working with you and

7  Mr. Strickland, have you seen his maturity level increase in

8  just this last year and a half?

9      A.  Yes, I have.

10      Q.  In what way?

11      A.  Through his knowledge, and the general application of

12  the word to his own life.  I've seen marked growth in that

13  area.

14      Q.  Let me just get to the bottom line.  Do you think

15  William deserves the death penalty?

16      A.  No.

17      Q.  Pass the witness.

18                    CROSS EXAMINATION

19  BY MR. MULLIN:

20      Q.  Hi, Mr. Nixon.

21      A.  Hi, how are you?

22      Q.  I'm good.

23      A.  Good.

24      Q.  We had a nice conversation with each other sometime

25  back, right?

94

1      A.   Right.

2      Q.   Mr. Nixon, is--I think I can understand you well

3   enough to know that you're not suggesting that becoming a

4   Christian means that we're exempt from man's laws?

5      A.   That's right.

6      Q.   That's absolutely right.   Being a Christian--becoming

7   a Christian doesn't in and of itself exempt us--anyone--from

8   any other punishments anyone else might face, isn't that right?

9      A.   True.

10      Q.   Okay.   Do you think--first of all, you don't see any

11   Biblical bar to the State seeking the death penalty, do you?

12      A.   No, sir.

13      Q.   Okay.   I mean, do you think it's inappropriate for

14   the State to be seeking the death penalty in a case where a man

15   has now committed his second capital murder?   Do you think

16   that's wrong?

17      A.   No, not really.

18      Q.   Okay.   Is--I don't think you were saying this earlier,

19   I just want to make sure I understand--you're not suggesting

20   that--we all know that people start lives of crimes for many

21   reasons--you mentioned a lot of them have unbroken homes--that

22   may be a reason someone does it, but you're not saying that's

23   an excuse, is it?

24      A.   No.

25      Q.   My father died when I was seven.   That wouldn't give

95

1    me an excuse to become a two time capital murderer, would it?

2        A.   No, sir.

3        Q.   You met William Speer on February 25th, 2000?

4        A.   Yes, sir.

5        Q.   Mr. Nixon, at that time had he given you any

6    indication when he had become a Christian?

7        A.   As Mr. Strickland probably stated, we were given an

8    I-60, which is an inmate request form to the chaplain--

9        Q.   --right--

10       A.   --and on that request that William sent to the

11   chaplain, he said, I have recently become a born again

12   Christian, and I would like for Christian volunteers to come by

13   and fellowship with me.

14       Q.   Okay.

15       A.   So it was probably a week or two prior to the 25th

16   when that request was sent to the Chaplain.

17       Q.   Mr. Nixon, I will represent to you that it has been

18   stipulated here today in evidence that Mr.Speer was arraigned

19   for the first time on these capital murder charges in this

20   Courtroom on February 7th, 2000, some eighteen days before you

21   met him.  Do you have any reason to dispute that at all?

22       A.   No, sir.

23       Q.   Okay.  Mr. Nixon, can you understand why someone in

24   my position may at least be partially cynical to the idea that

25   an inmate--

96

1          MR. DODSON: Your Honor, I am going to object,

2     that question in itself is a comment on the evidence, of Mr.

3     Mullin's personal beliefs.

4          MR. MULLIN: I'll rephrase it, Judge.  I'll

5     rephrase it.

6          Q. (MR. MULLIN): Can you understand why someone might be

7     cynical about someone receiving a capital murder indictment on

8     February 7th, and then immediately after calling for a chaplain

9     saying, I'm a Christian, knowing they're fixing to

10    face the death penalty?  Can you see why someone might think

11    that's not a genuine conversion?

12         A. (MR. NIXON): Certainly.

13         Q.   I'm not saying it is or it isn't.

14         A.   Oh, I understand.

15         Q.   But you can agree with me that that's something that

16    makes you hesitate?

17         A.   Right.

18         Q.   There are some--how long have you been doing this--

19    prison ministry?

20         A.   About ten years.

21         Q.   I'm guessing you've seen thousands of men in prison?

22         A.   Uh, huh (yes).

23         Q.   There are some truly good men in prison, aren't there?

24         A.   Yes.

25         Q.   Sinners I understand, but I mean, men who you've come-

97

1    -you've really come to have a fellowship with and love.  Would

2    you agree?

3         A.   Yes, sir.

4         Q.   I mean, there's some guys in there that yeah, they're

5    wearing white and they're behind bars, but you just get--these

6    are really good men?

7         A.   Uh, huh (yes).  Yes, sir.

8         Q.   So we're certainly--I don't want to give the

9    impression that we're saying there are no good inmates.  Do you

10   understand that?

11        A.   Right.

12        Q.   Did you do the word study Mr. Speer asked you to do?

13        A.   I started on it, but I don't think I ever completed

14   it, no, sir.

15        Q.   First of all, I understand that you believe William

16   Speer is a Christian, right?

17        A.   Yes, I do.

18        Q.   Is there room in your heart that it's possible you

19   could be wrong?

20        A.   Probably a small part, yes.

21        Q.   I'm not saying you are wrong.

22        A.   Right, I understand.

23        Q.   If Mr. Speer is a Christian, is that in and of itself

24   enough--does that mean, okay, now that he's a Christian, he

25   shouldn't face the death penalty?

98

1      A.   Well, I thought the question posed to me was, is he

2  still a threat, or would he be a continued threat, and I would

3  say, no.

4      Q.   Alright, you don't feel like he would be?

5      A.   No.

6      Q.   Okay, did you feel that way from the very first?

7      A.   Yes.

8      Q.   Alright, from February 25th of 2000, and certainly,

9  within a couple of months after that, at some point right in

10 there, you had that sense that this guy's the real deal. He

11 would not ever be a threat to anybody again.  Is that how you

12 felt?

13     A.   Sure.

14     Q.   Okay.  Do you know for a fact--I understand your

15 opinion, but now I'm asking--do you know for a fact that if Mr.

16 Speer actually is a Christian--if he is, do you know that he

17 will never hurt anyone again?

18     A.   Do I know that for sure?

19     Q.   Yes, sir.

20     A.   No, sir.

21     Q.   We, Christians do fall back, do they not?

22     A.   Yes, they do.

23     Q.   I don't know if you want to--I don't know if you agree

24 with the term, backsliding, or how you would put it, but do

25 Christians fall back into their old ways at times?  Do some

99

```
 1   Christians?
 2        A.   Well, if that happens you have to question was it
 3   genuine to begin with.
 4        Q.   Okay.  Have you ever seen anyone in your life that you
 5   believed to be a Christian, that fell back into old patterns?
 6        A.   Probably, yes, sir.
 7        Q.   I don't remember--I think you're a Baptist--I don't
 8   remember.  Are you--would--?
 9        A.   --I'm just a Christian.
10        Q.   Okay.  I couldn't remember if we talked about that.
11   The reason I bring that up, so I want to ask you about a couple
12   of men.  Did you believe that Jimmy Swaggart was a Christian?
13   Or do you?
14        A.   I have no opinion, really.
15             MR. DODSON: Judge, I'm going to object on the
16   relevancy--
17             MR. MULLIN: --oh, it's very relevant--
18             MR. DODSON: --of Jimmy Swaggart's Christianity.
19             MR. MULLIN: I think it's relevant.
20             JUDGE CARTER; Well, I--let's get to it, Mr.
21   Mullin.  I presume you're going to--
22        Q.(MR. MULLIN): Do you know Jimmy Swaggart?
23        A.(MR. NIXON): Yes, sir.
24        Q.   Did you think he was a Christian, or did you have any
25   thought about it?
```

100

1       A.   I truly had not formed an opinion.

2       Q.   Did you know Jim Baker of--

3       A.   --only on T.V. occasionally.

4       Q.   Did you have any opinion about his Christianity?

5       A.   No, sir.

6       Q.   Okay.  If they were Christians, you know that Jim

7   Baker was convicted of a Federal crime, and Jimmy Swaggart was

8   found with a prostitute.  Is that possible Christians could

9   wind up in those predicaments?

10      A.   Yes, they do.

11      Q.   Would you expect, Mr. Nixon, for a Christian, if he

12  had been involved in the past with gangs--with a gang--would

13  you expect him to break ties with that gang, as far as the

14  kinds of activities they used to carry on?  I mean, you

15  wouldn't expect him to keep doing those kinds of things, would

16  you?

17      A.   Not normally, I wouldn't.  No.

18      Q.   Sure, now you might expect them to minister to gang

19  members?

20      A.   Yes, sir.

21      Q.   But you wouldn't expect them to keep doing the kinds

22  of things that prison gangs do, would you?

23      A.   No.

24      Q.   Mr. Nixon, I feel like you love William Speer, do you

25  not?

101

1      A.   I care for him, yes, sir.

2      Q.   Sure, and you would not want to see him die, would

3   you?

4      A.   Deep down, no.

5      Q.   Sure.  I mean that's not anything anybody would wish

6   for?

7      A.   No.

8      Q.   Is it your belief, or do you agree with this idea,

9   that when people come under the most severe of circumstances,

10   it is easier for them to be on their best behavior in those

11   crisis moments of their life, than when there's really nothing

12   going on?

13      A.   Would you repeat that again, please?

14      Q.   Well, let me see if I can reword it.  If someone

15   comes under just extremely serious situation in their life--

16   they've got something hanging over their head that is just

17   heavy--I mean, it could be an extreme sickness.  It could be

18   total financial ruin.  Something that is devastating to them--

19   is it easier for them, first of all--this wasn't my original

20   question, but I'll come back to it--is it easier for those

21   people to turn to God in those moments because they're so down?

22   Or have you seen that?  Is that something you would expect to

23   see from people?

24      A.   I would believe that could be natural, yes.

25      Q.   Sure.  And isn't it easier for people in those crisis

1    moments of their life to turn their attention to whatever it is

2    that is plaguing them, and be on their best behavior, and to

3    deal with that issue because it is such a heavy burden to them?

4         A.   Be on their best behavior?

5         Q.   Let me spell it out for you.  Eighteen days before

6    William Speer met you, he found out the State was seeking the

7    death penalty on him.  Would you expect that to affect his

8    behavior?

9         A.   I don't know if I could determine that, sir.  I really

10   don't.

11        Q.   Mr. Nixon, if Mr. Speer is a Christian, you agree that

12   God would have forgiven him to the degree he--for whatever he

13   has repented of?  Do you agree?

14        A.   Yes, sir.

15        Q.   But that does not mean that he is not accountable to

16   man's laws for his crimes.  Do you agree with that?

17        A.   I agree with that, yes.

18        Q.   He would still be accountable?

19        A.   Yes, sir.

20        Q.   One last thing, Mr. Nixon.  Would you read Leviticus

21   24:17?  Just that one verse.

22        A.   You should have brought a giant print Bible, sir.

23        Q.   I should have.  I'm sorry.

24        A.   Leviticus, what?

25        Q.   24:17?

103

1       A.   24:17.  "If anyone take the life of a human being, he

2  must be put to death.  Anyone who takes the life of someone's

3  animal must--"

4       Q.   --that's far enough.  "If anyone takes the life of a

5  human being, he must be put to death?"

6            Do you think there is any reason--any Biblical

7  reason that you can think of, why the State should not be

8  seeking the death penalty against Mr. Speer?

9       A.   Basically, we're under a new covenant now, sir.

10       Q.   Okay.  So is the old covenant--has that been done

11  away with, and it's not in place any more?

12       A.   No, it's fulfilled with Jesus Christ.

13       Q.   So has it changed now?  Is the death penalty an

14  inappropriate response for a government to have in these

15  situations?

16       A.   No, I don't think so.  No, sir.

17       Q.   Okay, so you still agree that it's not inappropriate

18  for the State to seek the death penalty in cases like this

19  where someone has killed someone twice?

20       A.   Repeat that, please?

21       Q.   You don't think it's wrong for the State to seek the

22  death penalty in capital murder cases, do you?

23       A.   No, I don't.

24       Q.   Okay.  Thank you, Mr. Nixon.

25

104

```
 1                    REDIRECT EXAMINATION
 2   BY MR. DODSON:
 3        Q.   Mr. Nixon, Mr. Mullin asked you if--is it natural in
 4   moments of crisis for some people to turn to God.  That
 5   happens, doesn't it?
 6        A.   Yes, it does.
 7        Q.   And it also happens in a crisis people say, why me,
 8   and turn away from God.
 9        A.   True.
10        Q.   Correct?
11        A.   Yes.
12        Q.   Everybody does it differently.
13        A.   Uh, huh (yes).
14        Q.   Now you made reference--Mr. Mullin read to you from
15   the Old Testament, or had you read the Old Testament.  You
16   made reference to we're under a new covenant?
17        A.   Uh, huh (yes).
18        Q.   That's the New Testament--is that what you're
19   referring to?
20        A.   Right.
21        Q.   Now--I will be the--although I'm a Methodist
22   minister's son--I'd be the first one to tell you I'm not a
23   Biblical scholar.  Okay?
24        A.   Okay.  I'm not either.
25        Q.   You know more than I do probably.  My question to you
```

1    is, you can go through the Bible--and if I asked you to, you

2    could go to the Bible right now and find a phrase or a line

3    here or there, that could back up most anything you said,

4    couldn't you?

5         A.   Certainly.

6         Q.   And you certainly don't disagree with the one little

7    line that he read from Leviticus, do you?

8         A.   No, I don't.

9         Q.   But the question is--you don't have a problem with

10   the death penalty on two capital murders, do you?  In general?

11        A.   No.

12        Q.   Okay, but the question, you've got to focus on each

13   case?

14        A.   Right. Yes, sir.

15        Q.   And you're focusing on an individual that you've

16   prayed with and ministered to for a year and a half?

17        A.   Yes, sir.

18        Q.   And it's your opinion when you look at the facts and

19   circumstances of this case--

20             MR. MULLIN: Objection to the leading, Your Honor.

21        Q.(MR. DODSON): Okay.  Based on your knowledge in this

22   case, do you think that William Speer deserves the death

23   penalty in this case, with this individual that you've come to

24   know?

25        A.(MR. NIXON): No, I don't.

1    JUDGE CARTER; Any other questions?

2    MR. MULLIN: No, sir.

3    JUDGE CARTER: Thank you, sir, that's all.  You

4  may step down.

5    MR. DODSON: Judge, if we could have a ten minute

6  recess.

7    JUDGE CARTER; Alright, Ladies and Gentlemen, we

8  will take a short recess now.

9  RECESS

10  JURY OUT OF THE COURTROOM:

11    MR. DODSON: Judge, I would like to call William

12  Speer outside the presence of the jury if I could, sir.

13    JUDGE CARTER: Alright.

14    You've been sworn.  Just be seated.

15    WILLIAM SPEER

16  having been previously sworn, testified as follows:

17    DIRECT EXAMINATION

18  BY MR. DODSON:

19    Q.   William, we're coming at the close of your case in

20  the punishment stage, and basically, David Carter and I have

21  talked to you about your right to testify in your own behalf

22  in punishment.

23    A.   Yes, sir, you have.

24    Q.   And also told you that you do not have to testify.

25  That in the event you choose not to testify, the Court will

1    instruct the jury that they're not to take that into

2    consideration.

3         A.   Yes, sir, you have.

4         Q.   And we've talked about the types of questions the

5    prosecution could ask you if you took the witness stand, and

6    basically, they can ask you most anything in the world.

7         A.   Yes, sir.

8         Q.   And you can't answer some and not all.

9         A.   Yes, sir.

10        Q.   And it has been my recommendation, and independently,

11   Mr. Carter's recommendation, that you not testify.

12        A.   Yes, you have.

13        Q.   And it's my understanding that you independently of

14   us, had come to that same conclusion.

15        A.   Yes, sir.

16        Q.   And you're choosing not to testify.

17        A.   Yes, I am.

18        Q.   Now, we have heard testimony of Mr. Nixon, and Mr.

19   Strickland.

20        A.   Yes, sir.

21        Q.   There's also out in the hall, Officer Thelan that is

22   here to testify on your behalf if you so choose, and it's your

23   decision, along--after talking with us that we probably need

24   to rest right now.

25        A.   Yes, I have.

108

1     Q.   Alright, and you agree and are satisfied with the

2  testimony of Strickland and Nixon?

3     A.   I am satisfied, sir.

4          Thank you, Your Honor.

5          JUDGE CARTER; That's all, step down.

6          MR. DODSON: With that, we would rest.

7          JUDGE CARTER; Alright, any rebuttal?

8          MR. MULLIN: Judge, we are going to have a couple

9  of rebuttal witnesses, and we are going to have to take up a

10  couple of these motions in limine.

11          JUDGE CARTER; Well, let's take them up.

12          MR. MULLIN: But we don't have the witnesses here.

13  We wouldn't be able to get them here by 5:00 o'clock.

14          JUDGE CARTER; Well, how long are they going to

15  take, because that's going to--you know, I sure wanted to have

16  the Charge ready to read, like we did this morning.

17          MR. MULLIN: Sure, we can have the Charge ready,

18  but--

19          JUDGE CARTER; --well, I know, but I meant ready

20  so that we would read it when they got here.

21          MR. MULLIN: I would think they would probably

22  take--between the two of them, forty-five minutes.  Something

23  like that.

24          MR. DODSON: Forty-five on your side?

25          MR. MULLIN: I would think total personally, but--

1       JUDGE CARTER; Well, let's take up the motions

2   then.

3       MR. MULLIN: The first one--actually, it's Number

4   10 here on the Motion in Limine that was presented to the Court

5   today, about Michael Schwartz.  The Defense has chosen to use

6   as their mitigation, or in response to the future dangerousness

7   issue, the idea that Mr. Speer is now a Christian, and because

8   of that would not be a future danger.

9       We want to bring someone who has personal

10  knowledge that that is in and of itself, not enough.

11      JUDGE CARTER; I'm sorry?

12      MR. MULLIN: We want to bring someone who has

13  lived through this and has personal knowledge that just because

14  he's a Christian, doesn't mean he's not going to commit acts of

15  violence in the future.

16      JUDGE CARTER: Well, I mean, are you going to

17  bring a witness to say that?

18      MR. MULLIN: Yes.

19      JUDGE CARTER;  Well, I don't know if you need a

20  witness to say that.  You can say that without a witness'

21  testimony.

22      MR. MULLIN: He's a grafted witness.

23      JUDGE CARTER: Well, what are we talking about

24  here?  This says a person who had entered a plea bargain, and

25  then later reoffended, and Michael Schwartz--is that what

1  we're talking about?

2         MR. MULLIN: Yes.

3         JUDGE CARTER; Entered into a plea bargain with

4  Mark Mullin in a separate, unrelated case, because of M.A.

5  Schwartz religious faith, only to reoffend.  Schwartz does not

6  know William Speer; does not know anything about the facts of

7  the case--so forth and so on.  Purpose of this is to show

8  Schwartz religious belief was not genuine, and that Schwartz

9  reoffended.  Any such comparison between Schwartz and Speer is

10  unfounded--da--da--da--da--da.

11         Is that the purpose of it?

12         MR. MULLIN: Yes, Your Honor.

13         JUDGE CARTER; To show that somebody else in the

14  world said they were a Christian and still did something wrong?

15         MR. MULLIN: That's right.

16         JUDGE CARTER; Well, I grant that motion. I just

17  cannot see how that could possibly be relevant.  This--you

18  know, we could pick out people all day long forever and ever,

19  and say, this one did--this one didn't--this one did--this one

20  didn't.

21         MR. MULLIN: Right, but I wasn't going to do that.

22  I was just going to pick one.

23         JUDGE CARTER; Well, I know, but I just think

24  that is not relevant testimony.  If you're moving--well, do you

25  all have--well, right now we have a motion in limine.  I have

1    granted the motion.  We're now considering whether to admit it

2    into evidence.

3              MR. DODSON: And alternatively, I ask that it be

4    struck and not be allowed to present such testimony.

5              JUDGE CARTER; Well, I mean, if what I'm

6    understanding is that there is another person who has at one

7    time said they had a Christian or religious belief, and later

8    reoffended, that is just I think there is very, very, marginal

9    relevant evidence.  What does that have to do with this case?

10   Now, you can certainly argue all day long, Mr. Mullin that, you

11   know, just because somebody professes Christianity does not

12   necessarily mean they will not reoffend in the future, sure.  I

13   just don't believe you need a witness to come to be Exhibit A,

14   because to me that's just extremely marginal relevance.  I will

15   grant that motion.

16             MR. MULLIN: Well, we believe that it is relevant.

17             JUDGE CARTER; Well, I understand that, but you

18   know, I'm granting their motion.

19             MR. MULLIN: The second one, Number 11, deals

20   with--let me just say this.  Number 12, we're not worried

21   about.  We're not dealing with that.

22             JUDGE CARTER; Okay.

23             MR. MULLIN: We're not going to go there.

24             JUDGE CARTER; Okay.

25             MR. MULLIN: Number 11 is certainly relevant, and

1   we would like to go here because--

2          JUDGE CARTER; --well, let me see if I understand

3   this one.  Okay, this is the one attempting to revoke--well,

4   maybe you need to tell me what it is you're going to offer

5   here.

6          MR. MULLIN: Yes, sir.  Both of the Defense's

7   witnesses when I was cross-examining them indicated that if

8   someone truly has had a change of heart they should leave the

9   prison gang lifestyle, or words to that effect.

10         JUDGE CARTER; Yeah.

11         MR. MULLIN: And Mr. Speer made no attempt to

12  renounce his gang affiliations until July of this year, shortly

13  before he was to come to the final pretrials for this capital

14  murder case, and we believe that tends to show that he was not

15  sincere; that he did not try to renounce his gang affiliations.

16  We're not trying to be--

17         JUDGE CARTER; --what evidence are you going to

18  offer to establish that?

19         MR. MULLIN: I was going to bring--I would rather

20  the Court not make me tell what his name is--

21         JUDGE CARTER; --well, I don't care what his name

22  is--

23         MR. MULLIN: --I was going to bring a fellow

24  Texas Mafia member, plus I was going to bring Sergeant Calhoun,

25  Gang Intelligence, just to show that there's a process--not

1    what the words are--not what the questions are--there is a

2    process by which someone can renounce the gangs and that

3    William Speer didn't do that before July, this year.  We

4    actually--that's giving him more credit than he deserves.

5    There's nothing in the file, but I'm taking Mr. Dodson and Mr.

6    Carter at their word that he made--without ever having seen it,

7    that there is some document in which he attempted to do that as

8    of July, this year, but that leaves almost a year and a half

9    that he claims that he was a Christian, but he didn't renounce

10    the gang.

11                MR. CARTER; Your Honor, if I can speak to this

12    one.  Mr. Dodson mentioned yesterday--in the first place, I

13    think Mr. Mullin's wrong.  I think there are attempts by Mr.

14    Speer on record with the prison, to renounce gang membership in

15    2000, and not 2001.  My concern and the reason we filed this

16    motion, goes to a specific form that allows an inmate to

17    announce or renunciate membership in a gang.  And as Mr. Dodson

18    alluded to yesterday, Mr. Speer provided a copy of that form to

19    us, or to me, back in July.  He had completed that form.  That

20    form asked some questions that would have required him to

21    incriminate himself.

22                JUDGE CARTER; Well, he's saying that he would

23    say then that the--that he did attempt to I guess, make some

24    renunciation as of whatever that date is--without going into

25    the form and trying to--

114

1          MR. CARTER: If he can stay away from any specific

2     reference to a particular type of form--this particular form,

3     and when it was done, we may avoid the whole problem, but

4     obviously the Court is aware of our concern, Number 1, that I

5     get put in the position of having to testify, particularly in

6     light of the fact that I'm the guy that stood up and tried the

7     guilt-innocence, and we're now in the punishment phase.

8          MR. DODSON: He lost his credibility, Judge.

9          MR. CARTER; I'm not sure I ever had any, Judge,

10    but I think maybe we understand each other.

11         MR. MULLIN: We're not going to put Mr. Carter in

12    that position.  Now in all--you know--candor, they've never

13    shown me anything. They've only told me that he gave some

14    renunciation.  I don't know what it looks like.  I'm taking

15    their word for it, but what we would intend to do, Judge, is

16    through a fellow Texas Mafia member--

17         JUDGE CARTER; --well, I think he can testify

18    about the activities, if that's what you're talking about,

19    separate and apart, you know, from a form or filing something,

20    or something like that.

21         MR. MULLIN: But I would also like to ask this

22    inmate, is there a process through which one can get out of

23    the gang--a renunciation process--but I would not ask what

24    questions are on the form.

25         MR. DODSON: But see that's the problem. The

1    implication is, that there is a process and he didn't do it.

2              MR. MULLIN: That's right.

3              MR. DODSON: And the form says--

4              JUDGE CARTER; --but can we establish when he did

5    do it, and then all you have to do is say, yeah, he did do it

6    on a certain date.

7              MR. MULLIN: We'll stipulate it if they can show

8    me when he did do it.

9              MR. DODSON: When he filed grievances--

10             MR. CARTER; --yeah, and that's what I was going

11   to say, Your Honor.  We got--as the Court will recall, we

12   subpoenaed some grievance files late last week.  Mr. Mullin

13   will recall that, I think, while the jury selection was going

14   on.  I got those grievance records last week.  They have some

15   forms wherein Mr. Speer attempted to have them renunciate, or

16   take him out of the gang, that are dated in the year 2000.

17   That may solve the problem.  I will obviously make copies of

18   those available to Mr. Mullin, which may keep us from going

19   where he's talking about.

20             MR. DODSON: But the questionnaire says--asks

21   about his specific gang activity, which is incriminating in and

22   of itself, and he's had these charges over his head for two

23   years, and by saying there's a process and he didn't go through

24   it, well, the reason he didn't go through the process is

25   because it's asking for admissions.

1        JUDGE CARTER; No, I'm not saying that.  I'm

2   saying that he can say there is a process, and if did attempt

3   to go through with it at certain time, then that should at

4   least be a part of the evidence, that at a certain point in

5   time he did in fact--but I just don't want to get into the

6   form, the questions, and all of that.

7        MR. CARTER; Well, now my concern is that we're

8   already there because amongst the questions on this form, 'have

9   you ever been instructed by this group to assault or hit

10  anyone?  If so, and why?' 'Have you been ordered to do

11  anything--'

12       JUDGE CARTER; Nobody is offering that into

13  evidence, Mr. Carter.

14       MR. CARTER; The problem is, I held this, and we

15  did not turn it in because of his right not to incriminate

16  himself all along.

17       MR. MULLIN: But when did you get it?  When did

18  you get it?  I mean, that's all we need to know.

19       MR. CARTER; Well, I'd have to testify to that.

20       JUDGE CARTER; To what?

21       MR. MULLIN:  No, you wouldn't.

22       JUDGE CARTER; To what?

23       MR. CARTER; As to when I received this document.

24       MR. MULLIN: I will take your word for it.

25       MR. CARTER; He's got an absolute right not to

1  testify.  That's the can of worms I'm worrying about, Judge.

2           JUDGE CARTER; It's not a can of worms if you all

3  can tell them when he did in fact--you know, I think they're

4  entitled to show gang affiliation.  I don't want to get into

5  forms, particularly if they have something to do with--you

6  know, possible questions about other matters, and

7  incrimination, and attorney-client, whatever.

8           MR. MULLIN: We won't go there, Judge.  We just--

9  we don't believe that Mr. Speer, as soon as he could, or any

10 time in the reasonable future after that, made any attempts to

11 renounce, and we think it shows that it goes to the heart that

12 Mr. Nixon and Mr. Strickland--

13          JUDGE CARTER: Well, are you going to put a guard

14 up to talk about this, or are you talking about a gang member.

15 If you're talking about a gang member, then they can testify

16 about what he did, or didn't do that was gang affiliated, and

17 what he did, or didn't do to renounce, you know, from the gang.

18          MR. MULLIN: Right.  Yes.

19          JUDGE CARTER: Now, when we get into what forms

20 that he filed at TDC, that's a different problem.  I don't see

21 a bit of problem with the first evidence, but I do see we're

22 going to run into some difficulties, once you start talking

23 about filing a form, and all of that stuff.

24          MR. MULLIN: Okay, well, I'll have--I'll try to

25 have both of them here, and I'll put the gang member on first,

1    and see if we can be done with that, and hope that will work

2    out.

3                MR. DODSON: Judge, I think we're entitled to

4    know who he's calling as witnesses.  The Court has ordered him

5    to disclose witnesses.

6                MR. MULLIN: Not rebuttal.  Not rebuttal.

7                MR. DODSON: I think the order of this Court was

8    to disclose the witnesses.

9                JUDGE CARTER; Yeah, I think at this point in

10   time you need to disclose to them who you're going to call, as

11   far as a witness, if they're going to be here tomorrow.

12               MR. MULLIN: Mr. Speer lives out there in Seg

13   with this witness.  He can correspond with him tonight if he

14   wishes to do that.  We have some serious reservations about Mr.

15   Speer being able to have opportunity to write to him tonight,

16   and correspond with him, when we're going to call--the person

17   doesn't even know we're calling him to the stand in the

18   morning.

19               JUDGE CARTER; The person doesn't know it?

20               MR. MULLIN: No.  We don't want him to know, and

21   we have serious concerns about Mr. Speer being able to--I'm

22   not accusing him that he would, but there's a possibility he

23   could write to this person, and inform him what's going on, and

24   he prepare testimony.

25               How about if I tell the lawyers so that they

1    can prepare, but you order them not to tell Mr. Speer?

2              MR. DODSON: Well, then we're relying on Mr.

3    Mullin's recitation of what this witness knows without being

4    able to talk to our client to figure out what bias he has, what

5    motive he has--you know--who he is.  How well he knows Mr.

6    Speer, and we can't properly prepare for cross examination if

7    we can't talk to our client about who it is.

8              MR. MULLIN: Well, if we had had enough time

9    today, and I could have called him to stand right now, they

10   wouldn't have known.

11             MR. DODSON: Well, I would have objected.

12             MR. MULLIN: How?  It's rebuttal.

13             JUDGE CARTER; You're not normally entitled to

14   rebuttal witnesses, because you don't normally know who the

15   rebuttal witness is going to be until you have something to

16   rebut, but now that you have it, I thought it would be proper

17   to give it to them now.  Now this brings into another

18   consideration--thought about, you know--you mean there's no way

19   these parties can be separated enough tonight.

20             MR. MULLIN; I would like to think so, but I

21   don't control anything at TDCJ.  You know, I mean.

22             SSI's can send stuff, and I mean--I'm not even

23   trying to accuse Mr. Speer, I'm just--but I am concerned about

24   that possibility.

25             Is there anything to assure that this person is

1   not going to be talked to tonight before he comes to Court.

2            JUDGE CARTER; Separate them.  That's the only

3   thing, you know--

4            MR. MULLIN: I don't have any control over that.

5            JUDGE CARTER; I know you don't, and I sure don't

6   either.

7            MR. MULLIN:  Judge, how much notice would be

8   appropriate for the Defense, Judge, if we had this witness

9   brought earlier in the morning so that we could divulge it in

10  the morning?  How long would be appropriate for them to

11  prepare?

12           JUDGE CARTER; You're not going to get a whole

13  lot of time.

14           MR. CARTER; It depends on who it is.

15           MR. MULLIN: I'll call you and wake you up at

16  4:00 o'clock, and tell you if you want.

17           MR. CARTER; If you think I'm going to be asleep.

18           MR. MULLIN: We have some concerns about that.

19  Sergeant Harper, bring him early.

20           JUDGE CARTER; Bring him at 8:00 o'clock.

21           (SOMEONE IN THE AUDIENCE)--He'll be here.

22           MR. MULLIN: But that doesn't mean--that just

23  means he's going to be here, okay?  And you can know at that

24  point, right?

25           MR. CARTER: And if we need to prepare to talk to

1  this witness, the Court is going to allow that, I take it.

2          JUDGE CARTER: Well, from 8:00 to 9:00, all the

3  time you want.  I mean, I really don't believe this is going

4  to be all this big surprise.  I just don't think anybody is

5  going to be caught off guard here.  I mean, this is the last

6  part, of the last of the trial, I can't think this is going to

7  spring any big surprises, but you know, you all know more about

8  it than I do, but I--

9          Just have the witness here at 8:00 o'clock, and

10  divulge who the witness is.

11          MR. MULLIN: We'll be here at 8:00 as well.

12          JUDGE CARTER; Have you worked on a punishment

13  charge?

14          MR. MULLIN: I have, Your Honor.  I've already

15  given it to the Defense.

16          JUDGE CARTER; Well, let's bring the jury in, and

17  I'll let them go.

18  JURY IN THE COURTROOM:

19          JUDGE CARTER; Anything further, Mr. Dodson, from

20  the Defense?

21          MR. DODSON: The Defense would rest.

22          JUDGE CARTER: I understand the State does have

23  some rebuttal?

24          MR. MULLIN: We do, Your Honor.

25          JUDGE CARTER; Well, Ladies and Gentlemen, we're

```
1    going to cease for the afternoon.  I think there will be some
2    additional evidence, but it should not last--should not take a
3    long period of time, so tomorrow we will start and complete
4    with the final phase of the evidence.
5                The Defense has now--well, the State has
6    completed, and the Defense, and this would be rebuttal
7    testimony that may be presented tomorrow, and I would
8    anticipate that not to be lengthy testimony.  So we anticipate
9    finishing the testimony tomorrow morning, and then immediately
10   after that going into the second part of the punishment.  That
11   is the Charge on the issue of punishment.  I will read that to
12   you, just as I did on the guilt-innocence phase, and then the
13   attorneys will make their final statement on that phase, and
14   then the final phase of the case of course, is your
15   deliberation on the issue of punishment.  Of course, once you
16   have arrived at that, the case is concluded.  So we anticipate
17   finishing this case tomorrow, unless something happens that I'm
18   not expecting right now.
19               So hopefully, we will get the case submitted
20   to you in the morning, and have the jury begin your
21   deliberations immediately after that.
22               So at this time, Ladies and Gentlemen, we've not
23   completed the case.  It would still be improper to discuss it;
24   to read about it; same instructions that I've given you now for
25   many days, and I know you've followed those.  And again, we do
```

1    appreciate your service, Ladies and Gentlemen.  I realize we've

2    had to shuffle you around quite a bit and in and out, and this

3    has taken a long time to get this case completed, but we're

4    on the final stretch now, and we do anticipate finishing this

5    matter tomorrow.

6            So again, we appreciate your service. At this

7    time I'm going to excuse you until 9:00 o'clock tomorrow

8    morning.  Thank you very much.  You're excused.

9    JURY OUT OF THE COURTROOM:

10           JUDGE CARTER; You all can be seated.  I just

11   want to see what you've got.

12           MR. MULLIN: In an abundance of precaution, and

13   so no one can accuse the State of surprising anyone, I am going

14   to divulge who the witness is, because I want to give the

15   Defense a letter.

16           We intend to try to introduce a letter through

17   this witness tomorrow morning, and I don't want them to say

18   that I surprised them with this letter.  I've got it.  I'm

19   giving them a copy before we leave the Courthouse today, and

20   is there anything the Court--could the Court at least admonish

21   that Mr. Speer--I mean, is there anything we can do here to

22   try to keep him from doing anything with this witness.

23           JUDGE CARTER; Well, you know, I--

24           MR. DODSON: --Judge, I mean, for that matter, if

25   Mark will give us the letter, as officers of the Court, we

124

1   will represent we won't go over the letter with William until

2   tomorrow, but obviously for the morning, it would helpful if we

3   could have the letter tonight.

4            MR. MULLIN: We will do that.

5            MR. DODSON: So we know what's going on.

6            MR. MULLIN: We will do that.

7            JUDGE CARTER; I think that is a good suggestion,

8   and I would recommend that.

9            MR. CARTER; Whether or not it is a surprise, I

10  guess we'll have to wait and see.

11           MR. DODSON: Yes.

12           JUDGE CARTER; Well, I was wondering about the

13  Charge.

14           MR. MULLIN: Yes, Judge, I have two copies, and

15  I haven't looked at it for some time.  I don't know if anything

16  has changed, but that is my proposal.

17           JUDGE CARTER; Alright, we are adjourned then for

18  the afternoon.

19  ADJOURNED UNTIL OCTOBER 30, 2001, 9:00 A.M.

20

21

22

23

24

25

```
 1   THE STATE OF TEXAS      }
 2   COUNTY OF BOWIE         }
 3        I, Genny Day, Official Court Reporter in and for the Fifth
 4   District Court of Bowie County, State of Texas, do hereby
 5   certify that the above and foregoing contains a true and
 6   correct transcription of all portions of evidence and other
 7   proceedings requested in writing by counsel for the parties to
 8   be included in this volume of the Reporter's Record, in the
 9   above-styled and numbered cause, all of which occurred in open
10   court or in chambers and were reported by me.
11        WITNESS MY OFFICIAL HAND this the 30th day of March,
12   2002.
13
14
15        _____
16        Genny Day, Texas CSR 1291
17        Expiration Date: 12-31-2002
18        Official Court Reporter, Fifth District Court
19        Bowie County, Texas
20        23 Paul Drive, Texarkana, TX. 75503
21        (903) 792-0077
22
23
24
25
```

1           REPORTER'S RECORD

2         CAUSE NO. 99-F-0506-005

3            VOL. *14* OF *17*

4   THE STATE OF TEXAS          }      IN THE DISTRICT COURT

5   VS.                         }      BOWIE COUNTY, TEXAS

6   WILLIAM SPEER               }      FIFTH DISTRICT COURT

7

8

9

10

11

12            * * * * * * * * * * * * * * * * * * * * * * * *

13            REBUTTAL, CLOSING

14          ARGUMENTS & SENTENCING

15            * * * * * * * * * * * * * * * * * * * * * * * *

16

17

18

19

20

21       On the 15th day of October, 2001, the following

22   proceedings came on to be heard in the above-entitled and

23   numbered cause before the HONORABLE JACK CARTER, Judge

24   presiding, held in New Boston, Bowie County, Texas.

25       Proceedings reported by Gregg Shorthand.

Genny Day, C.S.R.
Official Court Reporter, 5th Judicial District of Texas
23 Paul Drive, Texarkana, Texas 75503
(903) 792-0077

```
1                    A P P E A R A N C E S
2    Mr. Mark Mullin, Prosecutor
3    Special Prosecution Unit
4    SBOT: 00788093
5    The State of Texas
6    340 Hwy 75N, Suite A.
7    Huntsville, TX.77340
8    Phone: (409) 291-2369
9              For the State of Texas
10
11   Mr. Richard Dodson, Attorney at Law
12   SBOT: 05942230
13   #4 Woodmont Crossing
14   Texarkana, TX. 75503
15   Phone: (903) 792-5400
16        and
17   Mr. David Carter
18   SBOT: 039332780
19   Mercy, Carter, & Elliott
20   1730 Galleria Oaks Dr.
21   Texarkana, TX. 75503
22   Phone: (903) 794-9419
23            For Defendant, William Speer
24
25
```

61

```
 1                        VOLUME 14

 2                       I N D E X

 3   OCTOBER 30, 2001

 4              REBUTTAL TESTIMONY - STATE

 5                    DIRECT   CROSS   REDIRECT   RECROSS

 6   WITNESS          EXAM     EXAM      EXAM      EXAM

 7   Randy Burrows      3       14        19        20

 8   Randall Calhoun   21        -

 9   Objections to Courts Charge              Page   25

10   Argument by Mr. Mullin for The State of Texas   Page   27

11   Argument by Mr. Dodson for Defense       Page   28

12   Argument by Mr. Mullin for The State of Texas   Page   40

13   Jury Verdict                             Page   53

14   Sentencing                               Page   57

15

16

17                    E X H I B I T S

18   NO.   DESCRIPTION                OFF'D    REC'D

19   S46   Letter                      11       11

20

21

22

23

24

25
```

1                      OCTOBER 30, 2001

2    JURY IN THE COURTROOM;

3                      JUDGE CARTER; Good morning, Ladies and Gentlemen.

4    We're ready to proceed with our case.

5                      Call your next witness, Mr. Mullin.

6                      MR. MULLIN: The State calls rebuttal witness,

7    Randy Burrows.

8                      REBUTTAL BY STATE

9                      RANDY BURROWS

10   having been duly sworn, testified as follows:

11                     DIRECT EXAMINATION

12   BY MR. MULLIN:

13        Q.   Tell the jury your name?

14        A.   Burrows--Randy Burrows.

15        Q.   Randy Burrows.

16        A.   Yes.

17        Q.   Mr. Burrows, I'm going to show you State's Exhibit

18   46.  Do you recognize your handwriting?

19        A.   Yes.

20        Q.   Second page, do you recognize your signature?

21        A.   Yes.

22        Q.   Do you go by the nickname 'Spot?'

23        A.   Yes.

24        Q.   Have you ever been affiliated with the Texas Mafia?

25        A.   Yes, sir.

4

| | | |
|---|---|---|
| 1 | Q. | Are you currently? |
| 2 | A. | No, sir. |
| 3 | Q. | Do you know William Speer? |
| 4 | A. | Yes, sir, vaguely. |
| 5 | Q. | Do what? |
| 6 | A. | Yes sir, vaguely, I do. |
| 7 | Q. | Vaguely? |
| 8 | A. | Yes. |
| 9 | Q. | Was he ever in the Texas Mafia with you? |
| 10 | A. | No. |
| 11 | Q. | William Speer was never in the Texas Mafia? |
| 12 | A. | William Speer has never been a Texas Mafia member. |
| 13 | No. | |
| 14 | Q. | Okay, was he ever a prospect of the Texas Mafia? |
| 15 | A. | Not to my knowledge he wasn't.  To my knowledge, no, |
| 16 | sir. | |
| 17 | Q. | Could he have been? |
| 18 | A. | Could he have been? |
| 19 | Q. | And you not know it? |
| 20 | A. | I was regional director.  I doubt it. |
| 21 | Q. | You were regional director for Texas Mafia? |
| 22 | A. | Right. |
| 23 | Q. | How many regions are there? |
| 24 | A. | Three. |
| 25 | Q. | Okay, which region were you director of? |

5

1      A.   All 75 zip code numbers.

2      Q.   Okay.  So there are three regional directors.  How

3  many positions in the Texas Mafia are there over the regional

4  director?

5      A.   There's six regional directors.  There's one position

6  over the regional directors.

7      Q.   Six--my apologies--six regional directors.  You were

8  one of the six, and there is one president of the Texas Mafia

9  over them.  Is that right?

10      A.   Exactly.

11      Q.   And his name is?

12      A.   Steiner--John Steiner.

13      Q.   He goes by J.R., is that right?

14      A.   J.R. Steiner, yeah.

15      Q.   A year ago this month--this is October, 2001--one

16  year ago, where did you live exactly?

17      A.   C-22, I believe.  I don't remember.  I think it was

18  C-22, or--

19      Q.   --alright.  Did you ever live--first of all, were you

20  on 12 Building at Telford?

21      A.   Yes.

22      Q.   Alright, were you on--did you ever live on B-pod?

23      A.   Yes.

24      Q.   Did you live in E-section?

25      A.   E-section?

6

```
 1        Q.   Yes.
 2        A.   I don't know about E-section.  I lived in 5-section,
 3   yes.
 4        Q.   Okay.  Excuse me, Judge.
 5             Mr. Burrows--if I may--does this ring a bell.
 6   Did you ever live in that cell?
 7        A.   Yeah, 12-B-yeah--1-63.
 8        Q.   1-row--?
 9        A.   --1-row, 63 cell.
10        Q.   1 row, 63 cell.  At any time while you lived in 63
11   cell on that section, did Mr. Speer live in the same section?
12        A.   Yes, he did.
13        Q.   He lived in which cell, do you remember?
14        A.   66.
15        Q.   66 cell.  That's--so you were on the first row on
16   the end, is that right?
17        A.   Exactly, yes.
18        Q.   And he was down the run, and up one row, is that
19   right?
20        A.   Yes.
21        Q.   Okay, but he lived--
22        A.   --on the same section, yes.
23        Q.   The same section, one floor above you, and down
24   several cells?
25        A.   Yes.
```

1    Q.   Alright.   During the time that William Speer lived

2  with you on that section--that you all lived in the same

3  section, did you have an occasion to look at a transcript of

4  some testimony regarding this case?

5    A.   Not from William Speers, no.

6    Q.   That wasn't my question.   Are you ready to answer my

7  question?

8    A.   Yes.

9    Q.   Did you have an occasion to look at testimony--at a

10  transcript of testimony involving the death of Gary Dickerson?

11    A.   Yes.

12    Q.   Whose testimony was it?

13    A.   Doyle Wayne.

14    Q.   Doyle Wayne who?

15    A.   Hill.

16    Q.   Doyle Wayne Hill.   Diablo?

17    A.   Yeah.

18    Q.   Was Doyle Wayne Hill at one time a Texas Mafia member?

19    A.   At one time, yes.

20    Q.   Okay, and Doyle Wayne Hill--did you read a transcript

21  of his testimony regarding some things he might know about the-

22  -that he might possibly know about the death of Gary Dickerson?

23    A.   I read a transcript saying that Doyle Wayne--well, I

24  didn't read--I read a transcript of a videotape, yes.

25    Q.   Okay, of his--

8

1    A.   --testimony.  Yes.

2    Q.   Why would you be interested in Doyle Wayne Hill's

3  testimony?

4    A.   Why?  Why would I be interested in it?

5    Q.   Yes?

6    A.   I really wasn't interested in it, because I've known

7  Doyle Wayne for over 25 years.  Doyle Wayne was--as far as

8  everybody knew in Texas Department of Corrections, Doyle Wayne

9  was an honorable, standup, straight, convict, inmate, yes.

10   Q.   Okay.

11   A.   I mean it was the inmate code, because me and Doyle

12  Wayne used to run together on Dancer Unit, and we did a lot

13  together, and we associated in the Texas Department of

14  Corrections together, and if somebody said something wrongly

15  about Doyle Wayne, they had to explain it.

16   Q.   Alright--

17        JUDGE CARTER; Mr. Mullin, can we get to what it

18  is that is rebuttal testimony?  I'm--you know--

19        MR. MULLIN: Yes, sir.  Yes, sir.

20        JUDGE CARTER; Alright, let's get to it.

21   Q.(MR. MULLIN); Why would you be interested in Doyle

22  Wayne Hill's testimony?

23   A.(MR. BURROWS): Because of what I just said.  Doyle Wayne

24  was an upstanding inmate, and it was my understanding that

25  somebody had said something wrongly about Doyle Wayne, and it

1    was--to find out if it was wrongly said.

2        Q.    Where did you get the transcript of Doyle Wayne Hill's

3    statement?

4        A.    From 'Greyhound.'

5        Q.    Who is Greyhound?

6        A.    Speer.

7        Q.    Who is Speer?  What Speer?

8        A.    Greyhound.  He's an inmate at Texas Department of

9    Corrections.  He is a TDC--he is a Texas Mafia member.

10        Q.    Right, but when you said Greyhound, you didn't mean

11    William Speer?

12        A.    No.

13        Q.    You mean Herman Speer?

14        A.    Yes.

15        Q.    Herman Speer is a Texas Mafia member, is that right?

16        A.    Right.

17        Q.    And you got the transcript from Herman Speer?

18        A.    Well, it was sent to me by Herman Speer, but it came

19    from Big Foot.

20        Q.    Okay.  Now did you--have you ever said anything other

21    than that before today?  That you received the transcript from

22    somewhere else?

23        A    Have I ever said it?

24        Q.    Yes?

25        A.    No.

1      Q.   Alright.  I'm going to show you State's Exhibit 46,

2   and ask you to read this and see if it refreshes your memory.

3   I'm going to ask you to read it to yourself, starting with

4   'Doyle Wayne'--right here--

5      A.   You didn't ask me if I wrote it, you asked me if I

6   said it.  I've never said it before.

7      Q.   Well then, let's be very clear.  Have you ever written

8   or communicated in any way--

9      A.   --yes--

10      Q.   --that you got the transcript from someone other than

11   Herman Speer?

12      A.   Yes, I did.

13      Q.   And what did you write?

14      A.   I wrote that Will gave me a--let me see a transcript.

15      Q.   Alright, then who is Will?

16      A.   Will--it's just a name that we put in a letter.

17      Q.   Right.  Who were you referring to?

18      A.   Basically, I wasn't really referring to anybody.  If

19   you'll check, I've used no official T.M. gang member's name in

20   that letter.

21      Q.   Okay.

22      A.   I just used a name to throw the gang intelligence off.

23      Q.   Gang intelligence?

24      A.   Yeah.

25      Q.   Okay.  So when you refer--did you refer to 'Will' in

11

1       your letter?

2              A.    Yes, sir.

3              Q.    Who was 'Will?' You're saying that was nobody?  That

4       person doesn't exist?

5              A.    Well--uh, yeah.

6              Q.    Did you write State's Exhibit 46?

7              A.    Yeah.

8                    MR. MULLIN: Your Honor, at this time the State

9       will offer into evidence, State's Exhibit 46.

10                   MR. DODSON: No objection.

11                   JUDGE CARTER; Alright, received.

12             Q.(MR. MULLIN): Mr. Burrows, read along with me.  Let's

13      make sure we get this right.  If I make any mistakes, please

14      correct me. Alright?

15             A.    (No audible response).

16             Q.    Alright?

17             A.    Yes.

18             Q.    "My regards.  I hope this finds you in perfect health

19      as well as high spirits."

20                   First of all, who is this letter written to?

21             A.    It's written to--shit, I don't remember.  I mean-

22      excuse me.  I don't remember.  I asked you earlier, and you

23      told me I should know.

24             Q.    Look at the third page.

25             A.    It's written to Joe Henry.

```
 1        Q.   Joe Henry, who is he?

 2        A.   He's a Texas Mafia gang member.

 3        Q.   So you're writing to Joe Henry?

 4        A.   Yes.

 5        Q.   Alright.  Let's continue.

 6             "I haven't heard from J.R. in a while, and need

 7   to hear from him.  I go home 1-1-2001."

 8             Who is J.R.?

 9        A.   J.R. is Steiner.

10        Q.   Steiner, the president of Texas Mafia.

11             MR. DODSON: Excuse me.  May we approach a minute.

12             JUDGE CARTER; Yes, sir.

13             BENCH CONFERENCE - ALL ATTORNEYS

14        MR. DODSON: This is being offered as rebuttal

15   testimony.  This witness has said, he wrote a letter.  He

16   wrote a letter to a guy named Henry, and I don't--if it's

17   not written to William, I don't see the relevancy.

18        JUDGE CARTER; I haven't picked up on it yet.  Where

19   are we going?

20        MR. MULLIN: Well, you can read it right here. It says

21   he got the transcript from Speer.

22        JUDGE CARTER; Is that what this is all about?

23        MR. MULLIN: Yes, it says, Will--

24        JUDGE CARTER; --well, let's get to it, and let's get

25   it over with.
```

13

1   Q. (MR. MULLIN): Who is J.R.?

2   A. (MR. BURROWS): J.R. Steiner.

3   Q.   Obviously, you didn't get out 1-1-2001.   Is that

4   correct?

5   A.   Yes, sir.

6   Q.   Alright, "let me run this down, and I need you to get

7   back to me on all.  Big Foot just got shipped back over here

8   from Be Do."

9           Do you remember when this letter was written?

10   A.   Don't--I don't even remember the letter.  No.

11   Q.   Alright.  Let's continue.

12           "Doyle Wayne did a videotape against Big Foot

13   and William Speer.  I didn't believe it, but Will showed me the

14   transcript to the video.  I read it all.  They just shipped

15   Doyle Wayne to a P.C. program on Eastham.  He gets out in

16   December.  I have his home address and all.  I will be going

17   home in January.  After 23 years, I am ready."

18           Is that what it says?

19   A.   Yes.

20   Q.   Turn with me to the next page.

21   A.   (Does so).

22   Q.   Down toward the bottom, do you see where it starts,

23   "Bruce Richards?"

24   A.   Yeah.

25   Q.   "Bruce Richards, bitch ass is here with me.  Her

14

1    daddy, Charlie Ray, just got shipped to Eastham with Doyle

2    Wayne.  He is Christian now."

3              Who are you talking about?

4        A.  It's evident.  I just said, Charlie Ray.

5        Q.  Charlie Ray, right?  Charlie Ray is Christian.  Okay.

6    "He is Christian now,"--and then you go on and talk about some

7    other people.

8              Do you say at the bottom, "P.S. Remember I go home

9    in January, and I need to hear from him before then."

10       A.  Yes.

11       Q.  Did you say that?

12       A.  Yes.

13       Q.  Pass the witness.

14                        CROSS EXAMINATION

15   BY MR. DODSON:

16       Q.  Mr. Burrows, now I believe you testified that you and

17   Doyle Wayne have been friends for 25 years?

18       A.  Probably over 25 years, yes, sir.

19       Q.  And he's your best buddy, and he's your buddy today?

20       A.  Yes, sir.

21       Q.  And that's why you know where he lives, because you

22   all are friends?

23       A.  I lived with him on C--he was in C-19, and I was in

24   C-22, yes, sir.

25       Q.  And you have no intention of harming your friend of

1    25 years, do you?

2         A.    Not with the testimony Doyle Wayne gave, no.

3         Q.    Alright.  Now Mr. Mullin asked you about a transcript.

4    That transcript didn't say anything about William Speer, did

5    it?

6         A.    No, it didn't, sir.

7         Q.    Now, let's talk about transcripts.  You're locked up

8    in Administrative Segregation?

9         A.    Yes, sir.

10        Q.    Locked up 23 hours a day?

11        A.    Yes, sir.

12        Q.    You do get the Texarkana Gazette in prison, do you

13   not?

14        A.    That and other newspapers.

15        Q.    And other newspapers?

16        A.    Yes, sir.

17        Q.    And so you know by reading the newspaper who is going

18   to trial, and who is what?

19        A.    Exactly, yes, sir.

20        Q.    Is it common for you--or any inmate in Administrative

21   Segregation to read Court documents or transcripts of somebody

22   else's testimony?

23        A.    Yes, sir.

24        Q.    Is that usual?

25        A.    Yes, sir.

1    Q.    Why?

2    A.    Most inmates are--

3    Q.    --anything else to do?

4    A.    Ain't nothing else to do.

5    Q.    Okay, and it's common to circulate everybody's

6    transcripts from testimony amongst you?

7    A.    Right.

8    Q.    Okay, and there's nothing unusual about that?

9    A.    Nothing, no.

10   Q.    Nothing sinister about that?

11   A.    No, nothing.

12   Q.    Now, you are the director, or was a director of

13   Texas Mafia?

14   A.    One of the regional directors, yes.

15   Q.    A regional director.  Do you remember your first

16   conversation that you had with William Speer?

17   A.    Yes, sir.

18   Q.    Now you were transferred in June of 2000--to Telford?

19   A.    Yes, sir.

20   Q.    Tell us about that first conversation you had with

21   William Speer.

22   A.    William Speer told me he was a Christian now, and he's

23   no longer involved with the Texas Mafia in any kind of way--you

24   know--he appreciates the friendship, but he's no longer

25   involved, as far as any kind of Texas Mafia activities or

17

1   nothing.

2       Q.   Why would he tell you that?  Did he know you were a

3   regional director?

4       A.   Well, inmates around him knew me very well, and they

5   told him I was a Texas Mafia gang member.

6       Q.   Did he ask if there was going to be hard feelings?

7       A.   Yes.

8       Q.   What did he say?

9       A.   He asked me if there was any hard feelings.  I told

10  him, no, I don't even know you.

11      Q.   Now the letter that Mr. Mullin introduced, that's not

12  to William Speer?

13      A.   No, it's not to William Speer.  If you'll read the

14  top of the letter, it says that Big Foot just got shipped over

15  here.  Big Foot was the one that sent me the transcript.

16      Q.   Okay.  Now after June, 2000--of course, you don't know

17  what happened before you got here to this unit, do you?

18      A.   No, sir, not at all.

19      Q.   After June, 2000, to your knowledge as a former

20  regional director of the Texas Mafia, did William have any

21  involvement in any type of criminal activity?

22      A.   No, none at all.  Not to my knowledge, or anybody--

23  any letter I ever received.

24      Q.   Did William ever send you letters?

25      A.   No, I never even heard of William Speer.

18

1    Q.   I'm talking about after you got here in June?

2    A.   A letter?  No.

3    Q.   Or any kites or anything?

4    A.   No.

5    Q.   Now, at the time--

6    A.   --yeah, William has sent me a couple of kites, yes.

7    Q.   Okay, and what did they say?  What was the gist of it?

8    A.   We were talking about radios and Christian activities.

9    Q.   Was William trying to talk to you about Christ and

10   Jesus?

11   A.   Yes.

12   Q.   Now, you said you talked to William--you're both in

13   Administrative Segregation?

14   A.   Yes.

15   Q.   You all are let out an hour a day to exercise?

16   A.   Yes, sir.

17   Q.   Are you ever put in the same exercise yard?

18   A.   Sometimes, yes, sir.

19   Q.   Alright, is there bars separating you?

20   A.   Yes, sir.

21   Q.   Okay, so you can talk through the bars?

22   A.   Yes, sir.

23   Q.   Has William ever suggested in any way that there

24   needed to be steps taken as a result of his trial against

25   anybody else?

1          A.   It's none of William's business to say that.

2               MR. DODSON: One second Judge.

3               Pass the witness.

4               MR. MULLIN: Redirect, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. MULLIN:

7          Q.   Mr. Burrows, why would Mr. Speer ask you if there's

8    hard feelings if he was never in the Texas Mafia?

9          A.   He didn't vaguely ask me--tell me that he--what he

10   told me was, he was not a Texas Mafia gang member, and that he

11   wanted to make sure that I understood that.

12         Q.   As a regional director, you wouldn't know that?

13         A.   Well, Will didn't know any Texas Mafia--Will didn't

14   know I was a regional director, he knew I was Texas Mafia gang

15   member.

16         Q.   So why would he ask you if there's any hard feelings?

17         A.   Well, he really didn't ask me if there was any hard

18   feelings, he just was explaining to me that he's not a Texas

19   Mafia gang member, because of his affiliation with Big Foot.

20         Q.   Okay.  A couple more questions.  Was Anibel Canales--

21   is Anibel Canales a Texas Mafia member?

22         A.   Is Canales--no, he's not no longer a Texas Mafia

23   member.

24         Q.   Alright, was he in the year, 2000?

25         A.   In the year 2000, he was a prospect, yes.

```
 1        Q.   Did you consider him in good standing with the Texas
 2   Mafia?
 3        A.   I didn't consider him, no.  Somebody else did.
 4        Q.   So is it appropriate for Doyle Wayne Hill, a Texas
 5   Mafia member to testify against Anibel Canales?  Is that okay?
 6        A.   For Doyle Wayne's reasons, yeah.
 7        Q.   Okay, so you--the Texas Mafia had no problem with the
 8   fact that Doyle Wayne Hill testified against Canales?  No
 9   problem?
10        A.   I had no problem.
11        Q.   As a regional director?
12        A.   Right.
13        Q.   Nothing further.
14                  JUDGE CARTER; Anything else?
15                  MR. DODSON: One question--or a couple.
16                       RECROSS EXAMINATION
17   BY MR. DODSON:
18        Q.   Now in this transcript that you read from Big Foot,
19   Speer wasn't mentioned, correct?
20        A.   No, he wasn't.
21        Q.   Now in the letter though you set out where everybody
22   is in this in your pod?
23        A.   Right
24        Q.   Is it correct that you're basically relating to who is
25   where that was involved in Big Foot's trial, or was involved
```

1   with Big Foot?

2       A.   No, basically I was relating where other inmates--

3   where they were in the--involved--

4       Q   --well, let me ask you this. why did you include

5   William's name in that list?

6       A.   William Speer's name?

7       Q.   Yes?

8       A.   Because he was involved with Big Foot's case.

9       Q.   Okay. Now--pass the witness.

10              MR. MULLIN: Nothing further.

11              JUDGE CARTER; You may step down.

12              Call your next witness.

13              MR. MULLIN: The State calls to the stand Sergeant

14  Randall Calhoun.

15                    RANDALL CALHOUN

16  having been duly sworn, testified as follows:

17                  DIRECT EXAMINATION

18  BY MR. MULLIN:

19      Q.   Sergeant, tell the jury your name, please.

20      A.   Sergeant Randall Calhoun.

21      Q.   Tell them what you do for a living?

22      A.   I'm the Sergeant who is in charge of the Security

23  Threat Group Office at the Telford Unit.  Security Threat Group

24  is what most people call and refer to as gangs, but the

25  appropriate term is Security Threat Group, or STG.

1    Q.   Do most of us laymen call you gang intelligence?

2    A.   Yes, most all refer to us as gang intelligence or GI.

3    Q.   Yeah.  Explain--just a quick overview of your duties.

4  First of all, do you work at the Telford Unit?

5    A.   Yes, sir, I do.

6    Q.   Alright, would you just give a brief overview of your

7  duties.  What do you do?

8    A.   We monitor the STG activity of the various groups on

9  the Telford Unit, through an assortment of ways that include

10  conducting searches of their property, interviews, intelligence

11  reports, we monitor their mail--you know, incoming and

12  outgoing--and various things of that nature.  You know if

13  something comes up, we investigate it, and we try to alleviate

14  as much of the problem as possible by trying to stay on top of

15  the business that the various gangs or STG's are doing.

16    Q.   Alright, I'm going to show you State's Exhibit 46,

17  Sergeant.  Have you ever seen that document before?

18    A.   Yes, sir, I have.

19    Q.   When was the first time you ever--that is in evidence

20  by the way--when is the first time you ever you ever laid eyes

21  on that document?

22    A.   I had the original letter in my hand, I believe it

23  was around--it was in October of 2000.

24    Q.   Alright, do you have anything--do you know exactly

25  when we're talking about?  Do you have a date?

23

1       A.   There is a date--I have a date on the denial cover

2  sheet.  When we deny a letter, we have to draw up the cover

3  sheet, and type up the reason why it's being denied, and this

4  letter itself was being denied, because it posed potential

5  threat of physical harm to another person, and on the cover

6  sheet I had the exact date, and I believe it was October 22nd,

7  or October 23rd--I'd have to see the exact cover sheet, but I

8  do have it documented.

9       Q.   It was in October of the year 2000?

10      A.   Yes, sir, last year.

11      Q.   One year ago this month?

12      A.   Yes, sir.

13      Q.   Alright, and where did you come to possession of that

14 letter?

15      A.   We have a list of various STG members who we know, or

16 believe are active, or possibly ranking members, who might be

17 calling shots, or determining different--you know--things that

18 go on inside the prison.  We give that list to the mail room,

19 and if there's any mail coming in or out to that offender, or

20 from that offender, they'll pull it to the side, give it to us,

21 we'll review what the correspondence says.  If it's no problem,

22 we'll send it on through.  If it is something in there that

23 they should not be writing, or cannot be receiving, then we'll

24 deny it, and this particular letter was one of those letters.

25 We were monitoring the incoming and outgoing mail of offender,

24

1    Burrows.  They set this letter aside; I reviewed it; saw it's

2    content; I denied it.

3         Q.   You reviewed the letter?

4         A.   I, myself, reviewed the letter.

5         Q.   Alright, and did you keep a copy of that letter in

6    your file?

7         A.   Yes, sir, I did.

8         Q.   And did you give me the copy that is now labeled

9    State's Exhibit 46?

10        A.   Yes, sir, I did.

11        Q.   And you came into possession of that letter from the

12   mail room in October of 2000?

13        A.   Yes, sir.

14        Q.   Pass the witness.

15             MR. DODSON: No questions.

16             JUDGE CARTER; Thank you, sir, that's all.

17             MR. MULLIN: The State Rests.

18             JUDGE CARTER; Anything further from the Defense?

19             MR. DODSON: No, sir.

20             JUDGE CARTER; Then, Ladies and Gentlemen, that

21   completes the evidence in this phase of the case.  We will in

22   just a few minutes have the Charge read to you, and then the

23   final statements of the attorneys, so we will take a break to

24   get that completed, so if you will step in the jury room, we

25   will be in recess at this time.

1    RECESS.

2    JURY OUT OF THE COURTROOM:

3                    JUDGE CARTER; You have the Charge there. Any

4    further objections or suggestions?

5                    MR. MULLIN: Not from the State, Your Honor.

6                    MR. CARTER; Your Honor, the Defendant would

7    request that with respect to the second alternative answer to

8    Special Issue Number 2, rather than reading, 'we the jury,

9    answer Special Issue Number 2, 'yes'--that that should be

10   reworded as follows:

11                   'We the jury, because at least ten jurors find

12   that there is sufficient mitigating circumstance or

13   circumstances to warrant that a sentence of life imprisonment

14   rather than a death sentence be imposed, answer this Special

15   Issue, 'yes.'

16                   I believe that is a more accurate statement of

17   the law, and the jurors responsibility under Special Issue

18   Number 2, and object to the current language.  Other than that,

19   Your Honor, we don't have any suggested changes to the Charge.

20                   JUDGE CARTER:  Alright, I believe that's

21   incorporated in the Charge in other places, and the jury is

22   instructed on that, and I will overrule that.

23                   It is my understanding the Defense asks

24   specifically the parole instruction.

25                   MR. DODSON: Yes, sir, we filed that before voir

1    dire.

2                    JUDGE CARTER: Okay, and that is of course, in

3    there.

4                    MR. CARTER; We would also, Your Honor, renew our

5    objections previously stated to the death qualification

6    process, and the punishment assessment process, in that it

7    violates the Sixth, Eighth and Fourteenth Amendments to the

8    United States Constitution, and make that same objection with

9    respect to charging the jury on punishment.

10                   JUDGE CARTER: Alright, overruled.

11                   Alright, bring the jury in.

12   JURY IN THE COURTROOM.

13                   MR. DODSON: May we approach the bench?

14                   JUDGE CARTER; Yes.

15                   BENCH CONFERENCE - ALL ATTORNEYS

16           MR. DODSON: I understand this is closing argument,

17       but we would request that Mr. Mullin not be able to

18       approach the Defense table, and pointing at the Defendant,

19       as he got earlier in closing during on guilt-innocence.

20       He came and started shaking his finger in his face.

21           JUDGE CARTER; Well, don't get in his face, but he--you

22       know, can point to him.  Just don't get close to him.

23           MR. MULLIN: Okay.

24   JUDGE CARTER READ THE CHARGE ON PUNISHMENT TO THE JURY.

25   (COPIES OF CHARGE DISTRIBUTED TO EACH JUROR)

1           JUDGE CARTER; The attorneys will make their

2    closing summation statements, just as they did on the other

3    phase of the trial.  So Mr. Mullin, you may address the jury.

4           MR. MULLIN: Thank you, Your Honor.  Your Honor,

5    we would request that any unused time be reserved.

6           JUDGE CARTER; Alright, sir.

7    ARGUMENT BY MR. MULLIN:

8        The State is asking you--I am requesting that you would

9    answer Special Issue Number 1, yes, to future dangerousness,

10   and that you would answer Special Issue Number 2, no, there is

11   not sufficient mitigating evidence.

12       The first issue as the Judge has instructed you, is the

13   State's burden of proof.  I believe we have done that.  I

14   believe we have shown that William Speer, unfortunately, is a

15   future danger.

16       The second issue is no one's burden of proof.  There is

17   no burden of proof on the second issue.  It does not rest on

18   the State or the Defense.  It is whatever you believe, based on

19   the evidence that you heard, and there's no burden of proof.

20       It is the State's burden of proof on the first one, and

21   not on the second one.

22       I will tell you again, and Mr. Dodson is going to visit

23   with you, and then I will speak last, because we do have the

24   burden of proof on the first issue, and will tell you again,

25   if you answer these questions yes and no, full well knowing the

1    outcome will be that William Speer will be sentenced to death

2    by lethal injection.

3    ARGUMENT BY MR. DODSON:

4         May it please the Court; Mr. Mullin:

5              We both find ourselves in the position that neither

6    one of us hoped we would be in.  I have the task of choosing

7    the right words of how to relay to you why William Speer should

8    live.  You have the task of determining whether this young man

9    can go on and live or die.

10             William admittedly committed a horrible murder when

11   he was 16 years of age.  He was convicted at age 17 in Harris

12   County.  He was sentenced to life in the Texas Department of

13   Corrections.  You found him guilty of the murder of Gary

14   Dickerson, four years ago, but you've also heard testimony that

15   William has changed.  Many of you were asked specifically by

16   Mr. Mullin during voir dire; some of you were asked by me, do

17   you think an individual can change.  To those of you that were

18   asked that question, you said, yes, I think an individual can

19   change.  And I would submit to you that in this punishment

20   evidence that is what you've heard.

21             Now, you have been instructed that in the State of

22   Texas, the law provides for two punishments on capital murder.

23   Life in prison, and the death penalty.  You've also been

24   instructed that that is the law.   If it wasn't the law--if it

25   wasn't recognized that people can change, if it wasn't

1  recognized that circumstances dictate each individual case, it
2  wouldn't be there, you wouldn't have that option.
3       As I told you in voir dire, just because the law says
4  the death penalty is an option, you're not required to give the
5  death penalty.  The twelve of you who are the ones in this jury
6  box who have heard all of the evidence, you're not required to
7  give death.
8       Each of you were asked, individually, by myself, Mr.
9  Mullin, and most of you by Judge Carter, that if the evidence
10  showed that William had committed two murders, does that
11  automatically mean to you that he is a future danger.  Each and
12  everyone of you said, no, it does not mean, automatically, that
13  he is a future danger.  Each of you said that you wanted to
14  hear all of the evidence during the punishment phase before you
15  made that determination on punishment.
16       Of course, you have been instructed, and you were told
17  sure, you can consider the circumstances of the 1991
18  conviction, and you can consider the circumstances of the death
19  of Gary Dickerson, but folks, you knew going into this thing
20  every murder has bad facts.  Every murder is horrible.  Every
21  murder is inexcusable.  You knew that going in, and you
22  committed to us, I want to hear what the State produces from
23  this witness stand on the punishment issue.
24       If you had said, well, if he has killed twice, I
25  think he is going to do something again, you wouldn't be in

1   this box.  You are to look at what kind of life William had

2   prior to 1997, what kind of life he had after 1997; his

3   religious faith, as well as what the future holds.

4           At the time of Mr. Collins death, William was 16 years

5   old; convicted at 17.  You heard the testimony of Mr. Nanyoma,

6   that William was so immature, he didn't even know how to cash a

7   check.  Didn't even know you were supposed to endorse it.

8   William has been in jail since he was 16 years old.  Most kids

9   learn how to drive; got their first relationship with their

10  first girlfriend; going to high school football games; going to

11  the prom.  William is in the Texas Department of Corrections.

12  Even though it was his own act that put him there--his own

13  actions--rather than growing up in the life that you and I have

14  done, he has grown up in the Texas Department of Corrections.

15          You heard the testimony of inmates, what it's like in

16  Texas prisons.  It's not pretty.

17          You heard from Bruce Innes.  Three choices.  You can

18  ride--paying money, providing sexual favors, for protection.

19  You can fight.  Mr. Innes said, it's not a fair fight.  He used

20  the word 'kids'.  He said two inmates would go in a cell with

21  the kids--never a fair fight.  Your third option, you can join

22  a gang.

23          You remember Mr. Innes testimony of the dispute that

24  they had with the Mandingo Warriors, over who was going to

25  control the kids in the building.

1          William was sentenced to TDC at 17.  That's what he

2    grew up in.

3          Finally, in 1997, William is 22.  He decided to try

4    option 3.  He became a prospect of the Texas Mafia.  You've

5    heard no evidence whatsoever, of William being involved with

6    anything illegal, any gang activity, any disciplinary problems

7    from age 17 to 22, because in July of '97, William would have

8    been 22 years old.  You heard about his involvement--you found

9    him guilty of the death of Gary Dickerson, but it wasn't until

10   he had the positive influence of James Strickland and Gary

11   Nixon that William began to change.  Accepted the fact and

12   realized that his life was awful.

13         You've heard the testimony of Mr. Nixon and Mr.

14   Strickland, who have spent--I think Mr. Nixon said ten years

15   about, in Fruitful Harvest Ministry, and Mr. Strickland, nine

16   years--said they have talked to thousands of inmates.  They

17   both believe in the death penalty.  We could have paraded folks

18   up here who said, I don't believe in the death penalty.  Don't

19   kill William.  But we called two witnesses who had worked with

20   inmates for ten years.  Both of them said I've worked with

21   inmates facing the death penalty, and I thought they needed to

22   die.  They come up here and say, William Speer is different.

23         Mr. Strickland said, a small percentage of the people

24   I talk to, I feel are different.  They thought that in their

25   opinion, based on their experience, William has a life ahead of

32

```
 1   him.  This is an individual they've prayed with; this is an
 2   individual they've ministered to, he's found the true meaning
 3   of Christ; he has asked for forgiveness; he has shown his
 4   remorse.  Sure, he did not specifically say, 'forgive me, I
 5   killed Gary Dickerson.'
 6         Mr. Carter and I are certainly not much, but we
 7   certainly tell our clients, as any lawyer would, don't make an
 8   admission; don't tell anybody.  You've got a trial pending.
 9   Don't you think that if Mr. Speer had made such statements, Mr.
10   Mullin would have found out about it.  Sure, he didn't say
11   that, but he did say, what is the difference between killing
12   and a murder.  Can a murderer be forgiven by God?
13         Mr. Strickland said when William talked about his
14   past life, he hung his head down.  He was ashamed.  Mr.
15   Strickland talked about the joy he saw in William when he would
16   go minister to him.
17         Mr. Strickland, Mr. Nixon--neither one of them had an
18   interest in this case.  Mr. Strickland said though that this is
19   the first time that he's ever testified in Court on behalf of
20   an inmate.  He's been asked before, but this is the first time.
21         You've heard inmates testify.  They get something in
22   return, get a deal, try to get a new jail assignment, a new
23   farm.
24         On the front row right here is Richard Speer.  That's
25   William's daddy.  We could have called him, but what father is
```

1    not going to get up here and ask the jury to spare his son?

2           What motive, other than sincere conviction and belief,

3    would Mr. Strickland and Mr. Nixon come into this Courtroom,

4    and say, I've talked to thousands of inmates who are always

5    playing the game with me, always asking for something, waving

6    the flag of Christianity for something in return, but William

7    Spoeer is not doing that.  I believe he's genuine.  I believe

8    he's sincere, and this is the first time I've shown up in a

9    Courtroom to tell a jury that.

10          Both of them said William makes them work; makes them

11   study the Bible.  Asks them questions they don't know. Spends

12   ninety-nine percent of the time he has with them, talking about

13   the Bible, and you realize he's locked up twenty-three hours a

14   day in Administrative Segregation.  You'd think if you finally

15   get a visitor to talk through his window, he's going to talk

16   about verything under the sun, but spends ninety-nine percent

17   of the conversation on the Bible.

18          I would submit to you that the evidence that Mr.

19   Mullin asked you to wait for, that he promised to put on to

20   you on future dangerousness is, that William is not a future

21   danger.  Where is the evidence? What has he put on in this

22   punishment phase that you did not already know?  You already

23   knew two horrible murders.  What has he shown you since then?

24          The State--you've been instructed--the State has the

25   burden of proof that there is a probability--not a burden of

1    proof that it's possible--not a burden beyond a reasonable

2    doubt that it could happen.  The burden of proving beyond a

3    reasonable doubt that there is a probability that William will

4    commit criminal acts of violence.  Not just violence.  Criminal

5    acts of violence and be a continuing threat to society in the

6    future.

7         The State hasn't done it.  There are letters before

8    you of William boasting about the death of Gary Dickerson.

9    Don't mess with Texas Mafia.  Uses language that you shouldn't.

10        I anticipate also Mr. Mullin, who wants you to look

11   at Exhibit 38, this is the letter from Kung Fu and Bruce Innes,

12   where he's talking about Larry Whited, or Bam, or Iron Pile,

13   but remember the bottom part, where you've got the arrow here--

14   that's what William wrote.  'And about any kite C.Ray sent out

15   to drop the Pile, well I didn't even know it.' So don't let

16   yourself be confused about any alleged threat that William had

17   against anybody else.  But folks, that's four years ago.

18        You're instructed to look at the circumstances of the

19   offense.  Sure, but also where are we now?  Mr. Mullin told you

20   in voir dire, that's the good stuff.  You do say in here--the

21   instruction that it is what reduces one's moral

22   blameworthiness, but it includes the good stuff about him.

23   Where is he now?

24        Had reference to William playing Dungeons and Dragons

25   in the past, but you heard the Chaplain Strickland say, we

1    talked about that.  We talked about what it's like to feel the

2    spirit, that's in the past.  The inmates that he played with,

3    they've been transferred off.

4         You've heard many witnesses during this trial giving

5    you examples of problems in our prison system.  Assaults on

6    guards; assaults on inmates; disciplinary problems.  Mr. Bruce

7    'Kung Fu' Innes or Gumby, had a hundred and sixteen

8    disciplinary actions.

9         Warden Massengill told you that if an inmate has a

10   problem or a disciplinary problem, we write it down.  They keep

11   records of it.  Not a single piece of evidence of any

12   disciplinary action against William by the Texas Department of

13   Corrections was ever produced to you.  Not a single bit of

14   evidence of threat on guards.  Not a single bit of evidence on

15   threats on inmates after '97.  Not a single shred of evidence

16   of assaults on inmates before '97.  No misconduct whatsoever,

17   and they're required to keep the records.  No evidence of it.

18        Mr. Burrows called this morning.  Mr. Mullin asked

19   him about a letter that he wrote; about a transcript of Doyle

20   Wayne Hill's testimony.  This letter makes--uses the word

21   'Will'.  Mr. Burrows was a regional director of the Texas Mafia

22   said we're going to talk in code.  I don't know what that's--

23   that's not referring to anybody specific, but he did say the

24   transcript on Doyle Wayne Hill made no reference to William

25   Speer.  This letter is not written to William Speer.  William

1   Speer has nothing to do with this letter, but interestingly
2   enough, once Mr. Mullin put him on the stand, this regional
3   director--William may not have known he was a regional
4   director--William knew he was in T.M.--the first time he saw
5   William Speer, William told him, 'I'm a Christian.  Don't want
6   T.M. to hold that against me.  I'm a Christian.' This is June
7   of 2000.

8          Officer Calhoun said they monitor mail from many,
9   many, many inmates.  Probably in the last two years have gotten
10  thousands of letters they've monitored.  If William was a
11  future danger, if William was involved still with Texas Mafia,
12  if he was threatening other inmates, if he was threatening
13  guards, if he was just raising cane, don't you think out of
14  those thousands of letters you would have seen one?

15         Mr. Mullin talked to everyone of you all, and as he
16  said, I'm going to ask you the same question a hundred times.
17  Just because he has been convicted of two murders, does that
18  automatically mean he is a future danger?  You all said, no.
19  He said, why?  Because you said, I want to hear the punishment
20  evidence.  What has he brought you for punishment evidence on
21  the issue of future dangerousness?  Nothing.  He called Mr.
22  Nanyoma, who didn't even recognize William it was so long ago.
23  Mr. Nanyoma didn't talk about future dangerousness.  He called
24  the sister of Gary Dickerson, who talked about her loss, which
25  is natural.  He called Mr. Burrows this morning who said,

```
 1   William told me he's a Christian, and didn't want T.M. to be
 2   mad at him about it, and then he called Randall Calhoun, who
 3   said I intercept thousands of letters, but didn't show you a
 4   single letter where anything had ever threatening had ever
 5   occurred in correspondence.
 6           As the Chaplains have explained, he's a different
 7   person.  He believes in Christ.  He can be a positive example
 8   for others, and perhaps try to stop this cycle that inmates go
 9   through from the kids to those who have been hardened from
10   being in the system since they're 17.  Try to have the
11   influence on inmates that Strickland and Nixon have had on
12   William.
13           Now I'm not trying to downplay what William has done
14   in the past, but the answer to future dangerousness is based
15   on the evidence.  Mr. Mullin is a nice fellow.  I've gotten to
16   know him over the last year--the last year getting ready for
17   this trial.  I think he's a devout man, but I would anticipate
18   Mr. Mullin may want to suggest Bible scriptures to you.
19   Everyone of you on your questionnaire said you're a Christian.
20   Everyone of you believe in Christ.  Everyone of you probably
21   have a different interpretation of the Bible.  We know that you
22   can find one lined in the Bible to say pretty much what you're
23   looking for.  You've got to look at the context.  I was taught
24   that we have a loving and forgiving God.  Mr. Mullin doesn't
25   know what's in William's heart.
```

1       You've been told that what we say is not evidence.

2   Mr. Mullin may want to say whether or not William receives

3   salvation from God, is between William and God.   That's true.

4   But it's not Mr. Mullin who has ministered to William Speer for

5   two years.   It is not Mr. Mullin who has prayed with him for

6   two years, and that is Mr.Strickland and Mr. Nixon, who has

7   seen what God has done for William Speer.

8       He's in Administrative Segregation.   Not a threat to

9   any inmates; not a threat to any guards.   Spends twenty-three

10  hours a day there.

11      The answer to Question Number 1, is he a future

12  danger?   No.

13      Mr. Mullin wants you to speculate as he did with Mr.

14  Strickland.   What if he backslides?   Could a Christian lose

15  his faith?   Is it possible?   Yes, it's possible, but beyond a

16  reasonable doubt is not 'what if?'  Could?   Possibly?   You've

17  got to prove it beyond a reasonable doubt, and he hasn't done

18  it.

19      Issue of mitigation. Hard to define.   It's that gut

20  feeling you have.   You don't all have to agree.   I would submit

21  to you that the mitigation evidence is overwhelming that this

22  is a different individual from the kid who grew up among

23  inmates in the Texas Department of Corrections.

24      The law also allows you to consider as mitigation the

25  issue of duress.   Pressure.   The testimony that Michael

1  Constandine--

2         MR. MULLIN: Objection, Your Honor, there's

3  nothing in the Court's Charge about duress.  That's not a legal

4  issue in this case.

5         JUDGE CARTER; He's arguing it as mitigation.

6  Overruled.   Go ahead.

7         MR. DODSON: The testimony before you is

8  Constandine said I ordered the hit, if he didn't participate,

9  he could be killed or expect to be killed himself.  That's the

10  system that William grew up in.

11         You've been instructed that in sentencing William to

12  life, he's got to serve forty years, before he even comes up

13  for parole.  You've also been instructed that that forty years

14  won't start until he finishes the life sentence he's on now.

15  Irrespective of the life sentence he's on now, that's 67 years

16  old.

17         MR. MULLIN: Your Honor, we're going to object.

18  That's a misstatement of the law.  His first capital murder

19  came under a different law, and it's not forty flat.  That's

20  just a misstatement.

21         MR. DODSON:  I said--let me rephrase that.  Under

22  this sentence he's got to serve forty years, but that doesn't

23  start until he has finished the life sentence he is serving

24  now.

25         You're twelve people who make up a jury, but it's

1    your individual decision.  Stick to your gun; weigh the

2    evidence, and make your decision.  You're a group of twelve,

3    but you're going to have to deal with it individually of what

4    your decision may be.  Whether it's tomorrow; next week; next

5    month; or next year.  Answer future dangerousness, no.  They

6    have not proven it.  Even if you disagree, and for some reason

7    say, yes, the mitigation testimony is that this is a different

8    individual.  They have not put on any evidence to show

9    otherwise.  Answer mitigation, yes, so that William receives

10   life.

11          Thank you

12   ARGUMENT BY MR. MULLIN:

13          These are hard questions for men to have to answer.

14          Let me clear up something, folks.  First of all, in voir

15   dire, you were not asked by me, will you not--do you promise

16   not to consider both capital murders in punishment, or however

17   Mr. Dodson said it a while ago.  You were not asked that.  What

18   you were asked in voir dire was, if we proved two capital

19   murders, would you wait and listen to everything before you

20   make up your mind about punishment.  That's very different.

21   You have every right to consider the first capital murder right

22   now in making your decision, but you promised that you would

23   consider everything, the good and the bad, before you made that

24   decision.  That's a big distinction.  So when Mr. Dodson said,

25   Mullin brought you no other evidence here in punishment, you

42

1    he changed enough?   No.   Unfortunately, no.

2          Folks, you've seen no other disciplinary cases of

3    Mr. Speer in prison, but there is that one minor incident that

4    he had in prison back on July 11th, 1997.   You didn't see a

5    bunch of other disciplinary, but there was that one minor

6    incident, where twice he put his arms around a man's throat and

7    killed him.

8          Mr. Dodson talked to you about a loving and forgiving

9    God, and that I don't know Mr. Speer's heart.   We do have a

10   loving and forgiving God.   Unequivocally, and that's a good

11   thing for all of us, but that does not negate our actions.

12   Okay.   That does not negate our responsibility if we've done

13   something like murder.   God's love and forgiveness is all

14   encompassing, and it is eternal, but now that is not the issue

15   before you.   That's not even contested.   The issue before you

16   is, what do we do with William Speer, because of his prior

17   conduct, because he's a murderer.   Don't confuse that with the

18   the loving and forgiving God.   Yes, He is, and He will love and

19   forgive him, if William Speer asks for repentance wherever he

20   goes, for as long as he's on this earth. That is not your

21   issue.   That part is between him and God.   Our issue here today

22   is to decide, what is our society going to do about this kind

23   of capital murder.

24          Mr. Dodson told you he is in Seg now.   Yes, he's in

25   Seg now.   We don't know where he'll be in the future.

43

1      Now, folks what does the face of a murderer look like?

2   Mr. Speer is a nice looking young man.  He is 27 years old.  He

3   cleans up well.  He has nice clothes, and he can sit here and

4   act appropriate.  We look in his face. We don't see the face of

5   a heinous monster.  We don't see someone who is waiting to

6   pounce from behind the next bush to kill anybody he can.

7   That's not what we're representing to you that William Speer

8   is.  What does the face of a murderer look like?  Well, in this

9   particular case, that's what he looks like.  He looks like a

10  very nice young man.

11      And in the case of Jessie Barnes, the one that put his

12  arms around my neck to show you how it worked, looked--nice

13  looking young man, jet back hair, a nice looking guy, a first

14  degree murderer is what he told you.

15      Abbott--Terry Abbott, the Defense's first witness.

16  You clean him up; give him a haircut; take those big fat

17  glasses off, clean him up, put him in a nice set of clothes,

18  that's the face of a capital murderer.  He's in for capital

19  murder.  That's what the face of a murderer looks like.

20      It doesn't look like Jason of the movies, or Jack

21  Nicholson coming after you with an ax.  It can, but in this

22  case it doesn't.  Don't be deceived by his appearance.  In this

23  case that is what a murderer looks like.

24      I'm asking you not to feel sorry for him because of

25  the way he appears to you.  What I'm asking you is, and which

1   is the irony of it, both the Defense and the State are asking

2   you to look into his heart.  They have asked you to look into

3   his heart, and they've brought you Chaplain Strickland and

4   Chaplain Nixon to show the good things.  And that--you should.

5   Look into his heart.  The problem is, his heart, if it's headed

6   the right direction, if it is, and I hope it is--what you will

7   not hear me say today is William Speer is not a Christian.

8   You will not hear that.  I will not make that determination.

9   But what I will tell you is, what is in his heart, cannot be

10  trusted.  Here's how we know that.

11          Folks, our life comes down to the hundred tiny

12  moments of decision, or is it millions of tiny moments of

13  decision?  We make those decisions everyday, and those

14  decisions determine the course of our life.  And let's look at

15  what we do know about William Speer's life.

16          What we do know is that in 1990, William Speer

17  volunteered for murder.  He volunteered--folks, in 1990,

18  William Speer volunteered to commit his first murder.  Franklin

19  Nanyoma told you that he and John Collins were talking about

20  what to do about Jerry Collins--let's put this up here--

21  'Victim'--'Jerry Collins'.

22          John Collins, his son, and Franklin Nanyoma talked

23  about what to do about the problem of the father, Jerry

24  Collins.   In a different conversation, at some point when

25  William Speer was there, and in the conversation, William

45

1    Speer volunteered to get a gun, and go kill Jerry Collins.

2    William Speer, when he was only 16 tender years of age, went

3    into the back window of Jerry Collins home; he walked up--by

4    his own statement to Franklin Nanyoma, walked up with a 25

5    caliber semi automatic hand gun, held it over the sleeping head

6    of Jerry Collins, and when Jerry Collins opened his eyes, the

7    last thing he saw was the flash of that pistol as he was shot

8    in the head.  And Mr. Speer walked out the front door of the

9    house, got in the car and drove away, and was very calm.  He

10   was not juiced up--jacked up--he was very calm.

11          As incredible as that act is, what happened next was

12   more incredible.  He said let's go back, and Franklin Nanyoma

13   drove him back to the house.  William Speer went back into the

14   front door of the house; walked up and looked at the dead body

15   laying there and made certain he was dead; that he heard a

16   gurgling noise; turned around and walked back out the front

17   door of the house, and walked back to the car.  Still not

18   jacked up, not excited, very calm.  We do know he made that

19   decision in his life.

20          In 1997, Mr. Speer prospected for the T.M.--Texas

21   Mafia, and he wanted to get in the Texas Mafia, and whatever

22   you want to believe about if he had to or didn't have to, he

23   wanted in the Texas Mafia, and folks, if you had put yourself

24   in the position the way William Speer did--he's the one that

25   committed capital murder when he was 16--he's the one that put

1    himself in prison, and if you put yourself--if we had put

2    ourselves in a position where we find our butt in a sling, we

3    don't have a good way out, we do not have the right to take

4    someone else's life or to do something bad to someone else to

5    get us out of our bad situation.  We must live with the

6    consequences of our actions, we do not have the right to take

7    it out on somebody else, so that our life is easier.

8           You decide if he wanted to be in the Texas Mafia or

9    not.  He did not have the right to get in the Texas Mafia to

10   hurt other people, to make his life easier.  He made that

11   decision.

12          In July--on July 11th, of 1997--we have too many

13   commas in there--Mr. Speer volunteered for his second murder.

14   This is the second time he has volunteered to kill a man, and

15   Mr. Speer walked up in the cell, and led Gary Dickerson to

16   believe, it's okay--it's alright--you're going to be alright

17   in this deal, let's just smoke, and Mr. Dickerson leaned over

18   with the last smoke of his life to blow the smoke out, William

19   Speer wrapped his arms around Gary Dickerson's neck and

20   choked the life out of him, put him up on the bunk, and when

21   Mr. Dickerson gurgled trying to live, Mr. Speer went back to

22   the bunk, put his arms back around Gary Dickerson's neck, and

23   strangled the life out of him.  Do you see a pattern here,

24   folks?

25          This is the second time he volunteered for a murder.

1   This is the second time he had gone back to make sure the

2   person was dead.

3           And sometime shortly after July of 1997, maybe August,

4   maybe September--up here we've got a growing list of victims.

5   This one is Gary Dickerson--sometime shortly after in 1997,

6   Mr. Speer wants Bam killed.  He clearly--let me find this for

7   you--he's talking here about Bam--about what can he be saying,

8   okay?  And then when he writes back to Mr. Innes, down here,

9   talking about Whited--he says, --'handle up with Bam--how come

10  he's not taken out?  Tell them to handle up.' That's his

11  writing.  'Tell them to handle up.' You can tell from the

12  contents, as the evidence was brought to you, they want him

13  taken out.  No--no--he wants Bam taken out.  Not just 'they'--

14  William Speer wants Larry Whited taken out so that Larry Whited

15  doesn't come and testify against William Speer.

16          Larry Whited was never killed.  Larry Whited is alive,

17  but not because of William Speer.  William Speer wanted him

18  dead--wanted him taken out.

19          Now folks, at this point of William Speer's life--

20  unequivocally--unequivocally--William Speer is a future danger.

21  That's easy to see.  So now the question is, is he a danger

22  today?  How do you answer that question?

23          On February 7th, 2000--last year--William Speer was

24  arraigned and charged with capital murder, and told he was

25  facing the death penalty.  Within days--within days he became

1    a Christian according to the testimony of the Chaplain.  I will

2    not tell you that is not true.  God will judge his heart, but

3    it is significant that it happened immediately after finding

4    out he's facing the death penalty.  And in that same month, on

5    2-25-00, he saw the Chaplain.  Okay?

6         Now Chaplain Nixon -- Chaplain Strickland wasn't as

7    clear on this particular question--he was clear on a lot of

8    things but Chaplain Nixon said the first time I met William

9    Speer on 2-25-00, William Speer was a different person.

10   Chaplain Nixon and Chaplain Strickland are good men.  They do

11   good work. They're not here to lie to you.  They're not trying

12   to pull anything over your eyes.  They're good men, but they

13   don't have the benefit of knowing what you know about William

14   Speer.  They know him differently than you do. They've seen

15   part of his life, but they don't know anything about all of

16   this.  And Chaplain Nixon told you when I first met William

17   Speer, he was different.  He was a Christian, I could tell

18   that. I could see it in his eyes.

19         Folks, it's significant--that is the point that

20   they begin to tell you, William Speer started changing.  He

21   is different, but look, in October, of 2000--folks, one year

22   ago this month, eight months--eight months after William Speer

23   professed to become a Christian and said he had changed--eight

24   months later, what does this letter tell you?  Randy Burrows--

25   we didn't bring Randy Burrows here because we thought he would

1  tell you the truth, we figured he would do what he did, and

2  lie, but we saw--we brought him here so you could see what's

3  really going on.  What's really happening.  One year ago today,

4  eight months after William Spear was supposed to become a

5  Christian, Randy Burrows wrote this letter, and Randy Burrows

6  said, Doyle Wayne did a videotape against Big Foot and William

7  Speer, 'I didn't believe it, but Will showed me the transcript

8  to a video.  I read it all.  They just shipped Doyle Wayne to

9  a T.C. program on Eastham.  He gets out in December.  I have

10  his home address and all.  I will be going home in January.'

11  And at the end he write, 'P.S. Remember I go home in January,

12  and need to hear back--and need to hear from him before then.'

13  Needs to hear from J.R. Steiner, the President of the Texas

14  Mafia regarding what to do about Doyle Wayne Hill.  He is not

15  asking him for permission to go have ice cream with him, he's

16  asking for permission from J.R. Steiner, do you want me to

17  kill him for testifying.  And where did the transcript come

18  from, folks?

19         'I didn't believe it, but Will showed me the

20  transcript to the video.' And on the stand in trying to cover

21  for William Speer, he said, oh, there is no Will.  He had just

22  said, against Big Foot and William Speer, I didn't believe it,

23  but Will showed it to me.  Folks, he lied to you about there

24  is no Will, that's a code name--he sat on that stand, and twice

25  today--I hope you can recollect this--twice on the stand, after

1   saying there is no Will, that's a code name, he sat here and

2   called this man, Will.  And he told you William Speer was never

3   a Texas Mafia.  He was never involved in the Texas Mafia, and

4   yet he said that William Speer asked, am I going to have a

5   problem with the Texas Mafia, I'm a Christian.  Am I going to

6   have a problem.  Randy Burrows was lying.  Randy Burrows was

7   one of the leaders of the Texas Mafia.  He was over William

8   Speer, and William Speer wanted to make sure there was not

9   going to be a problem to get out.

10          Why would William Speer get a transcript of one of

11   the State's witnesses to Randy Burrows?  Folks, do you

12   understand the implication?  The implication was that if

13   William Speer had his way, Doyle Wayne Hill would have been the

14   fourth.

15          Folks, if you want to talk about future dangerousness,

16   you have got to explain how is it that William Speer would have

17   given a transcript to a regional director of the Texas Mafia?

18   That's what this regional director of the Mafia wrote in his

19   letter.  He wrote that.  I didn't write that.

20          And at the end, again, I repeat, I'm not telling you

21   that William Speer is not a Christian, but Randy Burrows, says

22   that Charlie Ray Adamson, he is Christian now. You understand

23   that means he's not one of them, that's a separation, but he

24   doesn't say that about William Speer. He says William Speer

25   gave me a transcript.  He didn't say William Speer is a

1    Christian.   He said Charlie Ray Adamson.   Why would Speer give

2    him a transcript?   Speer knows the consequences of someone

3    testifying against the Texas Mafia.   For God sakes he killed a

4    snitch.   He killed a snitch on the Texas Mafia.

5              What would Doyle Wayne be?   What would Doyle Wayne

6    Hill be?   A snitch.   We've seen what happens to snitches, which

7    snitch against the Texas Mafia.   He's living proof.   He knows

8    what happens, so why would he put Doyle Wayne Hill in that

9    situation?   You know the answer to that.

10             Folks, taking William Speer's life, doing what you are

11   asked to do today by the State is extremely difficult, and it

12   should be, but you understand that taking Gary Dickerson's life

13   was not difficult for William Speer.   It was not hard.   Taking

14   Jerry Collins life was not hard.   Do you remember he was calm.

15   Do you understand--Chaplain Nixon said William Speer is

16   different, but Chaplain Nixon didn't know William Speer before.

17   He didn't know anything about his past life.   The William Speer

18   you see in the Courtroom today, it is just on the outside,

19   I can't tell you about his heart, but on the outside, is the

20   same William Speer who walked in that bedroom and shot that man

21   in the head, and it's the same William Speer that walked in

22   that cell and choked Gary Dickerson to death.   He was calm.

23   He didn't have to work himself into a frenzy.   He manipulates

24   to get what he needs, and in this situation he's trying to get

25   out of dying. I don't blame him.

52

1        Folks, it's hard to answer the question.  He wants you

2   to look in his heart. You can't trust him.  Not yet.  Maybe

3   someday, who knows, but not now.

4        Folks, William Speer caused this.  We didn't bring

5   you--we didn't want this to happen.  We didn't want Gary

6   Dickerson to die.  He put us in this situation.  He has brought

7   this.  He chose to commit this act.  This isn't anybody else's

8   fault.  It's his responsibility.  The answer is yeah, he's a

9   future danger, and we are asking you to find 'yes' and 'no'.

10       Don't take the easy road out just because it's easier.

11  Gary Dickerson was a human being.  Somebody loved him too.

12  Don't forget about him.  Okay?

13       JUDGE CARTER; Alright, Ladies and Gentlemen,

14  that completes the final statements of the attorneys.  I am

15  going to deliver the Charge to the Bailiff, and you may go into

16  the jury room.  We are setting up a process of having you out

17  to lunch, or taking a lunch break because it's almost that time

18  now, so I would anticipate that really about all that you're

19  going to get done is just go back into the jury room for a

20  few minutes, and then we will make the arrangements necessary

21  to have you taken for lunch, and then immediately after that

22  of course, begin your deliberations.  So I don't think it

23  would be necessary for you to try to start deliberating before

24  that time, so I just suggest you wait until after lunch, and

25  come back and then we'll start at that time.

1    Of course, until then, you're not to discuss

2  the case even with the other members of the jury.  You are all

3  to stay together during this time.  You can leave those copies

4  of the Charge in the jury room as well, and then when you come

5  back with the Bailiff when all of you are present back in the

6  jury room, you will then begin your deliberations on these

7  issues.

8    So at this time, I'll ask you to step into the

9  jury room, and then you can be excused for lunch.

10    We will be in recess at this time.

11  LUNCH RECESS.

12  JURY DELIBERATION.

13  JURY IN THE COURTROOM:

14    JUDGE CARTER; I will read the answers.

15    "Is there a probability that the Defendant, William Speer,

16  would commit criminal acts of violence that would constitute

17  a continuing threat to society?"

18    "ANSWER: We, the jury, unanimously find and determine

19  beyond a reasonable doubt that the answer to this Special Issue

20  is, yes."

21    Signed by the Presiding Juror.

22    "Number 2: Whether taking into consideration all of the

23  evidence, including the circumstances of the offense, the

24  Defendant's character and background, and the personal moral

25  culpability of the Defendant, there is a sufficient mitigating

1  circumstance or circumstances to warrant that a sentence of

2  life imprisonment rather than a death sentence be imposed."

3      "ANSWER: We, the jury, answer Special Issue Number 2,

4  no."

5              Signed by the Presiding Juror.

6              And then the Verdict itself is signed by the

7  Presiding Juror.

8              Ladies and Gentlemen, if this verdict, and all

9  of the answers contained in it are your verdict, please

10  indicate that by raising your right hand at this time.

11              (ALL INDICATED THEIR VERDICT)

12              Alright, thank you.  Any further desire of

13  polling of the jury at this time?

14              MR. DODSON: No, Your Honor.

15              JUDGE CARTER; Well, Ladies and Gentlemen, that

16  completes your service here.  It is a little bit hard to say

17  just thank you for your service.  This is not the kind of thing

18  that any individual or person wants to be involved in, or be a

19  part of.  On the other hand, these are matters that require the

20  intervention of a jury, for you to carefully listen to the

21  evidence, and after doing so, discuss it with each other, and

22  arrive at the verdict that you think is the fair and the proper

23  verdict under the law and under the evidence that you have

24  heard.

25              I know that you've carefully listened to all

1    evidence as it was being presented, and that you have been

2    very attentive to all of the details of the evidence, and I

3    know that you have followed the instructions that I've been

4    giving you over this period of time, and now that you have

5    conscientiously deliberated, and arrived at the verdict that

6    you believe correctly reflects the evidence that you heard,

7    and you were chosen in a fair manner.  This trial has been

8    tried in a fair manner.   Obviously, the attorneys are very

9    capable, and have done an outstanding job I think on both

10   sides.

11            I think you were given all of the evidence that

12   was important and relevant for your consideration, and that's

13   the way our system has to work, is to allow a fair trial.  To

14   have all the parties properly represented so that the matter

15   can be fairly presented.  Good advocates on both sides, and a

16   fair trial, primarily due to the fact that we rely on our

17   jury system to provide that, and that means you.  That means

18   individuals such as yourself, serving on a regular basis on

19   our juries, and this case certainly has taken more time than

20   many of the cases that we try, due to the nature of the case.

21   It's not a case to rush.  It's a case to carefully present, and

22   carefully examine, and I know that's what you have done.

23            So I personally want to thank you for your

24   service. This again is important that we have a system where

25   these matters can be resolved and done in a fair manner.

56

1          Obviously, what we all do here will be reviewed.
2     These type of cases are always, and properly so, subject to
3     review, but I believe--I know that you've done everything that
4     you've been asked to do to make sure that a fair trial took
5     place in this regard.  So we do appreciate your service.
6          I am finally now going to be able to fully and
7     completely discharge you.  You're no longer bound by any of
8     the instructions that I've given to you about not talking about
9     the case.  You don't--you're no longer required not to discuss
10    the case with anyone.  On the other hand, you're not required
11    to discuss it either, if you don't care to, so that is
12    certainly your option--your choice as to how you want to handle
13    that.
14         But after you leave here, when you're out in the
15    hall, I'll ask the Clerk to give you your checks for being here
16    this week.  Again, I know--even though we've increased the
17    amount of your daily fee a little bit, it certainly doesn't
18    offset the loss that most everybody has by being here and by
19    being a part of this, and you've certainly done your part as a
20    citizen.
21         I don't know of a higher duty other than maybe
22    serving in the armed forces than serving on a jury.  It's not
23    easy. Nobody told you it was going to be an easy chore.  Nobody
24    really volunteers for it, but it is important, and you've
25    certainly done your part.  So we sincerely appreciate your

1    service, your appearance, your promptness.  You all have all

2    been here--you've been waiting on us.  We haven't been waiting

3    on you, but we thank you for your service.

4              At this time, Ladies and Gentlemen, I am going

5    to discharge the jury.  I will ask the others to stay in the

6    Courtroom.  The Court will enter the sentence as required under

7    the law, but at this time the jury is discharged and excused.

8              Thank you very much, Ladies and Gentlemen, you

9    are excused.

10   JURY EXCUSED.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           SENTENCING

2               JUDGE CARTER: We of course have received the

3      verdict of the jury.  Is there any reason the Court should not

4      go ahead and pronounce sentence at this time?

5               MR. MULLIN: Not from the State.

6               MR. DODSON: No, Judge.

7               JUDGE CARTER:  Mr. Speer, in accordance with

8      the verdict that the jury has entered, the jury has found 'yes'

9      in answer to Special Issue Number 1; and 'no' in response to

10     Special Issue Number 2, and therefore, by law, the sentence

11     of this Court is that you will be sentenced to the death

12     penalty.  Of course, that is subject to review by the Court of

13     Criminal Appeals, and a date for the death penalty execution

14     will of course be set at a later time after appeals have been

15     completed.

16               At this time you are remanded over to the custody

17     of the Texas Department of Criminal Justice and to be delivered

18     to the appropriate facility.

19               Is there anything further at this time by either

20     party?

21               MR. MULLIN: There is, Your Honor.  I just ask

22     that Mr. Speer be held until we can get the Judgment and get

23     his fingerprints on the Judgment.

24               JUDGE CARTER: Alright, sir.

25               MR. MULLIN: That's being worked on at this time.

59

1           JUDGE CARTER; Alright, the Court will be

2     available to sign the appropriate forms.

3           Otherwise, Court is adjourned.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Genny Day, C.S.R.
Official Court Reporter, 5th Judicial District of Texas
23 Paul Drive, Texarkana, Texas 75503
(903) 792-0077

1    THE STATE OF TEXAS     }

2    COUNTY OF BOWIE        }

3        I, Genny Day, Official Court Reporter in and for the Fifth

4    District Court of Bowie County, State of Texas, do hereby

5    certify that the above and foregoing contains a true and

6    correct transcription of all portions of evidence and other

7    proceedings requested in writing by counsel for the parties to

8    be included in this volume of the Reporter's Record, in the

9    above-styled and numbered cause, all of which occurred in open

10   court or in chambers and were reported by me.

11       I further certify that the cost for the preparation of

12   this Reporter's Record is $_____, and will be paid by

13   the County of Bowie.

14       WITNESS MY OFFICIAL HAND this the 9th day of March, 2002.

15

16

17   _____

18   Genny Day, Texas CSR 1291

19   Expiration Date: 12-31-2002

20   Official Court Reporter, Fifth District Court

21   Bowie County, Texas

22   23 Paul Drive, Texarkana, TX. 75503

23   (903) 792-0077

24

25